# THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MEYERS DIVISION

CONTINENTAL 332 FUND, LLC,
CONTINENTAL 298 FUND LLC,
CONTINENTAL 306 FUND LLC,
CONTINENTAL 326 FUND, LLC,
CONTINENTAL 347 FUND LLC,
CONTINENTAL 355 FUND LLC,
CONTINENTAL 342 FUND LLC and
CONTINENTAL 245 FUND LLC,

          Plaintiffs,

v.

DAVID ALBERTELLI,
ALBERTELLI CONSTRUCTION INC.,
GEORGE ALBERTELLI, WESTCORE
CONSTRUCTION, LLC (Del.),
WESTCORE CONSTRUCTION, L.L.C.
(Nev.), FOUNDATION MANAGEMENT
LLC, NATIONAL FRAMING, LLC, KMM
CONSTRUCTION LLC, MFDC LLC
TEAM CCR, LLC, BROOK KOZLOWSKI,
JOHN SALAT, KEVIN BURKE, ANGELO
EGUIZABAL, BRAVO21, LLC, KERRY
HELTZEL, AMY BUTLER, and US
CONSTRUCTION TRUST

          Defendants.

_____/

Case No. 2:17cv41-FtM-38MRM

---

**SECOND AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES UNDER R.I.C.O. AND OTHER RELIEF**

Plaintiffs, Continental 332 Fund LLC ("332 Fund"), Continental 298 Fund LLC ("298 Fund"), Continental 306 Fund LLC ("306 Fund"), Continental 326 Fund LLC ("326 Fund"); Continental 347 Fund LLC ("347 Fund"), Continental 355 Fund LLC ("355 Fund"), Continental 342 Fund LLC ("342 Fund"), and Continental 245 Fund LLC ("245 Fund") (hereinafter referred to as a "Fund" or "Plaintiff", and collectively as "Funds" or "Plaintiffs"), by and through their attorneys Larry Selander, Jeffrey L. Hamera and Alvin Lodish, for their Second Amended Verified Complaint for Damages Under R.I.C.O. and Other Relief against Defendants David Albertelli, Albertelli Construction, Inc. ("ACI"), George Albertelli, (David and George Albertelli and ACI are referred to collectively as "the Albertellis"), Westcore Construction, LLC (Del.) ("Westcore I"), Westcore Construction, L.L.C. (Nev.) ("Westcore II"); Foundation Management, LLC (which also does business as Foundation Management Services) ("Foundation Management"), National Framing, LLC ("National Framing"), KMM Construction LLC ("KMM"), MFDC, LLC ("MFDC"), Team CCR, LLC ("Team CCR"), Brook Kozlowski, John Salat, Kevin Burke, Angelo Eguizabal, Amy Butler, US Construction Trust, and Kerry Heltzel, state as follows:

**<u>Preface</u>**

1.      This is a case about stopping "Old School Contracting." George Albertelli and now David Albertelli, his son, used Old School Contracting to defraud Plaintiffs and cost them millions – likely in excess of $10,000,000 – on numerous construction projects over the course of years. In this context Old School Contracting is not doing high quality work for a fair price. Far from it. It is a euphemism for bribery, kickbacks and fraud to

2

get construction contracts from unsuspecting owners and then extract every cent possible out of the owner through deceptive and fraudulent business practices.

2.       Specifically, the Albertellis used bribery and kickbacks totaling over a million dollars, and the promise of future bribery and kickbacks, to secure contracts from Continental[1] for the construction of apartment complexes in multiple states under false pretenses.  While having drinks on the rooftop of George Albertelli's oceanfront home in Jacksonville in 2013, the Albertellis promised defendant Angelo Eguizabal ("Eguizabal") who was then Continental's Vice President of Construction, that he would get a "fee" - bribes and kickbacks – if ACI got contracts and favorable treatment from Continental.

3.       ACI got contracts.  Eguizabal got kickbacks.  Eguizabal at first accepted bribes and kickbacks into his personal bank account from the Albertellis through Southern Supply and Equipment, LLC, and then from a company called MFDC, LLC, which was set up by the Albertellis specifically for the purpose of funneling bribes to him.  Eguizabal later institutionalized the practice by forming Bravo21, LLC, to accept bribes and kickbacks.  After Continental cut off ACI from new work, David Albertelli created and used Fasanelli Construction, LLC and similarly named companies (collectively, "FCS"), and defendant Westcore Construction, LLC to get new work by paying, or in some cases promising, but never paying, kickbacks to Eguizabal's Bravo21 account.

---

[1] "Continental" refers to Continental Properties Company, Inc., a developer, owner and operator of apartment complexes and other properties that  is the managing member for each of the Plaintiffs.

4. Once they had a project, the Albertellis used ACI, FCS, Westcore and a host of sham subcontractors to steal money from the Plaintiffs through fraud, bribery, kickbacks, extortion, deception, and outright theft. The Albertellis enlisted others in their schemes. The individual defendants named in this complaint joined in the Albertellis' acts of fraud, bribery, kickbacks, deception and theft. Each of them is culpable for perpetuating Old School Contracting.

5. The Albertellis used fraud and deception to be paid money that they had not earned, or worse yet, money that was earned by others who will never see it. In December of 2016, David Albertelli, with the help of others at ACI, stole approximately $2,000,000 by indorsing joint checks that were payable to subcontractors and ACI, but depositing them in ACI's account even though they were intended for the subcontractors. The Albertellis further inserted themselves into Plaintiffs' projects through an enterprise of sham and corrupt companies, using David Albertelli's company, Foundation Management, as a veil to hide the Albertellis' ownership and participation. Those companies posed as contractors or subcontractors to increase the cost of the projects, extract payments that should have gone to authentic subcontractors who built the projects, and provide an artifice of paperwork to keep money flowing to the Albertellis. Meanwhile, the Albertellis exposed the project owners to lien claims, defective construction and incomplete projects, and left legitimate subcontractors and suppliers with unpaid bills.

6. The Albertellis were able to conceal their bribes, kickbacks, fraud and deception for years. Eguizabal worked inside Continental to gain new work for ACI even

DM1\7930086.4

as it faltered on project after project. Moreover, when ACI's poor performance and suspicious behavior seemed destined to lead to ACI being barred from future Continental projects, David Albertelli schemed to create new entities to insert himself surreptitiously into new Continental projects.

7. David Albertelli attached himself to Fabio Fasanelli, who was in good favor with Continental and doing projects as Fasanelli Construction, Inc. David Albertelli caused FCS Construction, LLC, Fasanelli Construction, LLC, and FCS of Florida, LLC (collectively "FCS") to be formed, which were to appear to be "Fasanelli". Mr. Fasanelli thought he had a partner. He soon found out that David Albertelli had defrauded him and cut him out of ownership of FCS. In the meantime, David Albertelli used the same tactics on FCS projects for Continental that he used with ACI to take money from Continental and legitimate subcontractors.

8. David Albertelli wouldn't stop. When Continental was planning new projects in Texas and Colorado, which David Albertelli knew he would never be allowed to bid on, David Albertelli attached himself to Greg Hilz ("Hilz"). They formed a new general contracting company called Westcore Construction, LLC ("Westcore I"). David Albertelli hid his involvement from Continental, because he knew Continental would bar Westcore I if Continental knew he was involved. David Albertelli and Westcore I paid and promised Eguizabal kickbacks totaling about $1,000,000 on the three upcoming projects, and fraudulently created documents to deceive Continental into approving Westcore I as a general contractor.

9. To gain approval from Continental, David Albertelli fabricated a qualification statement for Westcore I, which had actually been formed on February 13, 2015 by Greg Hilz. That qualification statement included a false 23-year history of construction, annual business volume of $376,196,476 over the prior five years, an experience section listing projects that Westcore I never built, and a completely fabricated financial statement.

10. Westcore I was as awful as any company that David Albertelli touched. His new partner, Hilz, fared no better than Fasanelli. David Albertelli and his cohorts used sham subcontractors, false payment applications, fraud and deception to extract more money from Continental. He even created a second Westcore in Nevada (Westcore II) to take payments on contracts entered into by Westcore I, thereby cheating Hilz of his interest in such payments. He created a fake subcontractor "Team CCR", named to sound like one of the legitimate subcontractors, to divert payments and provide documents misleadingly indicating that subcontractors were paid. As Continental moved toward terminating Westcore I from existing projects and barring it from future projects, Albertelli did not bother to try to correct earlier misdeeds of Westcore on the projects. He flew to Longmont, Colorado, to begin conning his next "partner" – a twenty-something year-old subcontractor who was doing actual, legitimate work on Continental projects and aspired to be a general contractor for Continental. David Albertelli won't stop.

11. When Eguizabal told David Albertelli that he wanted out of his arrangement, David Albertelli told him,

DM1\7930086.4

"This is like the mafia, no one gets out."

12. When Eguizabal offered several hundred thousand dollars to buy his way out, David Albertelli told him he would take his money, but Eguizabal wasn't getting out. After David Albertelli stole and deposited $2,000,000 of Joint Checks intended as payments for subcontractors, and George Albertelli refused to bail David out, David tried to extort Eguizabal by threatening to expose him to Continental's management unless he contributed $375,000 to help fund the reimbursement of $2,000,000 stolen from Plaintiffs.

13. This is not just a case about breaches of contracts, although the continual, intentional abuse of agreements and violation of contractual obligations was inherent in the Albertellis' fraudulent conduct. This is a case about the law protecting not just these Plaintiffs but also other unsuspecting owners, contractors, subcontractors, partners, employees and construction workers from the Albertellis' perpetuation of the bribery, kickbacks and fraud that define Old School Contracting. This is about stopping Old School Contracting, the Albertellis and their cohorts.

14. Plaintiffs are entitled to in excess of $10,000,000 to reimburse them for damages they have suffered. Additionally, they are entitled to punitive damages and statutory treble damages, which would exceed $30,000,000 to punish the Defendants and deter further misconduct.

7

**The Parties**

**The Plaintiffs**

15. Continental 332 Fund LLC ("332 Fund") is a special purpose entity that owns and is developing an apartment complex known as the Springs at Six Mile Cypress, Fort Myers, Florida ("Six Mile Project"). 332 Fund is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.

16. 332 Fund is the subrogee or assignee, or both, of certain claims against ACI to which 332 Fund is subrogated by payment or that were assigned by the following former Subcontractors of ACI:

   a. Action Automatic Door & Gate

   b. Adkins Electric Inc.

   c. J.R. Hobbs Co. – Atlanta, L.L.C.

   d. CQ Insulation

   e. BMC (BMC West)

   f. Ciano's Tile and Custom Finishes, L.L.C.

   g. Crown Roofing LLC

   h. Floor Technologies, Inc.

   i. GE Appliances

   j. Gulf Coast Plumbing of Central Florida, Inc.

   k. Mr. Drywall Service, LLC

   l. Master Woodcraft Cabinetry, LLC

DM1\7930086.4

m. Sousa Cabinets Inc.

n. Sunny Grove Landscaping Inc.

o. Bruno Chavez Painting, LLC

p. Haskins Inc.

q. Liberty Aluminum Company

r. Texas Contract Floors

17. Continental 298 Fund LLC ("298 Fund") is a special purpose entity that owns and is developing an apartment complex known as the Springs at Egan Drive, Savage, Minnesota ("Savage Project"). 298 Fund is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.

18. Continental 306 Fund LLC ("306 Fund") is a special purpose entity that owns and developed an apartment complex known as the Springs at Creekside, New Braunfels, Texas ("New Braunfels Project"). 306 Fund is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.

19. Continental 326 Fund LLC ("326 Fund") is a special purpose entity that owns and is developing an apartment complex known as the Springs at Rochester, and also known as the Springs at South Broadway, Rochester, Minnesota ("Rochester Project"). 326 Fund is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.

DM1\7930086.4

20. 326 Fund is the subrogee or assignee, or both, of certain claims against ACI to which 326 Fund is subrogated by payment or that were assigned by the following former Subcontractors of ACI:

    a. Absolute Drywall, Inc.

    b. Advanced Building Center

    c. General Sprinkler Corporation

    d. Citywide Insulation, Inc.

    e. L&W Supply (M&S Drywall Supply)

    f. Seamless Gutter (Seamless Gutterworks, LLC)

    g. SL Contracting Inc.

    h. Stone Pro LLC (Stone Pro Masonry)

    i. Viking Gypsum Floors LLC

    j. American Fence Company

    k. Bruno Chavez Painting, LLC

    l. Texas Contract Floors

21. Continental 355 Fund LLC ("355 Fund") is a special purpose entity that owns and is developing an apartment complex known as the Springs at University Drive, Bryan, Texas ("Bryan Project"). 355 Fund is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.

22. Continental 347 Fund LLC ("347 Fund") is a special purpose entity that owns and is developing an apartment complex known as the Springs at Cottonwood

DM1\7930086.4

Creek, Waco, Texas ("Waco Project"). 347 Fund is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.

23. Continental 342 Fund LLC ("342 Fund") is a special purpose entity that owns and is developing an apartment complex known as the Springs at Sandstone Ranch, Longmont, Colorado ("Longmont Project"). 342 Fund is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.

24. Continental 245 Fund LLC ("245 Fund") is a special purpose entity that owns and developed an apartment complex known as the Springs at Winchester Road, Lexington, Kentucky ("Lexington Project"). 245 Fund is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.

25. 332 Fund, 298 Fund, 306 Fund, 326 Fund, 355 Fund, 347 Fund, 342 Fund, and 245 Fund, or any combination of them, are referred to herein as a "Fund" or the "Funds". The Six Mile Project, Savage Project, New Braunfels Project, Rochester Project, Bryan Project, Waco Project, Longmont Project, and Lexington Project, or any combination of them, are referred to herein as a "Project" or the "Projects".

26. Continental is a developer, owner and operator of real estate, including the Projects, and is the managing member of each of the Funds. Continental is not a plaintiff but acted on behalf of the Plaintiffs.

DM1\7930086.4

**The Defendants**

27.     David Albertelli is an individual who resides in the state of Florida.  David Albertelli is the President and an owner of ACI.  He also created, controls, influences and owns (in part or whole), directly or indirectly, the other corporate defendants: MFDC, Foundation Management, National Framing, KMM, Westcore I, Westcore II, and Team CCR.  He also has or had ownership interests in companies in the construction industry that are not currently named as defendants: Albertelli Construction, LLC, FCS, Devcon Hospitality Partners, LLC, Orion Construction LLC, All-Wall Construction, LLC, Whisper Cove LLC, and others.  On information and belief, David Albertelli is also the trustee and the beneficiary of defendant US Construction Trust.

28.     George Albertelli is an individual who, on information and belief, resides in the state of Florida.  He is David Albertelli's father, and the founder of, was the President of, and has an ownership interest in ACI. On information and belief, he helped form and has an ownership interest in MFDC. He was a Vice-President of Company A[2], which also employed Eguizabal, Fasanelli, John Salat and David Albertelli.

29.     Brook Kozlowski is an individual who, on information and belief, resides in the state of Florida.  On information and belief, Kozlowski is a manager, officer and owner of ACI, Foundation Management, Westcore I, Westcore II and other companies that are affiliated with David Albertelli.  Kozlowski is so important to David Albertelli

---

[2] "Company A" is a Jacksonville-area construction company that is not alleged to be part of the Albertellis' recent corrupt practices or involved in this lawsuit.

DM1\7930086.4

that he included Kozlowski as a 10% partner in Westcore I. Kozlowski is David Albertelli's chief lieutenant.

30. ACI is a Florida corporation with a place of business at 10751 Deerwood Park Boulevard, Jacksonville, Florida.

31. Westcore Construction, LLC ("Westcore I") is a Delaware limited liability company. It has or had places of business in Newport Beach, California, Irving, Texas, Longmont, Colorado, and Jacksonville, Florida. Westcore I was formed by David Albertelli and Greg Hilz. David Albertelli, Hilz, and Kozlowski own Westcore I.

32. Westcore Construction, L.L.C. ("Westcore II") is a Nevada limited liability company. It has or had places of business in Longmont, Colorado, and Jacksonville Beach, Florida. (Where Westcore I and Westcore II's actions are indistinguishable or the distinction is not relevant, they may be referred to as "Westcore.") One or more of David Albertelli, John Salat, Brook Kozlowski, Kevin Burke and Foundation Management formed Westcore II for the purpose of diverting funds that would have been paid to Westcore I to an entity that was controlled by David Albertelli and his cohorts but excluded Hilz.

33. MFDC, LLC ("MFDC") is a Delaware limited liability company. It has a place of business at 10751 Deerwood Park Boulevard, Jacksonville, Florida. MFDC was formed by or at the direction of George Albertelli and David Albertelli. Kevin Burke was or is an agent of MFDC. MFDC was used as a conduit for kickbacks to Eguizabal and Eguizabal's company, Bravo21, LLC.

13

34. Team CCR, LLC ("Team CCR") is a Delaware limited liability company formed on September 27, 2016, with places of business in Jacksonville Beach, Florida, and Longmont, Colorado. Team CCR was registered to do business in Colorado. On information and belief, Team CCR was formed by David Albertelli, Brook Kozlowski and John Salat to be a sham subcontractor (a company that provided no service, performed no work and added no value) on the Longmont Project.

35. Ken Jones is, on information and belief, a resident of Florida and had been held out by ACI to be its Chief Financial Officer and Controller. Ken Jones is not, at this time, a named defendant.

36. Amy Butler ("Butler") is, on information and belief, a resident of Florida and the current or past Accounting Manager of ACI.

37. Melissa Peek is, on information and belief, a resident of Florida and an employee of ACI. Melissa Peek is not, at this time, a named defendant.

38. Kevin Burke ("Burke") is, on information and belief, the Chief Financial Officer of Foundation Management, a resident of Florida and an agent of MFDC, Foundation Management, and Westcore II.

39. John Salat ("Salat") is, on information and belief, a resident of Florida, a Project Manager and Division Manager for Westcore I who holds himself out to be its owner, an owner of Westcore II, a former employee of ACI and Company A, a co-investor with the Albertellis in Whisper Cove, LLC, and the owner of Florida Detail Services LLC, which operated out of ACI's offices.

40. Angelo Eguizabal ("Eguizabal") is a resident of Wisconsin and is the former Vice President of Construction of Continental. He was previously an employee of Company A and reported to George Albertelli.

41. Bravo21, LLC ("Bravo21"), is a Delaware limited liability company that has a place of business in the State of Florida. It is owned by Eguizabal and has the sole purpose of accepting bribes and kickbacks related to Continental projects.

