## THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

CONTINENTAL 332 FUND, LLC,
CONTINENTAL 298 FUND LLC,
CONTINENTAL 306 FUND LLC,
CONTINENTAL 326 FUND, LLC,
CONTINENTAL 347 FUND LLC,
CONTINENTAL 355 FUND LLC,
CONTINENTAL 342 FUND LLC, and
CONTINENTAL 245 FUND LLC,

        Plaintiffs,

v.                              Case No. 2:17cv41-FtM-38MRM

DAVID ALBERTELLI,
ALBERTELLI CONSTRUCTION INC.,
GEORGE ALBERTELLI, WESTCORE
CONSTRUCTION, LLC (Del.), WESTCORE
CONSTRUCTION, L.L.C. (Nev.),
FOUNDATION MANAGEMENT LLC,
NATIONAL FRAMING, LLC, KMM
CONSTRUCTION LLC, MFDC LLC, TEAM
CCR, LLC, BROOK KOZLOWSKI, JOHN
SALAT, KEVIN BURKE, KERRY
HELTZEL, AMY BUTLER, and US
CONSTRUCTION TRUST,

        Defendants.

_____/

---

## THIRD AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES UNDER RICO AND OTHER THEORIES

---

## TABLE OF CONTENTS

I.    **Summary of the Case** ...................................................................................1

II.   **The Parties** ......................................................................................................5

     A.     **The Plaintiffs** ......................................................................... 5

     B.     **The Defendants** ...................................................................... 6

     C.     **Dismissed Defendants** .......................................................... 9

III.   **The Underlying Construction Contracts** ....................................................9

IV.   **Jurisdiction and Venue** ...............................................................................13

**COUNT 1 – RICO – AGAINST ALL DEFENDANTS** ..........................................14

     A.     **Overview of Plaintiffs' RICO Case** .................................... 14

     B.     **ACI, Westcore I, Westcore II and the Albertellis Bribed Eguizabal to Get Work and Favorable Treatment** ................ 16

           B-1.    **The Albertelli - Eguizabal Connection** ................................ 16

           B-2.    **Hatching the Bribery Scheme** ................................ 16

           B-3.    **The First Bribes on the New Deal** ........................ 17

           B-4.    **Establishing a Corporate Structure for Bribes: MFDC and Bravo21** .............................................. 17

           B-5.    **The Bribes were a Permanent Way of Doing Business for the Corrupt Enterprise** ........................... 18

           B-6.    **The Totality of the Bribes** .................................... 19

           B-7.    **Misrepresentations and Omissions Perpetuating the Bribes** ............. 19

           B-8.    **What the Corrupt Enterprise Gained From the Bribes** ...................... 20

     C.     **David Albertelli, Brook Kozlowski, Gregory Hilz and Others Falsified a Qualification Statement and Financials for Westcore** ................................. 20

     D.     **Examples of ACI, Westcore I and other Members of the Corrupt Enterprise Defrauding Plaintiffs** ........................ 24

i

D-1. **Example 1 - ACI Misled the Savage Fund by Agreeing to Change Order 10 to Induce a Payment but then Filing a Delay Claim and Lien** ........................................................ 25

D-2. **Example 2 - National Framing – Six Mile; Fraud by Subcontractor** ........................................................ 26

D-3. **Example 3 - Defendants Improper Self-Dealing on Savage and Rochester** ........................................................ 28

D-4. **Example 4 - Westcore II – Ghost Company; Fraudulent Diversion of Payments** ........................................................ 29

D-5. **Example 5 - Team CCR – A Sham Subcontractor** ........................................................ 31

D-6. **Example 6 - Fraud Involving Peal & Associates and Framing USA on the Waco Project.** ........................................................ 34

E. **Albertellis Infiltrate Fasanelli Construction; the Bribery and Fraud Continue** ........................................................ 36

F. **Defendants Stole Joint Checks That Were Intended to be Paid to Subcontractors** ........................................................ 37

F-1. **Six Mile Project – Theft of Joint Checks** ........................................................ 38

F-2. **Rochester Project – Theft of Joint Checks** ........................................................ 40

F-3. **Malice & Intent** ........................................................ 41

F-4. **What Defendants Obtained** ........................................................ 42

G. **Specific Acts of the Defendants as Part of the Corrupt Enterprise** ........................................................ 42

G-1. **Specific Predicate Acts of Each Defendant** ........................................................ 43

G-2. **Other Victims** ........................................................ 54

H. **Racketeering Predicate Acts** ........................................................ 55

**COUNT 2 - FLORIDA RICO AND CIVIL REMEDIES FOR CRIMINAL ACTIVITIES – AGAINST ALL DEFENDANTS** ........................................................ 59

**COUNT 3 - FLORIDA RICO AND FLORIDA CIVIL REMEDIES FOR CRIMINAL ACTIVITIES – CONSPIRACY – AGAINST ALL DEFENDANTS** ........................................................ 62

**COUNT 4 - CIVIL THEFT (Fla. Stat. 772.11) – AGAINST ACI, GEORGE ALBERTELLI AND DAVID ALBERTELLI** ........................................................ 63

ii

**COUNT 5 -  COMMON LAW FRAUD – AGAINST  ALL DEFENDANTS** ........................65

    **A.**    **Fraud through Bribery** ...................................................... 65

    **B.**    **Creation of Non-Existent Subcontractors to Steal Money from Plaintiffs** .................................................................. 66

    **C.**    **Falsified Westcore I Qualification Statement and Financials** ....................... 67

    **D.**    **Theft of Joint Checks** ......................................................... 68

**COUNT 6 - COMMON LAW CONSPIRACY TO COMMIT FRAUD –  AGAINST ALL DEFENDANTS** ..................................................................69

**COUNT 7 - CONVERSION - AGAINST DAVID ALBERTELLI AND ACI** ......................69

**COUNT 8 – THEFT BY CONTRACTOR -  MINN. STAT. § 514.02 – AGAINST ACI** ........................................................................................70

**COUNT 9 – BREACH OF SUBCONTRACTS – AGAINST ACI** ..........................................72

**COUNT 10 – FLORIDA PROMPT PAYMENT ACT  VIOLATIONS –AGAINST ACI** ...............................................................................................76

**COUNT 11 – MINNESOTA PROMPT PAYMENT ACT VIOLATIONS – AGAINST ACI** ..........................................................................................77

**COUNT 12 - BREACH OF CONTRACT – SAVAGE – AGAINST ACI** ............................77

**COUNT 13 - PROFESSIONAL NEGLIGENCE – SAVAGE – AGAINST ACI** .................81

**COUNT 14 - BREACH OF CONTRACT – ROCHESTER- AGAINST ACI** ......................82

**COUNT 15 - BREACH OF CONTRACT – SIX MILE – AGAINST ACI** ...........................85

**COUNT 16 - BREACH OF IMPLIED WARRANTY – SIX MILE – AGAINST ACI** ........89

**COUNT 17 - BREACH OF CONTRACT – NEW BRAUNFELS – AGAINST ACI** ...........90

**COUNT 18 - BREACH OF CONTRACT – WACO – AGAINST WESTCORE I** .............92

**COUNT 19 - BREACH OF CONTRACT – BRYAN – AGAINST WESTCORE I** .............95

**COUNT 20 - BREACH OF CONTRACT – LONGMONT –  AGAINST WESTCORE I** ........................................................................................97

**COUNT 21 - BREACH OF CONTRACT – LEXINGTON – AGAINST ACI** ......................99

Plaintiffs, Continental 332 Fund LLC, Continental 298 Fund LLC, Continental 306 Fund LLC, Continental 326 Fund LLC, Continental 347 Fund LLC, Continental 355 Fund LLC, Continental 342 Fund LLC, and Continental 245 Fund LLC,  (hereinafter referred to as a "Fund" or "Plaintiff", and collectively as "Funds" or "Plaintiffs"), for their Third Amended Verified Complaint for Damages Under R.I.C.O. and Other Relief against Defendants George Albertelli, David Albertelli, Albertelli Construction, Inc. ("ACI"), Westcore Construction, LLC (Del.) ("Westcore I"), Westcore Construction, L.L.C. (Nev.) ("Westcore II"); Foundation Management, LLC (which also does business as Foundation Management Services) ("Foundation Management"), National Framing, LLC ("National Framing"), KMM Construction LLC ("KMM"), MFDC, LLC ("MFDC"), Team CCR, LLC ("Team CCR"), Brook Kozlowski, John Salat, Kevin Burke, Kerry Heltzel, Amy Butler, and US Construction Trust state as follows:

I.      **Summary of the Case**

1.      George Albertelli is the founder and CEO of Albertelli Construction, Inc. ("ACI"), a commercial construction contractor based in Jacksonville, Florida.  He founded the business 21 years ago, and later brought in his son, David Albertelli, who joined the organization as Vice President and at some time became a minority owner of ACI.

2.      A third construction executive who is also central to the RICO violations in this case – Mr. Angelo Eguizabal – previously worked for George Albertelli and with David Albertelli at a contractor where unlawful bribes, expensive gifts, and kickbacks were used to obtain construction contracts and to retain clients.

3.      In November 2007, Angelo Eguizabal was hired by Continental Properties, a large development and property management company, as its Vice President of Construction. Continental is a national company headquartered in Wisconsin that has developed projects in 24 states across the U.S.  By 2017, Continental had developed or broken ground on more than 20,000

1

apartment homes. During the years after Eguizabal was hired, the development of residential apartment complexes became an increasingly significant business for Continental, which is what eventually brought the Albertellis calling.

4.     Before Continental hired Eguizabal, neither ACI nor any other Albertelli-controlled entity had done construction or any other work for Continental. But given the past experience of Eguizabal and George and David Albertelli with the use of bribes and kickbacks to win construction contracts – and given that Eguizabal was now not only inside a major development company, but also as head of construction was in a pivotal position to steer business and influence contract awards, terms and implementation – it was not long before the Albertellis were bribing Eguizabal to obtain work from Continental. Beginning in 2011, David and George Albertelli gave several small bribes to Eguizabal.

5.     But then, in early 2013, the three took the corrupt scheme to a new level. Hatched during a meeting in Jacksonville, Florida, both George and David Albertelli confirmed that ACI would pay bribes or kickbacks to Eguizabal for up to 2% of the value of the contracts awarded by Continental to ACI.

6.     Eguizabal accepted the Albertellis' corrupt offer. By May 2013 the Albertellis had raised the stakes and paid Eguizabal a bribe of $30,000. Less than three months later, Eguizabal fulfilled his part in the unlawful conspiracy by using his influential post as Vice President for Construction at Continental to help arrange for ACI to be awarded the contract to build an apartment complex in Lexington, Kentucky – a contract worth $16,192,014.

7.     The bribes continued and more construction contracts were awarded by Continental to ACI. Although Continental was not aware of the bribes, ACI's poor job performance and late delivery of projects eventually caused Continental to decide to award no new contracts to ACI and

the Albertellis.  The Albertellis and ACI responded by doubling down on their illegal conduct, and expanded the conspiracy to recruit new front men and create sham construction companies.

8.      David Albertelli recruited Gregory Hilz, the owner of an occasional ACI subcontractor, to form Westcore Construction, LLC (Westcore I), to continue the bribery and fraud begun by ACI and the Albertellis.  To obtain Continental's approval of Westcore I as an acceptable general contractor, David Albertelli and others created and submitted to Continental a sworn qualification statement that consisted almost entirely of lies:  that the newly created Westcore I had total assets of $69,433,530; 23 years of construction experience; and a bonding capacity of $325 million, when it actually had no assets and had not performed a single job.  David Albertelli even sought a banker to assist their criminal actions and falsely "vouch for us having $10MM in a bank account that has $100".  David Albertelli intentionally hid his ownership in Westcore I from Continental because he knew Continental would not give Westcore I any work if Continental knew he was involved.

9.      Continental relied on the truth of the phony qualification statement and awarded a contract to Westcore I.  Westcore I continued to bribe Eguizabal and was awarded two more contracts.

10.     The Albertellis were relentless in their pursuit of Continental contracts.  Even while chasing work as Westcore, the Albertellis ingratiated themselves with Fabio Fasanelli, an owner of Florida based construction companies doing business with Continental.  Albertelli created new companies (referred to as the "New Fasanelli Companies") to mirror the original Fasanelli companies, but hid his ownership in them from Continental.  Albertelli, via the New Fasanelli Companies, then bribed Eguizabal to get two contracts for the newly formed companies and such companies failed to perform.

3

11.     During the course of the Defendants' illegal conduct, they devised and carried out a series of elaborate and unlawful schemes, including:

    a.   bribing Eguizabal to obtain contracts for ACI, Westcore I and the New Fasanelli Companies and to arrange favorable financial terms and treatment from Plaintiffs on change orders and assessments of liquidated damages,

    b.   inventing a series of sham subcontractors and submitting false payment applications to divert construction payments from the rightful recipients to the Defendants,

    c.   stealing outright over $2 million by illegally converting Joint Checks issued by Continental, which were intended to be paid to legitimate subcontractors which had performed the actual work.

12.     The Albertellis did not act alone.  The schemes were assisted by the illegal conduct of accountants and administrators such as Amy Butler and Kerry Heltzel, and a team of men including Brook Kozlowski, John Salat, and Kevin Burke who secretly created, owned or controlled sham companies like KMM, MFDC, and Team CCR, and whose affirmative acts on behalf of the conspiracy ranged from assisting in receiving tens of millions of dollars of corruptly obtained and managed construction contracts to concealing the wrongdoing and involvement of the Albertellis from Continental.

13.     Because Defendants purposefully hid their wrongdoing from Continental and were aided by Eguizabal, Continental did not learn many of these facts until after Continental filed this lawsuit.  In fact, the bribery of Eguizabal, the involvement of the Albertellis in Westcore, and the complete fabrication of the sworn qualification statement submitted by Westcore were not discovered until just before the Second Amended Complaint was filed in this case.

14.     But in the end, the facts are not so mysterious.  Many of the most significant facts are not even in dispute.  Angelo Eguizabal is now cooperating with Continental, and has described in detail the bribery and other fraudulent schemes.  And Westcore I admitted when it filed a counterclaim in state court in Colorado that Westcore alone had paid "kickbacks totaling about

4

$1,000,000 on three projects."  All told, in their unlawful efforts to obtain construction contracts from Continental and the Plaintiffs, which are eight Continental-related Funds that held the major construction contracts at issue in this case, during the six years from 2011 to  2017 ACI, George Albertelli, David Albertelli, Westcore I, Brook Kozlowski, John Salat and Kevin Burke paid at least $1,464,735 in bribes to Continental's Vice President for Construction, Angelo Eguizabal – and each played roles in the looting and manipulation of construction contracts with a value of over $200 million dollars that are at issue in this case.  Because of the complexity of the schemes to extract money, the Plaintiffs are still learning the full extent of the damages they suffered.

15.     As such, Defendants' acts violate the commercial bribery and other statutes of multiple states.  Defendants committed and conspired to commit wire fraud, mail fraud, bank fraud, Federal RICO violations and common law fraud.  Defendants also breached every contract awarded to them and their surrogates, and committed professional negligence and other torts.  The total damages caused to Plaintiffs by Defendants are myriad and still undetermined, but upon information and belief, will exceed $10,000,000.

## II.     The Parties

### A.     The Plaintiffs

16.     Each Plaintiff (individually a "Fund" and collectively the "Funds") is a Wisconsin limited liability company with its principal place of business at W134N8675 Executive Parkway, Menomonee Falls, Wisconsin.  Each Fund is a special purpose entity that owns and is developing, or has developed, an apartment complex (individually a "Project" and collectively the "Projects") as follows:

a.     Continental 332 Fund LLC ("Six Mile Fund") owns and is developing Springs at Six Mile Cypress, Fort Myers, Florida ("Six Mile Project").

DM1\8519672.3

b. Continental 298 Fund LLC ("Savage Fund") owns and is developing Springs at Egan Drive, Savage, Minnesota ("Savage Project").

c. Continental 306 Fund LLC ("New Braunfels Fund") owns and developed Springs at Creekside, New Braunfels, Texas ("New Braunfels Project").

d. Continental 326 Fund LLC ("Rochester Fund") owns and is developing Springs at Rochester, and also known as the Springs at South Broadway, Rochester, Minnesota ("Rochester Project").

e. Continental 355 Fund LLC ("Bryan Fund") owns and is developing Springs at University Drive, Bryan, Texas ("Bryan Project").

f. Continental 347 Fund LLC ("Waco Fund") owns and is developing Springs at Cottonwood Creek, Waco, Texas ("Waco Project").

g. Continental 342 Fund LLC ("Longmont Fund") owns and is developing Springs at Sandstone Ranch, Longmont, Colorado ("Longmont Project").

h. Continental 245 Fund LLC ("Lexington Fund") owns and developed Springs at Winchester Road, Lexington, Kentucky ("Lexington Project").

17. Continental is the manager of each of the Funds.  Continental is not a plaintiff but acted on behalf of the Plaintiffs.

**B. The Defendants**

18. Albertelli Construction, Inc. ("ACI") is a Florida corporation owned in whole or in part by George and David Albertelli.  ACI has an office at 10751 Deerwood Park Boulevard, Jacksonville, Florida.

19. George Albertelli resides in Florida.  He is David Albertelli's father and the founder, past President and an owner of ACI. On information and belief, George Albertelli helped form and has an ownership interest in MFDC.

6

20.     David Albertelli resides in Florida.  David Albertelli is the President and an owner of ACI.  David Albertelli created, controls, influences and owns (in part or whole, directly or indirectly) the other corporate Defendants: MFDC LLC ("MFDC"), Foundation Management LLC ("Foundation Management"), National Framing, LLC ("National Framing"), KMM Construction LLC ("KMM"), Westcore Construction, LLC (Del.) ("Westcore I"), Westcore Construction, L.L.C. (Nev.) ("Westcore II"), and Team CCR.  On information and belief, David Albertelli is also the trustee and the beneficiary of defendant US Construction Trust.

21.     Brook Kozlowski, on information and belief, resides in Florida.  On information and belief, he is a manager, officer and owner of ACI, Foundation Management, Westcore I, and Westcore II.

22.     Westcore Construction, LLC ("Westcore I") is a Delaware limited liability company.  Westcore I was formed by David Albertelli and Gregory Hilz ("Hilz"), the owner of a subcontractor that had worked for ACI.  David Albertelli (through US Construction Trust), Hilz, and Kozlowski own Westcore I.

23.     Westcore Construction, L.L.C. ("Westcore II") is a Nevada limited liability company.  It has or had places of business in Jacksonville, Florida and Jacksonville Beach, Florida.  One or more of David Albertelli, John Salat, Brook Kozlowski, Kevin Burke and Foundation Management formed Westcore II for the purpose of diverting funds from Westcore I.

24.     MFDC, LLC ("MFDC") is a Delaware limited liability company.  It has a place of business at 10751 Deerwood Park Boulevard, Jacksonville, Florida.  MFDC was formed by or at the direction of George Albertelli and David Albertelli.  MFDC was used as a conduit for bribes to Eguizabal and Eguizabal's company, Bravo21, LLC.

7

25.     Team CCR, LLC ("Team CCR") is a Delaware limited liability company formed on September 27, 2016, with a place of business in Jacksonville Beach, Florida.