42. Kerry Heltzel ("Heltzel") is a resident of Florida and is a current or former project accountant for ACI, Westcore and Foundation Management.

43. US Construction Trust is, on information and belief, a trust owned, controlled and benefitting David Albertelli. US Construction Trust is used by David Albertelli to, among other things, own part of Westcore I.

**Jurisdiction and Venue**

44. This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1964(c).

45. This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 in that they are part of the same case or controversy as Plaintiffs' claims under 18 U.S.C. § 1962.

46. Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) in that many of the Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. The Six Mile Project is located in Ft. Myers, Florida.

DM1\7930086.4

47. This Court has personal jurisdiction over each Defendant in that, at all relevant times hereto, each Defendant transacted business in this judicial district and except for Eguizabal, MFDC, Westcore I, and Westcore II, each Defendant resided in this judicial district.

## Summary

48. Defendant George Albertelli, on information and belief, started using corrupt business practices - bribery, kickbacks and fraud – while employed by Company A. He instituted those Old School Contracting corrupt methods to ACI. By 2013 he was using Old School Contracting to obtain contracts from Continental.

49. Continental had not used ACI as a general contractor before it hired Eguizabal.

50. The Albertellis promised Eguizabal a kickback of part of all contracts that Eguizabal steered to ACI. Shortly thereafter, in 2013, at ACI's offices, Eguizabal and David Albertelli agreed in principal to an arrangement of kickbacks and bribes in return for preferential treatment. George Albertelli and David Albertelli cemented the arrangement with Eguizabal while having drinks on the rooftop deck of George Albertelli's new oceanfront house in Jacksonville in 2013.

51. Eguizabal influenced decisions at Continental and provided inside information to the Albertellis. The Albertellis were awarded nine contracts from 2013 through 2015. Eguizabal got his kickback payments.

52. George Albertelli and David Albertelli expanded the corrupt practice of ACI by submitting payment applications early in projects that were front-end loaded with

16

DM1\7930086.4

costs that had not been incurred, included amounts that would be kicked-back as bribes for being awarded the work, and included subcontractor charges for intermediate sham companies controlled by Albertelli that did not need to be incurred and were not disclosed.

53. Even after ACI performed poorly on projects, Eguizabal kept pushing within Continental to have ACI hired for new projects. George Albertelli and David Albertelli made promises of future kickbacks to Eguizabal if he was able to secure new contracts for ACI.

54. David Albertelli runs ACI as a corrupt enterprise that used many unlawful schemes consisting of bribery, kickbacks, fraud, theft, statutory violations, misappropriation of funds through improper depositing of the Joint Checks, bad faith, intentional breaches of contracts, wire fraud, mail fraud and bank fraud, and damaged the Plaintiffs by use of the corrupt enterprise on numerous different construction projects.

55. David Albertelli and ACI misappropriated almost $2 million dollars from the Funds by stealing the Joint Checks in December of 2016. Pursuant to an agreement with ACI, Continental issued dozens of checks on behalf of two of the Funds, each payable jointly to ACI and a subcontractor of ACI (each individually a "Subcontractor")(the "Joint Checks"). The Joint Checks were sent to ACI so it could indorse them and forward them to the designated Subcontractor as payment for that Subcontractor's work. Instead, David Albertelli had the Joint Checks removed from envelopes addressed to the Subcontractors, unilaterally indorsed them and then deposited

them into ACI's account at CenterState Bank all without the indorsement, knowledge or consent of the payee Subcontractor or the Fund.

56. The Joint Check fraudulent scheme was one of many schemes of illegal and improper acts and conspiracies of David Albertelli, George Albertelli, Kozlowski, Burke, Salat, Butler, Heltzel, ACI, Westcore I, Westcore II, Foundation Management, National Framing, KMM, MFDC, Eguizabal, Bravo21, and US Construction Trust. ACI, Westcore, and FCS breached their contracts, warranty obligations and design obligations by allowing the projects to be chronically behind schedule without any reasonable effort by ACI to recover lost time, plagued by poor quality work and poor designs, encumbered by liens of unpaid Subcontractors and ACI's and Westcore's baseless liens, and virtually abandoned by ACI and Westcore. David Albertelli and ACI, FCS, and Westcore were worse than incompetent contractors. They used bribery, kickback and fraud to get contracts. Then, David Albertelli, ACI, and Westcore submitted false and misleading payment applications, lien waivers, change order requests and claims for additional compensation throughout each of the Projects. Then they breached their performance obligations without any care but pressured Eguizabal and leveraged the financial risk posed to the Funds on the different projects to induce the Funds into paying ACI, FCS, and Westcore amounts not earned. Those moneys were diverted from their intended purpose and wrongfully converted to the Defendants' own use, were used to pay kickbacks to Eguizabal, and were invested in new sham companies to perpetuate the enterprise.

57.     Defendant Brook Kozlowski joined with David Albertelli to further the corrupt enterprise that started at ACI by using Foundation Management to gain control of subcontracting and contracting companies, use those companies on Continental projects without disclosing ownership interests, submitting lien waivers and sworn statements to give the false impression that the Subcontractors actually doing the work had been paid and then filing liens for the sham subcontractors for payments that had already been made to ACI or another of Albertelli's general contractors.  Kozlowski also participated in falsifying Westcore I's financial statement and its Qualification Statement, which Westcore submitted to Continental in November, 2015.

58.     Defendant John Salat joined with David Albertelli to further the corrupt enterprise through Westcore I and Westcore II.  Salat had been involved with the Albertellis for years.  He ran a detailing company out of Albertelli Construction's offices, invested in Whisper Cove, LLC, a residential complex in Florida, with Albertelli and was employed by Albertelli.  As conflicts developed between David Albertelli and Greg Hilz over how to operate Westcore I, Salat and David Albertelli conspired to have Salat nominally take over Westcore I.  Salat falsely claimed to own Westcore while, on information and belief, diverting payments to Westcore II.  Salat caused Westcore to use sham subcontracting companies to siphon off payments while giving the impression to Continental that legitimate subcontractors were being paid.  In one egregious example, Westcore paid a company called Team CCR that was formed at David Albertelli's direction and named to resemble the holding company that the owner of Consolidated Resource had stated he intended to form and call Team CCR.

19

59. Defendant Kevin Burke, Foundation Management's Chief Financial Officer, joined with David Albertelli to further the corrupt enterprise by using Foundation Management as a vehicle for hiding David Albertelli's role in companies and manipulating payments on Continental projects.

60. Defendants' misconduct is not isolated or mere breaches of contracts. Defendants perpetually use illegal and fraudulent tactics to obtain money on false pretenses that they then use to invest in companies within the construction industry, many of which they use as subcontractors on projects without disclosing an ownership interest.

61. Defendants also use the same tactics on projects that are not related to any of the Funds. For example, as alleged in the Plaintiff's Original Petition in Lakefront Trail Rockwall Hotel, L.P. v. Albertelli Construction, Inc., David Albertelli, *et al*, No. 1-17-0359 (District Court, 382nd Judicial District, Rockwall County, Texas) ("Lakefront Case"), a true and correct copy of which is attached hereto as Exhibit 1, the owner of a construction project in Rockwall, Texas, alleges that ACI and David Albertelli used, among other things, false applications for payment sent by wire or through the mail, redirection of funds received from lenders that were earmarked for subcontractors to their own account, "front-end loading" (or requesting payment at the start of a project for work that will be done later), over-billing for work and supervision, refusing to correct defective work, failing to provide required staffing to keep the project on schedule, and not paying subcontractors in which Defendants have an interest and allowing those subcontractors to file liens for the "unpaid" amounts in an attempt to recover a second payment.

DM1\7930086.4

**COUNT I - RICO**

62.     The allegations of paragraphs 1 through 61 above are incorporated as though set forth in full herein as the allegations in this paragraph.

**Overview of Plaintiff's RICO Case**

63.     This Count I is a complex action for civil remedies authorized by the Racketeering Influenced and Corrupt Practices Act ("RICO") in federal statutes at 18 U.S.C. 1961 *et seq.*  See 18 U.S.C. §§ 1964(a) and (c).

64.     The grounds for this RICO Count include that Defendants George Albertelli, David Albertelli, Kozlowski, Salat, Burke, Butler, Eguizabal, Foundation Management, Westcore I, Westcore II, National Framing, KMM, Team CCR, MFDC, Heltzel, US Construction Trust, and ACI, individually, as an enterprise and through their conspiracy, engaged in a pattern of racketeering activity across state lines, and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts over a period of not more than ten years.  The RICO predicate acts include unlawful acts related to at least eight construction projects in five states described in this complaint, approximately a dozen other projects for Continental, and another project for an unrelated owner in the Lakefront Case, and include bribery, fraud, wire fraud, mail fraud, bank fraud, conversion, conspiracy to commit fraud, violations of the Florida Uniform Commercial Code – Negotiable Instruments (Fla. Stat. 673.1011 *et seq.*), The Minnesota Theft by Contractor Act (Minn. Stat. § 514.02), Florida Civil Theft Act (Fla. Stat. 772.11), the Florida Prompt Payment Act (Fla. Stat. § 715.12(2)), the Minnesota Prompt Payment Act (Minn. Stat. § 337.10 subdiv. 3), the Texas Prompt Payment Act (Tex.

21

Prop. Code. Ann. § 28.002), the Colorado Theft Act (C.R.S.A. § 18-4-401 et seq.) perjury on sworn statements, violations of constructive trusts, and other illegal acts. The Defendants used their Corrupt Enterprise and a pattern of racketeering activities to receive payments to which they are not entitled, withhold payments from subcontractors who were entitled to those payments, delay payments to subcontractors, be awarded projects by Continental on false pretenses, and violate contractual and legal obligations related to quality, schedule, payments and reporting without repercussions, thereby damaging the Plaintiffs and others.

65. The Defendants use ill-gotten gains to perpetuate their Corrupt Enterprise by keeping ACI afloat financially, creating, funding or acquiring interests in construction industry companies, some of which are Defendants, and which Defendants use those companies financed in part by ill-gotten gains to commit further racketeering violations on construction projects.

66. Most blatantly, in December of 2016, David Albertelli and ACI's racketeering activity included their misappropriation of approximately $2,000,000 by indorsing thirty-four (34) checks that were each payable jointly to ACI and a Subcontractor and then depositing those checks in ACI's account without obtaining the indorsement of the Subcontractor. All of those checks were to be indorsed by ACI and then delivered to the relevant Subcontractor so that Subcontractor could deposit the check as payment for work on the project.

67. The Plaintiffs are entitled to relief through this count because, as alleged more fully elsewhere herein, Defendants and their affiliated companies used a pattern of

bribery, kickbacks, wire fraud, mail fraud, bank fraud, fraud, conversion, and civil theft, on multiple occasions over a period of years to illegally obtain money from the Plaintiffs and others, some of which money Defendants invested in an enterprise of construction companies that were in turn used to perpetrate other acts of fraud on the Plaintiffs and others. Plaintiffs have been damaged by the fraudulent acts and the coordination between the Defendants and the companies in which they have an interest or control.

**The Corrupt Enterprise**

**Overview**

68. Defendants George Albertelli and David Albertelli started a corrupt enterprise that grew to include, at least, ACI, George Albertelli, David Albertelli, Kozlowski, Salat, Burke, Butler, Foundation Management, MFDC, Westcore I, Westcore II, Team CCR, National Framing, KMM, Heltzel, US Construction Trust, and Eguizabal, acting individually and collectively ("Corrupt Enterprise"). The Corrupt Enterprise exploits subcontractors and owners of construction projects, primarily the Plaintiffs, to obtain moneys through fraud, deception, theft, coercion and intentional, bad faith refusals to follow contracts and applicable laws. The purpose of the Corrupt Enterprise is to be awarded construction contracts on false pretenses, obtain payments for work that is not done or is done poorly, and add unnecessary costs to construction projects to ensure that the maximum price is paid by the owners of the projects. The Corrupt Enterprise was designed to extract as much money as it could, as quickly as it could, without regard for the performance or right to payment of the participants in the Corrupt Enterprise.

23

69. At first, the Corrupt Enterprise used ACI as a general contractor. As ACI began to fall out of favor with Continental, David Albertelli created FCS and then Westcore to perpetuate the Corrupt Enterprise. As ACI, Westcore and FCS were awarded more projects, Continental became more dependent on ACI, FCS and Westcore, allowing the Corrupt Enterprise to extort unwarranted additional compensation or relief from liquidated damages, misappropriate money that was owed to legitimate subcontractors, and get payments that were not owed by owners or their lenders, all under the threat that ACI, FCS or Westcore would abandon work on other Continental projects then under construction.

70. On information and belief, David Albertelli and ACI have been using the money inappropriately obtained to further the interests of the Corrupt Enterprise, enable schemes on other projects, and to perpetuate the Corrupt Enterprise. David Albertelli used the unwarranted payments to fund sham subcontractors and contractors through Foundation Management and Westcore II, and to get new projects under false pretenses.

71. The Corrupt Enterprise was used by the Defendants to inflate the costs charged to owners on construction projects, request payment for work that had not been performed, file liens that are overstated, and provide false and misleading payment applications, sworn statements and lien waivers that were used by Defendants to inappropriately obtain payments from owners of projects and their lenders.

72. Defendants used ACI in conjunction with some of the subcontractors within their Corrupt Enterprise to extract double payments from project owners. For example, on the Six Mile Project, ACI submitted payment applications that included

24

payments earmarked for National Framing, a subcontractor influenced by David Albertelli through Foundation Management, which on information and belief David Albertelli and Kozlowski own. ACI was paid for National Framing but, on information and belief, ACI did not pay National Framing so David Albertelli could position the Corrupt Enterprise to receive a double payment through a lien claim. Based on the non-payment by ACI, National Framing filed a lien against the Six Mile Project. David Albertelli will benefit twice if the liens are enforced or lien amounts paid by Plaintiffs to the subcontractors within the Corrupt Enterprise.

73. Defendants have used and continue to attempt to use proceeds from the Corrupt Enterprise to acquire ownership interests in or form companies such as Foundation Management, MFDC, FCS, Westcore I, Westcore II, Team CCR, National Framing and KMM with the purpose of perpetuating the fraud and other racketeering, and hiding David Albertelli's role in those companies. David Albertelli does not stop when one of his companies is caught. He forms a new company to continue to suck money out of Continental-related companies through fraud and deception. When ACI was caught, Albertelli used Foundation Management to infiltrate Fasanelli Construction Inc.'s relationship with Continental by forming multiple entities using "Fasanelli" or "FCS" in their names so the Corrupt Enterprise could access more Continental projects before he defrauded his partner. Then Albertelli used a new partner to create Westcore I, and misrepresented its experience and finances so he could access more Continental Projects. Then Albertelli created Westcore II to defraud his partner in Westcore I and

25

extract more money from Continental projects.  All the while, the other elements of the Corrupt Enterprise sucked money out of the projects as usual.

74.     On information and belief, George Albertelli, David Albertelli, Kozlowski, Eguizabal,  Salat, Burke, Heltzel and Butler all knowingly participated in and benefited from the Corrupt Enterprise.

### The Albertellis and Eguizabal, Bribes and Kickbacks

75.     Eguizabal worked for George Albertelli at another construction company ("Company A") from 1999 to 2004.  He met David Albertelli while working there. Company A used Old School Contracting methods – bribes, gifts, kickbacks – to secure work and keep clients.  The Albertellis and Eguizabal knew of the Old School Contracting used at Company A.

76.     Eguizabal left Company A when its ownership changed and went to work for another construction firm located in Atlanta.

77.     In 2007 ACI was not working on any Continental-related project.

78.     In November of 2007, Continental hired Eguizabal as its Vice President of Construction.

79.     By 2011 the Albertellis had used their connections with Eguizabal to get work from Continental for ACI.

80.     The Albertellis wanted more work from Continental.

81.     In 2013 Eguizabal and David Albertelli discussed starting the kickback scheme over dinner.  David Albertelli offered to give Eguizabal a kickback.  That is, he offered to give Eguizabal a percentage of the contracts awarded by Continental to ACI.

DM1\7930086.4

Eguizabal would also have to keep the projects profitable for the Albertellis by giving favorable treatment on change orders and damages assessments. Eguizabal wanted to hear from George Albertelli that he would get a kickback from the Albertellis. David Albertelli told Eguizabal that George knew and agreed to kickback money to Eguizabal in return for favorable consideration on projects. Eguizabal insisted that he hear it from George Albertelli.

82.     In 2013, Eguizabal visited the offices of ACI in Jacksonville, Florida. David Albertelli and George Albertelli corruptly offered and promised, and subsequently gave, Eguizabal a kickback with the intent to fraudulently influence Eguizabal to perform certain acts favorable to the Albertellis. George Albertelli and David Albertelli confirmed the terms of the kickback while having drinks on the rooftop of George Albertelli's oceanfront home in Jacksonville, Florida. Eguizabal was to receive up to 2% of the amount of the projects awarded to ACI.

83.     George Albertelli and David Albertelli paid the kickbacks by causing ACI to send payments through an entity called Southern Supply and Equipment directly to Eguizabal's personal account at USAA bank at the outset of the scheme with payments by wire transfers on September 27, 2013 and April 30, 2014. On July 31, 2014, David Albertelli and George Albertelli caused MFDC to be formed in Delaware, on information and belief, for the purpose of sending bribe and kickback payments by wire transfer to Eguizabal's USAA account after Continental awarded a project to ACI. The Albertelli's paid bribes and kickbacks to Eguizabal through wire transfers by MFDC from September 19, 2014 through July 7, 2016. Eguizabal caused Bravo21, LLC, to be formed

DM1\7930086.4

in Delaware on May 24, 2016. Thereafter, Eguizabal used Bravo21 to accept the kickback payments made by the Albertellis, through wire transfers from FCS, specifically Fasanelli Construction, LLC, and Westcore to Bravo21's account at Wells Fargo. The Albertelli's paid bribes and kickbacks to Eguizabal by wire transfers to the Bravo21 account at Wells Fargo from December 5, 2016 through April 21, 2017.

84. On June 24, 2016, Kevin Burke filed a registered agent form for MFDC, showing that he had authority to act for MFDC. Kevin Burke was the CFO of Foundation Management, which, was the manager of MFDC when it processed the kickback payments.

85. The kickbacks became such a normal part of the business of the Corrupt Enterprise that David Albertelli and, on information and belief, Kozlowski and Salat included a line item in the internal Westcore budgets for the Waco, Bryan and Longmont Projects that identified MFDC as the recipient of a 1% fee to be used for a kickback to Eguizabal.