26.     Amy Butler ("Butler") is, on information and belief, a resident of Florida and the current or past Accounting Manager of ACI.

27.     Kevin Burke ("Burke") is, on information and belief, the Chief Financial Officer of Foundation Management, a resident of Florida and an agent of MFDC, Foundation Management, and Westcore II.

28.     John Salat ("Salat") is, on information and belief, a resident of Florida.  Salat was or is a Project Manager, Division Manager, Vice-President or President of Westcore I who has held himself out to be Westcore I's owner, and is an owner of Westcore II.  He is a former employee of ACI; a former co-worker of David Albertelli, George Albertelli and Eguizabal; and the owner of a separate company which operated out of ACI's offices.

29.     Kerry Heltzel ("Heltzel") is a resident of Florida and is a current or former project accountant for ACI, Westcore I, Westcore II and Foundation Management.

30.     US Construction Trust is, on information and belief, a trust owned, controlled by and benefitting David Albertelli.  US Construction Trust is used by David Albertelli to, among other things, own part of Westcore I.

31.     Foundation Management LLC ("Foundation Management") is a Delaware limited liability company and, on information and belief, is owned by David Albertelli.  Foundation Management has a principal place of business in Jacksonville Florida.

32.     National Framing, LLC ("National Framing") is a Delaware limited liability company and, on information and belief, is owned by David Albertelli.  Foundation Management is the manager of National Framing.

33.     KMM Construction, LLC ("KMM") is a Delaware limited liability company with a place of business in Pembroke Pines, Florida.  Foundation Management is the manager of KMM.

### C.     Dismissed Defendants

34.     Angelo Eguizabal ("Eguizabal") is a resident of Wisconsin and is the former Vice President of Construction of Continental.  Eguizabal was a defendant in this case but was dismissed without prejudice on November 13, 2017.

35.     Bravo21, LLC ("Bravo21"), is a Delaware limited liability company that has a place of business in the State of Florida.  It was created and is owned by Eguizabal and has the sole purpose of accepting bribes related to Continental projects. Bravo21 was a defendant in this case but was dismissed without prejudice on November 13, 2017.

### III.     The Underlying Construction Contracts

36.     Each Fund entered into a separate construction contract with either ACI or Westcore I under which, among other things, ACI or Westcore I agreed to provide labor, materials and services for the construction of an apartment complex Project.  The price to be paid under the contract was either a "Stipulated Sum" or "Cost of the Work Plus Fee with a Guaranteed Maximum Price" ("Cost Plus Fee").

37.     Where the basis of payment is a stipulated sum, the contractor is paid monthly progress payments that in total equal an agreed upon lump sum amount.  When the contract is based on Cost Plus Fee, the contractor is paid monthly for the legitimate costs it incurs plus a fee but in no event more that the guaranteed maximum price.  Both contract types require the contractor to submit to the relevant Fund, and that Fund's construction lender, a monthly application for payment that is accompanied by a sworn statement representing the amount paid to, and remaining to be paid to, each of its subcontractors.  Subcontractors are likewise required to

submit payment applications and sworn statements for their own work and their own sub-subcontractors.

38.     Other than price structure, the contracts all follow the same basic form.    All contracts use modified American Institute of Architects ("AIA") forms and include AIA A201 General Conditions that establish many of the terms and conditions governing the process applicable to the construction of the various Projects.   Each contract also includes many exhibits that, among other things, identify the scope of work and schedule for the work to be performed by the general contractor.

39.     Each contract structures progress payments so that the amount paid to the general contractors, ACI or Westcore I, would not exceed the value of the work performed at any time, required the general contractor to pay its subcontractors and suppliers promptly after receipt of funds, and, as a condition to its right to be paid, required the general contractor to represent under oath the amount owed and previously paid to each subcontractor on the Project.  The payment terms were intended to ensure that the Project owner had sufficient funds to complete the Project and pay the various subcontractors within the Project budget should the general contractor fail to do so.

40.     The Funds and the construction lender for each Project relied upon the truth of the payment applications and sworn statements submitted by ACI, Westcore I, Westcore II and their subcontractors in managing the Projects and in paying ACI, Westcore I, Westcore II and their subcontractors.

41.     Each of the contracts included terms requiring the contractor to pay liquidated damages for late completion of the individual buildings that comprise each particular Project.  The liquidated damages are assessed in an agreed amount for each day that the relevant building was

10

completed late without contractually authorized excuse. Each contract included a maximum amount of liquidated damages which could be assessed against the contractor, typically two percent of the contract price.

42.     All of the contracts allowed for changes in the contract price, the scope of work and time for completion of the work under defined circumstances. Each time such a change was made, the Fund and the contractor were required to execute a written "change order", effectively an amendment of the contract.

43.     The contracts provide that they could be terminated for cause if the contractor substantially breaches the contract, including by failing to provide enough materials or workers on the job and by failing to pay subcontractors.

44.     All of the Projects were completed late by ACI or Westcore I and have substantial defective work, thereby damaging the Funds. More specifically:

   a.     Lexington Fund and ACI entered into a written contract[1] dated August 22, 2013, ("Lexington Contract") for the construction of the Lexington Project for a Stipulated Sum of $16,192,014. The Lexington Project was completed by ACI. Significant defects in the construction have greatly diminished the value of the Lexington Project, causing the Lexington Fund to undertake repair work at additional cost.

   b.     Savage Fund and ACI entered into a written contract dated April 25, 2014 ("Savage Contract") for the construction of the Savage Project on a Cost Plus Fee basis with an initial guaranteed maximum price of $28,209,835.

---

[1] The contracts for the projects are too voluminous to attach and the Defendants have a copy of the contracts.

ACI abandoned the Savage Project in July, 2016 and it was thereafter completed and repairs of ACI work were performed by the Savage Fund directly managing the construction at additional cost.

c.  New Braunfels Fund and ACI entered into a written contract dated November 21, 2014 ("New Braunfels Contract") for the construction of the New Braunfels Project on a Cost Plus Fee basis with an initial guaranteed maximum price of $23,992,353. The New Braunfels Project was completed late by ACI. Extensive construction defects in the work executed by ACI have been corrected by others at additional cost.

d.  Six Mile Fund and ACI entered into a written contract dated February 20, 2015, ("Six Mile Contract") for the construction of the Six Mile Project for a Stipulated Sum of $29,367,849.38. ACI was terminated on January 6, 2017 and the Six Mile Project was thereafter corrected and completed by the Six Mile Fund, by directly managing the construction at additional cost.

e.  Rochester Fund and ACI entered into a written contract dated June 23, 2015, ("Rochester Contract") for the construction of the Rochester Project for a Stipulated Sum of $27,331,562. ACI was terminated by Continental on January 6, 2017 and the Rochester Project was completed late by Continental both by managing the construction directly and by hiring a construction manager, causing Continental to incur additional construction costs.

f.  Bryan Fund and Westcore I entered into a written contract dated January 19, 2016, ("Bryan Contract") for the construction of the Bryan Project for a

12

Stipulated Sum of $20,502,517. Westcore I was terminated by Continental on June 27, 2017, causing the Bryan Fund to complete and repair the Bryan Project by directly managing the construction at additional cost.

g.      Waco Fund and Westcore I entered into a written contract dated February 19, 2016, ("Waco Contract") for the construction of the Waco Project for a Stipulated Sum of $24,845,569.00. Westcore I was terminated on the Waco Project on June 27, 2017. The Waco Project is being corrected and completed by a replacement contractor hired by the Waco Fund at additional cost.

h.      Longmont Fund and Westcore I entered into a written contract dated July 16, 2016, ("Longmont Contract") for the construction of the Longmont Project for a Stipulated Sum of $32,254,889.00. Westcore I was terminated on the Longmont Project on June 6, 2017. The Longmont Project is being corrected and completed by a replacement contractor hired by the Longmont Fund at additional cost.

45.     The Contracts are too voluminous to be attached to the Complaint.

**IV.    Jurisdiction and Venue**

46.     This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1964(c).

47.     This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 in that they are part of the same case or controversy as Plaintiffs' claims under 18 U.S.C. § 1962.

48.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) in that The Albertellis, ACI and many of the other Defendants reside in this judicial district and a substantial part of the

conduct, events and/or omissions giving rise to Plaintiffs' claims occurred in this judicial district. In addition, the Six Mile Project is located in Ft. Myers, Florida.

49.    This Court has personal jurisdiction over each Defendant in that, at all relevant times hereto, each Defendant transacted business in this judicial district and except for MFDC, and Westcore I, each Defendant resided in this judicial district.

## COUNT 1 – RICO – AGAINST ALL DEFENDANTS

### A.    Overview of Plaintiffs' RICO Case

50.    Count 1 is a complex action for civil remedies authorized by the Racketeering Influenced and Corrupt Practices Act ("RICO") in federal statutes at 18 U.S.C. 1961 *et seq.*  See 18 U.S.C. §§ 1964(a) and (c).

51.    Defendants George Albertelli and David Albertelli started a corrupt enterprise (the "Corrupt Enterprise") that grew to include Defendants ACI, George Albertelli, David Albertelli, Kozlowski, Salat, Burke, Butler, Foundation Management, MFDC, Westcore I, Westcore II, Team CCR, National Framing, KMM, Heltzel, US Construction Trust, together with former Defendants Eguizabal and Bravo21, and non-Defendants Gregory Hilz and Fabio Fasanelli, acting collectively.  The role of each Defendant in the Corrupt Enterprise is described below.

52.    All Defendants, as participants in the Corrupt Enterprise, conspired to engage and engaged in a pattern of racketeering activity across state lines involving numerous RICO predicate acts over a period of approximately six years   The actions of the Defendants, acting as the Corrupt Enterprise, damaged each of the Plaintiffs.  The identity of the Parties to this Count are alleged above in Paragraphs 16 to 33 and incorporated herein.

53.    The purpose of the Corrupt Enterprise is to be awarded construction contracts by bribery, obtain payments for work that is not done or is deficient, and add unfounded costs to construction projects to ensure that the maximum price is paid by the owners of the projects.  The

Corrupt Enterprise was designed to extract as much money as it could, as quickly as it could, without regard to contractual performance or any lawful right to payment of the participants in the Corrupt Enterprise.

54.     The RICO predicate acts can generally be characterized as 1) bribery to get contracts; 2) falsification of a qualification statement for Westcore I to win approval of Continental as a general contractor: 3) paying bribes to get contracts from Continental for the New Fasanelli Companies; 4) defrauding Plaintiffs by falsifying payment applications and using subcontractors owned by Defendants to divert funds from the rightful recipients; and 5) stealing over $2 Million worth of checks intended to be paid to subcontractors ("Joint Checks") in December 2016.

55.     David and George Albertelli, ACI, Westcore I, Westcore II, Kozlowski, Salat, Foundation Management, Burke and MFDC used the proceeds of their fraudulent activities to perpetuate and grow the Corrupt Enterprise, in part by: 1) funding the creation of sham subcontractors (subcontractors that performed no work but added unwarranted cost), such as Team CCR; 2) funding contractors operating under false pretenses such as Westcore I, Westcore II, and the New Fasanelli Companies; 3) paying bribes to get new projects; and 4) funding Foundation Management to hide the Albertellis' role in the Corrupt Enterprise.

56.     George and David Albertelli are the leaders of the Corrupt Enterprise, and all the Defendants played significant roles in furthering the fraud of the Corrupt Enterprise.   While additional unlawful conduct is still being uncovered, certain acts of each Defendant are set forth below and are also summarized for each Defendant at the end of Count 1.

DM1\8519672.3

## B.  ACI, Westcore I, Westcore II and the Albertellis Bribed Eguizabal to Get Work and Favorable Treatment

### B-1.  The Albertelli - Eguizabal Connection

57.     Prior to being employed by Continental, Eguizabal worked for George Albertelli, and with David Albertelli, Salat and Fabio Fasanelli, at another construction company, where bribes, expensive gifts, and kickbacks were used to secure construction contracts and retain clients.

58.     In November 2007, Continental hired Eguizabal as its Vice President of Construction.

59.     Before Continental hired Eguizabal, neither ACI nor any other Albertelli-controlled entity ever worked for Continental.

60.     In 2011, ACI began paying bribes to Eguizabal.  In 2011, ACI began performing work for Continental. Between 2011 and October 2012, ACI paid 7 bribes by wire transfer to Eguizabal in amounts ranging from $100 to $10,000.  Those bribes totaled $30,731.76.

### B-2.  Hatching the Bribery Scheme

61.     In early 2013, George and David Albertelli wanted contracts for more and larger projects from Continental. Eguizabal and David Albertelli discussed a larger bribery scheme over dinner.  David Albertelli offered to give Eguizabal a percentage of the value of future contracts awarded by Continental to ACI.

62.     Eguizabal asked David Albertelli for confirmation from George Albertelli that Eguizabal would be paid bribes.  David Albertelli told Eguizabal that George knew about, and agreed to, kicking-back money to Eguizabal in return for favorable consideration on projects. Nevertheless, Eguizabal insisted that he hear this directly from George Albertelli.

63.     Shortly thereafter, Eguizabal met with George Albertelli and David Albertelli in Jacksonville, Florida.  During that meeting, George Albertelli and David Albertelli confirmed that

Eguizabal would receive bribes or kickbacks of up to 2% of the amount of the contracts awarded to ACI.  As part of their unlawful agreement, David and George Albertelli also required Eguizabal to keep the projects profitable for the Albertellis by, among other things, giving ACI favorable treatment on change orders and assessments of liquidated damages.

### B-3.    The First Bribes on the New Deal

64.    On or before May 31, 2013, David and George Albertelli and ACI began paying substantial bribes to Eguizabal under the new arrangement.  On that date, the Albertellis and ACI paid a $30,000 bribe to Eguizabal.

65.    On August 22, 2013, Continental awarded ACI the Springs at Winchester Road, in Lexington, Kentucky.

66.    From May 31, 2013 to May 21, 2014, George Albertelli and David Albertelli paid bribes to Eguizabal totaling at least $244,724.20 by wire transfer from Southern Supply and Equipment, a company used by the Albertellis to funnel bribes to Eguizabal, to Eguizabal's personal account at USAA Bank.  There were at least 13 such wire transfers during that period. See **Exhibit 1**, a chart that includes the dates and amounts of the bribes presently known to Plaintiffs that were paid to Eguizabal, and the dates and amounts of the construction contracts that were awarded to ACI, Westcore I and the New Fasanelli Companies.  **Exhibit 1** shows the continued pattern of paying bribes to Eguizabal at the direction of the Albertellis and getting contracts from Continental.

### B-4.    Establishing a Corporate Structure for Bribes: MFDC and Bravo21

67.    On July 31, 2014, David Albertelli, George Albertelli and, on information and belief, Burke and Kozlowski formed MFDC in Delaware as a conduit to pay secret bribes to Eguizabal.

68.     The Albertellis and ACI paid bribes to Eguizabal through MFDC by wire transfers from at least September 19, 2014 ($100,000) through August 16, 2016 ($9,972), in the total amount of not less than $669,302.   See **Exhibit** 1.

69.     Soon thereafter, on May 24, 2016, Eguizabal formed his own company in Delaware, Bravo21, to conceal his receipt of bribes.   Beginning with a payment on October 21, 2016 of $50,000, George and David Albertelli, ACI, MFDC, Burke and Kozlowski sometimes sent bribes to Eguizabal at Bravo21.

70.     By 2016, the bribes became such an ingrained part of their business that David Albertelli and, on information and belief, Kozlowski and Salat, included a line item in the internal budgets for the Waco, Bryan and Longmont Projects that identified MFDC as the recipient of a $495,000 fee to be used to bribe Eguizabal.   The notes for the MFDC Fee on the Longmont Project state:

> this is for Angelo [Eguizabal] but if he dicks with ACI then this will be paid to
> ACI toward the open change orders.   **Exhibit** 2.

71.     David Albertelli, MFDC, Burke, Kozlowski, Westcore I and Westcore II concealed from Longmont Fund the MFDC Fee portion of the contract price on the Longmont Contract – that is, concealed the portion that represented the bribe to Eguizabal.

72.     On March 16, 2017, Eguizabal sent "invoices", which were really for some of the bribes, by email to Burke and David Albertelli and, on information and belief, Burke then paid the bribes to Eguizabal.

### B-5.   The Bribes were a Permanent Way of Doing Business for the Corrupt Enterprise

73.      By May 2016, the Albertellis' scheme of paying hundreds of thousands of dollars of secret bribes to Eguizabal in exchange for tens of millions of dollars of construction contracts had continued for more than five years.   But during a phone call that same month, when Eguizabal

suggested ending the bribery scheme, David Albertelli told Eguizabal, "This is like the mafia, no one gets out."

74.     The hardball was played in both directions.  On May 18, 2016, Eguizabal sent an email to David Albertelli setting forth a counterproposal for a bribe to be paid in return for Eguizabal's assistance in steering the contract for Longmont to Westcore I, saying "[t]he only way Longmont is going to [Westcore I] is if I force it."  Eguizabal also complained of David Albertelli's failure to pay the full amount of the agreed kickbacks, telling Albertelli, "[i]f we were in the mafia, as you mentioned, you would be in a wheelchair because somebody would have taken a baseball bat to your kneecaps for not paying."

### B-6.     The Totality of the Bribes

75.     In their unlawful efforts to obtain construction contracts from Continental and the Funds, from approximately December 11, 2011 through April 21, 2017, ACI, George Albertelli, David Albertelli, Westcore I, Westcore II, Kozlowski, Salat, Burke, MFDC and the New Fasanelli Companies paid at least $1,464,735 in bribes to Eguizabal.

76.     In a counterclaim filed in state court litigation in Colorado by Westcore II, Westcore II admitted it alone paid "kickbacks totaling about $1,000,000 on three projects, including the Longmont Contract." (Consolidated Resource, LLC v. Westcore Construction, L.L.C., Dist. Court, Weld County, CO, Case 2017CV30381.)

### B-7.     Misrepresentations and Omissions Perpetuating the Bribes

77.     None of the Defendants disclosed the wrongful bribery of Eguizabal to Continental or any of the Funds.

78.     To obtain money to pay the bribes, David and George Albertelli, ACI, Westcore I, Westcore II, Kozlowski, Salat, Burke, and MFDC misrepresented the cost of projects, the amount

due on payment applications, and the amount attributed to overhead, profit and general conditions costs.

### B-8.    What the Corrupt Enterprise Gained From the Bribes

79.     Between 2011 and 2015, ACI obtained 17 contracts from Continental to construct Projects, many, if not all, procured by bribing Eguizabal.  Three more were awarded to Westcore I and two more were awarded to the New Fasanelli Companies.  None of the contracts awarded to ACI would have been awarded had Continental known of the bribes.  None of the contracts awarded to Westcore I or the New Fasanelli Companies would have been awarded if Continental had been aware of the bribery, the false and perjurious qualification statements, or that the Albertellis had any connection with either Westcore or the New Fasanelli Companies, all of which was intentionally hidden from Continental.

80.     In return for the bribes paid by the Albertellis, ACI and Westcore I, Eguizabal provided them confidential, internal information about competing bids and Continental's confidential budgets for new projects.  Eguizabal also worked secretly inside Continental to steer new projects to ACI, Westcore I and the New Fasanelli Companies, to receive favorable treatment for increases in project prices through change orders, and to be granted relief from contractual liquidated damages resulting from construction delays.