86. The Albertellis used Eguizabal to obtain information about competing bids and confidential information on Continental's *pro formas* for new projects, to be awarded new projects, to get favorable treatment for increases in project price through change orders, and to get relief from contractual liquidated damages for delays. In return, for the favorable treatment on a project, the Albertellis paid Eguizabal a percentage of the contract price for that project. The total of those "kickbacks" exceeded $1,000,000 from 2013 through 2017.

DM1\7930086.4

87.    Eguizabal and David Albertelli knew they were in the wrong.  To attempt to conceal their fraud, they used private emails:  livinglarge213@yahoo.com for Eguizabal, livinglarge713@yahoo.com for David Albertelli.  David Albertelli also used livinglarge713@outlook.com.

**Westcore I**

88.    In about August 2014, a business relationship was formed between David Albertelli and Greg Hilz.  Hilz was the owner and President of Diversified Steel & Stone, LLC, a custom fabricator of structural and decorative steel products ("DSS").

89.    DSS performed work as a subcontractor for ACI at the Springs at Stone Creek project.  To secure the unpaid balance of its contract, DSS filed a mechanic's lien on the project.  Hilz and David Albertelli were among the parties on a phone conference to resolve the DSS lien.  To resolve the lien, Hilz promised to send a lien release and Albertelli promised to wire payment in the amount of the unpaid balance of the subcontract.  Both David Albertelli and Hilz did as they promised.

90.    Over the ensuing months, Hilz and David Albertelli talked from time to time on the phone.

91.    David Albertelli invited Hilz to Jacksonville FL to see the ACI operation and Hilz accepted, visiting ACI in November, 2014.  Hilz and David Albertelli discussed and agreed to cooperate in the pursuit of construction work.

92.    Toward that goal, Hilz and David Albertelli agreed to form a new company to be called Devcon, which was to be owned 70% by David Albertelli and 30% by Hilz.

29

93.     Because of the failure of ACI to pay subcontractors amounts owed to them, failure to properly and timely execute its work and numerous failures to execute its work free of construction defects, Continental decided to not award any further work to ACI.  The decision to not award any new work to ACI was made by and discussed among the senior management of Continental Properties, including Eguizabal.

94.     David Albertelli knew that Continental was dissatisfied with the performance of ACI on Continental projects and that Continental had decided to discontinue using ACI for any future Continental projects.  Eguizabal told David Albertelli about Continental's dissatisfaction with ACI and that ACI would be unlikely to get any more work from Continental.

95.     To continue to perform work for Continental, in early 2015, David Albertelli advised Hilz of a potential opportunity to perform work for Continental, described by Albertelli as a long-term client of ACI.  Specifically, Albertelli told Hilz Continental intended to build several multi-family residential properties in Texas, Colorado, Utah, Arizona and possibly Nevada.  David Albertelli told Hilz that he knew the costs and would provide the business expertise to obtain the projects but did not want to pursue them directly with ACI because ACI was owned in the majority by David Albertelli's father, George.  David Albertelli asked Hilz to form a new company, Westcore, under the same ownership structure as had been discussed for Devcon.

96.     As requested, Hilz formed both Devcon Hospitality Partners, LLC and Westcore Construction, LLC ("Westcore I") as Delaware limited liability companies, on February 13, 2015.  On February 25, 2015, Hilz received the employer identification

30

numbers for both Westcore I and Devcon and forwarded all the information related to Devcon and Westcore I to David Albertelli. At some point in early 2015, David Albertelli transferred a portion of his interest in Westcore I to Kozlowski, a friend and associate of David Albertelli, such that the ownership of Westcore I was 60% David Albertelli, 30% Hilz and 10% Kozlowski.

97. On March 5, 2015, David Albertelli was vacationing in San Diego, CA with Kozlowski. While there, David Albertelli and Kozlowski met Hilz at a Chase bank in Mission Beach where Hilz, David Albertelli and Kozlowski signed banking documents to open accounts for Devcon. Hilz and David Albertelli signed as owners and Kozlowski as an account signatory, but not an owner.

98. David Albertelli told Hilz he would open the Westcore bank account in Florida since there were additional documents needed to open the account.

99. As of April 1, 2015, the websites for Devcon and Westcore I were operational. On or about March, 2015, David Albertelli informed Hilz that neither David Albertelli nor Kozlowski should be included on the Westcore website nor to be acknowledged to be a part of Westcore to executives of Continental. David Albertelli told Hilz that issues had arisen between Continental and ACI and unless those issues were resolved, it was likely ACI would be doing no further work for Continental.

100. In April 2015, Hilz attended a dinner with David Albertelli and Eguizabal. David Albertelli and Eguizabal explained to Hilz that Eguizabal had a significant role at Continental in the awarding of work to new contractors. Eguizabal told Hilz and Albertelli about the qualification process for new contractors.

DM1\7930086.4

101. To be awarded work by Continental, Westcore was required to submit a Qualification Statement to demonstrate Westcore had the financial capacity and experience to perform the projects for which it was being considered. Continental required Westcore to submit its Qualification Statement under oath.

102. David Albertelli began creating a fictitious history for Westcore I on or before July, 2015. Albertelli finalized the fictitious Qualification Statement on or before November 6, 2015. Albertelli transmitted the Qualification Statement, attached as Exhibit 2, to Continental by email. Michael Breaton, CPA, as the Chief Financial Officer of Westcore, signed the Qualification Statement. Among other false and fraudulent representations included on the Qualification Statement are that Westcore had been in business for 23 years under its present name, that it was incorporated in 1992 in Nevada, that it performed an average of $376,196,476 of work annually over the past 5 years, and that the financial statement included with the Qualification Statement is for the "identical organization named on page one" (Westcore) of the Prequalification Statement.

103. The financial statement attached to the Qualification Statement shows, as of September 30, 2015, total assets of $69,433,530 and total cash and cash equivalents of $23,147,340. The financial statement shows slightly lesser amounts for total assets and cash and cash equivalents as of September 30, 2014. Also attached to the Qualification Statement is a letter from Vertex Insurance Solutions claiming that, based on the normal and standard underwriting criteria of its carrier, Westcore had a bonding capacity of $150,000,000 for a single project and $325,000,000 in the aggregate.

104. The financial statement and the surety letter are fraudulent.

DM1\7930086.4

105.    The Qualification Statement was prepared by or at the direction of David Albertelli.

106.    In October, 2015, Hilz met with Continental at their offices in Menomonee Falls, WI to present the Westcore bid for a project located in Lubbock, Texas.  In January and February, 2016, Hilz negotiated and executed contracts with Continental for projects in Waco, Texas and Bryan, Texas.  Hilz also began negotiations with Brian Strandt, a Senior PM for Continental, for a project in Longmont, Colorado.

107.    The Longmont project was awarded to Westcore in August 2016.  Shortly thereafter, on information and belief, David Albertelli sent an internal project budget to Hilz for the Longmont project.  Included in the budget was a line item for MFDC Fee in the amount of $495,000.  When Hilz asked David Albertelli about the fee, David Albertelli told Hilz this was a 1% fee to be paid as a kickback directly to Eguizabal.

**Westcore's Fraud During Projects**

108.    Westcore's payment applications have included multiple fraudulent entries to the detriment of Continental on the Waco, Bryan, and Longmont projects.  Westcore and/or David Albertelli have created shell companies and have subcontracted various work to such companies but the companies have performed no work.  Rather, in many cases, the shell company has in turn sub-subcontracted the work to companies that have actually performed the work.  On information and belief, subcontracting work to such shell companies was part of a scheme to either pull money out of the project earlier than Westcore is entitled to receive such money or to divert funds to persons other than Westcore, or for both reasons.

DM1\7930086.4

109. An example of such a fraudulent subcontract is the subcontract awarded to Team CCR on the Longmont project. One of the subcontractors on Longmont is Consolidated Resources ("Consolidated"). At Longmont, Consolidated was awarded subcontracts for three separate scopes of work: earthwork, framing and electrical work. Consolidated is owned and operated by Marchel Morningstar. Near the start of his work on Longmont, Mr. Morningstar informed Kelly Moore, the project manager assigned to the Longmont project by Continental, that he would be changing the name of his company to Team CCR. The initial work performed by Consolidated was earthwork. Continental uses an electronic billing system called Textura for its projects. Westcore and all subcontractors of all tiers are required to input their payment applications into Textura. When Westcore submitted its first payment application, it did so using Textura and included only a single subcontractor on the application, Team CCR. Team CCR also submitted its payment information using Textura for the earthwork it claimed to be performing. Team CCR did not list any subcontractors, thereby representing it was performing the earthwork with its own forces. Ms. Moore knew Consolidated was performing the earthwork and assumed Consolidated was using the Team CCR name as Mr. Morningstar had said he was going to do. Subsequent billings continued in like manner, with Team CCR listed as the only subcontractor and Team CCR listing no subcontractors of its own. All Team CCR applications were electronically signed by "Robert Anderson" in Textura.

110. At some point, Ms. Moore inquired of Mr. Morningstar as to the role of Robert Anderson. Mr. Morningstar informed Kelly Moore that he had no employee by

34

that name. When Ms. Moore described the billing pattern to Mr. Morningstar, Mr. Morningstar became upset and accused Westcore of stealing the name, Team CCR. Marchel Morningstar informed Ms. Moore that, at the direction of Westcore, Consolidated had been submitting paper applications to Westcore, rather than using Textura.

111. Ms. Moore confronted Mark Baugh, the on-site superintendent of Westcore, about the payment irregularities and Mr. Baugh told her that Team CCR had been set up by Westcore to bill Westcore's self-performed work. The earthwork was not being self-performed by Westcore but rather was subcontracted to Consolidated. Based upon information included in unconditional lien waivers submitted by Consolidated, the earthwork contract awarded by Westcore to Consolidated was for $1,805,450.55. The allocation to Team CCR for earthwork was in the amount of $2,083,723.71. That allowed Team CCR to collect the difference, $278,273.16, while performing no work to justify such payment.

112. The arrangement with Team CCR is an artificial subcontract intended to allow Westcore to front-load the project payments, receiving funds much sooner than Westcore is entitled to collect such amounts, if ever, thereby putting Continental at greater risk of contractor default and greater damages in the event of such a default. On information and belief, this arrangement also allowed David Albertelli, Salat, Kozlowski and Burke, to divert money away from Westcore I and Hilz, who owned 30% of Westcore I, to Team CCR, which David Albertelli controlled.

DM1\7930086.4

113.    Another example that occurred at the Waco, Texas project involved a framing subcontractor, Peal & Associates.   Under circumstances much like those involving Team CCR at Longmont, Westcore subcontracted the framing and siding labor to a company called Framing USA, on information and belief, a company owned by David Albertelli or David Albertelli and his associates.  The contract with Framing USA is in the amount of $3,205,072.33.  Framing USA has subcontracted the entirety of the framing and siding labor to Peal & Associates for $1,907,000.00, thereby allowing Westcore to improperly divert $1,298,072.33.

114.    In the fall of 2016, Ms. Moore became dissatisfied with the performance of Westcore as they progressed with the Longmont project.  Marchel Morningstar had expressed a desire to be considered as a general contractor for Continental projects. Kelly Moore attended a meeting with two other Continental employees where they discussed the possibility of replacing Westcore with Consolidated.  Very shortly thereafter, in late 2016, David Albertelli traveled to Longmont to meet with Marchel Morningstar.  At that meeting, David Albertelli told Marchel Morningstar that if Westcore was replaced by Consolidated, David Albertelli would be interested in investing in Consolidated and assisting Consolidated with performance of the Longmont project.  Ms. Moore was very surprised when Marchel Morningstar told her of the meeting as to the best of her knowledge, only she, Brian Strandt and Eguizabal knew such a move had even been raised.

115.    Typical of contracts between owners and general contractors, the agreements between Westcore I and the applicable Fund, all of which follow the same

36

form, were designed to limit the likelihood of a default by Westcore and to minimize the damage to Continental should a default occur by ensuring the payments to Westcore were not in excess of the work performed by Westcore. Among the contract terms intended to protect the owner are Section 9.3.1.2 of the General Conditions, which prohibits Westcore from including amounts on an application for payment that Westcore does not intend to pay to a subcontractor or supplier. The payments to Framing USA and Team CCR directly contravene Section 9.3.1.2 and involved an elaborate and intentional scheme to defraud Continental. The intention of the construction contract is to pay only for work that has actually been performed. As neither Framing USA nor Team CCR performed any actual work, no amounts should have been paid to them.

**The Underlying Contracts**

116. 332 Fund and ACI entered into a written contract dated February 20, 2015, ("Six Mile Contract"), under which, among other things, ACI was to provide labor, materials and services for the construction of the Six Mile Project on a "Stipulated Sum" basis. The Six Mile Contract includes an agreement, general conditions, numerous exhibits and incorporated documents, which are too voluminous to attach to this complaint but which are in the possession of the Defendants. The Six Mile Project involved the design and construction of an apartment complex in Fort Myers, Florida consisting of several low-rise, wood framed buildings with several residential units each, common buildings, parking, roads, utilities, site work and other facilities, with an initial contract price of $29,367,849.38.

DM1\7930086.4

117. 298 Fund and ACI entered into a written contract dated April 25, 2014 ("Savage Contract"), under which, among other things, ACI was to provide labor, materials and services for the construction of the Savage Project on a "Cost of the Work Plus Fee with a Guaranteed Maximum Price" basis. The Savage Contract includes an agreement, general conditions, numerous exhibits and incorporated documents, which are too voluminous to attach to this complaint but which are in the possession of the Defendants. The Savage Project involved the design and construction of an apartment complex in Savage, Minnesota consisting of several low-rise, wood framed buildings with several residential units each, common buildings, parking, roads, utilities, site work and other facilities, with an initial guaranteed maximum price of $28,209,835.

118. 306 Fund and ACI entered into a written contract dated November 21, 2014 ("New Braunfels Contract"), under which, among other things, ACI was to provide labor, materials and services for the construction of the New Braunfels Project on a "Cost of the Work Plus Fee with a Guaranteed Maximum Price" basis. The New Braunfels Contract includes an agreement, general conditions, numerous exhibits and incorporated documents, which are too voluminous to attach to this complaint but which are in the possession of the Defendants. The New Braunfels Project involved the design and construction of an apartment complex in New Braunfels, Texas consisting of several low-rise, wood framed buildings with several residential units each, common buildings, parking, roads, utilities, site work and other facilities, with an initial guaranteed maximum price of $23,992,353.

DM1\7930086.4

119.    326 Fund and ACI entered into a written contract dated June 23, 2015, ("Rochester Contract"), under which, among other things, ACI was to provide labor, materials and services for the construction of the Rochester Project on a "Stipulated Sum" basis. The Rochester Contract includes an agreement, general conditions, numerous exhibits and incorporated documents, which are too voluminous to attach to this complaint but which are in the possession of the Defendants. The Rochester Project involved the design and construction of an apartment complex in Rochester, Minnesota consisting of several low-rise, wood framed buildings with several residential units each, common buildings, parking, roads, utilities, site work and other facilities, with an initial contract price of $27,331,562.

120.    Continental 245 Fund LLC and ACI entered into a written contract dated August 22, 2013, ("Lexington Contract"), under which, among other things, ACI was to provide labor, materials and services for the construction of the Lexington Project on a "Stipulated Sum" basis. The Lexington Contract includes an agreement, general conditions, numerous exhibits and incorporated documents, which are too voluminous to attach to this complaint but which are in the possession of the Defendants. The Lexington Project involved the design and construction of an apartment complex in Lexington, Kentucky consisting of several low-rise, wood framed buildings with several residential units each, common buildings, parking, roads, utilities, site work and other facilities, with an initial contract price of $16,192014.

121.    Continental 355 Fund LLC and Westcore I entered into a written contract dated January 19, 2016, ("Bryan Contract"), under which, among other things, Westcore

DM1\7930086.4

I was to provide labor, materials and services for the construction of the Bryan Project on a "Stipulated Sum" basis. The Bryan Contract includes an agreement, general conditions, numerous exhibits and incorporated documents, which are too voluminous to attach to this complaint but which are in the possession of the Defendants. The Bryan Project involved the design and construction of an apartment complex in Bryan, Texas consisting of several low-rise, wood framed buildings with several residential units each, common buildings, parking, roads, utilities, site work and other facilities, with an initial contract price of $20,502,517.

122. Continental 347 Fund LLC and Westcore I entered into a written contract dated February, 2016, ("Waco Contract"), under which, among other things, Westcore I was to provide labor, materials and services for the construction of the Waco Project on a "Stipulated Sum" basis. The Waco Contract includes an agreement, general conditions, numerous exhibits and incorporated documents, which are too voluminous to attach to this complaint but which are in the possession of the Defendants. The Waco Project involved the design and construction of an apartment complex in Waco, Texas consisting of several low-rise, wood framed buildings with several residential units each, common buildings, parking, roads, utilities, site work and other facilities, with an initial contract price of $24,845,569.00.

123. Continental 342 Fund LLC and Westcore I entered into a written contract dated July 16, 2016, ("Longmont Contract"), under which, among other things, Westcore I was to provide labor, materials and services for the construction of the Longmont Project on a "Stipulated Sum" basis. The Longmont Contract includes an agreement,

DM1\7930086.4

general conditions, numerous exhibits and incorporated documents, which are too voluminous to attach to this complaint but which are in the possession of the Defendants. The Longmont Project involved the design and construction of an apartment complex in Longmont, Colorado consisting of several low-rise, wood framed buildings with several residential units each, common buildings, parking, roads, utilities, site work and other facilities, with an initial contract price of $32,254,889.00.

**Racketeering Acts Defined**

124.    The definition of Racketeering in RICO includes violations of "section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud),  …." 18 U.S.C.A. § 1961 (West).

125.    Section 1341 addresses mail fraud and fraud using private interstate carriers:

> "Whoever, having **devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises**, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, **or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing**, shall be fined under this title or imprisoned not more than 20 years, or both. …. ."  18 U.S.C. § 1341 (West) (emphasis added).

41

126. Section 1343 addresses wire fraud, including telephone and electronic transmissions:

> "Whoever, having **devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire,** radio, or television **communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice**, shall be fined under this title or imprisoned not more than 20 years, or both. …. If the violation …. affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1343 (West) (Emphasis added).

127. Section 1344 addresses bank fraud, including the fraudulent attainment of funds from a financial institution:

> "Whoever knowingly executes, or attempts to execute, a scheme or artifice
>
> (1) to defraud a financial institution; or
>
> (2) to **obtain any of the moneys, funds**, credits, assets, securities, or other property owned by, or **under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises**; …. 18 U.S.C. § 1344 (West)(emphasis added).