81.     For example, on March 18, 2015, Eguizabal secretly sent David Albertelli the confidential site plan and budget of a Westcore I competitor for the Longmont Project.

### C.    David Albertelli, Brook Kozlowski, Gregory Hilz and Others Falsified a Qualification Statement and Financials for Westcore

82.     By late 2014, because of ACI's repeated failures to pay subcontractors, deliver projects on time, provide adequate supervision and execute its work free of construction defects, Continental decided to award no further work to ACI.

83.    David Albertelli knew of this decision in late 2014.

84.    To circumvent the decision to not award more contracts to ACI, David Albertelli developed a plan to get more work from Continental by using other companies as fronts.  In early 2015, David Albertelli advised Gregory Hilz, the owner of one of his former subcontractors, of a potential opportunity to perform work for Continental using different companies.

85.    In early 2015, David Albertelli asked Hilz to form a new company, namely Westcore I. Hilz formed Westcore I as a Delaware limited liability company, on February 13, 2015.

86.    Hilz and David Albertelli agreed that Westcore I was to be owned 70% by Albertelli and 30% by Hilz.

87.    David Albertelli then transferred a portion of his interest in Westcore I to his ACI colleague, Kozlowski. The ownership of Westcore became 60% David Albertelli, 30% Hilz and 10% Kozlowski.

88.    David Albertelli informed Kozlowski and Hilz on October 24, 2015, that an "extra $240,000" would be included in the Six Mile Project Price "to fund DEVCON/Westcore Operations".

89.    In approximately March 2015, David Albertelli told Hilz that neither David Albertelli nor Kozlowski should be included on the Westcore I website nor be acknowledged to be a part of Westcore I to executives of Continental.  David Albertelli told Hilz that issues had arisen between Continental and ACI, and it was unlikely ACI would be doing any further work for Continental.  Continental viewed the website prior to approving Westcore I as a contractor.

90.    To bid on Continental projects, Continental required potential contractors to submit sworn qualification statements to demonstrate their financial capacity and experience to perform

Continental's projects.  Consistent with that practice, Continental required Westcore I to submit such a qualification statement under oath as a condition to being considered as a contractor for Continental.

91.     To further disguise Westcore I's true identity from Continental, on March 23, 2015, David Albertelli warned Hilz to sanitize Hilz' work history on the web site "LinkedIn" to remove any ties to the Albertellis.  David Albertelli wrote that Hilz should "make sure that your linked in is pretty clean of most things or take it down for the short term.  I just don't want CPCI [Continental] to see how new west core [sic] is."

92.     As a further part of the scheme, beginning in March 2015, David Albertelli invented a fictitious business history for Westcore I.

93.     Also beginning in March 2015, David Albertelli and, on information and belief, Hilz and Kozlowski, fabricated a sworn qualification statement for Westcore I ("Qualification Statement") that was comprised almost entirely of lies.

94.     David Albertelli sent an email to Hilz and Kozlowski dated July 6, 2015 that described David Albertelli's preferred method of creating phony documents, including using "real people for this stuff when possible" and inquiring whether Hilz might

> have someone at the bank that's a buddy and would vouch for us having $10MM in a bank account that has $100 then great use a real person.  **Exhibit 3**.

95.     The Qualification Statement submitted to Continental for Westcore I states "[t]he undersigned certifies under oath that the information provided herein is true and sufficiently complete so as not to be misleading".  In the bogus Qualification Statement, David Albertelli included a signature purporting to be a Mr. "Michael Breaton, CPA", as the Chief Financial Officer of Westcore.

DM1\8519672.3

96.     On information and belief, it appears there is no such "Michael Breaton".  Michael Breaton did not sign the Qualification Statement, was not Westcore's CFO, and there is no CPA named Michael Breaton in California, Westcore's purported state of residence.

97.     David Albertelli attached to the Qualification Statement a letter from a surety representing that Westcore I had $325,000,000 in bonding capacity and a financial statement for Westcore I indicating that Westcore I held total assets of more than $69,000,000.

98.     The information included in the financial statement and the surety letter attached to the Qualification Statement are completely false.

99.     Among the false representations included on the Qualification Statement are that Westcore I had been in business for 23 years under its present name, that it was incorporated in 1992 in Nevada, and that it performed an average of $376,196,476 of work annually over the past 5 years.

100.    In October and November 2015, Continental informed Westcore I that the Qualification Statement and attached information was needed for Continental and Continental's lenders to approve Westcore I as a general contractor to bid on Continental's projects.

101.    David Albertelli finalized the fictitious Qualification Statement on or before November 6, 2015.  On information and belief, David Albertelli sent the Qualification Statement to Eguizabal on or about November 6, 2015.  On information and belief, Westcore I also sent the Qualification Statement to others at Continental in November 2015.

102.    Continental relied upon the false representations of Westcore I in the Qualification Statement in awarding construction contracts to Westcore I.

103.    In January and February 2016, Hilz, acting for Westcore I, continued negotiations and executed contracts with Continental for projects in Waco, Texas and Bryan, Texas.  Hilz also began negotiations with Continental, for a project in Longmont, Colorado.

104.    At the direction of David Albertelli, Hilz concealed the involvement of David Albertelli and Brook Kozlowski in Westcore I and did not inform Continental that the Qualification Statement was false.

105.    Hilz had many opportunities to do so.  For example, on February 22, 2016, Continental asked Hilz to provide Continental with information as to any additional experience of Westcore I in Colorado.

106.    Hilz sent the request to David Albertelli.  In an email dated February 24, 2016 to Hilz, David Albertelli responded, "I don't really have any. I would say let's provide him with the Residences at Little Nell and I'll look pick [sic] an apartment complex off of the internet."

107.    And in fact, on March 2, 2016, Hilz sent an email to Continental misrepresenting the Residences at Little Nell as an example of Westcore I's work in Colorado.

108.    Continental was materially misled by the sworn Qualification Statement that portrayed Westcore I as having significant experience, financial resources, bonding support, a CFO, and other elements of an established general contractor and by deliberately hiding and omitting any identification of David Albertelli, Kozlowski or others linked to ACI as having an interest in or control over Westcore I.

**D.     Examples of ACI, Westcore I and other Members of the Corrupt Enterprise Defrauding Plaintiffs**

109.    As described below, ACI, David Albertelli, Kozlowski, and Butler, then the Accounting Manager of ACI, intentionally falsified payment applications to be paid money to

which ACI was not entitled.  Those Defendants tried to cover their tracks by characterizing the falsified payment applications as simply containing unintentional mistakes.

110.    After Westcore I was awarded contracts by Continental, David Albertelli, Kozlowski, one time ACI employee John Salat and ACI accountant Kerry Heltzel, engaged in fraudulent conduct similar to that perpetrated by ACI.

111.    By intentionally overstating the amounts due to subcontractors, ACI and Westcore I defrauded Plaintiffs by obtaining payments they were not entitled to receive.  On the projects on which a Fund terminated ACI or Westcore I's right to perform work and the work was completed by Continental or others under direct contracts with Continental or a Fund, the overpayments left Continental with insufficient budgeted funds to complete the Projects and pay the subcontractors. For example, Westcore I and its subcontractors have filed Mechanics Liens totaling $4,670,189.14 on the Waco Project and $4,052,473.73 on the Bryan Project.

112.    Judging by the evidence known to date, more of Defendants' fraud and breaches will be uncovered through Plaintiffs' investigation and discovery in this case.  Nevertheless, even at this early juncture, before discovery, Plaintiffs have learned of certain specific examples, as alleged below:

> **D-1.    Example 1 - ACI Misled the Savage Fund by Agreeing to Change Order 10 to Induce a Payment but then Filing a Delay Claim and Lien**

113.    By early 2015, the Savage Project was significantly behind schedule, thereby subjecting ACI to the assessment of liquidated damages.

114.    On June 2, 2015, David Albertelli signed Change Order Number 10 on the Savage Project in which ACI accepted responsibility for $401,780.00 in liquidated damages for delays.  In return, the Savage Fund extended the turnover dates for some buildings, thereby providing ACI relief from potential additional liquidated damages for delays.

25

115.   ACI and David Albertelli intended that the Savage Fund would rely on ACI's acceptance of responsibility for liquidated damages in Change Order Number 10 and continue to make payments to ACI, which the Savage Fund did.

116.   However, in late 2015 and early 2016, ACI, Kozlowski, and David Albertelli demanded that the Savage Fund pay for ACI's alleged costs due to delays that ACI and David Albertelli had already agreed were the fault of ACI.

117.   ACI, Kozlowski, and David Albertelli thereafter held the Savage Project "hostage" – both by slowing progress and threatening not to complete the work - unless the unwarranted payments were made to ACI by the Savage Fund.

118.   On September 23, 2016, ACI recorded a lien against the Savage Project that includes the delay damages that ACI had previously accepted as ACI's responsibility.

119.   On information and belief, ACI, Kozlowski, and David Albertelli believed that filing the lien would interfere with the Savage Fund's financing for the project and compel the Savage Fund to pay ACI more than ACI was owed.

120.   By misleading the Savage Fund regarding Change Order 10, ACI benefitted by obtaining a compromise on deadlines for some buildings and obtaining payments that it would not have otherwise received.  The Savage Fund was damaged by making payments it was not required to make and having to defend against a spurious lien claim.

### D-2.   Example 2 - National Framing – Six Mile; Fraud by Subcontractor

121.   ACI, David Albertelli, George Albertelli, Butler and National Framing lied on payment applications, sworn statements and other documents regarding the amount owed by ACI to National Framing, a related party subcontractor of the enterprise, to induce Six Mile Fund to pay ACI a progress payment of over $1 Million.  They represented that, after the payment, National Framing would be owed $364,783.75.  However, after the Six Mile Fund paid over $1 Million,

National Framing and ACI filed mechanics liens that claim $581,470.90 is owed to National Framing, $216,687.15 more than previously represented by ACI and National Framing in sworn statements.

122.    On November 10, 2016, David Albertelli executed and submitted by wire to Continental Payment Application 20 and a sworn statement for ACI that represented National Framing was due a payment of $60,673.14 and thereafter the balance due to National Framing would be $364,783.75.

123.    In its payment application, National Framing agreed with ACI's numbers.

124.    On December 1, 2016, acting in reliance on the accuracy of the representations of David Albertelli, ACI, Butler and National Framing, Six Mile Fund released the payment requested by ACI ($1,072,397.64), including the $60,673.14 for National Framing.

125.    After the Six Mile Fund paid, on April 3, 2017, George Albertelli signed two documents under oath, a Claim of Lien for ACI and a Contractor's Final Payment Affidavit.  Butler notarized both knowing they contradicted the earlier sworn statements.  The Claim of Lien represented $581,470.90 to be due and owing to National Framing.

126.    Three days later, on April 7, 2017, contrary to its earlier representation, National Framing executed, under oath and notarized, an Amended Claim of Lien for $581,470.90, $216,687.15 more than it and ACI previously represented National Framing was owed.

127.    As a result of the fraudulent representations and claims of George Albertelli, David Albertelli and ACI, Six Mile Fund was forced to procure a lien bond to "bond-over" the ACI and National Framing mechanics liens, thereby substituting the bond for the real estate as collateral for the lien claim.

128.    Because of false statements regarding the costs left to be incurred in Payment Application No. 20, Six Mile Fund was injured by paying $1,072,397.64 that was not deserved, procuring a lien bond, and defending against and potentially having to honor National Framing's lien claim that on its face is $216,687.15 more than what ACI and David Albertelli represented was owed to National Framing.

### D-3.    Example 3 - Defendants Improper Self-Dealing on Savage and Rochester

129.    The Savage Contract is a Cost Plus a Fee contract. ACI was to receive payments only for the legitimate costs of the work that were incurred by ACI plus a fee to account for ACI's profit for those Projects.

130.    Accordingly, the Savage Contract allowed ACI to be reimbursed for subcontractor payments only if they were legitimate payments to legitimate subcontractors.

131.    Section 7.8 of the "Standard Form of Agreement" portion of the Savage Contract required ACI to disclose commonality of ownership or management of any subcontractor it hired for the Project.  Specifically, Section 7.8.1 defines a "related party" to include "any entity in which any stockholder in, or management employee of, the Contractor [ACI] owns any interest in excess of ten percent in the aggregate".

132.    Section 7.8.2 of the General Conditions of the Savage Contract says:

> If any of the costs to be reimbursed arise from a transaction between the Contractor and a related party, the Contractor shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred.

133.    As such, ACI was prohibited from subcontracting any work for the Savage Project to a related party without notice to and the written approval of the relevant Fund.  David Albertelli is an owner of ACI.  David Albertelli, Brook Kozlowski and Kevin Burke are managers of ACI.

28

David Albertelli, Kozlowski and Burke owned and/or managed related party subcontractor National Framing.

134.    ACI, David Albertelli, Kozlowski and Burke did not disclose that National Framing was a related party and actively tried to hide their interest by having Foundation Management hold the ownership interest and manage National Framing.

135.    On Savage, ACI issued a subcontract to National Framing for $2,615,326 to perform framing work and another subcontract for $534,832 to perform siding work, both without the consent or knowledge of the Savage Fund.

136.    Similarly, the Rochester Fund has been damaged by ACI's use of undisclosed, related party subcontractors KMM and National Framing because both claim liens for work on the Rochester Project attributable to non-payment by ACI.  KMM and National Framing filed suit in Minnesota claiming $207,736.31 for KMM and $764,724.62 for National Framing and seeking a Foreclosure of Mechanic's Lien for both.  (*KMM Construction of Florida, LLC v. Continental 326 Fund, LLC*, State of Minnesota, Third Judicial District, County of Olmsted, Case 55-CV-17-8603.) However, neither KMM nor National Framing named ACI in that lawsuit despite claiming to be subcontractors of ACI.  The Rochester Fund has been damaged and continues to be by the existence of the liens on the title of the property and the cost of defending against those liens.

### D-4.    Example 4 - Westcore II – Ghost Company; Fraudulent Diversion of Payments

137.    Having duped Continental, both through the bribery of Eguizabal and the falsified Qualification Statement, into awarding Westcore I contracts for the construction of Continental Projects, Westcore I then utilized some of the same scams used by ACI to enrich the Corrupt Enterprise and hence the Defendants.

138.    In 2016 Westcore I entered into contracts for the Longmont Project, the Waco Project and the Bryan Project.  Those contracts called for the respective Funds to make payments to Westcore I.  Westcore I was owned by David Albertelli through US Construction Trust, Kozlowski and Hilz.

139.    On March 8, 2016, just two months after the Bryan Contract was signed and one month after the Waco Contract was signed, David Albertelli, Salat, Kozlowski, Burke, and Foundation Management formed Westcore II, a Nevada limited liability company called Westcore Construction, L.L.C.  Foundation Management is listed as the managing member in the Westcore II Articles of Organization.   David Albertelli, Salat, Kozlowski, Burke, and Foundation Management concealed the true nature and ownership of Westcore II from the Plaintiffs.

140.    David Albertelli, Salat, Kozlowski, Burke, and Foundation Management copied the name of Westcore I knowingly and intentionally to use Westcore II to obtain payments from the Funds that should have been paid to Westcore I.

141.    David Albertelli, Salat, Kozlowski, Burke, Heltzel, and Foundation Management, acting as Westcore I and/or Westcore II, directed Continental to make payments to an account established in the name of Westcore II.

142.    On March 10, 2016, Heltzel sent wire instructions to Continental for payments on the Bryan Project.

143.    On August 18, Heltzel sent an email to Continental directing payments be made to a new account.  On information and belief, the new account was for Westcore II.

144.    Throughout 2016, the Funds were misled by the payment requests and nearly identical company names of Westcore I and Westcore II.  As a result, the Funds made contract payments to Westcore II for the Waco Project, Bryan Project and Longmont Project.

145.    By creating Westcore II and diverting payments to Westcore II that were due, if at all, to Westcore I, Defendants Westcore I, Westcore II, Foundation Management, David Albertelli, Kozlowski, Salat, Heltzel and Burke diverted project funds away from Westcore I and Westcore I's subcontractors.  In engineering this diversion of funds, their purpose was to maintain and grow their Corrupt Enterprise.

146.    As a result of taking money from Westcore I, the Westcore I Projects have been subjected to more than $8 million dollars of liens from the subcontractors on those Projects.

### D-5.    Example 5 - Team CCR – A Sham Subcontractor

147.    David Albertelli, Salat, Kozlowski, Foundation Management, Westcore II, and Heltzel used Defendant Team CCR, which they formed, to impersonate Consolidated Resources ("Consolidated"), a subcontractor of Westcore I, in order to steal payments due Consolidated.

148.    Westcore I or Westcore II awarded subcontracts to Consolidated for three separate scopes of work on the Longmont Project:  earthwork, framing and electrical work.  The earthwork subcontract is dated September 22, 2016.

149.    In 2016, around the time Consolidated's work on the Longmont Project was getting started, Consolidated's owner, Marchel Morningstar, told Kelly Moore, Continental's project manager, that Consolidated would be changing its name to Team CCR.

150.    On information and belief, Morningstar also informed Westcore I that he would create a company called Team CCR.  On information and belief, Salat, David Albertelli, Kozlowski and Burke also knew that Morningstar planned to change the name of Consolidated.

151.    On information and belief, Salat, David Albertelli, Kozlowski and Burke formed Team CCR, LLC as a Delaware limited liability company on September 26, 2016, just four days after the date of the earthwork subcontract awarded to Consolidated in order to trick Continental into making payments to them instead of Consolidated.  A certificate of formation was filed in

31

Delaware on September 27, 2016, and a Statement of Foreign Authority was filed in Colorado on October 3, 2016.

152.    Continental had requested that Westcore I and all subcontractors on Westcore I projects use an internet-based system called Textura to input payment application data for the Longmont Project.

153.    Using Textura, Westcore I and Westcore II submitted payment applications for the Longmont Project.  Those payment applications included Team CCR as its sole subcontractor on its first payment application.  Team CCR also submitted its payment information using Textura for the earthwork it claimed to be performing.  Team CCR did not list any subcontractors.  In contrast, at the direction of Westcore I and/or Westcore II, Consolidated submitted only a paper application to Westcore I, rather than using Textura.  If Consolidated had used Textura instead of a paper application, Continental would also have received Consolidated payment application paperwork.

154.    Salat, David Albertelli, Kozlowski, and Burke used Team CCR and its representations via Textura to create the false impression that Team CCR was performing the earthwork without using any lower tier subcontractors, when in fact Consolidated was doing the work and submitted paper applications to Westcore I.

155.    By using the name "Team CCR", which is the same as the new name Consolidated planned to use, Westcore I and Westcore II's payment applications misled Continental and the Longmont Fund into believing that the payment being requested was for Consolidated under the new name "Team CCR" rather than for a sham contractor unrelated to Consolidated.

156.    Team CCR's payment applications in Textura are electronically signed by "Robert Anderson".  Moore asked Morningstar about the role of Robert Anderson and was informed by Morningstar that Consolidated had no employee by that name.

157.    On information and belief, Heltzel, Salat, David Albertelli, Kozlowski and Burke knew that the signature of Robert Anderson on the Team CCR applications was false.