**The Racketeering Schemes**

128. The RICO predicate acts alleged herein and each scheme were part of the overall conspiracy and *pattern of racketeering activity* alleged herein, *e.g.* wire fraud, mail fraud and bank fraud. See 18 U.S.C. §§ 1341, 1343, and 1344 , respectively.

129. The predicate acts include, as examples and not an exhaustive list, the payment of undisclosed bribes and kickbacks to Eguizabal beginning in or about 2013

and continuing into 2017; misrepresentations by the Defendants in the negotiations leading to the execution of the underlying contracts, the earliest of which in this complaint, the Lexington Contract, is dated, August 22, 2013; misrepresentations on payment applications submitted throughout each project; Change Order Number 10 on the Savage Project negotiated from before January 2015 and signed in June 2015 as discussed below; deceptive payment practice throughout the projects that came to a head by or before June 2016; the theft of Joint Checks in December of 2016; the filing and pursuit of spurious liens on projects at present; the creation of Westcore I in 2015 to conceal David Albertelli's involvement with new projects; the submission of a falsified Qualification Statement on November 6, 2015, by David Albertelli; the creation of Westcore II to divert payments from Westcore I; the use of Westcore I and Westcore II and FCS to continue the fraudulent conduct that David Albertelli started with ACI while concealing his role with the new companies; the fabrication of companies with names similar to subcontractors doing work on the projects to create a deceptive means to remove money from the normal stream of funding; and David Albertelli's attempt to insert himself into a new potential general contractor of Continental, Consolidated Resources, to perpetuate the Corrupt Enterprise into the future.

**Manipulation of Subcontracts to Avoid Reporting and Bonding**

130. Westcore agreed to provide bonds from subcontractors that had subcontract values in excess of $500,000 or were on the critical path of the project on the Waco, Bryan and Longmont Projects. On each of those Projects, Westcore split some subcontracts that would have had a price in excess of $500,000 into two or more

DM1\7930086.4

subcontracts or purchase orders to create a deceptive framework for keeping bond premium payments that were built into the Westcore contract price without providing the bonds that were required.

131. Westcore was also required to provide lien waivers from and include on sworn statements first tier subcontractors with subcontract values above $500,000. Westcore created sham entities to pose as subcontractors so that the sham entities controlled by Westcore and other defendants could provide documentation that deceived the project owners into thinking that legitimate subcontractors had been paid. Westcore also split subcontracts into multiple subcontracts and purchase orders to artificially reduce the subcontract amounts below the reporting threshold.

**Accelerated Payments Under False Pretenses**

132. The Defendants submitted and processed payment applications on all Projects that overstated amounts that were due.

133. On the Waco Project, Westcore requested that it be allowed to pay its carpentry subcontractor, Peal and Associates which was employed through a sham subcontract of US Framing, on a bi-weekly basis rather than monthly. Continental advanced funds to Westcore for this purpose but Westcore did not pay Peal and Associates and the individual carpenters were not paid.

**Sham Subcontractors Used to Inflate Costs and Accelerate Payments**

134. David Albertelli, Kozlowski and Burke used Foundation Management to own and control subcontractors.

DM1\7930086.4

135. The projects which had cost-plus contracts required that the general contractor, ACI, disclose its interest in any subcontractor and allowed the general contractor, ACI, to recover only legitimate payments to legitimate subcontractors as a cost of the work. Amounts not paid to ACI for defined recoverable costs were to be retained by Continental. David Albertelli had an interest in several subcontractors that were used on the Projects, including National Framing and KMM. David Albertelli did not disclose these interests and actively tried to hide his interests by having Foundation Management own his interest in those companies.

136. Defendants used the sham subcontractors to inflate the apparent cost of the work on a project by adding a layer of mark-up on the actual cost.

**Unwarranted Change Order Requests Scheme**

137. David Albertelli, ACI, and others routinely submitted change order requests without providing proper documentation demonstrating ACI's entitlement to a change order or establishing the amount to which ACI was entitled in an effort to obtain additional payments to which ACI may not have been due. ACI instead relied on its influence over Eguizabal and the threat of further delays to the Projects to force the Funds to accept change orders without proper documentation. Eguizabal's kickbacks from the Albertellis and Westcore were conditioned on favorable treatment of change order requests that were submitted by ACI or Westcore. At the least, the Funds had to perform ACI's job and determine if sufficient support for the Change Order requests could be found.

DM1\7930086.4

138. ACI and David Albertelli threatened to cause further delays to the Six Mile Project unless 332 Fund made an early payment of approximately $310,000 following the submission of the August 2016 Payment Application. 332 Fund made the early payment but ACI did not use the payment to prevent the Six Mile Project from falling further behind schedule.

139. ACI and David Albertelli intentionally installed materials in the Projects that did not conform to the specifications for the Projects without following the contractual process for having substitutions of materials approved by the architect. When faced with a demand to correct the materials, ACI and David Albertelli demanded additional compensation to which ACI was not entitled.

140. This scheme was carried out by David Albertelli and ACI, in part, through the transmission of documents with false pretenses by wire, mail and courier with the purpose of fraudulently obtaining funds from financial institutions.

141. David Albertelli and ACI also placed fraudulent mechanics liens on the Savage Project and the New Braunfels Project in attempts to coerce the Funds to pay amounts that were not owed to ACI. National Framing placed a fraudulent lien on the Rochester Project. David Albertelli and ACI provided a lien waiver from National Framing and the Fund paid ACI. On information and belief, the payment of money to National Framing and the filing of liens by National Framing is controlled by David Albertelli, Kozlowski, Burke, National Framing and Foundation Management.

142. For example, on the Savage Project, on June 2, 2015, David Albertelli signed a change order for the Savage Contract, Change Order Number 10, in which ACI

DM1\7930086.4

accepted responsibility for $401,780.00 in liquidated damages for delays cause by ACI and received relief on required turnover dates for some buildings. (Exhibit 3, Change Order Number 10.) Defendants represented that they agreed to a revised turnover schedule for buildings at the Savage Project as early as January 8, 2015. On information and belief, Defendants transmitted Change Order Number 10 as well as documents leading up to the parties' agreement to Change Order Number 10 through email and Federal Express. Defendants intended that 298 Fund would rely on Change Order Number 10 and representations leading up to Change Order Number 10 in deciding to cause money to be paid through Plaintiffs' bank to ACI. 298 Fund released payments to ACI for the Savage Project in reliance, in part, on ACI's acceptance of responsibilities for delays to the Savage Project. On information and belief, Defendants knew that their representations about accepting responsibility for delays were misstatements of material fact. As the Savage Project progressed nearer to completion, Defendants demanded that 298 Fund pay for additional costs that Defendants allegedly incurred due to the delays the Defendants had already agreed were their own fault. On information and belief, despite knowing it had no contractual right to a payment, Defendants attempted to hold the Savage Project "hostage" by slowing progress and threatening not to complete the work unless the unwarranted payments were authorized. On September 23, 2016, Defendants recorded a lien against the Savage Project that, on information and belief, includes the delay damages that Defendants had previously represented it would take responsibility for. (Exhibit 4, Mechanics Lien.) On information and belief, Defendants believed that filing the lien would interfere with 298 Fund's financing for the project and compel 298

DM1\7930086.4

Fund to make a payment to Defendants even though they have no legal right to a payment.

143.    On information and belief, the Lakefront Case involves similar improper, unwarranted change order requests by Defendants.

144.    The "Unwarranted Change Order Requests Scheme" described above includes violations of the Florida Civil Theft Act, the Minnesota Theft by Contractor Act, the Florida Prompt Payment Act and the Minnesota Prompt Payment Act, and includes wire fraud, mail fraud, bank fraud, fraud, conversion and intentional breaches of contract.

**Delayed Payments to Subcontractors Scheme**

145.    David Albertelli and ACI routinely requested payments for amounts earned by ACI's Subcontractors knowing that ACI would not pay its Subcontractors those amounts on a timely basis.  Those slow payments violated contracts, Prompt Payment Acts and were false representations made by ACI to obtain construction loan funds.

146.    David Albertelli and ACI's delayed payment scheme occurred, on information and belief, on each of the projects.  The scheme had these similar steps for each of the projects:

   a.  David Albertelli caused ACI to submit a monthly Payment Application for each project to the corresponding Fund by electronic transmission or FedEx delivery or both methods;

48

b. each Payment Application included representations by ACI and David Albertelli as to the amount owed to each subcontractor listed on the Payment Application;

c. ACI and Albertelli knew that the Fund would submit ACI's Payment Application to the construction lender for the Project so that the lender would release monies under its control to the Fund through an escrow with a title company, which the title company in turn would forward to ACI with the Fund's expectation that ACI would fulfill its legal obligations to pay the subcontractors in accordance with the Contract, any applicable Prompt Payment Act, and other laws;

d. ACI would instead withhold the monies from the subcontractors, on information and belief, in order to obtain the benefits of the monies without payment of interest, to pay other obligations and create financial hardship for subcontractors so ACI and David Albertelli could extort agreements from the subcontractor to accept lesser amounts than they were due;

e. When some Subcontractors asked ACI why payments were delayed, ACI falsely told the Subcontractors that the Funds were the cause of payment delays. After learning of one of those incidents of deception by ACI, the Funds began posting notices of payments in the job trailer at the Projects so that Subcontractors would know that ACI had been paid;

49

DM1\7930086.4

f. To the extent ACI made late payments, on information and belief, it paid only the principal due and not the interest required by statutes and contracts;

g. On information and belief, many Subcontractors who were not timely paid by ACI delayed their work, provided fewer resources than were necessary to timely complete their work, and otherwise delayed the completion of the Projects which damaged the Funds through an increase in duration of construction loans and the interest they were forced to pay and delay in the generation of revenue from the Project, among other things; and,

h. ACI and David Albertelli used contractual limits on liquidated damages for normal delays in bad faith by intentionally causing or threatening to cause the Funds to incur delay damages beyond the contractual limit for liquidated damages for normal delays.

147. For example, Six Mile Draws #15, #16 and #17 and Rochester Draws #12 and #13 had delayed payments to subs by ACI. ACI delayed payments to Subcontractors after receiving funding and did not pay Subcontractors until after the Funds caught ACI's misappropriation and demanded that ACI pay the Subcontractors. In another case, from August 15th to the 22nd, 2016, Sneha Tamma of Continental, who processed payments for the Funds, noticed that ACI was not paying Subcontractors even though the Funds had paid ACI. (Exhibit 5, Email string Tamma to Butler (ACI) starting August 15, 2016.) Ms. Tamma repeatedly asked Amy Butler of ACI to pay subcontractors and

provide the required proof of payment. Ms. Butler provided false and misleading responses that led the Funds to believe Subcontractors would be promptly paid. (Id.)

148. In yet another example, as early as March 2016, ACI slow-paid its door and window supplier, BMC, on the Six Mile Project. After BMC shipped products to the project, ACI was able to bill and get paid by 332 Fund but ACI did not pay BMC on a timely basis. (Exhibit 6, Email string Sell to Staples (BMC) dated March 22, 2016.) That inappropriate delay in payment allowed ACI and Albertelli to use BMC's money for other purposes.

**Slow Pay & Fraudulent Payment Requests on Six Mile**

149. ACI submitted fraudulent, intentionally inaccurate payment applications on the Six Mile Project.

150. For example, on the Six Mile Project, ACI submitted sworn statements with payment applications that David Albertelli or others from ACI signed which stated, in part, "…the following persons have been contracted with, and have furnished or are furnishing and preparing (sic) materials for, and have done or are doing labor on said improvements… this statement is a full, true and complete statement of all such persons, the amounts paid and the amounts due or to become due to each." (See Exhibit 7, Example of Sworn Statement signed by David Albertelli.) However, ACI did not disclose some of its subcontractors, or the amounts due or to become due them. For example, Synergy Rents provided equipment to ACI with rental fees totaling $56,479.73 as of August 17, 2016, according to Synergy Rents. (Exhibit 8, Email from Sell (332 Fund) to Butler (ACI) dated August 17, 2016, (invoices omitted).) ACI requested and

51

received payments from 332 Fund during that time but did not pay Synergy Rents and did not disclose the unpaid amounts. ACI and David Albertelli knew that 332 Fund would rely on the payment application documents sent by ACI to determine the amount due to ACI and to determine the subcontractors from whom 332 Fund should expect to receive lien waivers indicating payments were received. ACI and Albertelli intended that 332 Fund would rely on those payment documents and release payments to ACI. ACI and Albertelli also intended to hide the fact that 332 Fund should expect a lien waiver from Synergy Rents with subsequent payment applications as a precondition for releasing subsequent payments to ACI. By concealing the identity of subcontractors, ACI was able to defraud 332 Fund into making payments to ACI even though ACI was not paying its subcontractors. (Exhibit 8.)

151. Another example of slow payment and deceptive billing by ACI and Albertelli occurred on the Six Mile Project with respect to Bridgewell Resources. As of August 23, 2016, Bridgewell Resources, one of ACI's suppliers, had over $108,957.77 due and owing from ACI for materials delivered in May, June and July 2016. (Exhibit 9, Email string ending with Cass (Bridgewell) to Sell dated August 23, 2016.) ACI had been paid for its May and June 2016 payment applications, which months accounted for $106,383.89 of the amount Bridgewell Resources claimed was due for hardware invoices. ACI had not submitted Bridgewell Resources' invoices or breakdowns showing Bridgewell Resources billings to 332 Fund. As a result, through a scheme dating back to at least May 2016, ACI coerced 332 Fund to pay ACI amounts due Bridgewell Resources without allowing 332 Fund to track the payment of those amounts, which allowed ACI

the opportunity to keep those payments without detection and exposed 332 Fund to potential lien claims from Bridgewell Resources.  Id.

**Slow Pay of Subcontractors on Other Projects**

152.   As another example, on the Springs at Estero Project, which predated the Six Mile Project, ACI did not pay its window subcontractor, Florida Glass & Aluminum, progress payments for several months (Exhibit 10, Email string ending with Bass to Nick dated May 25, 2016, see email from Clement to Bass,) without any cause, even though it was paid by the Fund.

153.   On the Waco Project and the Bryan Project, Westcore delayed payments to subcontractors or did not pay them at all.  Carpenters who worked on those projects have still not been paid by Westcore despite Westcore having been paid for such work.

154.   On the Longmont Project, Westcore delayed payments to the plumber, and then the plumber refused to perform additional work on the Project as long as Westcore was the general contractor.

155.   On the Longmont Project, on information and belief, Westcore, Salat, David Albertelli, Kozlowski, and Foundation Management set up a company called Team CCR, LLC ("Team CCR") that was formed in Delaware on September 27, 2016, and registered in Colorado on October 3, 2016, to mimic the doing-business-as name that one of its subcontractors, Consolidated Resources, told project participants it intended to use as a holding company.  Consolidated Resources preformed site work on the Longmont Project, including earthwork and underground wet utility work. Westcore submitted payment applications showing Team CCR as a subcontractor when in fact Consolidated

DM1\7930086.4

Resources performed the work.  Westcore submitted lien waivers from Team CCR to 342 Fund to deceive it into thinking that the subcontractor performing work on the project had been paid.

156.    On information and belief, the Lakefront Case involves similar improper delayed payment of subcontractors by Defendants.

**Underpayment of Subcontractors Scheme**

157.    On information and belief, David Albertelli and ACI never fully paid some of the Subcontractors for which ACI received payments.  David Albertelli and ACI did not provide accountings of the amounts earned by and paid to Subcontractors.  However, the Funds have demanded accountings to which they are entitled under the Contracts.  (See Paragraph 9.6.4 of the General Conditions of the Contracts.)  On at least one occasion on the Savage Project ACI submitted a payment application that contradicted prior payment applications and attempted to assign negative amounts due subcontractors for whom 298 Fund had already paid ACI.

158.    For example, in June 2016, ACI provided its Subcontractor, Bridgewell Resources, with a lien waiver that indicated that ACI had paid Bridgewell Resources for work through a later date than was true.  (Exhibit 11, Email Sell to Butler (ACI) starting June 23, 2016.)  Rather than resolve the issue, ACI allowed the on-line system used to process some payments to close out the draw in question without Bridgewell being paid.  *Id*.

159.    Another example, this one from January 2016, shows that Defendants were not concerned about allowing Subcontractors to file liens and that Defendants slow

and non-payment schemes pre-dated the Six Mile Project. ACI hired Sunny Grove Landscaping as a Subcontractor on the Six Mile Project and a prior project, the Springs of Estero. On January 14, 2016, Sunny Grove informed David Albertelli and others at ACI that it would stop work and file liens on both projects because ACI had withheld payments. (Exhibit 12, Email from Carbary (Sunny Grove) to David Albertelli, et al dated January 14, 2016.)

160. Yet another example of Defendants' use of underpayment of Subcontractors is its dealings with National Framing on the Rochester Project. As of April 11, 2017, National Framing claimed it was due $764,724.62 from ACI for the Rochester Project. (Exhibit 13, Email from Decunto (National Framing) to Hazkial (326 Fund), dated April 11, 2017.) Defendants' underpayment started in June of 2016, for which month National Framing claims $182,275.15 is still due and owing. Id. National Framing requested $482,275.15 for that month and ACI was paid that full amount but ACI paid only $300,000.00 to National Framing. Id. Defendants intended that 326 Fund rely on the payment application in its decision to release a payment to ACI. Defendants knew that the payment application contained false statements of material fact. 326 Fund relied on the statements and released a payment to ACI that included $482,275.15 for National Framing. Defendants did not pay National Framing the amounts it represented it would or had paid National Framing. That non-payment allowed David Albertelli to benefit from the payment to ACI and a potential second payment to National Framing because, if the connection to Albertelli was not discovered, it would appear that National Framing might have a lien claim.

DM1\7930086.4

161.    ACI failed to pay a window subcontractor for work damaged by others on the Estero Project.  The work in question included repairs to window frame, trim and glass that was damaged by ACI and its subcontractors.  No payment was owed by the owner to ACI for the work.  ACI, however, owed the window subcontractor for the work.  Instead of paying for that work, ACI held pending payments on the Six Mile Project as a lever to coerce the subcontractor to provide warranty work without payments.  Continental is now facing potential claims from that subcontractor.

162.    The "Delayed Payments to Subcontractors Scheme" and the "Underpayment of Subcontractors Scheme" described above includes violations of the Florida Civil Theft Act, the Minnesota Theft by Contractor Act, the Florida Prompt Payment Act, the Florida R.I.C.O. Act, the Minnesota Prompt Payment Act, and the Colorado Theft Statute and includes wire fraud, mail fraud, bank fraud, fraud, conversion and intentional breaches of contract.