158.    When Moore described the billing pattern to Morningstar, Morningstar accused Westcore I of stealing the name "Team CCR" and also alerted Moore to the improper billing.

159.    Shortly thereafter, Moore confronted Westcore I's on-site superintendent, Mark Baugh, about the billing and payment irregularities.  In response, Baugh dissembled and falsely claimed that Team CCR had been created by Westcore I to bill work that Westcore I was itself performing directly, not through a subcontractor.  In reality, the Westcore I was not itself performing the earthwork, which had been subcontracted to Consolidated.

160.    The earthwork contract awarded by Westcore I to Consolidated was for $1,805,450.55.  But the subcontract that Westcore I gave to Team CCR for earthwork was in the amount of $2,083,723.71.  That allowed Team CCR, at a minimum, to pocket the difference, $278,273.16, while performing no construction work to justify the payment.

161.    Even worse, Westcore I failed to pay Consolidated.  As a result of Westcore I's unlawful failure to pay Consolidated, Consolidated recorded a mechanics lien on the Longmont Project, and then also filed a lawsuit to foreclose and collect on its lien.  Plaintiffs are currently defending the suit. If the Longmont Fund is required to pay Consolidated for work it has already paid Team CCR, its damages will increase by that amount.

162.    As this example shows, Westcore I intentionally deviated from proper, contractually required billing practices by charging Continental more than the work cost and by

33

failing to pay its subcontractors all amounts owed to them. Westcore I's fraud has caused unpaid subcontractors to file mechanics lien claims on the Projects for amounts they claim are owed to them by Westcore I.

### D-6. Example 6 - Fraud Involving Peal & Associates and Framing USA on the Waco Project.

163.    Westcore I used one of the sham subcontractors, Framing USA Group, LLC, which on information and belief is owned by David Albertelli through US Construction Trust and Foundation Management, to defraud the Waco Fund into believing the framing and siding labor on the Waco Project was more expensive than it actually was, thereby fraudulently inducing the Waco Fund to make inflated payments to Westcore I. After Westcore I defaulted on the Waco Contract, the Waco Fund was forced to have the project completed at a higher than budgeted cost balance because the Defendants had fraudulently billed and collected for work that was not done or was done defectively.

164.    The Waco Contract provides for progress payments to be made based on the state of completion of line items in a Schedule of Values, which allocates the contract price to each separate element of work. The Schedule of Values includes a value for each segment of work, for example plumbing or ceramic tile. In the Sworn Statements that Westcore I submitted on March 15, 2017 to get paid, Westcore represented that two line items in the Schedule of Values, "Framing labor" and "Siding", together accounted for $3,241,194.33 of the project cost.

165.    However, on or about August 5, 2016, Westcore I and Framing USA Group, LLC entered into a subcontract for $1,907,218.00 for "Framing, Siding and Cornice", which on information and belief related only to labor and did not include the materials required for that work.

166.    Further, on or about August 11, 2016, Framing USA Group, LLC entered into a sub-subcontract with Peal & Associates, Inc. in the amount of $1,907,000, for "Framing & Siding," which again on information and belief related only to labor.

167.    Based on these facts, Westcore I represented to the Waco Fund that the Framing and Siding Labor accounted for approximately $1.4 Million more of the contract price than it actually did: $3.3 million represented in the sworn statements versus the approximate $1.9 million of the actual subcontracts.

168.    Westcore I knew that the Framing and Siding Labor would be performed, billed and paid early in the project and that its payment application and sworn statement would be used as the basis for determining the amount to be paid.  By falsely inflating the amount of the contract price attributed to Framing and Siding Labor, Westcore defrauded the Waco Fund to pay Westcore more and sooner than if it had accurately represented such amount.

169.    Westcore I transmitted its misrepresentations to Continental by wire and knew that funding for the payments would come in part from a bank acting as a construction lender.

170.    In reliance on Westcore I's false representations about the amount of the contract price attributable to Framing and Siding Labor, the Waco Fund authorized payments to Westcore I for that work in late 2016 and early 2017.  Those payments were based on the inflated numbers that Westcore I provided for the value of that work and therefore the payments were also inflated.

171.    In the end, Westcore I defaulted on its obligations under the Waco Contract and its right to perform work was terminated on June 27, 2017.   At the time it was terminated, Westcore had been overpaid for Framing and Siding Labor.  The Waco Fund paid $2,325,864.35 for that work but would have been paid only approximately 60% of that amount if the cost had been accurately represented.

35

172.   Westcore II, on information and belief, received the excess payments and other Defendants, including Salat, Kozlowski, David Albertelli, Foundation Management and Burke benefitted from that overpayment.

173.   After Westcore I defaulted, the Waco Fund had to complete the Waco Project for more than the budgeted cost and was thereby damaged.

**E.   Albertellis Infiltrate Fasanelli Construction; the Bribery and Fraud Continue**

174.   The Albertellis were not content with only using Westcore I to defraud Continental. David Albertelli, Kozlowski and Burke used Foundation Management to infiltrate the relationship of another general contractor, Fasanelli Construction Inc., with Continental by purportedly partnering with Fabio Fasanelli to form multiple entities using "Fasanelli" or "FCS" in their names so the Corrupt Enterprise could access more Continental projects.

175.   In 2015, after Continental cut off ACI from new work, David Albertelli started forming a business relationship with Fabio Fasanelli, who was doing projects with Continental as Fasanelli Construction, Inc. in South Carolina. David Albertelli told Mr. Fasanelli that he had cash available through a vehicle to invest in contractors. Mr. Fasanelli agreed to partner with David Albertelli.

176.   David Albertelli caused FCS Construction, LLC; Fasanelli Construction, LLC; and FCS of Florida, LLC (collectively the "New Fasanelli Companies") to be formed.

177.   David Albertelli formed these multiple copy-cat entities to cause Continental to believe they were owned by Fabio Fasanelli. Fasanelli Construction, LLC was formed on June 26, 2015 in Delaware and subsequent filings identify Foundation Management as its Manager. FCS of Florida, LLC represented that Kevin Burke of Foundation Management was its agent on July 24, 2016. By a filing dated September 15, 2016, Fasanelli Construction, LLC changed its name to

FCS Construction, LLC and identified Foundation Management as its authorized representative. Kevin Burke is listed as the CFO of FCS Construction LLC as of May 8, 2017.

178.     David Albertelli prepared qualification statements to be submitted to Continental by the newly formed New Fasanelli Companies.  David Albertelli did not disclose his ownership or management of FCS to Continental and he requested that Mr. Fasanelli not disclose David Albertelli's involvement.

179.     David Albertelli, with the assistance of Kozlowski, used the same tactics on FCS projects for Continental that he used with ACI to take money from Continental and legitimate subcontractors.

180.     David Albertelli caused bribes of $125,000 to be paid to Eguizabal through the New Fasanelli Companies to obtain work for the New Fasanelli Companies.

181.     David Albertelli's involvement with Fasanelli follows the same pattern of corruption he used with ACI and Westcore I and Westcore II.

### F.     Defendants Stole Joint Checks That Were Intended to be Paid to Subcontractors

182.     In November and December 2016, David Albertelli, Kozlowski, ACI, Butler and Heltzel stole checks worth over $2 Million that were meant for subcontractors.

183.     They used false and misleading Payment Applications, Sworn Statements, emails and other documents to mislead the Six Mile Fund and Rochester Fund into believing that if they sent ACI checks payable jointly to ACI and a subcontractor, ACI would use them to pay the subcontractor.

184.     It is a common practice for construction owners to issue joint checks to the general contractor and its subcontractors to pay such subcontractors.  Typically, the joint check is delivered to the general contractor, which indorses it and delivers it to the subcontractor, which indorses it

37

and deposits it in its bank account.  The joint check process creates a paper trail showing payment to the contractor and ensures the money is received by the subcontractor.

185.    Continental and ACI had used the common joint check process with the added requirement that ACI would provide FedEx tracking number for the envelopes that ACI used to send the joint checks to the subcontractors – thus providing Continental with verification the checks had been forwarded to the subcontractors.

186.    In the Rochester Contract and Six Mile Contract, ACI agreed, among other things, that it would only include an amount for a Subcontractor in a Payment Application if it intended to pay that Subcontractor the amount requested, that work for which prior payments were received would be free of claims by subcontractors, that ACI would pay each Subcontractor within seven (7) days of receipt of payment,  and that any amount paid to ACI that was payable to a Subcontractor would be held in a constructive trust by ACI for that Subcontractor.

### F-1.    Six Mile Project – Theft of Joint Checks

187.    On November 10, 2016, David Albertelli signed a "Sworn Statement for Contractor and Subcontractor" for the period ending October 31, 2016 for the Six Mile Project.  The Sworn Statement includes a list identifying subcontractors by name and giving a specific amount due each Subcontractor for "This Payment."

188.    The Sworn Statement includes the following representation by David Albertelli and ACI:

> "That there is due and to become due them, respectively, the amounts set opposite their names for material or labor as stated.  That this statement is a full, true, and complete statement of all such persons, the amounts paid and the amounts due or to become due to each."

189.    On information and belief, Butler, as the Accounting Manager of ACI, knew the Sworn Statement was false because she knew that ACI did not intend to pay the subcontractors.

190.    With David Albertelli's and Kozlowski's direction and consent, Butler notarized the Sworn Statement and transmitted it to Continental on or about November 10, 2016, by uploading it as part of ACI's October 2016 Payment Application using the on-line payment administration service Textura.

191.    On November 30, 2016, a Continental project accountant, sent an email to Butler asking her to confirm that the amounts listed in the Sworn Statement should be used to prepare the Joint Checks.  In response, Butler confirmed the amounts for the Joint Checks.

192.    On information and belief, David Albertelli and Kozlowski knew that Butler confirmed the amounts for the Joint Checks.

193.    Six Mile Fund was misled by the Sworn Statement, Payment Application, agreements and emails from Butler, David Albertelli and ACI because that information was consistent with Continental and ACI's past practice of using joint checks to pay subcontractors. Six Mile Fund's explicit understanding was that the subcontractors would be paid if it issued Joint Checks to ACI, as requested.

194.    On December 1, 2016, Six Mile Fund delivered the Joint Checks to ACI as requested and they were received by Butler or Ken Jones, another ACI employee.

195.    On information and belief, Melissa Peek, an ACI employee, on the instructions of one or more of David Albertelli, Ken Jones and Butler, prepared FedEx envelopes that were addressed to the subcontractors and placed the waivers and documentation, but not the Joint Checks, in the FedEx envelopes.  Peek then sent the FedEx envelopes to the subcontractors and provided the tracking numbers to Continental.  At no time did anyone from ACI ask Six Mile Fund for permission to withhold the Joint Checks nor did anyone inform Six Mile Fund that the Joint Checks had been withheld.

DM1\8519672.3

196.    On or about December 5 and 6, 2016, David Albertelli indorsed nineteen Joint Checks that were intended to be paid to subcontractors and intentionally and wrongfully deposited those Joint Checks into ACI's account at CenterState Bank, without any of the second signatures from subcontractors.

197.    On information and belief, on or about December 5, 2016, the subcontractors received FedEx envelopes from ACI containing lien releases and/or lien waivers but without any Joint Checks.

198.    On December 5, 2016, Nichole Barton of Texas Contract Floors, Inc., a subcontractor, sent an email to Melissa Peek at ACI informing her that the FedEx envelope she received did not contain a Joint Check.  In an attempt to cover-up the fraud and theft, Ms. Peek lied to Ms. Barton and stated that the checks had not been "received at my desk" and delivery of the Fed Ex packages without the Joint Checks was the fault of an "admin".

### F-2.    Rochester Project – Theft of Joint Checks

199.    In November 2016, ACI, David Albertelli, Kozlowski and Butler submitted an October Payment Application and supporting documents to Continental, including a Sworn Statement signed by David Albertelli, and a supplemental list of amounts due subcontractors representing that payments were due from the Rochester Fund, with specific amounts earmarked for subcontractors.

200.    On November 30, 2016, Butler sent Continental an email containing "the joint check list for Draw 16."  That list identified subcontractors by name and listed the amount of the Joint Check that ACI wanted Rochester Fund to draw for each Subcontractor.

201.    On December 2, 2016, Rochester Fund sent Joint Checks in the amounts as requested by Butler, ACI, David Albertelli and Kozlowski. On information and belief, Ken Jones and/or Amy Butler received the Joint Checks on behalf of ACI.

40

202.    Tamma, a Continental project accountant, requested that Butler send the Joint Checks to the subcontractors, to which Butler replied, "Sure thing."

203.    On information and belief, Melissa Peek and Butler prepared FedEx envelopes for sixteen subcontractors, and on the instructions of David Albertelli, Kozlowski and Ken Jones, Peek and Butler placed the documentation but not the Joint Checks in the FedEx envelopes.  At the direction of David Albertelli, Kozlowski and Jones, Peek and Butler then sent the FedEx envelopes to the subcontractors and provided the FedEx tracking numbers to Rochester Fund.  At no time did anyone from ACI ask Rochester Fund for permission to exclude the Joint Checks or inform Rochester Fund that the Joint Checks had been withheld.

204.    On December 8, 2016, Butler told Tamma and others that Butler was told by people in ACI's office that the Joint Checks would be placed in FedEx boxes for the subcontractors that day.  But in fact, the Joint Checks were never sent to the subcontractors.

205.    Between December 7 and 8, 2016, David Albertelli intentionally and wrongfully deposited sixteen separate Joint Checks totaling $1,189,414.88 from the Rochester Project into ACI's account at CenterState Bank, without any of the second signatures from subcontractors and without notice to or consent from Rochester Fund.

### F-3.    Malice & Intent

206.    ACI, David Albertelli, Kozlowski and Butler intended and knew that Continental, Six Mile Fund and Rochester Fund would rely on their false representations and be fraudulently induced to issue the Joint Checks.

207.    ACI, David Albertelli, Kozlowski and Butler knew that they would not in fact send the Joint Checks to the subcontractors.

208.    Six Mile Fund and Rochester Fund were misled by and reasonably relied on the representations made by Butler and David Albertelli on behalf of ACI as to the amount due each

subcontractor, that ACI would pay each subcontractor, that ACI would forward each Joint Check to the appropriate subcontractor, and that the tracking numbers would be for FedEx packages that contained the Joint Checks that were sent to subcontractors.

### F-4.    What Defendants Obtained

209.    By the theft of the Joint Checks, ACI obtained $1,189,414.88 from the Rochester Fund and $896,146.51 from the Six Mile Fund to which it was not entitled by the theft of the Joint Checks.

210.    Continental's bank reimbursed amounts wrongfully transferred to ACI's bank but the Defendants did not return any of the stolen money.

211.    David Albertelli, Kozlowski, Butler and ACI defrauded the Rochester Fund and the Six Mile Fund by stealing checks worth over $2 Million that were intended for subcontractors. George Albertelli knew of the theft, profited from it and took steps to retain the stolen money.

### G.    Specific Acts of the Defendants as Part of the Corrupt Enterprise

212.    The Defendants committed and conspired to commit the predicate acts alleged above that include bribery, mail fraud, wire fraud and bank fraud.

213.    The bribery acts are each a predicate act because, among other things, they violate bribery statutes, are wire fraud because the bribe money was transferred by wire, and are bank fraud because the bribes were used to obtain contracts that were paid by money loaned by banks. The transmission of the false Qualification Statement for Westcore I is wire fraud or mail fraud, or both, and bank fraud because it was part of a scheme to obtain payments funded by a bank.  The transmission of false payment applications, supporting documents, change orders, liens and emails are wire fraud or mail fraud depending on how the information was transmitted, and bank fraud when the information was transmitted to obtain payments funded by banks through construction loans.  The theft of the stolen checks was wire fraud, mail fraud and bank fraud because it included

42

the transmission of false and misleading information by wire and mail (FedEx) for the purpose of obtaining payment funded by a bank.

214.    Each Defendant is part of the Corrupt Enterprise, had knowledge of one or more predicate acts committed by the Corrupt Enterprise, conspired to commit or committed one or more predicate acts, or has knowingly agreed to the commission of one or more illegal predicate acts by the Corrupt Enterprise.

215.    The predicate acts of each Defendant, which are alleged in detail above, are summarized below.

### G-1.    Specific Predicate Acts of Each Defendant

216.    **ACI** committed and conspired to commit the following predicate acts:

   a. bribery of Eguizabal; (see Section B; ¶¶ 50 – 75);

   b. sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors (see ¶¶ 103-106; 107- 114; 115-122; 123-134);  and

   c. stealing the Joint Checks by sending false representations to induce Continental to send the Joint Checks, wrongfully depositing the checks and then sending false statements by wire and mail to conceal the theft (see ¶¶ 180-184; 185-196; 197-203; 204-209).

217.    ACI benefitted from the enterprise through payments received for contracts awarded to ACI.

218.    **George Albertelli** committed and conspired to commit the following predicate acts:

   a. bribery of Eguizabal (see ¶¶ 57 - 81);

b.   sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors by wire and mail (see ¶¶ 121 - 128); and

c.   as majority owner and CEO of ACI, receiving the proceeds of the stolen Joint Checks and not returning those proceeds when Continental later made a demand (see ¶¶ 182-211).

219.   George Albertelli is a leader of the Corrupt Enterprise and was the president of ACI during commission of many of the predicate acts.  George Albertelli participated in and directed the execution of many of the predicate acts.

220.   George Albertelli benefitted from the enterprise through his ownership of and income from his employment by ACI and payments receive for contracts awarded to ACI.

221.   **David Albertelli** committed and conspired to commit all of the predicate acts alleged above throughout Count I.  More specifically, he committed and conspired to commit the following predicate acts:

a.   the bribery of Eguizabal, (see ¶¶ 57-81);

b.   preparing and sending the false Qualification Statement for Westcore I (see ¶¶ 82-108);

c.   not disclosing and actively concealing his interest in Westcore I, the New Fasanelli Companies, Westcore II, Foundation Management, National Framing, KMM and Team CCR (see ¶¶ 82-108; 129-136; 139; 178);

d.   creating and using Westcore II to fraudulently divert payments from Westcore I (see ¶¶ 137-146);

     e.   preparing and sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors (see ¶¶ 109-136; 146-173);

     f.   creating and using the New Fasanelli Companies to obtain contracts through fraud and deception, and not disclosing his ownership (see ¶¶ 174-181);

     g.   stealing the Joint Checks by sending and having others send false representations to induce Continental to send the Joint Checks, wrongfully depositing them in ACI's account and then authorizing others to send false statements to conceal the theft (see ¶¶ 182-211).

222.    David Albertelli is a leader of the Corrupt Enterprise and directed the execution of many of the predicate acts.

223.    David Albertelli benefitted from the enterprise through his ownership of and income from his employment by ACI; ownership, direct or indirect, of Westcore I, Westcore II, the New Fasanelli Companies, Foundation Management, Team CCR, MFDC, National Framing, KMM, and US Construction Trust; and payments received for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

224.    **Westcore I** committed and conspired to commit the following predicate acts:

     a.   bribery of Eguizabal (see ¶¶ 57-81);

     b.   submitting a false Qualification Statement for Westcore I (see ¶¶ 82-108);

     c.   not disclosing and actively concealing David Albertelli's and Kozlowski's interest in Westcore I (see ¶¶ 82-108);

     d.   creating, using and concealing the true nature of Team CCR so that it could wrongfully obtain payments (see ¶¶ 147-162); and

e. sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors (see ¶¶ 147-173).