**New Braunfels Payment Application Issues**

163.    Defendants similarly misrepresented the amounts that were or would be paid to Subcontractors on the New Braunfels Project.  On numerous occasions David Albertelli signed Sworn Statements that purported to show amounts paid to Subcontractors but those amounts were misrepresented in many Sworn Statements and altered from one Sworn Statement to the next in many instances.  Defendants also submitted lien waivers that did not match the amounts that Defendants had represented were paid to Subcontractors.  On March 18, 2016, Thomas Cecchini (306 Fund) informed David Albertelli that his misrepresentation in Draws #13 and #14 about the amounts paid

DM1\7930086.4

to Nationwide Gutter had been caught. (Exhibit 14, Email from Cecchini to D. Albertelli dated March 18, 2016.) On May 6, 2016, Sneha Tamma informed Ken Jones and Amy Butler of defects in the lien waivers and Sworn Statements #15 and #16 for the New Braunfels Project. (Exhibit 15, Email string starting with Tamma to Jones and Butler on May 6, 2016.) On May 11, 2016, Ken Jones sent partially corrected Sworn Statements and waivers after Tamma caught misrepresentations and errors in Defendants' Sworn Statements and waivers related to Subcontractors T&D Moravits, Wheeler Truss, Strand Systems, Titan Supply, Insulation Group and Al's Painting. (Exhibit 15, See Email Jones to Tamma, on May 12, 2016.) On May 12, 2016, Ken Jones of ACI sent Sneha Tamma of C306 Fund another corrected Sworn Statement and corrected lien waivers for Bridgewell Resources after Ms. Tamma had caught Defendants' misrepresentation about the amounts that had been paid to Bridgewell. (Exhibit 15.)

164. As detailed above, ACI and David Albertelli used fraudulent Payment Applications and other documents, transmitted by wire, mail or common couriers, accepted checks sent by common carrier or the US Mail, and obtained funds from the custody, control and ownership of financial institutions on false pretenses.

165. On information and belief, the Lakefront case involves similar improper underpayment of subcontractors by Defendants.

166. The "Underpayment of Subcontractors Scheme" includes violations of the Florida Civil Theft Act, the Minnesota Theft by Contractor Act, the Florida Prompt Payment Act, and the Minnesota Prompt Payment Act, and includes wire fraud, mail fraud, bank fraud, fraud, conversion and intentional breaches of contract.

DM1\7930086.4

**Late Delivery of Projects Scheme**

167. David Albertelli and ACI used the delayed status of the Projects as part of a scheme to extort unwarranted additional compensation from the Funds by holding the completion of the Projects hostage.

168. The Contract for each Project included a limitation on the amount of liquidated damages that could, under the circumstances reasonably foreseeable to the Fund, be assessed against ACI for delays that it caused. After ACI delayed a Project through its incompetence and malfeasance to the extent that the liquidated damages limit was or would certainly be met, David Albertelli and ACI did not attempt to recover lost time or avoid future delays by prosecuting the work diligently. Instead, they intentionally continued to inflict damages on the Funds while they submitted baseless requests for additional compensation. Their scheme relied on the Funds agreeing to baseless change order requests in order to avoid incurring additional damages due to delays that were not, from ACI's (incorrect) standpoint, subject to liquidated damages assessments. (Nevertheless, the Funds allege below and reserve their rights to pursue all damages caused by ACI's intentional misconduct.)

169. David Albertelli, ACI, and others also attempted to take advantage of the delayed status and limitation on liability by not adequately staffing the project with supervision, project management, and other overhead costs. Despite not incurring the cost of overhead and supervision that it was required to provide, ACI submitted Payment Applications requesting the full amount of the "General Conditions" costs that included payments for supervision.

DM1\7930086.4

170. David Albertelli caused the funds to incur additional, avoidable damages by preventing ACI from using overtime or otherwise accelerating its work to recover lost time on the Project schedules.

171. David Albertelli, ACI, and others also used intentional delays on one Project to attempt to extort unwarranted payments on other Projects. ACI slowed its work on the Rochester Project to force 332 Fund to process change order requests on the Six Mile Project that were not properly supported and to which ACI was not entitled. On information and belief, David Albertelli instructed ACI employees not to return phone calls from the Funds and subcontractors regarding the Projects in order to prevent problems from being resolved.

172. On information and belief, the Lakefront case involves similar improper late completion by Defendants.

173. The "Late Delivery of Projects Scheme" described above was carried out by David Albertelli and ACI, in part, through the transmission of documents with false pretenses by wire, mail, and courier with the purpose of fraudulently obtaining funds from financial institutions.

174. The Late Delivery of Projects Scheme includes wire fraud, mail fraud, bank fraud, fraud, conversion, and intentional breaches of contract.

**Six Mile Project Joint Checks Scheme**

175. Before November 2016, ACI had allowed the Six Mile Project, Rochester Project, Savage Project and New Braunfels Project to be behind schedule to such an

DM1\7930086.4

extent that the liquidated damages for delays were assessed up to their maximum as allowed by the respective Contract.

176.  On the Six Mile Project, 332 Fund had been withholding amounts for ACI's general conditions and fee from payments to ACI on the basis that ACI owed 332 Fund liquidated damages for delays, costs incurred to complete ACI's work, costs incurred to correct ACI's defective work, costs incurred to pay fines, amounts to cover mechanics liens, other charges incurred or threatened by ACI, costs incurred to provide supervision that ACI failed to provide, and other costs and damages incurred by the Fund due to ACI's poor performance, breaches of contract, negligence, breaches of warranties and intentional misconduct.

177.  On or about November 10, 2016, ACI submitted the October Payment Application for the Six Mile Project, along with other documentation, including a Sworn Statement.  The October Payment Application and the Sworn Statement for the Six Mile Project were signed by David Albertelli and notarized by Amy Butler, electronically. They contain representations by David Albertelli and ACI as to the amounts due the Subcontractors.  Those representations were material because, as Defendants knew, they would be relied upon by 332 Fund in making payments to ACI.  Those representations were false because the Defendants did not believe the amounts were due the Subcontractors and did not intend to pay the amounts to the Subcontractors (see Defendants Motion to Dismiss, p. 2).  Defendants knew that they would not be paid money by 332 Fund unless they submitted a payment application for a seemingly

appropriate amount. Defendants intended that 332 Fund pay the amount they requested in the October Payment Application.

178. In the Six Mile Contract, ACI agreed, among other things, that it would only include amounts for Subcontractors in a Payment Application if it intended to pay that Subcontractor the amount requested (Exhibit 16, see Six Mile Contract Gen. Cond. §9.3.1.2), that work for which prior payments were received would be free of claims by Subcontractors (Id. at §9.3.3), that ACI would pay each Subcontractor within seven (7) days of receipt of payment (Id. at §9.6.2), and that any amount paid to ACI that was payable to a Subcontractor would be held in a constructive trust by ACI for that Subcontractor.

179. After receiving the October Payment Application for the Six Mile Project from ACI, 332 Fund informed ACI that the Payment Application did not account for deductions, withholding, and liquidated damages, and had other errors that prevented the 332 Fund from paying to ACI the amounts requested for general conditions and fee.

180. The Funds and ACI had a history and course of dealing that involved the use of joint checks to pay Subcontractors for some Payment Applications. The August 2016 Payment Application was paid in part through joint checks.

181. David Albertelli signed ACI's August Payment Application on September 8, 2016. On information and belief, Amy Butler sent the August Payment Application to 332 Fund by Textura, an Internet-based service. The August Payment Application contained representations about the amounts due from ACI to its

Subcontractors, the amounts that ACI would pay to the Subcontractors and the amount earned by ACI.

182. This problem of deceptive billing and slow payment started before the August 2016 Payment Application. For example, on September 26, 2016, Mr. Drywall Services, LLC, contacted 332 Fund to report that ACI had not paid for work in July despite ACI having been paid by 332 Fund. (Exhibit 17, Email from Everington (Mr. Drywall Services) to Bass (332 Fund) dated Sept. 26, 2016). Haskins, Inc. suffered similar improper withholding. (Exhibit 18, Email Lago (Haskins) to Butler (ACI) dated October 13, 2016.) ACI's fraud relating to Haskins started at least as early as June 2016, when ACI submitted a payment application representing that it would pay Haskins and then, on information and belief, did not pay Haskins after 332 Fund paid ACI. (Exhibit 19, Email string Lago to Sell starting August 23, 2016.)

183. 332 Fund made part of the payments for the August Payment Application to ACI through Joint Checks payable to a Subcontractor and ACI. ACI processed those Joint Check payments by indorsing the Joint Check, generating a lien waiver and other documentation, and sending the Joint Check, waiver and documentation to the Subcontractors. ACI provided 332 Fund with tracking numbers for the FedEx packages that it sent to the Subcontractors. Subcontractors who were registered with and paid through Textura would have their lien waivers posted to Textura where 332 Fund could see that Subcontractors had executed waivers.

184. For the August Payment Application, 332 Fund paid the portion of ACI's Payment Application that was not paid using Joint Checks through a wire transfer to ACI

DM1\7930086.4

for amounts ultimately payable to Subcontractors who had registered to participate in the Textura on-line payment documentation system. ACI was required to submit payments to Subcontractors from the monies it received through the wire transfers. ACI breached its obligations to pay Subcontractors and instead withheld the money from Subcontractors in order to coerce 332 Fund to approve change order requests for other work or risk delays to the Six Mile Project. As the Subcontractors began to refuse to do further work, ACI and David Albertelli used the threat of further delays on the project and the fact that Defendants had money that should have been used to pay those Subcontractors to coerce 332 Fund to pay for change order requests that did not have a valid basis. 332 Fund reviewed and processed change order requests that resulted in change orders that increased the contract price and issued other change orders that reduced the contract price. ACI refused to process the deductive change orders. 332 Fund thereafter withheld amounts from ACI's general conditions and fee to account for the credits that it was owed.

185. To guard against ACI not paying subcontractors after ACI was paid for the October Payment Application, on or about November 30, 2016, Amy Butler and, on information and belief, others from ACI, and Ms. Sneha Tamma and others, on behalf of 332 Fund agreed the Subcontractors would be paid through joint checks payable to ACI and the respective Subcontractors.

186. On November 10, 2016, David Albertelli signed, electronically, and Amy Butler of ACI notarized a "Sworn Statement for Contractor and Subcontractor" for the period ending October 31, 2016 for the Six Mile Project. A true and correct copy of the

63

Sworn Statement is attached hereto as Exhibit 20. That Sworn Statement includes the following representation by David Albertelli and ACI:

> "That there is due and to become due them, respectively, the amounts set opposite their names for material or labor as stated. That this statement is a full, true, and complete statement of all such persons, the amounts paid and the amounts due or to become due to each"

It also includes a list identifying Subcontractors by name and giving a specific amount due each Subcontractor for "This Payment". On information and belief, Amy Butler transmitted the Sworn Statement to Plaintiffs on or about November 10, 2016, by uploading through an on-line service called Textura, with David Albertelli's and Kozlowski's consent.

187. On November 30, 2016, Ms. Sneha Tamma, on behalf of 332 Fund, sent an email to Amy Butler of ACI asking Butler to confirm that the amounts listed in the Sworn Statement for the Subcontractors should be used to prepare the Joint Checks. On November 30, 2016, Butler confirmed on behalf of the Defendants. A true and correct copy of the November 30, 2016, email is attached hereto as Exhibit 21 as though set forth in full herein.

188. By uploading the Sworn Statement through Textura and sending the November 30, 2016, email, Defendants used wire or radio or both to transmit the representations and information therein in furtherance of their scheme to defraud the Plaintiffs.

189. 332 Fund paid the October Payment Application through Joint Checks, each made payable to ACI and one of its Subcontractors. ACI in accordance with past practices was to indorse each joint check and generate a waiver and other documentation.

DM1\7930086.4

ACI was to place the joint check, waiver and other documentation for each Subcontractor in a FedEx envelope that ACI prepared, give the envelopes to FedEx, and provide 332 Fund with the tracking numbers. Subcontractors were expected to return signed lien waivers to ACI after the Subcontractor received its payment.

190. ACI knew that 332 Fund relied on ACI's representations about the amounts due Subcontractors, the manner in which payments would be administered, and the conclusion that receipt of a FedEx package by a Subcontractor would mean that ACI had delivered the joint check to that Subcontractor.

191. 332 Fund reasonably relied on the representations made by ACI and David Albertelli as to the amount due each Subcontractor, that ACI would pay each Subcontractor, that ACI would forward each joint check to the appropriate Subcontractor, and that the tracking numbers would be for FedEx packages that contained the Joint Checks.

192. On December 1, 2016, 332 Fund caused checks to be drafted with each payable to ACI and a Subcontractor listed on the Sworn Statement for the Six Mile Project in the October Payment Application, in the amount represented by ACI as being due that Subcontractor.

193. 332 Fund caused the Joint Checks to be delivered to ACI on or about December 1, 2016, for the Six Mile Project.

194. On information and belief, Ken Jones and/or Amy Butler received the Joint Checks on behalf of ACI on or about December 1, 2016. On information and belief,

David Albertelli, Ken Jones and/or Amy Butler agreed to exclude the Joint Checks from the other documentation that ACI prepared to be forwarded to the Subcontractors.

195. Sometime between December 1 and 6, 2016, David Albertelli indorsed nineteen separate Joint Checks related to the October Payment Application for the Six Mile Project.

196. On information and belief, Melissa Peek, an ACI employee, prepared FedEx envelopes for the Subcontractors, and, on the instructions of David Albertelli, Ken Jones and others at ACI, Ms. Peek placed the documentation but not the checks in the FedEx envelopes, sent the FedEx envelopes to the Subcontractors, and provided the FedEx tracking numbers to 332 Fund. At no time did anyone from ACI ask 332 Fund for permission to exclude the Joint Checks or inform 332 Fund that the Joint Checks had been withheld.

197. On December 5 and 6, 2016, David Albertelli and ACI intentionally and wrongfully deposited the Joint Checks from the Six Mile Project into ACI's account at CenterState Bank, without any of the second signatures from Subcontractors and without notice to or consent from 332 Fund or the Subcontractors. On information and belief, David Albertelli personally deposited those Joint Checks.

198. On information and belief, on or about December 5, 2016, the Subcontractors received Fed Ex envelopes from ACI without any check but with a lien release (or waiver) that would, if signed unknowingly, make it appear that the Subcontractor had been paid.

DM1\7930086.4

199.    On December 5, 2016, Nichole Barton of Texas Contract Floors, Inc., sent an email to Melissa Peek at ACI informing her that the Fed Ex envelope sent to Texas Contract Floors, Inc. by ACI did not contain the expected check but did contain a lien waiver for the payment.  Later that day, while ACI had the first tranche of improperly indorsed Joint Checks on the way to be wrongfully deposited in its own account, Ms. Peek responded that the checks had not been "received at my desk" and delivery of the Fed Ex packages without the checks was the fault of an "admin".  (Exhibit 22, Email starting with Barton (Texas Contract Floors) to Peek (ACI) dated December 5, 2016.)

200.    On or about December 21, 2016, Justin Sell of 332 Fund learned that Subcontractors Chavez Painting and Mr. Drywall had received Fed Ex boxes without Joint Checks but with lien waivers.  On information and belief, one of Subcontractors called ACI and was told a "temp" was responsible for leaving the checks out of the FedEx boxes but that ACI could not say when the checks would be ready.  By then, ACI already had deposited the Joint Checks in its own account.

201.    David Albertelli and ACI knowingly and for the purpose of misappropriating money from 332 Fund related to the October Payment Application on the Six Mile Project, deposited 19 Joint Checks without proper indorsements, totaling $896,146.51 in ill-gotten gains.

**The Rochester Joint Check Scheme**

202.    In November 2016, ACI submitted an October Payment Application and supporting documents, including a Sworn Statement identifying some Subcontractors and a supplemental list for the other Subcontractors, representing that payments were due

from the 326 Fund for work allegedly performed on the Rochester Project by ACI and its Subcontractors. ACI and David Albertelli omitted several Subcontractors from the Sworn Statements for Rochester in breach of ACI's obligations under the Rochester Contract and in contradiction to ACI's Sworn Statements, which David Albertelli signed. 326 Fund caught that misrepresentation by omission and compelled ACI and David Albertelli to provide a supplemental list of Subcontractors.

203. The Sworn Statement and supplemental list of Subcontractors for the October Payment Application and supporting documents requested specific amounts for payments that would be earmarked for specific Subcontractors. The October Payment Application and Sworn Statement and supplemental list for the Rochester Project were signed by David Albertelli and notarized by Amy Butler, electronically. The supporting documentation contains a Sworn Statement in which David Albertelli attests to the amount due seven Subcontractors and a supplemental list identifying other Subcontractors.

204. In the Rochester Contract, ACI agreed, among other things, that it would only include an amount for a Subcontractor in a Payment Application if it intended to pay that Subcontractor the amount requested (see Rochester Contract Gen. Cond. §9.3.1.2), that work for which prior payments were received would be free of claims by Subcontractors (Id. at §9.3.3), that ACI would pay each Subcontractor within seven (7) days of receipt of payment (Id. at §9.6.2), and that any amount paid to ACI that was payable to a Subcontractor would be held in a constructive trust by ACI for that Subcontractor.

68

205. ACI knew that 326 Fund relied on ACI's representations about the amounts due Subcontractors, the manner in which payments would be administered, and the conclusion that receipt of a FedEx package by a Subcontractor would mean that ACI had delivered the joint check to that Subcontractor.

206. On November 30, 2016, Amy Butler of ACI sent Tamma an email containing "the joint check list for Draw 16." (Exhibit 23, Email Butler to Tamma dated Nov. 30, 2016.) That list identified Subcontractors by name and listed the amount of the joint check that ACI wanted 326 Fund to draw for that subcontractor. It also identified the amount that would be retained by ACI.

207. Defendants intended that 326 Fund would have joint checks prepared in the specified amounts and sent to ACI in reliance on Butler's representations in the "joint check list" email.

208. Defendants knew that they would not in fact send the Joint Checks to the Subcontractors.

209. On December 2, 2016, 326 Fund caused checks to be drafted with each payable to ACI and a Subcontractor listed on the Rochester Project Sworn Statement in the October Payment Application documents and the supplemental "joint check list" in the amount represented by ACI as being due that Subcontractor. Tamma requested that Butler send the Joint Checks to the Subcontractors, to which Butler replied, "Sure thing." (Exhibit 24, Email string between Tamma and Butler starting Dec. 2, 2016.)