225. Westcore I benefitted from the enterprise through payments received for contracts awarded to Westcore I and from payments made on the New Braunfels Project that were used to fund Westcore I.

226. **Westcore II** committed and conspired to commit the following predicate acts:

a. bribery of Eguizabal (see ¶¶ 57-81);

b. not disclosing and actively concealing David Albertelli's interest in Westcore II (see ¶¶ 139);

c. wrongfully obtaining payments under Westcore I's contracts (see ¶¶ 137-146); and

d. sending false payment applications, sworn statements, and change orders, including claims for payments of sham subcontractors (see ¶¶ 147-173).

227. Westcore II benefitted from the enterprise through payments from Continental related to contracts awarded to Westcore I.

228. **Kevin Burke** conspired to commit and committed the following predicate acts:

a. Burke paid or caused bribes to be paid to Eguizabal, using Foundation Management and MFDC to wire money to Eguizabal (see ¶¶ 57-81);

b. setting up and processing payments, directly or through Foundation Management, to sham subcontractors including Team CCR, Framing USA, and National Framing, (see ¶¶ 147-173), and ghost contractor Westcore II (¶¶ 137-146); and the New Fasanelli Companies (see ¶¶ 174-181); and

46

      c.      Using Foundation Management to conceal the role of David Albertelli and Kozlowski in subcontractors and general contractors (see ¶¶ 82-108, 174 (Westcore I); ¶¶; see ¶¶ 174-181 (the New Fasanelli Companies); ¶¶ 129-136 (Related Parties), ¶ 139 (Westcore II).

229.    Burke was the de facto CFO of the enterprise; he controlled several other Defendants by being a CFO, agent or manager, either directly or through Foundation Management, of National Framing, KMM, Team CCR, Westcore II, and Foundation Management.

230.    Burke benefitted from the enterprise through income from employment by Foundation Management and payments received for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

231.    **Brook Kozlowski** was David Albertelli's chief lieutenant within the enterprise and as such committed and conspired to commit all of the predicate acts alleged above.   More specifically, he committed and conspired to commit the following predicate acts:

      a.      bribery of Eguizabal; he set up budgets for Westcore I projects that included a line item for MFDC Fee, which was for the bribes (see ¶¶ 57-81);

      b.      Assisted with preparing and transmitting the false Qualification Statement for Westcore I (see ¶¶ 82-108);

      c.      not disclosing and actively concealing David Albertelli and his interest in Westcore I, Westcore II, the New Fasanelli Companies, Foundation Management, National Framing, KMM, Team CCR, MFDC and US Construction Trust (see ¶¶ 82-108, 129-136, 139, 174).

      d.      creating and using Westcore II to wrongfully obtain payments (see ¶¶ 137-146);

    e.    sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors by wire and mail (see ¶¶ 109-173);

    f.    on information and belief, assisting with the theft of the Joint Checks (see ¶¶ 182-211).

232.    Kozlowski is David Albertelli's chief lieutenant and as such had knowledge of all illegal activity of the enterprise.

233.    Kozlowski benefitted from the enterprise through the income for his employment by ACI and, on information and belief, Foundation Management, and his ownership in Westcore I and other of the companies established by the enterprise, and payments received for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

234.    **John Salat** conspired to commit and committed the following predicate acts:

    a.    Bribery related to Westcore I projects; Salat knew of the bribery, through his familiarity with the Westcore I and /or Westcore II budgets that showed an MFDC Fee (see ¶¶ 57-81);

    b.    Creation and transmission of the false Qualification Statement used to get contracts for Westcore I (see ¶¶ 82-108);

    c.    Failing to disclose the bribes and misrepresentations in the Qualification Statement (see ¶¶ 57-81; 82-108);

    d.    causing Westcore I and/or Westcore II to use sham subcontracting companies, notably Team CCR and Framing USA, to divert payment while giving the impression to Continental that legitimate subcontractors were

being paid, and concealing the true owners of those companies (see ¶¶ 147-173);

e.  participating in the diversion of payments to Westcore II (see ¶¶ 137-146); and

f.  Not disclosing and actively concealing the role of David Albertelli and Kozlowski in Westcore I and Westcore II, by among other things claiming to own Westcore I and/or Westcore II (see ¶¶ 137-146).

235.  Salat is part of the Corrupt Enterprise and held a leadership role within Westcore I and Westcore II.

236.  Salat benefitted from the RICO enterprise through income for his employment by Westcore, his ownership in Westcore II, and payments received for contracts awarded to Westcore I.

237.  **Foundation Management** conspired to commit and committed the following predicate acts:

a.  Bribery of Eguizabal; as the manager of MFDC, Westcore II and the New Fasanelli Companies, Foundation Management paid or caused the bribes to be paid (see ¶¶ 57-81);

b.  As Foundation Management is the manager of Westcore II, Team CCR, KMM, National Framing, and MFDC it is responsible for predicate acts they committed (see entries for those companies in this section);

c.  As the manager of Westcore II, National Framing and KMM, Foundation Management participated in the submission of fraudulent billing documents (see ¶¶ 150-176) and the diversion of payments from Westcore I to

49

Westcore II (see ¶¶ 140-149); and from legitimate subcontractors to sham

subcontractors (see ¶¶ 150-176); and

d.   Not disclosing and actively concealing the involvement of David Albertelli

and Kozlowski in Westcore I, Westcore II, the New Fasanelli Companies,

Team CCR, National Framing and KMM. MFDC and US Construction

Trust (see ¶¶ 82-108, 142, 150, 180-181).

238.   Foundation Management benefitted from the RICO enterprise through the fees it

derived from Westcore II, the New Fasanelli Companies, Team CCR, National Framing and

KMM, and, on information and belief, David Albertelli's investments in Foundation Management

through US Construction Trust of amounts received for contracts awarded to ACI, Westcore I and

the New Fasanelli Companies.

239.   **National Framing** conspired to commit and committed the following predicate

acts:

a.    providing false information about the cost of subcontract work as part of

the fraud related to sham subcontractors (see ¶¶ 121-136);

b.   National Framing provided misleading payment application documents that

misrepresented the amount it could claim is due and then filed a fraudulent

mechanics lien for a greater amount on the Six Mile Project in an attempt

to obtain a double payment from the Six Mile Fund to the enterprise (see

¶¶ 121-128); and

c.   placing a fraudulent lien on the Rochester Project for amounts not owed by

Rochester Fund to ACI (see ¶ 136).

240.    National Framing benefitted from the enterprise through the payments it received from ACI, Westcore I, Westcore II and the New Fasanelli Companies; on information and belief, David Albertelli's investments in National Framing through US Construction Trust of payments for contracts awarded to ACI, Westcore I and the New Fasanelli Companies; and lien claims that it may have due to nonpayment by ACI and Westcore I.

241.    **KMM** conspired to commit and committed the following predicate acts:

  a.    KMM was a subcontractor for ACI and Westcore on multiple projects; KMM filed a fraudulent lien on the Rochester Project for an amount not owed by Rochester Fund to ACI (see ¶ 136); and

  b.    Not disclosing and actively concealing the involvement of David Albertelli and Kozlowski in KMM (see ¶¶ 129-136).

242.    KMM benefitted from the RICO enterprise through the payments it received from ACI and Westcore I and Westcore II; on information and belief, David Albertelli's investments in KMM through US Construction Trust of amounts received for contracts awarded to ACI, and Westcore I; and lien claims that it may have due to nonpayment by ACI and Westcore.

243.    **MFDC** conspired to commit and committed the predicate acts of bribing Eguizabal; MFDC was formed and operated for the purpose of and paid multiple bribes to Eguizabal and to Bravo21 (see ¶¶ 57-81).

244.    MFDC benefitted from the RICO enterprise through the payments it received from ACI and Westcore, on information and belief, David Albertelli's investments in MFDC through US Construction Trust of payments for contracts awarded to ACI, Westcore I and the New Fasanelli Companies; and on information and belief, MFDC retained deposits to MFDC's account earmarked for bribes which were never paid.

245.   **Team CCR** conspired to commit and committed the following predicate acts:

    a.    submitting false payment applications to divert project payments on the Longmont Project from the true subcontractor, Consolidated Resources (see ¶¶ 150-165); and

    b.    Team CCR intentionally concealed its true identity and David Albertelli's indirect ownership of Team CCR (see ¶ 150).

246.   Team CCR benefitted from the enterprise through payments for the Longmont Project and, on information and belief, David Albertelli's investments in MFDC through US Construction Trust and Foundation Management of payments for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

247.   **Kerry Heltzel** conspired to commit and committed the following predicate acts:

    a.    Bribery of Eguizabal, on information and belief, as an accountant for several defendants (see ¶¶ 29, 51), Heltzel processed payments of bribes and payment requests that were used to fund bribes;

    b.    On information and belief, Heltzel participated in the submission of payment applications she knew to be false (see ¶ 110);

    c.    On information and belief, Heltzel manipulated the Textura system for electronic submission of payment applications to allow her to electronically sign payment applications related to Westcore I and/or Westcore II and Team CCR on behalf of other persons without the consent or knowledge of those persons (see ¶¶ 150-165, specifically ¶¶ 150, 160); and

d.      sending wiring instruction to Continental for Westcore I jobs that, on information and belief, were for accounts controlled by Westcore II not Westcore I (see ¶¶ 140-149, specifically, ¶¶ 144-148).

248.    Heltzel benefitted from the RICO enterprise through income for her employment by Foundation Management or ACI, Westcore I and Westcore II, and from payments for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

249.    **Amy Butler** conspired to commit and committed the predicate acts:

a.      Bribery of Eguizabal, on information and belief, Butler as an accounting manager of ACI (See ¶ 26) directed or at least knew of the bribes being paid to Eguizabal related to ACI contracts (see ¶¶ 57-81);

b.      On information and belief, Butler either prepared or supervised the preparation of false payment applications submitted to Continental (see ¶¶ 109-128);

c.      Ms. Butler was directly involved with the theft of the Joint Checks and made material misrepresentations to Continental to help conceal the theft of the Joint Checks (see ¶¶ 185-214).

250.    Butler benefitted from the enterprise through income for her employment by ACI.

251.    **US Construction Trust** conspired to commit and committed the following predicate acts:

a.      Bribery; US Construction Trust was a managing member of Westcore I and, pursuant to a Consent in lieu of an Organizational Meeting dated February 13, 2015, held a 60% interest in Westcore I. As such, US Construction

Trust is responsible for the bribes and other fraud committed by Westcore I (see ¶¶ 57-81);

b.    On information and belief, David Albertelli used US Construction Trust to invest in companies that he formed or acquired, and then used to commit bribery, wire fraud, mail fraud and bank fraud (see ¶¶ 30, 51, 141, 166); and

c.    Concealing David Albertelli's ownership or other companies (see ¶¶ 30, 51, 141, 166).

252.    US Construction Trust benefitted from the enterprise through the income it derived as an owner of Westcore I and, on information and belief, David Albertelli's investments in US Construction Trust of payments from ACI, Westcore I and The New Fasanelli Company's contracts.

### G-2.    Other Victims

253.    While the Plaintiffs' focus is on the actions of the Corrupt Enterprise as it relates to Plaintiffs, the Corrupt Enterprise defrauded parties other than Plaintiffs.

254.    The Corrupt Enterprise stole funds from multiple legitimate subcontractors and used the same tactics against other project owners.  For example, as alleged in the plaintiff's Original Petition in Lakefront Trail Rockwall Hotel, L.P. v. Albertelli Construction, Inc., David Albertelli, et al, No. 1-17-0359 (District Court, 382nd Judicial District, Rockwall County, Texas) ("Lakefront Case"), the owner of a construction project in Rockwall, Texas, alleges that ACI and David Albertelli used, among other things, false applications for payment sent by wire or through the mail, redirection of funds received from lenders that were earmarked for subcontractors to their own account, "front-end loading" (or requesting payment at the start of a project for work that has not yet been done), over-billing for work and supervision, refusing to correct defective work, failing to provide required staffing to keep the project on schedule, and not paying subcontractors

in which Defendants have an interest and allowing those subcontractors to file liens for the "unpaid" amounts in an attempt to recover a second payment.

### H. Racketeering Predicate Acts

255.    The Defendants, as part of the Corrupt Enterprise, have committed numerous RICO predicate acts.  Each of those predicate acts have damaged Plaintiffs as further explained below.

256.    18 U.S.C. § 1961(1) states that: "racketeering activity" means (A) any act or threat involving  murder,  kidnapping,  gambling,  arson,  robbery,  **bribery**,  extortion  .  .  .  which  is chargeable under State law and punishable by imprisonment for more than one year") [emphasis added].  Continental had projects in Colorado, Texas, Minnesota, and Florida that were negatively affected by the bribery scheme.  Each of these states have bribery statutes carrying penalties in excess of a year. *See* Colorado Revised Statutes Title 18 Criminal Code § 18-5-401 (bribery is a class  6  felony);  Texas  Penal  Code  § 32.43;  Minnesota  Criminal  Statute  609.86  (commercial bribery sentence is up to five years' imprisonment).

257.    The bribery is wire fraud as the bribes were paid by wire transfers and the nature of such  payments  was  intentionally  concealed  from  Plaintiffs.   The  bribes  fraudulently  induced Plaintiffs to award contracts to ACI and Westcore I and Plaintiffs have been severely damaged by the poor performance of ACI and Westcore on those contracts.

258.    The use of the sham subcontractors and related false statements on sworn payment applications are mail and/or wire fraud and occurred many, many times and resulted in payments being made for more than the amounts that were due, payments being made to the incorrect entities and a host of large mechanic's lien claims being filed against the Projects.

259.    The creation and submission of the phony Qualification Statement involved the use of email and constitutes wire fraud.  But for the submission of the phony Qualification Statement, Continental would never have allowed Westcore I, or Westcore II, to perform any of its contracts

and would have avoided the significant damage it has incurred on the Westcore Projects as pleaded herein.

260.   The theft of the Joint Checks is a predicate act as mail fraud, wire fraud and bank fraud.  The theft of the Joint Checks damaged Plaintiffs by the amount of the checks that was stolen and by other amounts in thereafter paying subcontractors.

261.   The definition of Racketeering in RICO includes violations of "section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud),  …."  18 U.S.C.A. § 1961 (West).

262.   Section 1341 addresses mail fraud and fraud using private interstate carriers:

> "Whoever, having **devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,** or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, **or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing**, shall be fined under this title or imprisoned not more than 20 years, or both. ….."  18 U.S.C. § 1341 (West) (emphasis added).

263.   Section 1343 addresses wire fraud, including telephone and electronic transmissions:

> "Whoever, having **devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire,** radio, or television **communication in interstate or foreign commerce, any writings, signs, signals, pictures,**

56

**or sounds for the purpose of executing such scheme or artifice**, shall be fined under this title or imprisoned not more than 20 years, or both. …. If the violation …. affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1343 (West) (Emphasis added).

264.    Section 1344 addresses bank fraud, including the fraudulent attainment of funds from a financial institution:

> "Whoever knowingly executes, or attempts to execute, a scheme or artifice
>
> (1) to defraud a financial institution; or
>
> (2) to **obtain any of the moneys, funds**, credits, assets, securities, or other property owned by, or **under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises**; …. 18 U.S.C. § 1344 (West) (emphasis added).

### (1)    Remedies Available

265.    RICO, among other things, provides the following remedies:

> "§ 1964. Civil remedies
>
> (a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: **ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments** of any person, including, but not limited to, **prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce**; or **ordering dissolution or reorganization of any enterprise**, making due provision for the rights of innocent persons.
> (b) ….
> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court **and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, ….**
> (d) ….   18 U.S.C. §1964 (emphasis added).

266.    Rochester Fund and Six Mile Fund were damaged by the fraud and misappropriation of the Joint Checks. Rochester Fund and Six Mile Fund are entitled to treble

damages related to the joint check scheme. Because Continental has received reimbursement from third parties, not the Defendants, of the amount of the stolen Joint Checks, the Defendants may be entitled to a credit against the trebled damages in the amount reimbursed.

267.    The Funds were further damaged by the Defendants' other schemes and are entitled to treble damages arising from those schemes. Those damages include, but are not limited to, costs of correcting ACI's defective work, cost of completing ACI's scope of work, costs of payments to subcontractors, costs of removing or addressing mechanics liens, costs of adding crews to complete work and recover time on schedules, costs of adding supervision to Projects, costs of additional management time for the Projects, costs of delayed completion, costs of legal services, additional interest on loans, additional payments to investors, payments of fines and other costs.

268.    The damages suffered by the Funds were proximately caused by the Defendants fraud and bribery.

269.    The Funds are entitled to damages incurred by the subcontractors and treble damages for the claims that were assigned to the Funds by the subcontractors and to which the Funds are subrogated by payment of the subcontractors.

270.    Pursuant to 18 U.S.C. § 1964 (a), ACI, George Albertelli, David Albertelli, Brook Kozlowski, John Salat, Kevin Burke, ACI, Foundation Management, Westcore I, Westcore II, National Framing, KMM, Team CCR, US Construction Trust and MFDC should be forbidden from participating in the construction industry.

271.    Plaintiffs have been injured in an amount in excess of $10,000,000.

WHEREFORE, on Count 1, Plaintiffs request that this Court provide the following relief against the Defendants:

a) Grant Plaintiffs injunctive relief by ordering George Albertelli, David Albertelli, Brook Kozlowski, John Salat, Kevin Burke, ACI, Foundation Management, Westcore I, Westcore II, National Framing, KMM Construction, Team CCR, LLC, US Construction Trust and MFDC, LLC, to i) divest himself or itself of any interest, direct or indirect, in any enterprise related to the construction industry, ii) be restricted from providing labor, services or materials to or participating in the construction industry as an employee, consultant, contractor, subcontractor, owner or otherwise, and iii) be restricted from making investments in or loans to any person or entity engaging in the construction industry;

b) Order dissolution of ACI, Foundation Management, Westcore I, Westcore II, National Framing, KMM Construction, MFDC, LLC, Team CCR, and US Construction Trust,

c) Grant Plaintiff's compensatory, statutory treble damages, exemplary, punitive, and other damages as shall be proven at trial;

d) Grant Plaintiffs their attorneys' fees and costs; and

e) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT 2 - FLORIDA RICO AND CIVIL REMEDIES
## FOR CRIMINAL ACTIVITIES – AGAINST ALL DEFENDANTS

272.    Because Count 2 is based on the same facts and circumstances as Count 1, the allegations of paragraphs 1 through 271, excluding paragraphs 46-50, are incorporated as though set forth in full herein as the allegations in this paragraph.

273.    This Count alleges claims against all Defendants under the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. Chapter 772, and the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. Chapter 895, asserting a statutory right of action against

Defendants for their conduct of, or participation in, an enterprise through a pattern of criminal and racketeering activity in violation of Fla. Stat. §§ 772.103 and 895.03.

274.    The Corrupt Enterprise constitutes an association-in-fact enterprise within the meaning of Fla. Stat. §§ 772.102(3), 772.103(3), 895.02(3), and 895.03(3).