210. 326 Fund reasonably relied on the representations made by Butler on behalf of ACI and David Albertelli as to the amount due each Subcontractor, that ACI

DM1\7930086.4

would pay each Subcontractor, that ACI would forward each joint check to the appropriate Subcontractor, and that the tracking numbers would be for FedEx packages that contained the Joint Checks.

211. 326 Fund caused the Joint Checks to be delivered to ACI on or about December 2, 2016, for the Rochester Project.

212. On information and belief, Ken Jones and/or Amy Butler received the Joint Checks on behalf of ACI. On information and belief, David Albertelli, Ken Jones and/or Amy Butler agreed to exclude the Joint Checks from the other documentation that ACI prepared to be forwarded to the Subcontractors.

213. David Albertelli indorsed sixteen separate Joint Checks related to the October Payment Application for the Rochester Project.

214. On information and belief, Melissa Peek or Amy Butler at ACI prepared FedEx envelopes for fifteen[3] Subcontractors, and on the instructions of David Albertelli, Ken Jones and others at ACI placed the documentation but not the checks in the FedEx envelopes, sent the FedEx envelopes to the Subcontractors, and provided the FedEx tracking numbers to 326 Fund. At no time did anyone from ACI ask 326 Fund for permission to exclude the Joint Checks or inform 326 Fund that the Joint Checks had been withheld.

215. Between December 7 and 8, 2016, ACI intentionally and wrongfully deposited the Joint Checks from the Rochester Project into ACI's account at CenterState

[3] One joint check appears to have been deposited by its Subcontractor Payee.

DM1\7930086.4

Bank, without any of the second signatures from Subcontractors and without notice to or consent from 326 Fund.

216. On December 8, 2016, after ACI had already begun depositing the Joint Checks into its own account, Butler told Tamma and others that Butler was told by people in ACI's office that the Joint Checks would be placed in FedEx boxes for the Subcontractors that day. (Exhibit 24. Email, Butler to Tamma, Dec. 8, 2016.) The checks were never sent to the Subcontractors.

217. David Albertelli and ACI knowingly and for the purpose of misappropriating money from 326 Fund related to the October Payment Application on the Rochester Project, deposited 15 Joint Checks without proper indorsements, totaling $1,121,882.88 in ill-gotten gains.

**Damages**

218. David Albertelli and ACI improperly deposited a total of $1,121,882.88 that was to be paid to Subcontractors for the Rochester Project and $869,146.51 that was to be paid to the Subcontractors for the Six Mile Project, for a total of $1,991,029.39 that was misappropriated by David Albertelli and ACI. On information and belief, some Subcontractors were later paid by ACI and the outstanding principal amount may be reduced to $1,538,162.64.

219. In late December 2016, the Funds were contacted by several Subcontractors who complained that they had not been paid the payment corresponding to the October Payment Application. Those Subcontractors indicated that ACI did not send them the joint check but did send a lien waiver and other documentation. The Funds

71

then reviewed the cancelled Joint Checks and learned that the cancelled Joint Checks did not have the required second signatures.

220. On December 29, 2016, the Funds gave notice to ACI that the Funds would terminate ACI's opportunity to perform any more work on the Rochester Project and the Six Mile Project if ACI and David Albertelli did not return the money stolen through the joint check schemes and cure other contractual defaults. ACI cured none of its defaults, committed an additional default, and kept the stolen money. The terminations of ACI's opportunity to perform work became effective on January 6, 2017. To keep the Rochester Project and Six Mile Project moving, mitigate damages, avoid Subcontractor liens, acquire the Subcontractors' claims against ACI, and to do the right thing, the Funds paid the amounts of the Joint Checks directly to the unpaid Subcontractors.

221. On information and belief, Defendants had used similar illegal, fraudulent and racketeering activities on the project in the Lakefront Case. On information and belief, Defendants used moneys improperly obtained on the four Projects from the Plaintiffs to continue operating their business with respect to the Lakefront project.

222. The "Joint Check Schemes" described above include violations of the Florida Civil Theft Act, the Minnesota Theft by Contractor Act, the Uniform Commercial Code, the Florida Prompt Payment Act, the Minnesota Prompt Payment Act, and the Florida R.I.C.O. Act, and include wire fraud, mail fraud, bank fraud, fraud, conversion, and intentional breaches of contract.

DM1\7930086.4

**Conspiracy**

223. On information and belief, each of the schemes of George Albertelli, David Albertelli, ACI, Kozlowski, Burke, Salat, Butler, Heltzel, Westcore I, Westcore II, Foundation Management, National Framing, KMM, MFDC, and US Construction Trust included the acts of one or more of the other defendants and other persons.

224. On information and belief, Ken Jones was knowingly involved in each of the schemes.

225. On information and belief, Amy Butler was knowingly involved in each of the schemes.

226. On information and belief, others employed by defendants were involved in one or more of the schemes.

227. Eguizabal and Bravo21 were involved in the bribes and kickback schemes, and aided in the Albertellis' other schemes.

228. Burke conspired with the Albertellis and others with respect to schemes that involved payments from or through Foundation Management.

229. On information and belief, David Albertelli and ACI have an ownership interest in and control over some subcontractors that it used on the Projects, including National Framing, LLC, KMM Construction of Florida, LLC, AllWall Interiors, LLC, US Corporate Group/Trust, LLC, and Orion Contracting, LLC, which, on information and belief, are associated with Foundation Management, LLC, and its General Manager, Brook Kozlowski, who is an associate of David Albertelli and acted on behalf of ACI, and all of whom participated in the Albertellis' schemes.

73

**Prohibited Acts**

230. ACI, David Albertelli, and the other defendants committed acts that are prohibited under RICO:

"§1962. Prohibited Activities:

"(a) **It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity** or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, **to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.** ….
(b) **It shall be unlawful for any person through a pattern of racketeering activity** or through collection of an unlawful debt **to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.**
(c) **It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity** or collection of unlawful debt.
(d) It shall be **unlawful for any person to conspire** to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. §1962 (emphasis added).

**Remedies Available**

231. RICO, among other things, provides the following remedies:

"§ 1964. Civil remedies

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: **ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments** of any person, including, but not limited to, **prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce**; or **ordering dissolution or reorganization of any enterprise**, making due provision for the rights of innocent persons.

DM1\7930086.4

(b) ….
(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court **and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, ….**
(d) ….   18 U.S.C. §1964 (emphasis added).

232.    326 Fund and 332 Fund were damaged by the fraud and misappropriation of the Joint Checks. 326 Fund and 332 Fund are entitled to treble damages related to the joint check scheme.

233.    The Funds were further damaged by the defendants' other schemes and are entitled to treble damages arising from those schemes. Those damages include, but are not limited to, costs of correcting ACI's defective work, cost of completing ACI's scope of work, costs of payments to subcontractors, costs of removing or addressing mechanics liens, costs of adding crews to complete work and recover time on schedules, costs of adding supervision to Projects, costs of additional management time for the Projects, costs of legal services, additional interest on loans, additional payments to investors, payments of fines and other costs.

234.    The Funds are entitled to damages incurred by the Subcontractors and treble damages for the claims that were assigned to the Funds by the Subcontractors and to which the Funds are subrogated by payment of the Subcontractors.

235.    Pursuant to 18 U.S.C. § 1964 (a), David Albertelli should be forbidden from participating in the activities of ACI, any subcontractor owned, controlled or influenced by David Albertelli, or any other business in the construction industry.

236.    Plaintiffs have been injured in an amount in excess of $10,000,000.

DM1\7930086.4

WHEREFORE, on Count I, Plaintiffs request that this Court provide the following relief against the Defendants:

a) Grant Plaintiffs injunctive relief by ordering George Albertelli, David Albertelli, Brook Kozlowski, John Salat, Kevin Burke, ACI, Foundation Management, Westcore I, Westcore II, National Framing, KMM Construction, Team CCR, LLC, US Construction Trust and MFDC, LLC, to i) divest himself or itself of any interest, direct or indirect, in any enterprise related to the construction industry, ii) be restricted from providing labor, services or materials to or participating in the construction industry as an employee, consultant, contractor, subcontractor, owner or otherwise, and iii) be restricted from making investments in or loans to any person or entity engaging in the construction industry;

b) Order dissolution of ACI, Foundation Management, Westcore I, Westcore II, National Framing, KMM Construction, MFDC, LLC, Team CCR, and US Construction Trust,

c) Grant Plaintiff's compensatory, statutory treble damages, exemplary, punitive, and other damages as shall be proven at trial;

d) Grant Plaintiffs their attorneys' fees and costs; and

e) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT II - FLORIDA RICO AND CIVIL REMEDIES FOR CRIMINAL ACTIVITIES

237. The allegations of paragraphs 1 through 236 above are incorporated as though set forth in full herein as the allegations in this paragraph.

DM1\7930086.4

238.     This Count is alleged and contains claims against the Defendants under the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. Chapter 772, and the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. Chapter 895, asserting a statutory right of action against Defendants for their conduct of, or participation in, an enterprise through a pattern of criminal and racketeering activity in violation of Fla. Stat. §§ 772.103 and 895.03.

239.     Defendants are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise ("Corrupt Enterprise"), described in Paragraphs 1 through 236 of this Complaint namely, to obtain and wrongfully retain the proceeds of the schemes described in Paragraphs 68 through 217 above ("Schemes").  They have adapted their Schemes to different construction projects, utilizing new conspirators to assist with their wrongful activities and altering the scope and nature of their activities as necessary to advance the objectives of the Corrupt Enterprise. That Corrupt Enterprise has been structured to operate as a unit, and the participants in the Corrupt Enterprise operate it to accomplish its common purpose and goal of the criminal Schemes.

240.     Defendants, operating out of Florida, are responsible for directing and managing the Schemes. They are associated with the Corrupt Enterprise within the meaning of Fla. Stat. § 772.103(c). At all relevant times, Defendants knew that these proceeds were obtained through wrongful criminal conduct. Defendants committed numerous criminal predicate acts in Florida, which served as the nerve center of the Corrupt Enterprise and the headquarters of its operations.

DM1\7930086.4

241. The Corrupt Enterprise constitutes an association-in-fact enterprise within the meaning of Fla. Stat. §§ 772.102(3), 772.103(3), 895.02(3), and 895.03(3). Defendants participated in the operation or management of the Enterprise.

242. Defendants participated, directly and indirectly, in the Corrupt Enterprise, including through the conduct, management, or operation of the Enterprise's affairs through a "pattern of criminal activity" within the meaning of Fla. Stat. § 772.102(4) and in violation of Fla. Stat. § 772.103(3), including the incidents of criminal activity set forth in Paragraphs 68 through 217 above. These incidents of criminal activity had the same or similar intents, results, accomplices, victims, or methods of commission or were otherwise interrelated by distinguishing characteristics and were not otherwise isolated incidents.

243. Defendants participated, directly and indirectly, in the Corrupt Enterprise, including through the conduct, management, or operation of the Corrupt Enterprise's affairs through a "pattern of racketeering activity" within the meaning of Fla. Stat. § 895.02(4) and in violation of Fla. Stat. § 895.03(3), including the incidents of racketeering conduct set forth in Paragraphs 68 through 217 above. These incidents of racketeering conduct had the same or similar intents, results, accomplices, victims, or methods of commission or were otherwise interrelated by distinguishing characteristics and were not otherwise isolated incidents.

244. Defendants committed a substantial number of related incidents of criminal activity and racketeering conduct over an extended period of time, including the predicate acts enumerated at Paragraphs 68 through 217 above. Each predicate act

78

constitutes "criminal activity" within the meaning of Fla. Stat. § 772.102(1) and "racketeering activity" within the meaning of Fla. Stat. § 895.02(1). Defendants' commission of predicate acts is part of a general course of business and will continue unless and until they are prevented from committing such acts.

245. The Funds were, and continue to be, injured by reason of Defendants' violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts, as set forth in Paragraphs 68 to 217 above.

246. Despite their diligence and efforts, the Funds' discovery of these ongoing injuries was delayed by Defendants' fraudulent concealment activity as set forth in Paragraphs 68 to 217 above.

247. The injuries to the Funds were a direct, proximate, and reasonably foreseeable result of the violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts enumerated at Paragraphs 68 to 217 above. The Funds have been and will continue to be injured in an amount to be determined at trial.

248. Pursuant to Fla. Stat. § 772.104(1), the Funds are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

249. Pursuant to Fla. Stat. §§ 895.05(1), 895.05(6), the Funds are entitled to an injunction preventing Defendants from committing further violations of Fla. Stat. § 895.03.

WHEREFORE, on Count II, Plaintiffs request that this Court provide the following relief against the Defendants:

a) Grant Plaintiffs injunctive, compensatory, statutory, exemplary, punitive, and other damages as shall be proven at trial;

b) Grant Plaintiffs their attorneys' fees and costs; and

c) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT III - FLORIDA RICO AND FLORIDA CIVIL REMEDIES FOR CRIMINAL ACTIVITIES – CONSPIRACY

250. The allegations of paragraphs 1 through 236 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

251. Defendants violated Fla. Stat. §§ 772.103(4) and 895.03(4) by conspiring to violate Fla. Stat. §§ 772.103(3) and 895.03(3), respectively.

252. In connection with the Corrupt Enterprise described in Paragraphs 68 to 217 above, Defendants agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity, including the incidents of criminal and racketeering activity set forth in Paragraphs 68 through 217 above.

253. Defendants agreed to the overall objective of the conspiracy, or each agreed to commit personally at least two acts of criminal and racketeering activity.

254. As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, the Funds have been injured in their business or property.

80

255. Despite their diligence and efforts, the Funds' discovery of these ongoing injuries was delayed by Defendants' fraudulent concealment activity as set forth in Paragraphs 68 through 217 above.

256. Pursuant to Fla. Stat. § 772.104(1), the Funds are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

257. Pursuant to Fla. Stat. §§ 895.05(1), 895.05(6), the Funds are entitled to an injunction preventing Defendants from committing further violations of Fla. Stat. § 895.03.

WHEREFORE, on Count III, Plaintiffs request that this Court provide the following relief against the Defendants:

a) Grant Plaintiffs injunctive, compensatory, statutory, exemplary, punitive, and other damages as shall be proven at trial;

b) Grant Plaintiffs their attorneys' fees and costs; and

c) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

### <u>COUNT IV - CIVIL THEFT (Fla. Stat. 772.11)</u>

258. The allegations of paragraphs 1-14, 15-47, 54-56, 116-123, and 175-222 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

81

259. Defendants ACI and David Albertelli knowingly obtained or used, or endeavored to use the proceeds of the Joint Checks by depositing the checks into the account of ACI at CenterState Bank without obtaining the second signature.

260. The proceeds of the Joint Checks were the Plaintiffs' property.

261. Any rights that the Subcontractor payees may have had related to the Joint Checks have been assigned to or subrogated to the Plaintiffs.

262. Defendants ACI and David Albertelli had felonious intent in depositing the Joint Checks into ACI's account after deceiving Plaintiffs' into believing that the joint Checks would be forwarded to Subcontractors. Defendants knew they had no right to keep the proceeds of those Joint Checks.

263. Defendants ACI and David Albertelli intended to temporarily or permanently deprive Plaintiffs of their right to or benefits of the Joint Checks or to appropriate the Joint Checks for Defendants' own use. The Joint Checks were drafted with the intention and for the sole purpose of allowing Plaintiffs to pay the Subcontractors amounts due on the Projects without Defendants being able to use the associated monies for their own purposes. Defendants intended to and are using the monies as bargaining chips against the Plaintiffs and Subcontractors, and for Defendants own purposes.

264. Plaintiffs have made a written demand on Defendants ACI and David Albertelli for the payment of treble damages that are due Plaintiffs under Florida Statutes Annotated §772.11(1). A true and correct copy of the demand letter sent by counsel for Plaintiffs to Counsel for Defendants and the Defendants is attached hereto as Exhibit 25

DM1\7930086.4

and incorporated as though set forth in full herein.  More than 30 days have expired since that that demand letter was received.

265.    Plaintiffs are entitled to receive treble damages, reasonable attorney's fees and court costs from the Defendants by statute.  FSA §772.11.

WHEREFORE, on Count IV, Plaintiffs 332 Fund and 326 Fund request that this Court provide the following relief against Defendants ACI and David Albertelli:

a) Grant Plaintiffs treble damages based on actual damages as shall be proven at trial;

b) Grant Plaintiffs their reasonable attorneys' fees and court costs; and

c) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

### COUNT V -  COMMON LAW FRAUD

266.    The allegations of paragraphs 1 through 236 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

267.    Each of the Funds reasonably relied on the false representations of ACI, George Albertelli, David Albertelli, Kozlowski, Salat, Westcore I, Westcore II, Butler, Burke, Heltzel, Eguizabal, Bravo 21 Foundation Management, National Framing, KMM, MFDC, Team CCR, and US Construction Trust.

268.    Each of the Funds was damaged by the bribes paid to Eguizabal pursuant to the bribery scheme entered into by David, George, and Eguizabal.

DM1\7930086.4

WHEREFORE, on Count V, Plaintiffs request that this Court provide the following relief against Defendants George Albertelli, David Albertelli, ACI, Kozlowski, Salat, Westcore I, Westcore II, Butler, Burke, Heltzel, Eguizabal, Bravo 21 Foundation Management, National Framing, KMM, MFDC, Team CCR, and US Construction Trust.:

a) Grant Plaintiffs compensatory, exemplary, punitive, and other damages as shall be proven at trial, including without limitation, the amount of all bribes paid to Eguizabal, all profits earned by ACI and Westcore on projects for which a bribe was paid to Eguizabal; and

b) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

### <u>COUNT VI - COMMON LAW CONSPIRACY TO COMMIT FRAUD</u>

269. The allegations of paragraphs 266 through 268 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

270. George Albertelli, David Albertelli, ACI, Kozlowski, Salat, Westcore I, Westcore II, Butler, Burke, Heltzel, Eguizabal, Bravo 21 Foundation Management, National Framing, KMM, MFDC, Team CCR, and US Construction Trust, and others conspired to defraud the Funds.

WHEREFORE, on Count VI, Plaintiffs request that this Court provide the following relief against Defendants George Albertelli, David Albertelli, ACI, Kozlowski, Salat,

DM1\7930086.4

Westcore I, Westcore II, Butler, Burke, Heltzel, Eguizabal, Bravo 21 Foundation Management, National Framing, KMM, MFDC, Team CCR, and US Construction Trust.:

a) Grant Plaintiffs compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

### COUNT VII - CONVERSION v. DAVID ALBERTELLI

271. The allegations of paragraphs 258 through 264 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

272. David Albertelli converted money, including, but not limited to the Joint Checks, that was the property of the Plaintiffs to his possession.