275.    Defendants participated, directly and indirectly, in the Corrupt Enterprise, including through the conduct, management, or operation of the Corrupt Enterprise's affairs through a "pattern of criminal activity" within the meaning of Fla. Stat. § 772.102(4) and in violation of Fla. Stat. § 772.103(3), including the incidents of criminal activity set forth in Count 1. These incidents of criminal activity had the same or similar intents, results, accomplices, victims, or methods of commission or were otherwise interrelated by distinguishing characteristics and were not otherwise isolated incidents.

276.    Defendants participated, directly and indirectly, in the Corrupt Enterprise, including through the conduct, management, or operation of the Corrupt Enterprise's affairs through a "pattern of racketeering activity" within the meaning of Fla. Stat. § 895.02(4) and in violation of Fla. Stat. § 895.03(3), including the incidents of racketeering conduct set forth in Count 1. These incidents of racketeering conduct had the same or similar intents, results, accomplices, victims, or methods of commission or were otherwise interrelated by distinguishing characteristics and were not otherwise isolated incidents.

277.    Defendants committed a substantial number of related incidents of criminal activity and racketeering conduct over an extended period of time, including the predicate acts enumerated at Count 1. Each predicate act constitutes "criminal activity" within the meaning of Fla. Stat. § 772.102(1) and "racketeering activity" within the meaning of Fla. Stat. § 895.02(1). Defendants'

DM1\8519672.3

commission of predicate acts is part of a general course of business and will continue unless and until they are prevented from committing such acts.

278.    The Funds were, and continue to be, injured by reason of Defendants' violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts, as set forth in paragraphs 54-260.

279.    Despite their diligence and efforts, the Funds' discovery of these ongoing injuries was delayed by Defendants' fraudulent concealment activity as set forth in paragraphs 82-111, 137-146, 153, 178, 187-197, and 199-204.

280.    The injuries to the Funds were a direct, proximate, and reasonably foreseeable result of the violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts enumerated at Paragraphs 54-260. The Funds have been and will continue to be injured in an amount to be determined at trial.

281.    Pursuant to Fla. Stat. § 772.104(1), the Funds are entitled to recover treble damages plus costs and attorneys' fees from Defendants. Because Continental has received reimbursement from third parties, not the Defendants, of the amount of the stolen Joint Checks, the Defendants may be entitled to a credit against the trebled damages in the amount reimbursed.

282.    Pursuant to Fla. Stat.§§ 895.05(1), 895.05(6), the Funds are entitled to an injunction preventing Defendants from committing further violations of Fla. Stat. § 895.03.

WHEREFORE, on Count 2, Plaintiffs request that this Court provide the following relief against the Defendants:

a)  Grant Plaintiffs injunctive, compensatory, statutory, exemplary, punitive, and other damages as shall be proven at trial;

b)  Grant Plaintiffs their attorneys' fees and costs; and

c)   Grant such other and further relief in favor of the Plaintiffs as this Court deems just and

proper.

### COUNT 3 -  FLORIDA RICO AND FLORIDA
### CIVIL REMEDIES FOR CRIMINAL ACTIVITIES –
### CONSPIRACY – AGAINST ALL DEFENDANTS

283.    Because Count 3 is for the conspiracy that is based on the same facts and

circumstances as the RICO violations in Counts 1 and 2, the allegations of paragraphs 1 through

271, excluding paragraphs 46-50 of Count 1, and paragraphs 273-281 of Count 2 are incorporated

as though set forth in full herein as the allegations in this paragraph.

284.    Defendants violated Fla. Stat. §§ 772.103(4) and 895.03(4) by conspiring to violate

Fla. Stat. §§ 772.103(3) and 895.03(3), respectively.

285.    In connection with the Corrupt Enterprise described in Paragraphs 51, 53, 55 and

56, above, Defendants agreed to accomplish an unlawful plan to engage in a pattern of criminal

and racketeering activity, including the incidents of criminal and racketeering activity set forth in

paragraphs 54-260, above.

286.    Defendants agreed to the overall objective of the conspiracy, or each agreed to

commit personally at least two acts of criminal and racketeering activity.

287.    As a direct and proximate result of the predicate acts taken in furtherance of the

conspiracy, the Funds have been injured in their business or property.

288.    Despite their diligence and efforts, the Funds' discovery of these ongoing injuries

was delayed by Defendants' fraudulent concealment activity as set forth in paragraph 279 above.

289.    Pursuant to Fla. Stat. § 772.104(1), the Funds are entitled to recover treble damages

plus costs and attorneys' fees from Defendants.

290.    Pursuant to Fla. Stat. §§ 895.05(1), 895.05(6), the Funds are entitled to an

injunction preventing Defendants from committing further violations of Fla. Stat. § 895.03.

DM1\8519672.3

WHEREFORE, on Count 3, Plaintiffs request that this Court provide the following relief against the Defendants:

a) Grant Plaintiffs injunctive, compensatory, statutory, exemplary, punitive, and other damages as shall be proven at trial;

b) Grant Plaintiffs their attorneys' fees and costs; and

c) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT 4 - CIVIL THEFT (Fla. Stat. 772.11) – AGAINST ACI, GEORGE ALBERTELLI AND DAVID ALBERTELLI

291. This Count is based upon the theft of the Joint Checks described in paragraphs 182-211 and those paragraphs, together with paragraphs 16-45 describing the parties and the Contracts, are incorporated as though set forth in full herein as the allegations in this paragraph. Defined terms used in those paragraphs shall have the meaning defined in this Third Amended Complaint even if such terms are not defined in a paragraph incorporated in this Count.

292. Defendants ACI and David Albertelli knowingly obtained or used, or endeavored to use the proceeds of the Joint Checks by depositing the checks into the account of ACI at CenterState Bank without obtaining the second signature.

293. The proceeds of the Joint Checks were the property of Plaintiffs Six Mile Fund and Rochester Fund and were intended to be paid to ACI's subcontractors.

294. All rights of ACI's subcontractors to the Joint Checks have been assigned to or subrogated to the Plaintiffs Six Mile Fund and Rochester Fund.

295. Defendants ACI, George Albertelli and David Albertelli knew the illegality of their actions when they deposited, or caused to be deposited, the Joint Checks into ACI's account after

deceiving Plaintiffs' into believing that the joint Checks would be forwarded to subcontractors. Defendants knew they had no right to the proceeds of those Joint Checks.

296.    Defendants ACI, George Albertelli and David Albertelli intended to temporarily or permanently deprive Plaintiffs of their right to or benefits of the Joint Checks or to appropriate the Joint Checks for Defendants' own use.  The Joint Checks were drafted with the intention and for the sole purpose of allowing Plaintiffs to pay the subcontractors amounts due on the Projects without Defendants being able to use the associated monies for their own purposes. Defendants intended to and used the monies as bargaining chips against the Plaintiffs and subcontractors, and for Defendants own purposes.

297.    On January 13, 2017, Plaintiffs made a written demand on Defendants ACI and David Albertelli for the payment of treble damages that are due Plaintiffs under Florida Statutes Annotated §772.11(1).  At the time of the demand, George Albertelli was, and he currently is, the Chief Executive Officer of ACI and the largest shareholder of ACI.  More than 30 days have expired since the demand letter was received by Defendants.

298.    Plaintiffs are entitled to receive treble damages, reasonable attorney's fees and court costs from the Defendants by statute.  FSA §772.11.    Because Continental has received reimbursement from third parties, not the Defendants, of the amount of the stolen Joint Checks, the Defendants may be entitled to a credit against the trebled damages in the amount reimbursed. WHEREFORE, on Count 4, Plaintiffs Six Mile Fund and Rochester Fund request that this Court provide the following relief against Defendants ACI, George Albertelli and David Albertelli:

a)  Grant Plaintiffs treble damages based on actual damages as shall be proven at trial;

b)  Grant Plaintiffs their reasonable attorneys' fees and court costs; and

DM1\8519672.3

c) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT 5 -  COMMON LAW FRAUD – AGAINST
## ALL DEFENDANTS

299.    Many of the actions that form the bases for the predicate acts alleged in Count 1 (RICO) are also cognizable under a common law fraud theory.  The common law fraud committed by the Defendants generally falls into the same categories as the RICO predicate acts.  Those fraud categories can generally be characterized as 1) bribery to get contracts; 2) falsification of a qualification statement for Westcore I to win approval of Continental as a general contractor; 3) paying bribes to get contracts from Continental for the New Fasanelli Companies; 4) defrauding Plaintiffs by falsifying payment applications and using subcontractors owned by Defendants to divert funds from the rightful recipients; and 5) stealing over $2 Million worth of checks intended to be paid to subcontractors ("Joint Checks") in December 2016.

### A.    Fraud through Bribery

300.    As alleged in paragraphs 57-81, beginning on or about December 11, 2011 through at least March 2017, Defendants David Albertelli, George Albertelli, ACI, Westcore I, Westcore II, MFDC, Burke, Salat and Kozlowski agreed to pay bribes to Eguizabal in exchange for Eguizabal steering projects to ACI, Westcore I, and the New Fasanelli Companies, and providing preferential treatment while administering those contracts.  From December 11, 2011 through March 14, 2017, those Defendants paid Eguizabal at least $1,464,735 in bribes.

301.    In exchange for bribes, Eguizabal steered the eight Projects to ACI and Westcore, as well as other projects to ACI and the New Fasanelli companies.

302.    Plaintiffs relied on Eguizabal to award the eight Projects and the other projects to contractors based upon the merits of the bids and qualifications of such contractors.

303.     Had Plaintiffs known Eguizabal was instead awarding the eight Projects and other projects to ACI and Westcore I based on bribes to Eguizabal, Plaintiffs would not have awarded ACI and Westcore I those Projects.

304.     Defendants' fraud damaged Plaintiffs in two distinct ways.  First, if not for the bribes, Plaintiffs would have hired a contractor that performed a higher standard of work.  Due to the shoddy work of Defendants, Plaintiffs had to and will have to spend additional funds to repair the Projects, which is expected to cost several million dollars.  ACI and Westcore I's poor performance also caused the Plaintiffs damages due to the delayed turnover and occupancy of the Projects.  Second, Eguizabal and George Albertelli, David Albertelli, ACI, Westcore I, Westcore II, Kozlowski, and Salat built the amount of the bribe payments into the prices that they charged Plaintiffs to complete the projects.  In certain cases, the bribes were included in the internal budgets of Westcore I and/or Westcore II.  (See ¶ 70.)  Had these bribe payments not been built into the project prices, Plaintiffs would have saved at least the amount of the bribes.

### B.     Creation of Non-Existent Subcontractors to Steal Money from Plaintiffs

305.     As set forth in greater detail in paragraphs 109-173, in order to defraud Plaintiffs, Defendants created non-existent or "sham" subcontractors and falsified documents to obtain payments to which Defendants were not entitled.

306.     Specific examples of this fraud are contained in paragraphs 121-128 (National Framing), 129-136 (self-dealing with sham subcontractors), 137-146 (Westcore II), 147-162 (Team CCR), 163-173.  The sham subcontractors were all owned by Defendants.

307.     At the direction of Defendants, the sham subcontractors submitted bills to Plaintiffs for work not actually performed.

308.     Defendants submitted lien waivers and sworn statements for the sham subcontractors to give the false impression that the subcontractors actually doing the work had

been paid.  Although the full extent of such actions is still being uncovered, on multiple occasions, the sham subcontractors filed liens for amounts already paid by the Plaintiffs.  (See paragraphs 113-120 (Change Order 10), 121-128 (National Framing), 137-146 (Westcore II), 147-162 (Team CCR) and 163-173 (Framing USA).

309.    Plaintiffs relied on the bills submitted by the sham subcontractors to determine how much to pay the sham subcontractors.  Had Plaintiffs known that the sham subcontractors did not perform all of the work that the subcontractors billed for, Plaintiffs would not have paid the full amounts of the bills.  Sham subcontractors and Westcore II, under the control and direction of Defendants, submitted bills millions of dollars for work they did not actually perform.

### C.    Falsified Westcore I Qualification Statement and Financials

310.    The full details of the falsified Qualification Statement are set forth in paragraphs 82-108, which are incorporated herein by reference.  The Qualification Statement was a sworn statement and submission of a sworn qualification statement demonstrating the appropriate experience and financial wherewithal to perform the work was a condition precedent to receiving work from Continental.

311.    Plaintiffs relied on the false statements in the Qualification Statement when awarding Westcore I the Waco Contract, the Bryan Contract and the Longmont Contract.

312.    Plaintiffs would not have awarded those projects to Westcore I had Plaintiffs known about the false statements on Westcore I's Qualification Statement.

313.    In turn, Westcore I performed subpar work, causing Plaintiff to have to expend money to fix their work and causing damage due to late delivery.  In addition, the false Qualification Statement allowed the bribery scheme to continue.

### D.      Theft of Joint Checks

314.    As set forth in paragraphs 182-211, incorporated herein by reference, David Albertelli, ACI and other Defendants executed a detailed, fraudulent scheme to steal the Joint Checks and to conceal the theft from Plaintiffs.

315.    The theft forced Plaintiffs to pay the unpaid subcontractors directly, thereby subjecting Plaintiffs to double payment and delayed work on those Projects.

316.    Plaintiffs Rochester Fund and Six Mile Fund have been damaged in the amount of the Joint Checks and damages due to delays.

317.    As set forth above and summarized in paragraphs 212-252, incorporated herein by reference, each of the Defendants played a part in Defendants' fraud.

WHEREFORE, on Count 5, Plaintiffs request that this Court provide the following relief against Defendants George Albertelli, David Albertelli, ACI, Kozlowski, Salat, Westcore I, Westcore II, Butler, Burke, Heltzel, Foundation Management, National Framing, KMM, MFDC, Team CCR, and US Construction Trust.:

a) Grant Plaintiffs compensatory, exemplary, punitive, and other damages as shall be proven at trial, including without limitation, the amount of all bribes paid to Eguizabal, all profits earned by ACI and Westcore on projects for which a bribe was paid to Eguizabal, the cost of corrective work and delays incurred due to hiring ACI and Westcore I to construct the Project, the costs associated with subcontractor, ACI and Westcore I liens, and payments to subcontractors by Plaintiffs; and

b) Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

DM1\8519672.3

## COUNT 6 - COMMON LAW CONSPIRACY TO COMMIT FRAUD – AGAINST ALL DEFENDANTS

318.     The allegations of Count 5, Common Law Fraud, paragraphs 299 through 317, form the basis for this Count 6, Conspiracy to Commit Fraud, and are incorporated herein as though set forth in full herein as the allegations in this paragraph.  Paragraphs 16-45 regarding definition of the parties and contracts are incorporated herein as though set forth in full. Any defined term used in such paragraphs shall have the meaning defined in this Third Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

319.     The Defendants conspired among themselves to coordinate the numerous details required for their fraud.

320.     George Albertelli, David Albertelli, ACI, Kozlowski, Salat, Westcore I, Westcore II, Butler, Burke, Heltzel, Eguizabal, Bravo21, Foundation Management, National Framing, KMM, MFDC, Team CCR, and US Construction Trust, and others conspired to defraud the Funds. WHEREFORE, on Count 6, Plaintiffs request that this Court provide the following relief against Defendants George Albertelli, David Albertelli, ACI, Kozlowski, Salat, Westcore I, Westcore II, Butler, Burke, Heltzel, Foundation Management, National Framing, KMM, MFDC, Team CCR, and US Construction Trust.:

a)  Grant Plaintiffs compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b)  Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT 7 - CONVERSION - AGAINST DAVID ALBERTELLI AND ACI

321.     The allegations regarding the theft of the Joint Checks in paragraphs 182-211 above are incorporated as though set forth in full herein as the allegations in this paragraph.  Paragraphs

16-45 regarding definition of the parties and Contracts are incorporated herein as though set forth in full.

322.    David Albertelli and ACI converted the proceeds of the Joint Checks, that was the property of the Plaintiffs Six Mile Fund and Rochester Fund, to their possession.

WHEREFORE, on Count 7, Plaintiffs request that this Court provide the following relief against Defendants David Albertelli and ACI:

a)  Grant Plaintiffs compensatory and other damages as shall be proven at trial; and

b)  Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT 8 – THEFT BY CONTRACTOR -
## MINN. STAT. § 514.02 – AGAINST ACI

323.    The allegations regarding the theft of Joint Checks on the Rochester Project in paragraphs 182-186 and 199-211, and paragraphs 16-45 regarding definition of the parties and contracts are incorporated herein as though set forth in full.

324.    ACI received payments from the Savage Fund on the Savage Project and from Rochester Fund on the Rochester Project that ACI requested for subcontractors who "furnished … labor, skill, material or machinery to the [Projects]".  The Projects are improvements to real estate.

325.    ACI failed to use those payments to pay the subcontractors, knew the subcontractors were unpaid, failed to provide a lien waiver under Minnesota Statutes section 514.07, and failed to provide a payment bond.

326.    ACI improperly deposited a total of $1,121,882.88 that was to be paid to subcontractors for the Rochester Project.  On information and belief, some subcontractors were later paid by ACI and the outstanding principal amount may be reduced.

327.    In late December 2016, the Funds were contacted by several subcontractors who complained that they had not been paid the payment corresponding to the October Payment Application.  Those subcontractors indicated that ACI did not send them the joint check but did send a lien waiver and other documentation.  The Funds then learned that the cancelled Joint Checks did not have the required second signatures.

328.    Minnesota Statutes Section 514.02 provides, in pertinent part:

> **Subdivision 1. Proceeds of payments; acts constituting theft.** (a) Proceeds of payments received by a person contributing to an improvement to real estate within the meaning of section 514.01 shall be held in trust by that person for the benefit of those persons who furnished the labor, skill, material, or machinery contributing to the improvement. ….
>
> (b) **If a person fails to use the proceeds of a payment made to that person for the improvement, for the payment for labor, skill, material, and machinery contributed to the improvement**, **knowing that the cost** of the labor performed, or skill, material, or machinery furnished **remains unpaid**, and who **has not furnished the person making such payment either a valid lien waiver under section 514.07, or a payment bond** in the basic amount of the contract price for the improvement, conditioned for the prompt payment to any person entitled thereto for the performance of labor or the furnishing of skill, material, or machinery for the improvement, **shall be guilty of theft** of the proceeds of the payment and is punishable under section 609.52. ….
>
> (c) ….
> (d) ….
>
> Subd. 1a. Civil action. A person injured by a violation of subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney fees, and receive other relief as determined by the court, including, without limitation, equitable tracing. A civil action under this subdivision may be brought:
>
> (1) against the person who committed the theft under subdivision 1; and
>
> (2) …..

* * *

71

329.    ACI is guilty of theft of the proceeds of payments made for improvements on the Savage Project and Rochester Project.

330.    Savage Fund was injured by ACI's theft of the proceeds of payments made for improvements on the Savage Project.

331.    Rochester Fund was injured by ACI's theft of the proceeds of payments made for improvements on the Rochester Project.