WHEREFORE, on Count VII, Plaintiffs 332 Fund and 326 Fund request that this Court provide the following relief against Defendant David Albertelli:

a) Grant Plaintiffs compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

### COUNT VIII – THEFT BY CONTRACTOR - MINN. STAT. § 514.02

273. The allegations of paragraphs 1-14, 15-47, 54-56, 116-123, and 202-222 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in

DM1\7930086.4

this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

274. ACI received payments from the 298 Fund on the Savage Project and from 326 Fund on the Rochester Project that ACI requested for subcontractors who "furnished … labor, skill, material or machinery to the [Projects]".

275. David Albertelli and ACI failed to use those payments to pay the subcontractors, knew the subcontractors where unpaid, failed to provide a lien waiver under Minnesota Statutes section 514.07, and failed to provide a payment bond.

276. 298 Fund and 326 Fund gave written notice to David Albertelli and ACI that subcontractors were not paid. On information and belief, subcontractors gave written notice to David Albertelli and ACI that they were not paid.

277. Minnesota Statutes Section 514.02 provides, in pertinent part:

> **Subdivision 1. Proceeds of payments; acts constituting theft.** (a) Proceeds of payments received by a person contributing to an improvement to real estate within the meaning of section 514.01 shall be held in trust by that person for the benefit of those persons who furnished the labor, skill, material, or machinery contributing to the improvement. ….
>
> (b) **If a person fails to use the proceeds of a payment made to that person for the improvement, for the payment for labor, skill, material, and machinery contributed to the improvement**, **knowing that the cost** of the labor performed, or skill, material, or machinery furnished **remains unpaid**, and who **has not furnished the person making such payment either a valid lien waiver under section 514.07, or a payment bond** in the basic amount of the contract price for the improvement, conditioned for the prompt payment to any person entitled thereto for the performance of labor or the furnishing of skill, material, or machinery for the improvement, **shall be guilty of theft** of the proceeds of the payment and is punishable under section 609.52. ….

(c) ….
(d) ….

**Subd. 1a. Civil action. A person injured by a violation of subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney fees**, and receive other relief as determined by the court, including, without limitation, equitable tracing. A civil action under this subdivision may be brought:

(1) against the person who committed the theft under subdivision 1; and

(2) …..

* * *

278.　David Albertelli and ACI are guilty of theft of the proceeds of payments made for improvements on the Savage Project and Rochester Project.

279.　298 Fund was injured by David Albertelli and ACI's theft of the proceeds of payments made for improvements on the Savage Project.

280.　326 Fund was injured by David Albertelli and ACI's theft of the proceeds of payments made for improvements on the Rochester Project.

WHEREFORE, on Count VIII, Plaintiffs request that this Court provide the following relief against Defendants ACI and David Albertelli:

a)　Grant Plaintiffs compensatory damages, together with costs and disbursements, including costs of investigation and reasonable attorney fees, and other damages as shall be proven at trial;

b)　Grant Plaintiffs their attorneys' fees and costs; and

DM1\7930086.4

c) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT IX – BREACH OF SUBCONTRACTS

281. The allegations of paragraphs 1-14, 15-47, 54-56, 116-123, and 175-222 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

282. On information and belief, ACI entered into written subcontracts with each of its Subcontractors.

283. ACI had a contractual obligation to each Subcontractor to make the payments to that Subcontractor in the amount reflected in the October Payment Application and other payments.

284. Without just cause or right, ACI has failed and refused to pay the Subcontractors amounts due under the subcontracts for the October Payment Application and other payments, among other breaches.

285. The Subcontractors were damaged by ACI's breaches.

286. Certain Subcontractors assigned their claims related to the October Payment Application to 326 Fund, for the Rochester Project, and 332 Fund, for the Six Mile Project. 326 Fund paid certain Subcontractors amounts related to the Rochester Project and 332 Fund paid certain Subcontractors amounts related to the Six Mile Project,

DM1\7930086.4

and 326 Fund and 332 Fund are subrogated to the corresponding claims of those Subcontractors.

WHEREFORE, on Count IX, Plaintiffs 332 Fund and 326 Fund request that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiffs compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT X – FLORIDA PROMPT PAYMENT ACT VIOLATIONS

287. The allegations of paragraphs 1-14, 15-47, 54-56, 116-123, 175-201, and 218-222 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

288. Florida Statutes Section 715.12(2) ("Florida Prompt Payment Act") requires a contractor to pay its subcontractors within 14 days of receipt of payment for work done by the subcontractor on a construction project in Florida.

289. ACI received joint check payments for work done by its Subcontractors on the Six Mile Project for the October Payment Application on or before December 2, 2016. ACI deposited those payments, improperly, on or before December 8, 2016.

290. ACI did not pay certain of its Subcontractors on or before December 16, 2016.

291. ACI violated the Florida Prompt Payment Act.

DM1\7930086.4

292. The Subcontractors are entitled to statutory damages, in addition to receipt of payments, under the Florida Prompt Payment Act.

293. The Subcontractors have assigned the claims for statutory damages to 332 Fund.

WHEREFORE, on Count X, Plaintiff 332 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory, statutory, and other damages as shall be proven at trial;

b) Grant Plaintiff its attorneys' fees and costs; and

c) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

**COUNT XI – MINNESOTA PROMPT PAYMENT ACT VIOLATIONS**

294. The allegations of paragraph 273 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

295. Minnesota Statutes Section 337.10 subdivision 3 ("Minnesota Prompt Payment Act") requires a contractor to pay its subcontractors within 10 days of receipt of payment for work done by the subcontractor on a construction project in Minnesota.

296. ACI received joint check payments for work done by its Subcontractors on the Rochester Project for the October Payment Application on or before December 2, 2016. ACI deposited those payments, improperly, on or before December 8, 2016.

90

297. ACI did not pay certain of its Subcontractors on or before December 12, 2016.

298. ACI violated the Minnesota Prompt Payment Act.

299. The Subcontractors are entitled to statutory damages, in addition to receipt of payments, under the Minnesota Prompt Payment Act.

300. The Subcontractors have assigned the claims for statutory damages to 326 Fund.

WHEREFORE, on Count XI, Plaintiffs 326 Fund and 298 Fund request that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiffs compensatory, statutory, and other damages as shall be proven at trial;

b) Grant Plaintiffs their attorneys' fees and costs; and

c) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

### COUNT XII -BREACH OF CONTRACT – SAVAGE

301. The allegations of paragraphs 1-14, 17, 25-26, 30, 44-47, 117, 129, 132-148, 152-162, 167-175, 218-222, and 274-279 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

302. ACI owes 298 Fund the duties set forth in the Savage Contract, implied therein and implied as a matter of law.

91

303. ACI has breached many of the duties that it owes 298 Fund under the Savage Contract. ACI's breaches include but are not limited to the following:

    a. late delivery of buildings;

    b. defective construction;

    c. failing to comply with applicable codes and other laws;

    d. improper design of certain elements;

    e. failing to provide enough qualified supervisory personnel;

    f. failing to remedy defaults;

    g. failing to comply with applicable laws;

    h. failing to pay amounts due;

    i. failing to indemnify 298 Fund;

    j. failing to perform in good faith and with fair dealing;

    k. failing to fulfill other contractual obligations; and

    l. ACI and David Albertelli recorded a mechanics lien against the Savage Project and related real property that is grossly overstated, fraudulent, unenforceable and a breach of the Savage Contract.

304. 298 Fund has been damaged by and continues to be damaged by ACI's breaches.

305. 298 Fund has performed all obligations required of it under the Savage Contract which were not excused.

WHEREFORE, on Count XII, Plaintiff 298 Fund requests that this Court provide the following relief against Defendant ACI:

DM1\7930086.4

a) Grant Plaintiff compensatory and other damages as shall be proven at trial;

b) Declare the mechanics lien recorded by ACI and David Albertelli against the Savage Project to be void and unenforceable;

c) Order ACI and David Albertelli to immediately release the mechanics lien recorded by them against the Savage Project; and

d) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XIII - BREACH OF EXPRESS WARRANTY – SAVAGE

306.    The allegations of paragraph 301 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

307.    ACI owes 298 Fund express warranties as set forth in the Savage Contract. Those warranties include:

   a.   Materials and equipment would be of good quality;

   b.   The work will conform to the Contract Documents, including plans and specifications;

   c.   The work will be free of defects not permitted by the Contract Document;

   d.   Title to work covered in a Payment Application would pass no later than when payment was made; and

   e.   Work paid for by 298 Fund would be free of claims and liens of Subcontractors before ACI submitted the next Payment Application;

308. ACI has breached one or more of those warranties.

309. 298 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

WHEREFORE, on Count XIII, Plaintiff 298 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial;

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XIV - BREACH OF IMPLIED WARRANTY – SAVAGE

310. The allegations of paragraph 301 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

311. ACI owes 298 Fund warranties implied under the law. The implied warranties include:

a. An implied warranty of workmanlike quality;

b. An implied warranty of fitness for a particular purpose;

c. An implied warranty of merchantability; and

d. An implied warranty of habitability.

312. ACI has breached one or more of those warranties.

313. 298 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

DM1\7930086.4

WHEREFORE, on Count XIV, Plaintiff 298 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

### COUNT XV - PROFESSIONAL NEGLIGENCE – SAVAGE

314. The allegations of paragraph 301 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

315. ACI owes 298 Fund a duty to provide certain professional design service related to the Savage Project.

316. ACI owed 298 Fund a duty to provide those design service in conformance with the Savage Contract and with the skill and care normally employed by professional designers performing similar design and other professional services for similar projects in Minnesota.

317. ACI provided some of its professional services in breach of the applicable standard of care, including but not limited to ACI's design of certain foundations.

318. ACI's breaches caused 298 Fund to be damaged.

WHEREFORE, on Count XV, Plaintiff 298 Fund requests that this Court provide the following relief against Defendant ACI:

95

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial;

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## <u>COUNT XVI - BREACH OF CONTRACT – ROCHESTER</u>

319.    The allegations of paragraphs 1-14, 19-20, 25-26, 30, 44-47, 119, 130-148, 152-162, 167-175, 202-222, 274-280, 286, and 296 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

320.    ACI owes 326 Fund the duties set forth in the Rochester Contract, implied therein and implied as a matter of law.

321.    ACI has breached many of the duties that it owes 326 Fund under the Rochester Contract.  ACI's breaches include but are not limited to the following:

      a.  late delivery of buildings;

      b.  defective construction;

      c.  failing to comply with applicable codes and other laws;

      d.  improper design of certain elements;

      e.  failing to provide enough qualified supervisory personnel;

      f.  failing to remedy defaults;

      g.  failing to comply with applicable laws;

      h.  failing to pay amounts due;

i. failing to perform in good faith and with fair dealing;

j. failing to indemnify 326 Fund; and

k. failing to fulfill other contractual obligations.

322. 326 Fund has been damaged by and continues to be damaged by ACI's breaches.

323. 326 Fund has performed all obligations required of it under the Rochester Contract which were not excused.

WHEREFORE, on Count XVI, Plaintiff 326 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial;

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XVII - BREACH OF EXPRESS WARRANTY – ROCHESTER

324. The allegations of paragraph 319 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

325. ACI owes 326 Fund express warranties as set forth in the Rochester Contract. Those warranties include:

a. Materials and equipment would be of good quality;

b. The work will conform to the Contract Documents, including plans and specifications;

DM1\7930086.4

c. The work will be free of defects not permitted by the Contract Document;

d. Title to work covered in a Payment Application would pass no later than when payment was made; and

e. Work paid for by 326 Fund would be free of claims and liens of Subcontractors before ACI submitted the next Payment Application;

326. ACI has breached one or more of those warranties.

327. 326 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

WHEREFORE, on Count XVII, Plaintiff 326 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## <u>COUNT XVIII - BREACH OF IMPLIED WARRANTY – ROCHESTER</u>

328. The allegations of paragraph 319 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

329. ACI owes 326 Fund warranties implied under the law. The implied warranties include:

a. An implied warranty of workmanlike quality;

b. An implied warranty of fitness for a particular purpose;

DM1\7930086.4

c.  An implied warranty of merchantability; and

d.  An implied warranty of habitability.

330.  ACI has breached one or more of those warranties.

331.  326 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

WHEREFORE, on Count XVIII, Plaintiff 326 Fund requests that this Court provide the following relief against Defendant ACI:

a)  Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)  Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XIX - PROFESSIONAL NEGLIGENCE – ROCHESTER

332.  The allegations of paragraph 319 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

333.  ACI owes 326 Fund a duty to provide certain professional design and other professional services related to the Rochester Project.

334.  ACI owed 326 Fund a duty to provide those design service in conformance with the Rochester Contract and with the skill and care normally employed by professional designers performing similar professional services for similar projects in Minnesota.

DM1\7930086.4

335. ACI provided some of its professional services in breach of the applicable standard of care.

336. ACI's breaches caused 326 Fund to be damaged.

WHEREFORE, on Count XIX, Plaintiff 326 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XX - BREACH OF CONTRACT – SIX MILE

337. The allegations of paragraphs 1-14, 15-16, 25-26, 30, 44-47, 72, 116, 132-162, 167-174, 175-201, and 218-222 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

338. ACI owes 332 Fund the duties set forth in the Six Mile Contract, implied therein and implied as a matter of law.

339. ACI has breached many of the duties that it owes 332 Fund under the Six Mile Contract. ACI's breaches include but are not limited to the following:

a. late delivery of buildings;

b. defective construction;

c. failing to comply with applicable codes and other laws;

DM1\7930086.4

d.  improper design of certain elements;

e.  failing to provide enough qualified supervisory personnel;

f.  failing to remedy defaults;

g.  failing to comply with applicable laws;

h.  failing to pay amounts due;

i.  failing to perform in good faith and with fair dealing;

j.  failing to indemnify 332 Fund; and

k.  failing to fulfill other contractual obligations.

340.  On the Six Mile Project, ACI failed to provide project management services that met the applicable standard of care and contractual obligations by, among other things, hiring properly licensed Subcontractors.  For example, ACI was cited for a violation for using and unlicensed painter in Lee County Building Code Violation case number VIO2016-06575, and an unlicensed siding contractor in case number VIO2016-04534.

341.  332 Fund has been damaged by and continues to be damaged by ACI's breaches.

342.  332 Fund has performed all obligations required of it under the Six Mile Contract which were not excused.

WHEREFORE, on Count XX, Plaintiff 332 Fund requests that this Court provide the following relief against Defendant ACI:

a)  Grant Plaintiff compensatory and other damages as shall be proven at trial; and

DM1\7930086.4

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

**COUNT XXI- BREACH OF EXPRESS WARRANTY – SIX MILE**

343. The allegations of paragraph 337 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

344. ACI owes 332 Fund express warranties as set forth in the Six Mile Contract. Those warranties include:

    a. Materials and equipment would be of good quality;

    b. The work will conform to the Contract Documents, including plans and specifications;

    c. The work will be free of defects not permitted by the Contract Document;

    d. Title to work covered in a Payment Application would pass no later than when payment was made; and

    e. Work paid for by 332 Fund would be free of claims and liens of Subcontractors before ACI submitted the next Payment Application.

345. ACI has breached one or more of those warranties.

346. 326 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

WHEREFORE, on Count XXI, Plaintiff 332 Fund requests that this Court provide the following relief against Defendant ACI:

DM1\7930086.4

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## <u>COUNT XXII - BREACH OF IMPLIED WARRANTY – SIX MILE</u>

347. The allegations of paragraph 337 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

348. ACI owes 332 Fund warranties implied under the law. The implied warranties include:

a. An implied warranty of workmanlike quality;

b. An implied warranty of fitness for a particular purpose;

c. An implied warranty of merchantability; and

d. An implied warranty of habitability.

349. ACI has breached one or more of those warranties.

350. 332 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

WHEREFORE, on Count XXII, Plaintiff 332 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

103

## COUNT XXIII - PROFESSIONAL NEGLIGENCE – SIX MILE

351. The allegations of paragraph 337 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

352. ACI owes 332 Fund a duty to provide certain professional design and other professional services related to the Six Mile Project.

353. ACI owed 332 Fund a duty to provide those design service in conformance with the Six Mile Contract and with the skill and care normally employed by professional designers performing similar services for similar projects in Florida.

354. ACI provided some of its professional services in breach of the applicable standard of care.

355. ACI's breaches caused 332 Fund to be damaged.

WHEREFORE, on Count XXIII, Plaintiff 332 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXIV - BREACH OF CONTRACT – NEW BRAUNFELS

356. The allegations of paragraphs 1-14, 18, 25-26, 30, 44-47, 118, 130-148, 152-174, and 218-222 above are incorporated as though set forth in full herein as the

DM1\7930086.4

allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

357. ACI owes 306 Fund the duties set forth in the New Braunfels Contract, implied therein and implied as a matter of law.

358. ACI has breached many of the duties that it owes 306 Fund under the New Braunfels Contract. ACI's breaches include but are not limited to the following:

    a.  late delivery of buildings;

    b.  defective construction;

    c.  failing to comply with applicable codes and other laws;

    d.  improper design of certain elements;

    e.  failing to provide enough qualified supervisory personnel;

    f.  failing to remedy defaults;

    g.  failing to comply with applicable laws;

    h.  failing to pay amounts due;

    i.  failing to perform in good faith and with fair dealing;

    j.  failing to indemnify 306 Fund; and

    k.  failing to fulfill other contractual obligations.

359. 306 Fund has been damaged by and continues to be damaged by ACI's breaches.

360. 306 Fund has performed all obligations required of it under the New Braunfels Contract which were not excused.

DM1\7930086.4

WHEREFORE, on Count XXIV, Plaintiff 306 Fund requests that this Court provide the following relief against Defendant ACI:

a)  Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)  Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXV - BREACH OF EXPRESS WARRANTY – NEW BRAUNFELS

361.    The allegations of paragraph 356 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

362.    ACI owes 306 Fund express warranties as set forth in the New Braunfels Contract.  Those warranties include:

a.  Materials and equipment would be of good quality;

b.  The work will conform to the Contract Documents, including plans and specifications;

c.  The work will be free of defects not permitted by the Contract Document;

d.  Title to work covered in a Payment Application would pass no later than when payment was made; and

e.  Work paid for by 306 Fund would be free of claims and liens of Subcontractors before ACI submitted the next Payment Application;

363.    ACI has breached one or more of those warranties.

DM1\7930086.4

364.     306 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

WHEREFORE, on Count XXV, Plaintiff 306 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXVI - BREACH OF IMPLIED WARRANTY – NEW BRAUNFELS

365.     The allegations of paragraph 356 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

366.     ACI owes 306 Fund warranties implied under the law. The implied warranties include:

a. An implied warranty of workmanlike quality;

b. An implied warranty of fitness for a particular purpose;

c. An implied warranty of merchantability; and

d. An implied warranty of habitability.