WHEREFORE, on Count 8, Plaintiffs request that this Court provide the following relief against Defendant ACI:

a)  Grant Plaintiffs compensatory damages, together with costs and disbursements, including costs of investigation and reasonable attorney fees, and other damages as shall be proven at trial;

b)  Grant Plaintiffs their attorneys' fees and costs; and

c)  Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

### COUNT 9 – BREACH OF SUBCONTRACTS – AGAINST ACI

332.    The allegations regarding the theft of Joint Checks in paragraphs 182-211 and paragraphs 16-45 regarding definition of the parties and Contracts are incorporated herein as though set forth in full.    Any defined term used in such paragraphs shall have the meaning defined in this Third Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

333.    On information and belief, ACI entered into written subcontracts with each of its subcontractors.

72

334.    ACI had a contractual obligation to each Subcontractor to make the payments to that Subcontractor in the amount reflected in the payment applications for the Rochester Project and the Six Mile Project, including the October payment applications.

335.    Without just cause or right, ACI failed and refused to pay the subcontractors amounts due under the Subcontracts for some of the payment applications, including the October payment applications for the Rochester Project and the Six Mile Project, and has committed other breaches of the Subcontracts.   The payments to the subcontractors for the October payment applications are the Joint Checks that were stolen by ACI as described in paragraphs 182-211.

336.    The subcontractors were damaged by ACI's breaches of the Subcontracts.

337.    On December 29, 2016, the Funds gave notice to ACI that the Funds would terminate ACI's opportunity to perform any more work on the Rochester Project if ACI did not return the money stolen through the joint check schemes and cure other contractual defaults.

338.    ACI cured none of its defaults, committed an additional default, and kept the stolen money.

339.    The terminations of ACI's opportunity to perform work on the Rochester Project became effective on January 6, 2017.

340.    On information and belief, subcontractors gave written notice to ACI that they were not paid on the Rochester Project.

341.    To keep the Rochester Project moving, mitigate damages, avoid Subcontractor liens, acquire the subcontractors' claims against ACI, and to do the right thing, the Funds paid the amounts of the Joint Checks directly to the unpaid subcontractors.

DM1\8519672.3

342.    Six Mile Fund is the subrogee or assignee, or both, of certain claims against ACI to which Six Mile Fund is subrogated by payment or that were assigned by the following former subcontractors of ACI:

     a.   Action Automatic Door & Gate

     b.   Adkins Electric Inc.

     c.   J.R. Hobbs Co. – Atlanta, L.L.C.

     d.   CQ Insulation

     e.    BMC (BMC West)

     f.   Ciano's Tile and Custom Finishes, L.L.C.

     g.    Crown Roofing LLC

     h.    Floor Technologies, Inc.

     i.   GE Appliances

     j.   Gulf Coast Plumbing of Central Florida, Inc.

     k.   Mr. Drywall Service, LLC

     l.   Master Woodcraft Cabinetry, LLC

     m.  Sousa Cabinets Inc.

     n.   Sunny Grove Landscaping Inc.

     o.   Bruno Chavez Painting, LLC

     p.   Haskins Inc.

     q.   Liberty Aluminum Company

     r.   Texas Contract Floors

343.   Rochester Fund is the subrogee or assignee, or both, of certain claims against ACI to which Rochester Fund is subrogated by payment or that were assigned by the following former subcontractors of ACI:

a.   Absolute Drywall, Inc.

b.   Advanced Building Center

c.   General Sprinkler Corporation

d.   Citywide Insulation, Inc.

e.   L&W Supply (M&S Drywall Supply)

f.   Seamless Gutter (Seamless Gutterworks, LLC)

g.   SL Contracting Inc.

h.   Stone Pro LLC (Stone Pro Masonry)

i.   Viking Gypsum Floors LLC

j.   American Fence Company

k.   Bruno Chavez Painting, LLC

l.   Texas Contract Floors

WHEREFORE, on Count 9, Plaintiffs Six Mile Fund and Rochester Fund request that this Court provide the following relief against Defendant ACI:

a)   Grant Plaintiffs compensatory and other damages as shall be proven at trial; and

b)   Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

DM1\8519672.3

## COUNT 10 – FLORIDA PROMPT PAYMENT ACT
## VIOLATIONS –AGAINST ACI

344.    Florida Statutes Section 715.12(2) ("Florida Prompt Payment Act") requires a contractor to pay its subcontractors within 14 days of receipt of payment for work done by the subcontractor on a construction project in Florida.

345.    As described in greater detail in paragraphs 182-198 and 206-211, ACI received Joint Check payments for work done by certain of its subcontractors on the Six Mile Project for the October payment application on or before December 2, 2016.  ACI improperly deposited those payments into ACI's own account on or before December 8, 2016.

346.    ACI did not pay those subcontractors on or before December 16, 2016.

347.    ACI violated the Florida Prompt Payment Act.

348.    The subcontractors are entitled to statutory damages, in addition to receipt of payments, under the Florida Prompt Payment Act.

349.    The subcontractors have assigned the claims for statutory damages to Six Mile Fund.

WHEREFORE, on Count 10, Plaintiff Six Mile Fund requests that this Court provide the following relief against Defendant ACI:

a)  Grant Plaintiff compensatory, statutory, and other damages as shall be proven at trial;

b)  Grant Plaintiff its attorneys' fees and costs; and

c)  Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

DM1\8519672.3

## COUNT 11 – MINNESOTA PROMPT PAYMENT ACT VIOLATIONS – AGAINST ACI

350.     Minnesota Statutes Section 337.10 subdivision 3 ("Minnesota Prompt Payment Act") requires a contractor to pay its subcontractors within 10 days of receipt of payment for work done by the subcontractor on a construction project in Minnesota.

351.     ACI received joint check payments for work done by certain of its subcontractors on the Rochester Project for the October payment application on or before December 2, 2016.  ACI improperly deposited those payments into ACI's own account on or before December 8, 2016.

352.     ACI did not pay those subcontractors on or before December 12, 2016.

353.     ACI violated the Minnesota Prompt Payment Act.

354.     The subcontractors are entitled to statutory damages, in addition to receipt of payments, under the Minnesota Prompt Payment Act.

355.     The subcontractors have assigned the claims for statutory damages to Rochester Fund.

WHEREFORE, on Count 11, Plaintiffs Rochester Fund and Savage Fund request that this Court provide the following relief against Defendant ACI:

a)  Grant Plaintiffs compensatory, statutory, and other damages as shall be proven at trial;

b)  Grant Plaintiffs their attorneys' fees and costs; and

c)  Grant such other and further relief in favor of the Plaintiffs as this Court deems just and proper.

## COUNT 12 - BREACH OF CONTRACT – SAVAGE – AGAINST ACI

356.     The allegations of paragraphs 16, 18, 44(b), and 45 defining parties and the Savage Contract are incorporated as though set forth in full herein as the allegations of this paragraph.

357.    ACI owes the Savage Fund the duties set forth in the Savage Contract, implied therein and implied as a matter of law.

358.    The Savage Contract includes multiple terms that were breached by ACI, including the following sections of the General Conditions to the Savage Contract:

     a.  3.3.1.  ACI is to supervise and direct the work of the Project using its best skill and attention.

     b.  3.7.2.  ACI shall comply with and give notices required by law.

     c.  3.9.1.  ACI shall employ a qualified superintendent who shall be at the Project site when work is being performed.

     d.  3.10.3.  ACI shall adhere to the Project schedule.

     e.  9.3.1.2.  ACI is prohibited from including amounts in payment applications that the contractor does not intend to pay to a subcontractor or supplier.

     f.  9.6.2.  ACI shall pay its subcontractors within 7 days of receipt of payment from the Savage Fund.

359.    ACI paid Eguizabal a bribe to procure the Savage Contract.  The bribe was included in the contract price to be paid to ACI.  ACI included the amount of the bribe in its billings to Savage Fund and falsified payment applications to disguise the truth of the amount billed.

360.     ACI submitted and processed payment applications on the Savage Project that overstated amounts that were due and diverted amounts owed to the subcontractors that had performed the work to sham subcontractors controlled by the ACI and others.

361.    ACI submitted change orders for amounts to which it was not entitled.  On June 2, 2015, David Albertelli signed a change order for the Savage Contract, Change Order Number 10,

78

in which ACI accepted responsibility for $401,780.00 in liquidated damages for delays caused by ACI and received relief on required turnover dates for some buildings.

362.    On information and belief, ACI knew that its representations about accepting responsibility for delays were misstatements of material fact.  As the Savage Project progressed nearer to completion, ACI demanded that Savage Fund pay for additional costs that ACI allegedly incurred due to the delays ACI had already agreed were its own fault.

363.    On information and belief, despite knowing it had no contractual right to a payment, ACI attempted to hold the Savage Project "hostage" by slowing progress and threatening not to complete the work unless the unwarranted payments were authorized.

364.    On September 23, 2016, ACI recorded a lien against the Savage Project that, on information and belief, includes the delay damages for which ACI had previously accepted responsibility.

365.    On information and belief, Defendants believed that filing the lien would interfere with Savage Fund's financing for the project and compel Savage Fund to make a payment to Defendants even though they had no legal right to a payment.

366.    Once ACI had incurred liquidated damages for delay to the maximum amount allowed by the Savage Contract, ACI requested unjustified increases to its contract price to continue to progress the completion of the Project, knowing further delay would be greatly detrimental to the Savage Fund but without recourse to ACI because of the cap on delay damages.

367.    ACI also attempted to take advantage of the delayed status and limitation on liability by not adequately staffing the project with supervision, project management, and other overhead costs.  Despite not incurring the cost of overhead and supervision that it was required to

provide, ACI submitted Payment Applications requesting the full amount of the "General Conditions" costs that included payments for supervision.

368. ACI repeatedly failed to pay its subcontractors within the time required by the Contract. ACI submitted payment applications seeking amounts due to subcontractors knowing full well it would not pay such subcontractors in a timely manner.

369. In addition to the foregoing, ACI's breaches of the Savage Contract include but are not limited to the following:

    a.  late delivery of buildings;

    b.  defective construction;

    c.  failing to comply with applicable codes and other laws;

    d.  improper design of certain elements, including but not limited to foundations;

    e.  failing to provide enough qualified supervisory personnel;

    f.  failing to remedy defaults;

    g.  failing to pay amounts due to subcontractors;

    h.  late payments to subcontractors;

    i.  failing to indemnify Savage Fund;

    j.  failing to perform in good faith and with fair dealing;

    k.  failing to fulfill other contractual obligations; and

    l.  recording a mechanics lien against the Savage Project and related real property that is grossly overstated, fraudulent, unenforceable and a breach of the Savage Contract.

370. Savage Fund has been damaged by and continues to be damaged by ACI's breaches.

371.   Savage Fund has performed all obligations required of it under the Savage Contract which were not excused.

WHEREFORE, on Count 12, Plaintiff Savage Fund requests that this Court provide the following relief against Defendant ACI:

a)   Grant Plaintiff compensatory and other damages as shall be proven at trial;

b)   Declare the mechanics lien recorded by ACI against the Savage Project to be void and unenforceable;

c)   Order ACI to immediately release the mechanics lien recorded by them against the Savage Project; and

d)   Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT 13 - PROFESSIONAL NEGLIGENCE – SAVAGE – AGAINST ACI

372.   The allegations of paragraphs 16, 18, 44(b), and 45 defining parties and the Rochester Contract are incorporated as though set forth in full herein as the allegations of this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Third Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

373.   ACI owes Savage Fund a duty to provide certain professional design service related to the Savage Project.

374.   ACI owed Savage Fund a duty to provide those design service in conformance with the Savage Contract and with the skill and care normally employed by professional designers performing similar design and other professional services for similar projects in Minnesota.

375.   ACI provided some of its professional services in breach of the applicable standard of care, including but not limited to ACI's design of certain foundations.

376.   ACI's breaches caused Savage Fund to be damaged.

81

WHEREFORE, on Count 13, Plaintiff Savage Fund requests that this Court provide the following relief against Defendant ACI:

a) Grant Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial;

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT 14 - BREACH OF CONTRACT – ROCHESTER- AGAINST ACI

377.    The allegations of paragraphs 16, 18, 44(e), and 45 defining parties and the Rochester Contract are incorporated as though set forth in full herein as the allegations of this paragraph.

378.    ACI owes the Rochester Fund the duties set forth in the Rochester Contract, implied therein and implied as a matter of law.

379.    The Rochester Contract includes multiple terms that were breached by ACI, including the following sections of the General Conditions to the Rochester Contract:

a. 3.3.1.  ACI is to supervise and direct the work of the Project using its best skill and attention.

b. 3.7.2.  ACI shall comply with and give notices required by law.

c. 3.9.1.  ACI shall employ a qualified superintendent who shall be at the Project site when work is being performed.

d. 3.10.3.  ACI shall adhere to the Project schedule.

e. 9.3.1.2.  ACI is prohibited from including amounts in payment applications that the contractor does not intend to pay to a subcontractor or supplier.

f. 9.6.2.  ACI shall pay its subcontractors within 7 days of receipt of payment from the Rochester Fund.

82

380.    ACI paid Eguizabal a bribe to procure the Rochester Contract.   The bribe was included in the Stipulated Sum to be paid to ACI.   ACI included the amount of the bribe in its billings to Rochester Fund and falsified payment applications to disguise the truth of the amount billed.

381.    ACI has failed to pay its subcontractors the amounts included for the subcontractors in payment applications.

382.    For example, as of April 11, 2017, National Framing claimed it was due $764,724.62 from ACI for the Rochester Project.

383.    ACI's underpayment to National Framing started in June of 2016, for which month National Framing claims $182,275.15 is still due and owing.   National Framing requested $482,275.15 for that month and ACI was paid that full amount but ACI paid only $300,000.00 to National Framing.

384.    Defendants did not pay National Framing the amounts it represented it would or had paid National Framing.   That non-payment allowed David Albertelli to benefit from the payment to ACI and a potential second payment to National Framing because, if the connection between National Framing and Albertelli was not discovered, the Rochester Fund might pay National Framing to avoid a lien claim.

385.    On payment applications 12 and 13, ACI delayed making timely payments to subcontractors after receiving funding.   ACI did not pay subcontractors until after the Rochester Fund caught ACI's misappropriation and demanded that ACI pay the subcontractors.

386.    ACI slowed its work on the Rochester Project to force Six Mile Fund to process change order requests on the Six Mile Project that were not properly supported and to which ACI was not entitled.   On information and belief, David Albertelli instructed ACI employees not to

return phone calls from the Funds and subcontractors regarding the Projects in order to prevent problems from being resolved.

387.   The theft of the Joint Checks constitutes a breach of the Rochester Contract.

388.   In addition to the foregoing, ACI's breaches of the Rochester Contract include but are not limited to the following:

     a.   late delivery of buildings;

     b.   defective construction;

     c.   failing to comply with applicable codes and other laws;

     d.   improper design of certain elements;

     e.   failing to provide enough qualified supervisory personnel;

     f.   failing to remedy defaults;

     g.   failing to comply with applicable laws;

     h.   failing to pay amounts due;

     i.   failing to perform in good faith and with fair dealing;

     j.   failing to indemnify Rochester Fund; and

     k.   failing to fulfill other contractual obligations.

389.   Rochester Fund has been damaged by and continues to be damaged by ACI's breaches.

390.   Rochester Fund has performed all obligations required of it under the Rochester Contract which were not excused.

WHEREFORE, on Count 14, Plaintiff Rochester Fund requests that this Court provide the following relief against Defendant ACI:

  a)   Grant Plaintiff compensatory and other damages as shall be proven at trial;

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

### COUNT 15 - BREACH OF CONTRACT – SIX MILE – AGAINST ACI

391. The allegations of paragraphs 16, 18, 44(d), and 45 defining parties and the Six Mile Contract are incorporated as though set forth in full herein as the allegations of this paragraph.

392. ACI owes the Six Mile Fund the duties set forth in the Six Mile Contract, implied therein and implied as a matter of law.

393. The Six Mile Contract includes multiple terms that were breached by ACI, including the following sections of the General Conditions to the Six Mile Contract:

    a. 3.3.1.  ACI is to supervise and direct the work of the Project using its best skill and attention.

    b. 3.7.2.  ACI shall comply with and give notices required by law.

    c. 3.9.1.  ACI shall employ a qualified superintendent who shall be at the Project site when work is being performed.

    d. 3.10.3.  ACI shall adhere to the Project schedule.

    e. 9.3.1.2.  ACI is prohibited from including amounts in payment applications that the contractor does not intend to pay to a subcontractor or supplier.

    f. 9.6.2.  ACI shall pay its subcontractors within 7 days of receipt of payment from the Six Mile Fund.

394. ACI paid Eguizabal a bribe to procure the Six Mile Contract.  The bribe was included in the Stipulated Sum to be paid to ACI.  ACI included the amount of the bribe in its billings to Six Mile Fund and falsified payment applications to disguise the truth of the amount billed.

395.    ACI submitted fraudulent, intentionally inaccurate payment applications on the Six Mile Project and often failed to pay subcontractors timely.  On Six Mile payment applications 15, 16 and 17, ACI delayed payments to subcontractors after receiving funding.  The Six Mile Fund caught ACI's misappropriation and demanded that ACI pay the subcontractors.

396.    In another case, from August 15th to the 22nd, 2016, Sneha Tamma of Continental, who processed payments for the Funds, noticed that ACI was not paying subcontractors even though the Funds had paid ACI.  Ms. Tamma repeatedly asked Amy Butler of ACI to pay subcontractors and provide the required proof of payment.  Ms. Butler provided false and misleading responses that led the Funds to believe subcontractors would be promptly paid.

397.    In yet another example, in March 2016, ACI slow-paid its door and window supplier, BMC, on the Six Mile Project.  After BMC shipped products to the project, ACI billed and was paid by Six Mile Fund but ACI did not pay BMC on a timely basis.  That inappropriate delay in payment allowed ACI to use BMC's money for other purposes.

398.    On at least one occasion on the Six Mile Project, ACI submitted a payment application that contradicted prior payment applications and attempted to assign negative amounts due subcontractors for whom Savage Fund had already paid ACI.

399.    In June 2016, ACI provided its Subcontractor, Bridgewell Resources, with a lien waiver that indicated that ACI had paid Bridgewell Resources for work through a later date than was true.  Rather than resolve the issue, ACI allowed the on-line system used to close out the draw in question without Bridgewell being paid.

400.    ACI did not disclose some of its subcontractors, or the amounts due or to become due them.  For example, Synergy Rents provided equipment to ACI with rental fees totaling $56,479.73 as of August 17, 2016, according to Synergy Rents.

401.    ACI requested and received payments from Six Mile Fund during that time but did not pay Synergy Rents and did not disclose the unpaid amounts or even the existence of Synergy Rents.  ACI intended to hide the fact that Six Mile Fund should expect a lien waiver from Synergy Rents.  By concealing the identity of subcontractors, ACI was able to defraud Six Mile Fund into making payments to ACI even though ACI was not paying its subcontractors.

402.    Another example of slow payment and deceptive billing by ACI concerned Bridgewell Resources, one of ACI's suppliers.  As of August 23, 2016, Bridgewell Resources had over $108,957.77 due and owing from ACI for materials delivered in May, June and July 2016, even though ACI had been paid for its May and June 2016 payment applications, which months accounted for $106,383.89 of the amount Bridgewell Resources claimed was due.