367.     ACI has breached one or more of those warranties.

368.     306 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

DM1\7930086.4

WHEREFORE, on Count XXVI, Plaintiff 306 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXVII - PROFESSIONAL NEGLIGENCE – NEW BRAUNFELS

369. The allegations of paragraph 356 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

370. ACI owes 306 Fund a duty to provide certain professional design and other professional services related to the New Braunfels Project.

371. ACI owed 306 Fund a duty to provide those services in conformance with the New Braunfels Contract and with the skill and care normally employed by professional designers performing similar services for similar projects in Texas.

372. ACI provided some of its design services and other professional services in breach of the applicable standard of care.

373. ACI's breaches caused 306 Fund to be damaged.

WHEREFORE, on Count XXVII, Plaintiff 306 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

DM1\7930086.4

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXVIII - BREACH OF CONTRACT – WACO

374. The allegations of paragraphs 1-14, 22, 25-26, 31-32, 44-47, 88-115, 122, 130-148, 152-162, 167-174, and 218-222 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

375. Westcore I or, in the alternative, Westcore II, or both ("Westcore") owe 347 Fund the duties set forth in the Waco Contract, implied therein and implied as a matter of law.

376. Westcore has breached many of the duties that it owes 347 Fund under the Waco Contract. Westcore's breaches include but are not limited to the following:

    a. late delivery of buildings;

    b. defective construction;

    c. failing to comply with applicable codes and other laws;

    d. improper design of certain elements;

    e. failing to provide enough qualified supervisory personnel;

    f. failing to remedy defaults;

    g. failing to comply with applicable laws;

    h. failing to pay amounts due;

    i. failing to perform in good faith and with fair dealing;

DM1\7930086.4

j.  failing to indemnify 347 Fund;

k.  violating contract document provisions related to the Americans with Disabilities Act;

l.  failing to install a fire-rated enclosure at stairwells;

m.  failing to install shoe moulding;

n.  installing the porch decks incorrectly;

o.  installing soffits incorrectly;

p.  Failing to install a fire rated enclosure in the demising wall system near the bath tubs;

q.  failing to correct or complete items on the punchlists;

r.  installing the sanitary sewer lift station incorrectly; and

s.  failing to fulfill other contractual obligations.

377.  347 Fund has been damaged by and continues to be damaged by Westcore's breaches.

378.  347 Fund has performed all obligations required of it under the Waco Contract which were not excused.

WHEREFORE, on Count XXVIII Plaintiff 347 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

a)  Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)  Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

DM1\7930086.4

## COUNT XXIX - BREACH OF EXPRESS WARRANTY – WACO

379.     The allegations of paragraph 374 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

380.     Westcore I or, in the alternative, Westcore II, or both owe 347 Fund express warranties as set forth in the Waco Contract.  Those warranties include:

    a.  Materials and equipment would be of good quality;

    b.  The work will conform to the Contract Documents, including plans and specifications;

    c.  The work will be free of defects not permitted by the Contract Document;

    d.  Title to work covered in a Payment Application would pass no later than when payment was made; and

    e.  Work paid for by 306 Fund would be free of claims and liens of Subcontractors before Westcore submitted the next Payment Application;

381.     Westcore has breached one or more of those warranties.

382.     347 Fund has been damaged by and continues to be damaged by Westcore's breaches of warranties.

WHEREFORE, on Count XXIX, Plaintiff 347 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

    a)  Grant Plaintiff compensatory and other damages as shall be proven at trial; and

DM1\7930086.4

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## **COUNT XXX -  BREACH OF IMPLIED WARRANTY – WACO**

383. The allegations of paragraph 374 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

384. Westcore I or, in the alternative, Westcore II, or both owe 347 Fund warranties implied under the law. The implied warranties include:

   a. An implied warranty of workmanlike quality;

   b. An implied warranty of fitness for a particular purpose;

   c. An implied warranty of merchantability; and

   d. An implied warranty of habitability.

385. Westcore has breached one or more of those warranties.

386. 347 Fund has been damaged by and continues to be damaged by Westcore's breaches of warranties.

WHEREFORE, on Count XXX, Plaintiff 347 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

112

## COUNT XXXI - PROFESSIONAL NEGLIGENCE – WACO

387.     The allegations of paragraph 374 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

388.     Westcore I or, in the alternative, Westcore II, or both owe 347 Fund a duty to provide certain professional design and other professional services related to the Waco Project.

389.     Westcore owed 347 Fund a duty to provide those services in conformance with the Waco Contract and with the skill and care normally employed by professional designers performing similar services for similar projects in Texas.

390.     Westcore provided some of its design services and other professional services in breach of the applicable standard of care.

391.     Westcore's breaches caused 347 Fund to be damaged.

WHEREFORE, on Count XXXI, Plaintiff 347 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

a)   Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b)   Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

**COUNT XXXII - BREACH OF CONTRACT – BRYAN**

392. The allegations of paragraphs 1-14, 21, 25-26, 31-32, 44-47, 88-115, 121, 130-148, 152-162, 167-174, and 218-222 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

393. Westcore I or, in the alternative, Westcore II, or both owe 355 Fund the duties set forth in the Bryan Contract, implied therein and implied as a matter of law.

394. Westcore has breached many of the duties that it owes 355 Fund under the Bryan Contract. Westcore's breaches include but are not limited to the following:

    a. late delivery of buildings;

    b. defective construction;

    c. failing to comply with applicable codes and other laws;

    d. improper design of certain elements;

    e. failing to provide enough qualified supervisory personnel;

    f. failing to remedy defaults;

    g. failing to comply with applicable laws;

    h. failing to pay amounts due;

    i. failing to perform in good faith and with fair dealing;

    j. failing to indemnify 355 Fund;

    k. violating contract document provisions related to the Americans with Disabilities Act;

114

l.  failing to install a fire-rated enclosure at stairwells;

m.  failing to install shoe moulding;

n.  installing the porch decks incorrectly;

o.  installing soffits incorrectly;

p.  Failing to install a fire rated enclosure in the demising wall system near the bath tubs;

q.  failing to correct or complete items on the punchlists; and

r.  failing to fulfill other contractual obligations.

395.    355 Fund has been damaged by and continues to be damaged by Westcore's breaches.

396.    355 Fund has performed all obligations required of it under the Bryan Contract which were not excused.

WHEREFORE, on Count XXXII, Plaintiff 355 Fund requests that this Court provide the following relief against Defendant Westcore:

a)  Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)  Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXXIII - BREACH OF EXPRESS WARRANTY – BRYAN

397.    The allegations of paragraph 392 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

DM1\7930086.4

398. Westcore I or, in the alternative, Westcore II, or both owe 355 Fund express warranties as set forth in the Bryan Contract. Those warranties include:

    a. Materials and equipment would be of good quality;

    b. The work will conform to the Contract Documents, including plans and specifications;

    c. The work will be free of defects not permitted by the Contract Document;

    d. Title to work covered in a Payment Application would pass no later than when payment was made; and

    e. Work paid for by 355 Fund would be free of claims and liens of Subcontractors before Westcore submitted the next Payment Application;

399. Westcore has breached one or more of those warranties.

400. 355 Fund has been damaged by and continues to be damaged by Westcore's breaches of warranties.

WHEREFORE, on Count XXXIII, Plaintiff 355 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

    a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

    b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

### COUNT XXXIV - BREACH OF IMPLIED WARRANTY – BRYAN

401. The allegations of paragraph 392 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such

DM1\7930086.4

paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

402. Westcore I or, in the alternative, Westcore II, or both owe 355 Fund warranties implied under the law. The implied warranties include:

    a. An implied warranty of workmanlike quality;

    b. An implied warranty of fitness for a particular purpose;

    c. An implied warranty of merchantability; and

    d. An implied warranty of habitability.

403. Westcore has breached one or more of those warranties.

404. 355 Fund has been damaged by and continues to be damaged by Westcore's breaches of warranties.

WHEREFORE, on Count XXXIV, Plaintiff 355 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

    a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

    b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

### COUNT XXXV - PROFESSIONAL NEGLIGENCE – BRYAN

405. The allegations of paragraph 392 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

117

406. Westcore I or, in the alternative, Westcore II, or both owe 355 Fund a duty to provide certain professional design and other professional services related to the Bryan Project.

407. Westcore owed 355 Fund a duty to provide those services in conformance with the Bryan Contract and with the skill and care normally employed by professional designers performing similar services for similar projects in Texas.

408. Westcore provided some of its design services and other professional services in breach of the applicable standard of care.

409. Westcore's breaches caused 355 Fund to be damaged.

WHEREFORE, on Count XXXV, Plaintiff 355 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXXVI - BREACH OF CONTRACT – LONGMONT

410. The allegations of paragraphs 1-14, 23, 25-26, 31-32, 44-47, 88-115, 123, 130-148, 152-162, 167-174, and 218-222 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

DM1\7930086.4

411. Westcore I or, in the alternative, Westcore II, or both owe 342 Fund the duties set forth in the Longmont Contract, implied therein and implied as a matter of law.

412. Westcore has breached many of the duties that it owes 342 Fund under the Longmont Contract. Westcore's breaches include but are not limited to the following:

   a. late delivery of buildings;

   b. defective construction;

   c. failing to comply with applicable codes and other laws;

   d. improper design of certain elements;

   e. failing to provide enough qualified supervisory personnel;

   f. failing to remedy defaults;

   g. failing to comply with applicable laws;

   h. failing to pay amounts due;

   i. failing to perform in good faith and with fair dealing;

   j. failing to indemnify 342 Fund;

   k. failing to fulfill other contractual obligations and,

   l. failure to pay the municipal use tax.

413. 342 Fund has been damaged by and continues to be damaged by Westcore's breaches.

414. 342 Fund has performed all obligations required of it under the Longmont Contract which were not excused.

WHEREFORE, on Count XXXVI, Plaintiff 342 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

DM1\7930086.4

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXXVII - BREACH OF EXPRESS WARRANTY – LONGMONT

415.    The allegations of paragraph 410 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

416.    Westcore I or, in the alternative, Westcore II, or both owe 342 Fund express warranties as set forth in the Longmont Contract.  Those warranties include:

   a. Materials and equipment would be of good quality;

   b. The work will conform to the Contract Documents, including plans and specifications;

   c. The work will be free of defects not permitted by the Contract Document;

   d. Title to work covered in a Payment Application would pass no later than when payment was made; and

   e. Work paid for by 342 Fund would be free of claims and liens of Subcontractors before Westcore submitted the next Payment Application;

417.    Westcore has breached one or more of those warranties.

418.    342 Fund has been damaged by and continues to be damaged by Westcore's breaches of warranties.

DM1\7930086.4

WHEREFORE, on Count XXXVII, Plaintiff 342 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

c) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

d) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XXXVIII -  BREACH OF IMPLIED WARRANTY – LONGMONT

419.    The allegations of paragraph 410 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

420.    Westcore I or, in the alternative, Westcore II, or both owe 342 Fund warranties implied under the law.  The implied warranties include:

a. An implied warranty of workmanlike quality;

b. An implied warranty of fitness for a particular purpose;

c. An implied warranty of merchantability; and

d. An implied warranty of habitability.

421.    Westcore has breached one or more of those warranties.

422.    342 Fund has been damaged by and continues to be damaged by Westcore's breaches of warranties.

DM1\7930086.4

WHEREFORE, on Count XXXVIII, Plaintiff 342 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

c) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

d) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

### COUNT XXXIX - PROFESSIONAL NEGLIGENCE – LONGMONT

423. The allegations of paragraph 410 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

424. Westcore I or, in the alternative, Westcore II, or both owe 342 Fund a duty to provide certain professional design and other professional services related to the Longmont Project.

425. Westcore owed 342 Fund a duty to provide those services in conformance with the Longmont Contract and with the skill and care normally employed by professional designers performing similar services for similar projects in Colorado.

426. Westcore provided some of its design services and other professional services in breach of the applicable standard of care.

427. Westcore's breaches caused 342 Fund to be damaged.

WHEREFORE, on Count XXXIX, Plaintiff 342 Fund requests that this Court provide the following relief against Defendants Westcore I or, in the alternative, Westcore II, or both:

DM1\7930086.4

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XL - BREACH OF CONTRACT – LEXINGTON

428. The allegations of paragraphs 1-14, 24-26, 30, 44-417, and 120 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

429. ACI owes 245 Fund the duties set forth in the Lexington Contract, implied therein and implied as a matter of law.

430. ACI has breached many of the duties that it owes 245 Fund under the Lexington Contract. ACI's breaches include but are not limited to the following:

a. defective construction;

b. failing to comply with applicable codes, other laws and contract document requirements related to the Americans with Disabilities Act;

c. failing to indemnify 245 Fund; and

d. failing to fulfill other contractual obligations.

431. 245 Fund has been damaged by and continues to be damaged by the diminution in value of the Lexington Project due to ACI's breaches.

DM1\7930086.4

432. 245 Fund has performed all obligations required of it under the Lexington Contract which were not excused.

WHEREFORE, on Count XL, Plaintiff 245 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XLI - BREACH OF EXPRESS WARRANTY – LEXINGTON

433. The allegations of paragraph 428 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

434. ACI owes 245 Fund express warranties as set forth in the Lexington Contract. Those warranties include:

a. Materials and equipment would be of good quality;

b. The work will conform to the Contract Documents, including plans and specifications; and

c. The work will be free of defects not permitted by the Contract Document;

435. ACI has breached one or more of those warranties.

436. 245 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

124

WHEREFORE, on Count XLI, Plaintiff 245 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XLII -  BREACH OF IMPLIED WARRANTY – LEXINGTON

437.    The allegations of paragraph 428 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

438.    ACI owes 245 Fund warranties implied under the law.  The implied warranties include:

a. An implied warranty of workmanlike quality;

b. An implied warranty of fitness for a particular purpose;

c. An implied warranty of merchantability; and

d. An implied warranty of habitability.

439.    ACI has breached one or more of those warranties.

440.    245 Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

WHEREFORE, on Count XLII, Plaintiff 245 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

DM1\7930086.4

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT XLIII - PROFESSIONAL NEGLIGENCE – LEXINGTON

441.     The allegations of paragraph 428 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

442.     ACI owes 245 Fund a duty to provide certain professional design and other professional services related to the Lexington Project.

443.     ACI owed 245 Fund a duty to provide those services in conformance with the Lexington Contract and with the skill and care normally employed by professional designers performing similar services for similar projects in Kentucky.

444.     ACI provided some of its design services and other professional services in breach of the applicable standard of care.

445.     ACI's breaches caused 245 Fund to be damaged.

WHEREFORE, on Count XLIII, Plaintiff 245 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

DM1\7930086.4

## COUNT XLIV – SLANDER OF TITLE - SIX MILE

446. The allegations of paragraph 337 above are incorporated as though set forth in full herein as the allegations in this paragraph. Any defined term used in such paragraphs shall have the meaning defined in this Second Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

447. ACI recorded a mechanics lien against the Six Mile Project that includes in excess of $1,000,000.00 for payments to subcontractors that ACI did not make, which 332 Fund has paid directly to subcontractors directly.

448. The lien is overstated, fraudulent and unenforceable.

449. 332 Fund has informed ACI of the overstatement. ACI has not reduced its lien or released any part of the lien.

450. 332 Fund continues to be damaged by the fraudulent and overstated lien that ACI has recorded against the Six Mile Project.

WHEREFORE, on Count XLIV, Plaintiff 332 Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial;

b) Declare the lien void and unenforceable;

c) Order ACI to release its mechanics lien; and

d) Grant such other and further relief in favor of 332 Fund as this Court deems just and proper.

DM1\7930086.4

Respectfully Submitted,

**DUANE MORRIS LLP**
*Trial Counsel for Plaintiffs*
*CONTINENTAL 332 FUND, LLC,*
*CONTINENTAL 298 FUND LLC,*
*CONTINENTAL 306 FUND LLC,*
*CONTINENTAL 326 FUND LLC,*
*CONTINENTAL 347 FUND, LLC,*
*CONTINENTAL 355 FUND LLC,*
*CONTINENTAL 342 FUND LLC, and*
*CONTINENTAL 245 FUND LLC*
190 S. LaSalle St., #3700
Chicago, IL 60603
Tel: 312.499-6782
Fax: 312.499.6701


By: s/ *Jeffrey L. Hamera*
     (*pro hac vice*)
     jlhamera@duanemorris.com


| | |
|---|---|
| Larry Selander (*pro hac vice*) | Alvin D. Lodish |
| Duane Morris LLP | Duane Morris LLP |
| 190 S. LaSalle St., #3700 | 200 S. Biscayne Blvd., #3400 |
| Chicago, IL  60603 | Miami, FL  33131 |
| Phone: 312-499-0147 | 305.960.2318 |
| lselander@duanemorris.com | Florida Bar No.: 622273 |
| | slodish@duanemorris.com |

*Pro Hac Vice* Counsel for Plaintiffs
**CONTINENTAL 332 FUND, LLC, CONTINENTAL 298 FUND LLC,**
**CONTINENTAL 306 FUND LLC, CONTINENTAL 326 FUND LLC,**
**CONTINENTAL 347 FUND, LLC, CONTINENTAL 355 FUND LLC,**
**CONTINENTAL 342 FUND LLC, CONTINENTAL 245 FUND LLC**

DM1\7930086.4

# VERIFICATION

I, Anthony Hazkial, the undersigned, certify that I am authorized to make this Verification, and that, to the best of my current knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the factual contentions set forth in the foregoing "Second Amended Verified Complaint for Damages Under R.I.C.O. and Other Relief" have evidentiary support or, with respect to matters therein stated to be on information and belief, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Pursuant to 28 U.S.C. §1746, I state under penalty of perjury that the foregoing is true and correct.

Executed on:   July 11, 2017

Anthony Hazkial
Corporate Counsel
Continental Properties Company, Inc.,
as Manager of
Continental 298 Fund LLC
Continental 306 Fund LLC
Continental 326 Fund LLC
Continental 332 Fund LLC
Continental 347 Fund LLC
Continental 355 Fund LLC
Continental 342 Fund LLC
Continental 245 Fund LLC

DM1\7508225.3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 11, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

*Jeffrey L. Hamera*