403.    ACI demanded unearned payments to progress the Six Mile Project in accordance with the agreed schedule.  ACI threatened to cause further delays to the already behind schedule Six Mile Project unless Six Mile Fund made an early payment of approximately $310,000 following the submission of the August 2016 Payment Application.  Six Mile Fund made the early payment but ACI did not use the payment to prevent the Six Mile Project from falling further behind schedule.

404.    ACI failed to provide project management services that met the applicable standard of care and contractual obligations by, among other things, hiring properly licensed subcontractors.  For example, ACI was cited for a violation for using an unlicensed painter in Lee County Building Code Violation case number VIO2016-06575, and an unlicensed siding contractor in case number VIO2016-04534.

405.    The theft of the Joint Checks as described in paragraphs 182-211 also constitutes a breach of the Six Mile Contract.

406.    In addition to the foregoing, ACI's breaches of the Six Mile Contract include but are not limited to the following:

      a.  late delivery of buildings;

      b.  defective construction;

      c.  failing to comply with applicable codes and other laws;

      d.  improper design of certain elements;

      e.  failing to provide enough qualified supervisory personnel;

      f.  failing to remedy defaults;

      g.  failing to comply with applicable laws;

      h.  failing to pay amounts due;

      i.  failing to perform in good faith and with fair dealing;

      j.  failing to indemnify Six Mile Fund; and

      k.  failing to fulfill other contractual obligations.

407.    Six Mile Fund has been damaged by and continues to be damaged by ACI's breaches.

408.    Six Mile Fund has performed all obligations required of it under the Six Mile Contract which were not excused.

WHEREFORE, on Count 15, Plaintiff Six Mile Fund requests that this Court provide the following relief against Defendant ACI:

a)  Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)  Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT 16 - BREACH OF IMPLIED WARRANTY – SIX MILE – AGAINST ACI

409.   The allegations of the Six Mile breach of contract count and paragraphs 390-408 (Count 15) above are incorporated as though set forth in full herein as the allegations in this paragraph.  Any defined term used in such paragraphs shall have the meaning defined in this Third Amended Complaint even if such term is not defined in a paragraph incorporated in this Count.

410.   ACI owes 332 Fund warranties implied under the law.  The implied warranties include:

a.   An implied warranty of workmanlike quality;

b.   An implied warranty of fitness for a particular purpose;

c.   An implied warranty of merchantability; and

d.   An implied warranty of habitability.

411.   The Six Mile Fund relied upon the warranties of ACI in deciding to award the contract for the Six Mile Project to ACI.

412.   ACI has breached one or more of those warranties.

413.   As ACI's failure to honor its warranties has caused Six Mile Fund to hire others to correct the work of ACI, Six Mile Fund has been damaged by and continues to be damaged by ACI's breaches of warranties.

WHEREFORE, on Count 16, Plaintiff 332 Fund requests that this Court provide the following relief against Defendant ACI:

a)   Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)   Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

DM1\8519672.3

## COUNT 17 - BREACH OF CONTRACT – NEW BRAUNFELS – AGAINST ACI

414.     The allegations of paragraphs 16, 18, 44(c), and 45 defining parties and the New Braunfels Contract are incorporated as though set forth in full herein as the allegations of this paragraph.

415.     ACI owes the New Braunfels Fund the duties set forth in the New Braunfels Contract, implied therein and implied as a matter of law.

416.     The New Braunfels Contract includes multiple terms that were breached by ACI, including the following sections of the General Conditions to the New Braunfels Contract:

    a.  3.3.1.  ACI is to supervise and direct the work of the Project using its best skill and attention.

    b.  3.7.2.  ACI shall comply with and give notices required by law.

    c.  3.9.1.  ACI shall employ a qualified superintendent who shall be at the Project site when work is being performed.

    d.  3.10.3.  ACI shall adhere to the Project schedule.

    e.  9.3.1.2.  ACI is prohibited from including amounts in payment applications that the contractor does not intend to pay to a subcontractor or supplier.

    f.  9.6.2.  ACI shall pay its subcontractors within 7 days of receipt of payment from the New Braunfels Fund.

417.     ACI paid Eguizabal a bribe to procure the New Braunfels Contract.  The bribe was included in the Stipulated Sum to be paid to ACI.  ACI included the amount of the bribe in its billings to New Braunfels Fund and falsified payment applications to disguise the truth of the amount billed.

418.     Defendants misrepresented the amounts that were or would be paid to subcontractors on the New Braunfels Project.  On numerous occasions David Albertelli signed

90

Sworn Statements that purported to show amounts paid to subcontractors but those amounts were misrepresented in many Sworn Statements and altered from one Sworn Statement to the next in many instances.

419.    Defendants submitted lien waivers that did not match the amounts that Defendants had represented were paid to subcontractors.  On March 18, 2016, Thomas Cecchini (New Braunfels Fund) informed David Albertelli that his misrepresentations in payment applications 13 and 14 about the amounts paid to Nationwide Gutter had been caught.

420.    On May 6, 2016, Continental, as New Braunfels Fund's agent, informed ACI of errors in the lien waivers and Sworn Statements for payment applications 15 and 16.  On May 11, 2016, ACI sent partially corrected Sworn Statements and waivers after Continental caught misrepresentations and errors in Defendants' Sworn Statements and waivers related to subcontractors T&D Moravits, Wheeler Truss, Strand Systems, Titan Supply, Insulation Group and Al's Painting.

421.    On May 12, 2016, ACI sent New Braunfels Fund another corrected Sworn Statement and corrected lien waivers for Bridgewell Resources after Continental had caught Defendants' misrepresentation about the amounts that had been paid to Bridgewell.

422.    In addition to the foregoing, ACI's breaches of the New Braunfels Contract include but are not limited to the following:

    a.  late delivery of buildings;

    b.  defective construction;

    c.  failing to comply with applicable codes and other laws;

    d.  improper design of certain elements;

    e.  failing to provide enough qualified supervisory personnel;

91

f.   failing to remedy defaults;

g.   failing to comply with applicable laws;

h.   failing to pay amounts due;

i.   failing to perform in good faith and with fair dealing;

j.   failing to indemnify New Braunfels Fund; and

k.   failing to fulfill other contractual obligations.

423.    New Braunfels Fund has been damaged by and continues to be damaged by ACI's breaches.

424.    New Braunfels Fund has performed all obligations required of it under the New Braunfels Contract which were not excused.

WHEREFORE, on Count 17, Plaintiff New Braunfels Fund requests that this Court provide the following relief against Defendant ACI:

a)   Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)   Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

### COUNT 18 - BREACH OF CONTRACT – WACO – AGAINST WESTCORE I

425.    The allegations of paragraphs 16, 18, 44(g), and 45 defining parties and the Waco Contract are incorporated as though set forth in full herein as the allegations of this paragraph.

426.    Westcore I owes the Waco Fund the duties set forth in the Waco Contract, implied therein and implied as a matter of law.

427.    The Waco Contract includes multiple terms that were breached by Westcore, including the following sections of the General Conditions to the Waco Contract:

a.   3.3.1.  Westcore I is to supervise and direct the work of the Project using its best skill and attention.

b.  3.7.2.  Westcore I shall comply with and give notices required by law.

c.  3.9.1.  Westcore I shall employ a qualified superintendent who shall be at the Project site when work is being performed.

d.  3.10.3.  Westcore I shall adhere to the Project schedule.

e.  9.3.1.2.  Westcore I is prohibited from including amounts in payment applications that the contractor does not intend to pay to a subcontractor or supplier.

f.  9.6.2.  Westcore I shall pay its subcontractors within 7 days of receipt of payment from the Waco Fund.

428.  Westcore I paid Eguizabal a bribe to procure the Waco Contract.  The bribe was included in the Stipulated Sum to be paid to Westcore.  Westcore included the amount of the bribe in its billings to Waco Fund and falsified payment applications to disguise the truth of the amount billed.

429.  Westcore I delayed payments to subcontractors or did not pay them at all.  Carpenters who worked on the Waco Project have still not been paid by Westcore despite Westcore having been paid for such work.

430.  The allegations regarding payment fraud perpetrated by Westcore I with regard to Peal & Associates contained in paragraphs 166-176 constitutes a breach of the Waco Contract.  In addition, Westcore I requested that it be allowed to pay Peal & Associates on a bi-weekly basis rather than monthly.  Continental advanced funds to Westcore for this purpose but Westcore did not pay Peal & Associates and the individual carpenters were not paid.

431.  In addition to the foregoing, Westcore's breaches of the Waco Contract include but are not limited to the following:

a.  late delivery of buildings;

b.  defective construction;

c.  failing to comply with applicable codes and other laws;

d.  improper design of certain elements;

e.  failing to provide enough qualified supervisory personnel;

f.  failing to remedy defaults;

g.  failing to comply with applicable laws;

h.  failing to pay amounts due;

i.  failing to perform in good faith and with fair dealing;

j.  failing to indemnify Waco Fund;

k.  violating contract document provisions related to the Americans with Disabilities Act;

l.  failing to install a fire-rated enclosure at stairwells;

m.  failing to install shoe molding;

n.  installing the porch decks incorrectly;

o.  installing soffits incorrectly;

p.  Failing to install a fire rated enclosure in the demising wall system near the bath tubs;

q.  failing to correct or complete items on the punch lists;

r.  installing the sanitary sewer lift station incorrectly; and

s.  failing to fulfill other contractual obligations.

432.  Waco Fund has been damaged by and continues to be damaged by Westcore I's breaches.

433.     Waco Fund has performed all obligations required of it under the Waco Contract which were not excused.

WHEREFORE, on Count 18 Plaintiff Waco Fund requests that this Court provide the following relief against Defendants Westcore I:

a) Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

### COUNT 19 - BREACH OF CONTRACT – BRYAN – AGAINST WESTCORE I

434.     The allegations of paragraphs 16, 18, 44(f), and 45 defining parties and the Bryan Contract are incorporated as though set forth in full herein as the allegations of this paragraph.

435.     Westcore I owes the Bryan Fund the duties set forth in the Bryan Contract, implied therein and implied as a matter of law.

436.     The Bryan Contract includes multiple terms that were breached by Westcore, including the following sections of the General Conditions to the Bryan Contract:

a. 3.3.1.  Westcore I is to supervise and direct the work of the Project using its best skill and attention.

b. 3.7.2.  Westcore I shall comply with and give notices required by law.

c. 3.9.1.   Westcore I shall employ a qualified superintendent who shall be at the Project site when work is being performed.

d. 3.10.3.  Westcore I shall adhere to the Project schedule.

e. 9.3.1.2.  Westcore I is prohibited from including amounts in payment applications that the contractor does not intend to pay to a subcontractor or supplier.

f. 9.6.2.  Westcore I shall pay its subcontractors within 7 days of receipt of payment from the Bryan Fund.

95

437.    Westcore I paid Eguizabal a bribe to procure the Bryan Contract.  The bribe was included in the Stipulated Sum to be paid to Westcore I.  Westcore I included the amount of the bribe in its billings to Bryan Fund and falsified payment applications to disguise the truth of the amount billed.

438.    Westcore I delayed payments to subcontractors or did not pay them at all. Carpenters who worked on the Bryan Project have still not been paid by Westcore I despite Westcore I having been paid for such work.

439.    In addition to the foregoing, Westcore I's breaches of the Bryan Contract include but are not limited to the following:

    a.  late delivery of buildings;

    b.  defective construction;

    c.  failing to comply with applicable codes and other laws;

    d.  improper design of certain elements;

    e.  failing to provide enough qualified supervisory personnel;

    f.  failing to remedy defaults;

    g.  failing to comply with applicable laws;

    h.  failing to pay amounts due;

    i.  failing to perform in good faith and with fair dealing;

    j.  failing to indemnify Bryan Fund;

    k.  violating contract document provisions related to the Americans with Disabilities Act;

    l.  failing to install a fire-rated enclosure at stairwells;

    m.  failing to install shoe molding;

n.   installing the porch decks incorrectly;

o.   installing soffits incorrectly;

p.   Failing to install a fire rated enclosure in the demising wall system near the bath tubs;

q.   failing to correct or complete items on the punch lists; and

r.   failing to fulfill other contractual obligations.

440.   Bryan Fund has been damaged by and continues to be damaged by Westcore I's breaches.

441.   Bryan Fund has performed all obligations required of it under the Bryan Contract which were not excused.

WHEREFORE, on Count 19, Plaintiff Bryan Fund requests that this Court provide the following relief against Defendant Westcore I:

a)   Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)   Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

### COUNT 20 - BREACH OF CONTRACT – LONGMONT – AGAINST WESTCORE I

442.   The allegations of paragraphs 16, 18, 44(h), and 45 defining parties and the Longmont Contract are incorporated as though set forth in full herein as the allegations of this paragraph.

443.   Westcore I owes the Longmont Fund the duties set forth in the Longmont Contract, implied therein and implied as a matter of law.

444.   The Longmont Contract includes multiple terms that were breached by Westcore I, including the following sections of the General Conditions to the Longmont Contract:

a. 3.3.1.  Westcore I is to supervise and direct the work of the Project using its best skill and attention.

b. 3.7.2.  Westcore I shall comply with and give notices required by law.

c. 3.9.1.  Westcore I shall employ a qualified superintendent who shall be at the Project site when work is being performed.

d. 3.10.3.  Westcore I shall adhere to the Project schedule.

e. 9.3.1.2.  Westcore I is prohibited from including amounts in payment applications that the contractor does not intend to pay to a subcontractor or supplier.

f. 9.6.2.  Westcore I shall pay its subcontractors within 7 days of receipt of payment from the Longmont Fund.

445.   Westcore I paid Eguizabal a bribe to procure the Longmont Contract.  The bribe was included as a line item in the internal budget for the project as MFDC Fee in the amount of $495,000.  Westcore I included the amount of the bribe in its billings to Longmont Fund and falsified payment applications to disguise the truth of the amount billed.

446.   Westcore I delayed payments to the plumber, and then the plumber refused to perform additional work on the Project as long as Westcore I was the general contractor.

447.   The allegations regarding Team CCR set forth in paragraphs 147 - 162 are breaches of contract.

448.   In addition to the foregoing, Westcore I's breaches of the Longmont Contract include but are not limited to the following:

a. late delivery of buildings;

b. defective construction;

c. failing to comply with applicable codes and other laws;

d.   improper design of certain elements;

e.   failing to provide enough qualified supervisory personnel;

f.   failing to remedy defaults;

g.   failing to comply with applicable laws;

h.   failing to pay amounts due;

i.   failing to perform in good faith and with fair dealing;

j.   failing to indemnify Longmont Fund;

k.   failing to fulfill other contractual obligations and,

l.   failure to pay the municipal use tax.

449.   Longmont Fund has been damaged by and continues to be damaged by Westcore I's breaches.

450.   Longmont Fund has performed all obligations required of it under the Longmont Contract which were not excused.

WHEREFORE, on Count 20, Plaintiff Longmont Fund requests that this Court provide the following relief against Defendants Westcore I:

a)   Grant Plaintiff compensatory and other damages as shall be proven at trial; and

b)   Grant such other and further relief in favor of the Plaintiff as this Court deems just and proper.

## COUNT 21 - BREACH OF CONTRACT – LEXINGTON – AGAINST ACI

451.   The allegations of paragraphs 16, 18, 44(a), and 45 defining parties and the Lexington Contract are incorporated as though set forth in full herein as the allegations of this paragraph.

452.   ACI owes the Lexington Fund the duties set forth in the Lexington Contract, implied therein and implied as a matter of law.

453.    The Lexington Contract includes multiple terms that were breached by ACI, including the following sections of the General Conditions to the Lexington Contract:

    a.  3.3.1.  ACI is to supervise and direct the work of the Project using its best skill and attention.

    b.  3.7.2.  ACI shall comply with and give notices required by law.

454.    ACI paid Eguizabal a bribe to procure the Lexington Contract.  The bribe was included in the Stipulated Sum to be paid to ACI.  ACI included the amount of the bribe in its billings to Lexington Fund and falsified payment applications to disguise the truth of the amount billed.

455.    In addition to the foregoing, ACI's breaches of the Lexington Contract include but are not limited to the following:

    a.  defective construction;

    b.  failing to comply with applicable codes, other laws and contract document requirements related to the Americans with Disabilities Act;

    c.  failing to indemnify Lexington Fund; and

    d.  failing to fulfill other contractual obligations.

456.    Lexington Fund has been damaged by and continues to be damaged by the diminution in value of the Lexington Project due to ACI's breaches.

457.    Lexington Fund has performed all obligations required of it under the Lexington Contract which were not excused.

WHEREFORE, on Count 21, Plaintiff Lexington Fund requests that this Court provide the following relief against Defendant ACI:

    a)  Grant Plaintiff compensatory and other damages as shall be proven at trial; and

DM1\8519672.3

b)  Grant such other and further relief in favor of the Plaintiff as this Court deems just and

proper.

Respectfully Submitted,

**DUANE MORRIS LLP**
*Trial Counsel for Plaintiffs*
*CONTINENTAL 332 FUND, LLC, CONTINENTAL*
*298 FUND LLC,*
*CONTINENTAL 306 FUND LLC,*
*CONTINENTAL 326 FUND LLC, CONTINENTAL*
*347 FUND, LLC, CONTINENTAL 355 FUND LLC,*
*CONTINENTAL 342 FUND LLC, and*
*CONTINENTAL 245 FUND LLC*
190 S. LaSalle St., #3700
Chicago, IL 60603
Tel: 312.499.6782
Fax: 312.499.6701

By: /s/ *Jeffrey L. Hamera*
          (*pro hac vice*)
          jlhamera@duanemorris.com

Larry Selander (*pro hac vice*)                    Alvin D. Lodish
Duane Morris LLP                                        Duane Morris LLP
190 S. LaSalle St., #3700                            200 S. Biscayne Blvd., #3400
Chicago, IL  60603                                       Miami, FL  33131
Phone: 312.499.0147                                  305.960.2318
lselander@duanemorris.com                    Florida Bar No.: 622273
                                                                   slodish@duanemorris.com

*Pro Hac Vice* Counsel for Plaintiffs
**CONTINENTAL 332 FUND, LLC**
**CONTINENTAL 298 FUND LLC**
**CONTINENTAL 306 FUND LLC**
**CONTINENTAL 326 FUND LLC**
**CONTINENTAL 347 FUND, LLC**
**CONTINENTAL 355 FUND LLC**
**CONTINENTAL 342 FUND LLC**
**CONTINENTAL 245 FUND LLC**

101

## **VERIFICATION**

Under penalties as provided by law, pursuant to 28 U.S.C. §1746, the undersigned certifies that he is authorized to make this Verification, and that the statements set forth in the foregoing "Third Amended Verified Complaint for Injunctive Relief and Damages Under R.I.C.O. and Other Theories" are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: March 6, 2018              *s/s Paul R. Seifert*
                        Paul R. Seifert
                        Executive Vice President of Operations/
                        Chief Legal Officer
                        Continental Properties Company, Inc., Manager of:
                        Continental 332 Fund LLC
                        Continental 298 Fund LLC
                        Continental 306 Fund LLC
                        Continental 326 Fund LLC
                        Continental 347 Fund LLC
                        Continental 355 Fund LLC
                        Continental 342 Fund LLC
                        Continental 245 Fund LLC

DM1\8519672.3

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 6, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

_/s/ Jeffrey L. Hamera_

DM1\8519672.3