UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CONTINENTAL 332 FUND, LLC,
CONTINENTAL 298 FUND LLC,
CONTINENTAL 306 FUND LLC,
CONTINENTAL 326 FUND LLC,
CONTINENTAL 347 FUND LLC,
CONTINENTAL 355 FUND LLC,
CONTINENTAL 342 FUND LLC and
CONTINENTAL 245 FUND LLC,

     Plaintiffs,

v.                          Case No:  2:17-cv-41-FtM-38MRM

DAVID ALBERTELLI, ALBERTELLI
CONSTRUCTION INC.,
WESTCORE CONSTRUCTION,
LLC, NATIONAL FRAMING, LLC,
MFDC, LLC, TEAM CCR, LLC,
BROOK KOZLOWSKI, JOHN
SALAT, KEVIN BURKE, KERRY
HELTZEL, AMY BUTLER, US
CONSTRUCTION TRUST,
FOUNDATION MANAGEMENT,
LLC, KMM CONSTRUCTION, LLC,
WESTCORE CONSTRUCTION,
L.L.C. and GEORGE ALBERTELLI,

     Defendants.
_____/

## OPINION AND ORDER[1]

_____

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

This matter comes before the Court on motions to dismiss filed by Defendants David Albertelli ("David") and Albertelli Construction, Inc. ("ACI") (Doc. 130), George Albertelli ("George") (Doc. 135), Amy Butler ("Butler") (Doc. 136), Kevin Burke ("Burke"), Foundation Management, LLC ("Foundation"), Kerry Heltzel ("Heltzel"), KMM Construction, LLC ("KMM"), Brook Kozlowski ("Kozlowski"), National Framing, LLC ("National"), John Salat ("Salat"), Team CCR, LLC, US Construction Trust, Westcore Construction, LLC ("Westcore I"), and Westcore Construction L.L.C. ("Westcore II") (Doc. 137), and a Motion for Joinder filed by David and ACI (Doc. 138). Plaintiffs responded in opposition on May 9, 2018. (Doc. 143). This matter is ripe for review.

## BACKGROUND

### A. Substantive Background

This case concerns an alleged pattern of fraud committed by a group of interrelated individuals and corporations on apartment construction projects around the country. Plaintiffs are funds created to bankroll the apartment construction projects. (Doc. 117 at ¶¶ 16(a)-(h)). They are managed by Continental Properties ("Continental"). (Doc. 117 at ¶¶ 3, 17). Defendants George Albertelli and his son David Albertelli (collectively, the "Albertellis")[2] own ACI, which is a commercial construction company. (Doc. 117 at ¶ 1, 18). George also has an ownership interest in MFDC, a shell company. (Doc. 117 at ¶ 19, 24). David controls or owns

- Foundation, a shell company;

- KMM, a subcontracting company;

---

[2] For simplicity's sake, the Court will refer to the Albertelli father and son Defendants by their first names. All other individual Defendants will be referred to by their last names.

- National, a subcontracting company;

- Team CCR, LLC, a subcontractor;

- Westcore I, a general contractor; and

- Westcore II, a shell company.

(Doc. 117 at ¶ 820, 121, 134-35, 153).  David is also the trustee and beneficiary of US Construction, which owns part of Westcore I.  (Doc. 117 at ¶ 20).

Brooke Kozlowski is an officer and owner of ACI, Foundation, Westcore I, and Westcore II.  (Doc. 117 at ¶ 21).  Amy Butler was or is ACI's accounting manager.  (Doc. 117 at ¶ 26).  Kevin Burke is the Chief Financial Officer and agent of Foundation, and an agent of MFDC and Westcore II.  (Doc. 117 ¶ at 27).  Kerry Heltzel was or is an accountant for ACI, Westcore I, Westcore II, and Foundation.  (Doc. 117 at ¶ 29).  John Salat was or is an officer of Westcore I, has represented that he is Westcore I's owner, and is an owner of Westcore II.  (Doc. 117 at ¶ 28).  Angelo Eguizabal ("Eguizabal") is the former Vice President of Construction at Continental, and the creator and owner of Bravo 21, LLC ("Bravo 21"), a shell corporation.  (Doc. 117 at ¶¶ 34-35).

From 2011 to 2017, Albertelli-affiliated companies were awarded over $200,000,000.00 in apartment construction contracts, including:

- An August 22, 2013, contract between Plaintiff Continental 245 Fund LLC (the "Lexington Fund") and ACI for a project in Lexington, Kentucky (the "Lexington Project");

- On April 25, 2014, contract between Plaintiff Continental 298 Fund LLC (the "Savage Fund") and ACI for a project in Savage, Minnesota (the "Savage Project");

- A November 21, 2014, contract between Plaintiff Continental 306 Fund LLC (the "New Braunfels Fund") and ACI for a project in New Braunfels, Texas (the "New Braunfels Project");

- A February 20, 2015, contract between Plaintiff Continental 332 Fund, LLC (the "Fort Myers Fund") and ACI for a project in Fort Myers, Florida (the "Fort Myers Project");

- A June 23, 2015, contract between Plaintiff Continental 326 Fund LLC (the "Rochester Fund") and ACI for a project in Rochester, Minnesota (the "Rochester Project");

- A January 19, 2016, contract between Plaintiff Continental 355 Fund LLC (the "Bryan Fund") and Westcore I for a project in Bryan, Texas (the "Bryan Project");

- A February 19, 2016, contract between Plaintiff Continental 347 Fund LLC (the "Waco Fund") and Wescore I for a project in Waco, Texas (the "Waco Project"); and

- A July 16, 2016 contract between Plaintiff Continental 342 Fund LLC (the "Longmont Fund") and Westcore I for a project in Longmont, Colorado (the "Longmont Project")).

(Doc. 117 at ¶¶ 14, 44(a)-(h)).  Each Project was allegedly completed defectively.  (Doc. 117 at ¶¶ 44(a)-(h)).

While securing and undertaking the Projects, Defendants allegedly engaged in a wide swath of intentionally fraudulent activity (the "Scheme") "designed to extract as much money as [they] could, as quickly as [they] could, without regard to contractual performance or any lawful right to payment."  (Doc. 117 at ¶ 52-53).  Because it is alleged the Scheme was carried out by a bevy of Defendants, on eight Projects, and over the course of six years, the Court summarizes the facts according to the type of actions alleged.

*1. Bribery*

Beginning in 2014, the Albertellis purportedly paid Eguizabal to provide them with internal Continental information and to persuade Continental to award construction contracts to Albertelli-affiliated entities.  (Doc. 117 at ¶¶ 14, 75, 80).  From May 2013 to May 2014, the Albertellis used a third-party company to transfer at least thirteen payments

totaling $244,724.20 to Eguizabal's bank account. (Doc. 117 at 66). During this time, the Lexington and Savage Projects were awarded to ACI. (Doc. 117 at ¶¶ 44(a)-(b)).

Then, from July 2014 to August 2016, the Albertellis, Burke, and Kozlowski formed MFDC as a shell company, and the Albertellis and ACI used it to funnel at least $669,302.00 to Eguizabal. (Doc. 117 at ¶¶ 67-8). During this stretch, Continental awarded the New Braunfels, Fort Myers, Rochester, Bryan, Waco and Longmont Projects to ACI and Westcore I. (Doc. 117 at ¶¶ 44(c)-(h)). In May 2016, Eguizabal also formed his own company, Bravo21, to receive payments. (Doc. 117 at 69). The Albertellis, ACI, MFDC, Burke and Kozlowski then occasionally sent Eguizabal's payments to Bravo21, amounting to at least $50,000.00. (Doc. 117 at 69).

Eventually, the payments became so commonplace that David, Kozlowski and Salat included a line item for Eguizabal on the Waco, Bryan and Longmont Projects. (Doc. 117 at 69-70). In total, over $1,464,735.00 was funneled to Eguizabal from 2011 to 2017, which was financed through misrepresentation of costs on the Projects, including amounts due to subcontractors. (Doc. 117 at ¶¶ 14, 75, 78).

### 2. Other Albertelli Entities

#### a. Westcore I

After ACI entered into a number of contracts with Continental, it performed its duties poorly and deliver Projects late. (Doc. 117 at ¶¶ 7, 44(a)-(e)). As a result, Continental internally decided to avoid awarding future contracts to ACI. (Doc. 117 at ¶ 7). To continue seeking Continental contracts, David convinced his acquaintance Gregory Hilz to form a general contracting company called Westcore I. (Doc. 117 at ¶¶ 8, 22, 89, 91). David and Hilz agreed to joint ownership of Westcore I, but David

concealed his ownership and control. (Doc. 117 at ¶¶ 86-87, 89). David later stated that Westcore I would be funded by including an extra $240,000.00 in the price of the Fort Myers Project. (Doc. 117 at ¶ 88).

David then invented a fictitious business history for Westcore I to bolster its chances of securing additional Continental contracts. (Doc. 117 at ¶¶ 8, 92). This included falsifying a sworn qualification statement with Hilz and Kozlowski, which was submitted in November 2015. (Doc. 117 at ¶¶ 8, 93, 101). Among the allegedly false representations, were

- A statement in the Qualification Statement that Westcore I was formed in 1992, even though it was formed in February 2015;

- A statement in the Qualification Statement that Westcore I performed an average of $376,196,476 worth of work over the previous five years, even though it had existed for less than two months at the time;

- A certification by Westcore I's Chief Financial Officer, Michael Breaton, that the facts in the Qualification Statement were true, even though Michael Breaton does not exist;

- A financial statement representing Westcore I had total assets of more than $69,000,000.00;

- A letter from a surety representing Westcore I had a bonding capacity of $325,000,000.

(Doc. 117 at ¶¶ 85, 97-99). Westcore I was then granted the Bryan, Waco and Longmont Projects. (Doc. 117 at ¶¶ 44(f)-(h)).

b. Westcore II

After Westcore I began to secure construction contracts, David, Salat, Kozlowski, Burke, and Foundation formed Westcore II. (Doc. 117 at ¶¶ 138-39). Westcore II (Westcore Construction, L.L.C.) is very similar in name to Westcore I (Westcore Construction, LLC). (Doc. 117 at 5). Plaintiffs allege David, Salat, Kozlowski, Burke,

Heltzel, and Foundation used the nearly identical names to mislead Continental and direct it to make payments to Westcore II (instead of Westcore I) for the Waco, Bryan, and Longmont Projects. (Doc. 117 at ¶¶ 140-144). The diversion of payments from Westcore I eventually resulted in subcontractors imposing more than $8,000,000.00 in liens on the Projects. (Doc. 117 at ¶¶ 145-46).

3. *Fraud*

a. ACI's Savage Project Change Order

In early 2015, the Savage Project fell behind schedule and ACI was subjected to contractually-mandated liquidated damages. (Doc. 117 at ¶ 113). The parties then agreed to a change order where ACI accepted responsibility for $401,780.00 in liquidated damages in return for an extension of the deadlines to turn over some buildings and continued progress payments. (Doc. 117 at ¶ 114). Despite this agreement, David, Kozlowski, and ACI later demanded that the Savage Fund pay for ACI's alleged costs due to the delays that ACI itself had caused. (Doc. 117 at ¶ 116). David, Kozlowski, and ACI then attempted to leverage Savage Fund by slowing the already-delayed Project and threatening not to complete the work. (Doc. 117 at ¶ 117). ACI also filed a lien on the property that included the delay-related damages ACI had previously accepted as its responsibility. (Doc. 117 at ¶ 118). The entire process allowed ACI to obtain extended construction deadlines and to receive payments it would not have otherwise have received, while the Savage Fund was forced to defend itself against the lien claim. (Doc. 117 at ¶ 120).

### b. ACI's Involvement with National Framing on the Fort Myers Project

In November 2016, David, on behalf of ACI, executed a payment application for $1,072,397.64 for work done on the Fort Myers Project. (Doc. 117 at ¶¶ 121,124). Part of the application represented National Framing was due a $60,673.14 payment for subcontracting services, and thereafter the balance due to it would be $364,783.75. (Doc. 117 at ¶ 122). Notably, David owns both ACI and, through Foundation Management, National Framing. (Doc. 117 at ¶¶ 18, 20, 31-32). The Fort Myers Fund then relied on the application and paid ACI $1,072,397.64, with the requested $60,673.14 earmarked for National Framing. (Doc. 117 at ¶ 124). Four months after that, George signed a Claim of Lien and an Affidavit representing National Framing was due $581,470.90, which was $216,687.15 more than ACI had previously represented was owed. (Doc. 117 at ¶¶ 125-26). The Fort Myers Fund was then forced to procure a lien bond to as collateral for the lien claim. (Doc. 117 at ¶ 127).

### c. ACI's Involvement with National Framing on the Rochester Project

While working on the Rochester Project, ACI subcontracted with KMM, which is owned by David through Foundation Management, and National Framing. (Doc. 117 at ¶¶ 31, 33, 136). David failed to disclose his interest in KMM and National Framing. (Doc. 117 at ¶ 136). ACI then allegedly failed to pay for services rendered, causing KMM and National Framing to impose liens on their work, and to sue the Rochester Fund. (Doc. 117 at ¶ 136).

### d. Team CCR

While working on the Longmont Project, David, Salat, Kozlowski, Foundation, Westcore II, and Heltzel used a system of self-dealing to profit from subcontracted work.

(Doc. 117 at ¶¶ 147-48, 159). In substance, Westcore I received $2,083,723.71 for subcontracting services on the Project. (Doc. 117 at ¶ 160). But, in actuality, Westcore I subcontracted with a company called Consolidated Resources for $1,805,450.55. (Doc. 117 at ¶ 160). Consolidated Resources then informed both Continental's project manager and Westcore I that it intended to change the company name to Team CCR. (Doc. 117 at ¶¶ 149-150). David, Salat, Kozlowski and Burke then seized on the Team CCR name and formed a company called Team CCR, LLC ("Albertelli Team CCR"). (Doc. 117 at ¶ 151). Using an online portal, Albertelli Team CCR input payment application data as if it was performing the work, while Consolidated Resources submitted paper-based payment applications to Westcore I. (Doc. 117 at ¶¶ 153). This allowed Albertelli Team CCR to masquerade as if it were Consolidated Resources, and concealed that Consolidated Resources had been subcontracted for less than the amount allocated by the Longmont Fund for the Project. (Doc. 117 at ¶¶ 154-55, 160). In sum, Albertelli Team CCR pocketed $278,273.16, which was the difference between the amount granted to Westcore I for the subcontracting services and the subcontracting agreement with Consolidated Resources. (Doc. 117 at ¶ 160). Westcore I also failed to pay Consolidated Resources, which resulted in Consolidated Resources recording a mechanic's lien on the Longmont Project. (Doc. 117 at ¶ 161).

e. Westcore I's Involvement with Peale & Associates

While working on the Waco Project, Westcore I submitted a sworn payment application for $3,241,194.33 for siding and framing labor. (Doc. 117 at ¶ 164). But it then subcontracted that work to Framing USA, a company also owned by David through US Construction Trust, who then sub-subcontracted it to a third company, Peal &

Associates, for $1,907,000.00. (Doc. 117 at ¶¶ 165-66). Westcore I then defaulted on its work on the Waco Project and was terminated in June 2017. (Doc. 117 at ¶ 171). By that time, the Waco Fund had paid Westcore I $2,325,864.35 for the work, which was $418,864.35 more than it had been sub-subcontracted for. (Doc. 117 at ¶ 171-72). Westcore II, David, Salat, Kozlowski, Foundation Management, and Burke benefitted from the overpayment. (Doc. 117 at ¶ 172). Then the Waco Fund had to complete the Waco Project for more than the budgeted cost. (Doc. 117 at ¶ 173).

4. *Theft*

In December 2016, David improperly deposited thirty-five checks worth over $2,000,000.00 into ACI's bank account. (Doc. 117 at ¶¶ 182, 196, 205). The Fort Myers and Rochester Projects made the checks out jointly to ACI and the individual subcontractor the payment was meant for. (Doc. 117 at ¶¶ 184-85, 187, 189-90, 194, 199-201). As is customary in the construction industry, ACI was supposed to endorse the check and deliver it to the subcontractor, creating a paper trail showing payment. (Doc. 117 at ¶ 184). But instead of forwarding the checks to the subcontractors, David deposited them into ACI's bank account. (Doc. 117 at ¶¶ 182, 184, 196, 205, 209). Then, through David, Kozlowski, and Butler, ACI mailed lien releases or waivers to the subcontractors that had performed the work and used parcel tracking numbers to indicate it had distributed the checks. (Doc. 117 at ¶ 185, 190, 195, 197-201, 203). Allegedly, ACI, David, Kozlowski, and Butler knew the Fort Myers and Rochester Funds would be induced to issue checks based on ACI's representations, and never intended to send the joint checks to the subcontractors. (Doc. 117 at ¶ 206-07). George knew about the theft, profited from it, and tried to retain the stolen money. (Doc. 117 at ¶ 211). Though

Continental's bank reimbursed the amounts transferred to ACI's bank, ACI returned none of the money.  (Doc. 117 at ¶ 211).

## B.    Procedural Background

The Fort Myers, Savage, New Braunfels and Rochester Funds filed a Complaint against David and ACI in January 2017.  (Doc. 1).  After Defendants moved to Dismiss, Plaintiffs filed an Amended Complaint against the Defendants, along with Eguizabal and Bravo 21.  (Doc. 49).  Defendants again moved to dismiss.  (Docs. 80; 81; 82; 83; 84; 85; 86; 87; 88).  Before the Court could enter an Order on the then-pending motions, Plaintiffs voluntarily dismissed Eguizabal and Bravo 21.  (Doc. 93).  Then, the Court granted Defendants' motions to dismiss in part, finding that the Amended Complaint largely failed to meet the pleading requirements of Federal Rules of Civil Procedure 8(a)(2) and 9(b).  (Doc. 110).  Plaintiffs filed a Third Amended Complaint in March 2016.  (Doc. 117).  It contains these counts:

(1)    All Defendants are liable for violations of the Federal Racketeering Influenced and Corrupt Practices Act (the "RICO Act");

(2)    All Defendants are liable for violations of Florida's civil and criminal RICO Act;

(3)    All Defendants are liable for conspiring to violate Florida's civil and criminal RICO Act;

(4)    The Albertellis and ACI are liable for Civil Theft;

(5)    All Defendants are liable for common law fraud;

(6)    All Defendants are liable for common law conspiracy to commit fraud;

(7)    David and ACI are liable for Conversion;

(8)    ACI is liable for a breach of Minnesota's Theft by Contractor Statute;

(9)    ACI is liable for breach of subcontracts;

(10)    ACI is liable for violation of the Florida Prompt Payment Act;

(11)    ACI is liable for violation of the Minnesota Prompt Payment Act;

(12)    ACI is liable for breach of contract on the Savage Project;

(13)    ACI is liable for professional negligence on the Savage Project;

(14)    ACI is liable for breach of contract on the Rochester Project;

(15)    ACI is liable for breach of contract on the Fort Myers Project;

(16)    ACI is liable for breach of implied warranty on the Fort Myers Project;

(17)    ACI is liable for breach of contract on the New Braunfels Project;

(18)    Westcore I is liable for breach of contract on the Waco Project;

(19)    Westcore I is liable for breach of contract on the Bryan Project;

(20)    Westcore I is liable for breach of contract on the Longmont Project;

(21)    ACI is liable for breach of contract on the Lexington Project.

(Doc. 117 at 2-4).  Now, Defendants again move to dismiss.  (Docs. 130; 135; 136; 137; 138).

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a short and plain statement of a claim showing the pleader is entitled to relief.  The Rule's purpose is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal punctuation omitted).

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a pleading for failure to state a claim upon which relief can be granted.  This decision hinges on the *Twombly–Iqbal* plausibility standard, which requires a plaintiff to allege sufficient facts raise a reasonable inference "that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 556.  The Court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff.  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  But acceptance is limited to well-pleaded factual allegations.  *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).  A "the-defendant-unlawfully harmed me accusation" is insufficient.  *Iqbal*, 556 U.S. at 677.  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotations omitted).

## DISCUSSION

Defendants argue Counts 1-6 should be dismissed because they have not been sufficiently alleged.  They also argue the Court should dismiss the other counts by declining to exercise supplemental jurisdiction.  Each argument will be addressed.

## A.    RICO

Count 1 alleges Defendants violated the RICO Act.  Counts 2 and 3 respectively allege Defendants violated the Florida RICO Act and conspired to violate the Florida RICO Act.  Beginning with the RICO Act, 18 U.S.C. § 1962 provides that

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . .to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (b) It shall be unlawful for any person through a pattern of racketeering activity . . .  to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. §§ 1962(a)-(d).

Section 1961(1) contains a list of racketeering acts, which are otherwise called predicate acts. 18 U.S.C. § 1961(1); *see also Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000). That list includes bribery, mail fraud, wire fraud, and bank fraud. *See* 18 U.S.C. § 1961(1). "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004); *see also* 18 U.S.C. § 1961(5).

Section 1964(c) provides for a civil RICO remedy where a plaintiff alleges "(1) the requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation." *See Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282–83 (11th Cir. 2006), *abrograted on other grounds by Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702 (11th Cir. 2014) (internal quotations omitted); *see also* 18 U.S.C. § 1964(c). If successful, a plaintiff may recover "threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

Florida has its own RICO statute. Fla. Stat. § 772.103. But it "is informed by case law interpreting the federal RICO statute." *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir.1994) (internal citation omitted). Therefore, the Eleventh Circuit applies federal RICO Act analysis equally to Florida RICO claims. *Jackson*, 372 F.3d at 1263–64.

Defendants argue counts 1-3 should be dismissed for multiple reasons: the counts are shotgun pleadings; Plaintiffs fail to adequately plead an association in fact enterprise; Plaintiffs fail to adequately plead RICO predicate acts; and Plaintiffs fail to allege an actionable injury to business or property. The Court disagrees with each contention.

*1. Shotgun Pleadings*

Defendants argue Count 1 should be dismissed as a shotgun pleading because it: (1) pleads multiple claims, (2) combines the claims of eight separate plaintiffs, and (3) joins all defendants into one count. Defendants further contend their arguments apply to Counts 2 and 3 as they each incorporate the facts alleged in Count 1.

Complaints that violate Rules 8(a)(2) and 10(b) are commonly called "shotgun pleadings." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). As is mentioned above, Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 10 states that "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." The Eleventh Circuit has found four types of shotgun pleadings:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject

reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Id.* at 1321–23. All four types are deficient because "they fail to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 23.

Against this backdrop, Defendants first argue Count 1 should be dismissed because it contains claims for both substantive and conspiratorial violations of 18 U.S.C. § 1962. This argument tracks with the third of the Eleventh Circuit's four types of shotgun pleadings, which pertains to the failure to separate distinct causes of action into different counts. *See Weiland*, 792 F.3d at 1322-23. But courts in this district have found that not every count involving multiple claims is a shotgun pleading. *See Howard v. Wells Fargo Bank, N.A.,* No. 6:16-CV-505-PGB-TBS, 2016 WL 3447514, at *3 (M.D. Fla. June 23, 2016); *see also Amegy Bank Nat. Ass'n v. Deutsche Bank Corp.*, 917 F. Supp. 2d 1228, 1233 (M.D. Fla. 2013). To the contrary, a plaintiff need not separate her claims where they arise out of the same transaction or occurrence and defendants are provided with adequate notice. *See Howard*, 2016 WL 3447514, at *3. This makes sense, because notice is the touchstone of the Eleventh Circuit's shotgun pleading framework. *See Weiland*, 792 F.3d at 1323.

Defendants do not meaningfully contest that the claims arise out of the same transaction or occurrence for shotgun pleading purposes. But they contend they have not received adequate notice for two reasons. First, Defendants argue they have not received adequate notice because Count 1 does not state the specific subsection of 18 U.S.C. § 1962 that was allegedly violated. In support, they cite a case from the Eastern District of Michigan, *Ralston v. Capper*, where a court dismissed a RICO claim devoid of specificity as to the subsection on which it rested. 569 F. Supp. 1575, 1581 (E.D. Mich. 1983). The court there noted that although the claim seemed to track with § 1962(c), the defendants were "clearly entitled to have notice of which specific provisions of § 1962 plaintiffs [were] relying on." *Id.*

*Ralston*, however, is not the law of the land. Over thirty years after *Ralston* was decided, the Supreme Court found that the Federal Rules of Civil Procedure only require a plaintiff to plead facts sufficient to show plausibility; "they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014). Defendants are incorrect that Plaintiffs were required to specifically state the statutory grounds for the claim in order to provide adequate notice.

Second, Defendants contend they have not received adequate notice because Count 1 contains multiple theories of liability. As evidence, they cite paragraph 214, which alleges, "[e]ach Defendant is part of the [Scheme], had knowledge of one or more predicate acts committed by the [Scheme], conspired to commit or committed one or more predicate acts, or has knowingly agreed to the commission of one or more illegal predicate acts by the [Scheme]." (Doc. 117 at ¶ 214). They claim that to achieve requisite notice,

Count 1 should allege each Defendant's specific acts, including whether the Defendant conspired to commit, committed, or knowingly agreed to the commission of predicate acts. But this argument fails because Rule 8(d)(2) states that "a party may set out [two] or more statements of a claim" and that such a claim will survive if "any one of them is sufficient." Plaintiffs are well within the law to allege in the alternative.

Returning to substance, Count 1 alleges each Defendant's specific acts. (Doc. 117 at ¶¶ 216-252). It also states that the acts giving rise to the claims were part of the same pattern because they were committed to further the Scheme. (Doc. 117 at 52-53). Moreover, Defendants' Motion to dismiss addresses Count 1's claims in relation to each subsection of § 1962, and indicates no prejudice or confusion regarding the current state of the allegations. Consequently, the mere fact that Count 1 contains multiple causes of action is not grounds for dismissal.

Defendants argue that even if pleading multiple claims in the same count is permissible here, Count 1 should still be dismissed because it improperly combines the claims of eight separate plaintiffs. While this argument does not fit into a *Wieland* shotgun pleading type, Defendants cite to the Eleventh Circuit's opinion in *Davis v. Coca-Cola Bottling Co.*, to argue that the claims of separate plaintiffs must be alleged in separate counts. 516 F.3d 955, 980 n.57 (11th Cir. 2008). This misconstrues *Davis*. There, a group of black employees sued their employer, claiming they had been discriminated against based on race. *Id.* at 961. But their complaint was dismissed as a shotgun pleading because it contained multiple plaintiffs and causes of action in one count, and linked no particular plaintiff to any particular cause of action. *Id.* at 980-81. In a footnote, the court also found that plaintiffs' use of one count to mount a range of discrimination

claims that affected multiple plaintiffs in different ways was incompatible with Rule 10(b)'s focus on clarity. *Id.* at 980 n.57.

Defendants seize upon the *Davis* footnote as evidence of a bright line ban on joining multiple plaintiffs in a single claim. But it is not. Rule 10(b) – the basis for that footnote – is a flexible standard that turns on whether pleading multiple claims in one count advances or hinders the interests of clarity. *See* FED. R. CIV. P. 10(b). Other courts have found that the interests of clarity can be advanced by joining multiple plaintiffs in a single claim based on a pattern of behavior that caused injuries. *See Erickson v. Hunter*, 932 F. Supp. 1380, 1384 (M.D. Fla. 1996); *see also Bautista v. Los Angeles Cty.*, 216 F.3d 837, 844 (9th Cir. 2000). The pattern of behavior need not manifest itself the same way to each plaintiff. *Erickson*, 932 F. Supp. at 1384. And so it is here. Count 1 alleges Defendants participated in a clear and individualized pattern of behavior over a course of time. (Doc. 117 at ¶¶ 52-54). Each Defendant's actions are spelled out, as is how each Plaintiff was affected. (Doc. 117 at ¶¶ 216-252). These factors, and the fact that the Scheme was perpetrated by several Defendants against several Plaintiffs, in several locations, over several years, indicate that the interests of clarity are served by including multiple Plaintiffs in Count 1. A different conclusion would lead to a duplicative and unwieldy pleading that would benefit neither the parties nor the interests of justice.

Still, Defendants contend that even if their prior arguments do not prevail, Count 1 should be dismissed as a shotgun pleading because it joins all Defendants into one count. This argument casts Count 1 as the fourth type of shotgun pleading identified in *Wieland*. 792 F.3d at 1323. But, like the ones before it, Defendants' argument fails. The Court does not read *Wieland* to prohibit all instances where a count lodges a claim against

multiple defendants, but rather only where such a claim fails to provide Defendants with adequate notice of the claims against them. *See Weiland*, 792 F.3d at 1323. Other courts have also reached this nuanced distinction by approving of claims lodged against multiple defendants where the activities undertaken by each defendant were alleged. *See FFC Mortg. Corp. LLC v. Red Door Title Ins. Agency, Inc.*, No. 13-61132-CIV, 2013 WL 12138556, at *3 (S.D. Fla. Dec. 12, 2013); *see also F.T.C. v. Centro Nat. Corp.*, No. 14-23879-CIV, 2014 WL 7525697, at *7 (S.D. Fla. Dec. 10, 2014). As is mentioned above, this is precisely the case here because Count 1 alleges the existence and purpose of the Scheme with the individual actions each Defendant perpetrated.[3] (Doc. 117 at ¶¶ 52-54, 216-252). Count 1 cannot be called a shotgun pleading. The same is true of Counts 2 and 3.[4]

### 2. Association In Fact Enterprise

Next, Defendants argue Count 1 should be dismissed because it fails to allege the existence of a RICO enterprise under 18 U.S.C. § 1962(c). Under § 1962(c), an

---

[3] David and ACI also take issue with the possibility of facing treble damages for actions perpetrated by other Defendants in Count 1. This is a puzzling argument because it does not relate whether the claim is a shotgun pleading. In any event, RICO Act defendants are subject to joint and several liability. *See Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1334 (S.D. Fla. 2009). The same is true for Florida Rico Act defendants. *See Albertson's, Inc. v. Adams*, 473 So.2d 231, 233 (Fla.2d DCA 1985) ("Under Florida law "[j]oint and several liability exists where two or more wrongdoers negligently contribute to the injury of another by their several acts, which operate concurrently, so that in effect the damages suffered are rendered inseparable."). Thus, as long as Plaintiffs allege Defendants took part in a RICO enterprise, all defendants are exposed to similar liability.

[4] Separately Defendants also argue Counts 5 and 6, which respectively allege all Defendants committed common law fraud and conspiracy to commit common law fraud, are shotgun pleadings because the claims plead multiple claims in the same counts, because they include multiple Plaintiffs, and because they include multiple Defendants. These arguments mirror those made in relation to Counts 1-3 and they fail for the same reasons. Counts 5 and 6 are not shotgun pleadings.

enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association in fact enterprise need not have a formal name, regular meetings, established rules, a hierarchical structure or a chain of command. *Boyle v. United States*, 556 U.S. 938, 948 (2009). Decisions in the enterprise may instead be made on an ad hoc basis and members may lack defined roles. *Id.* All that matters is whether the enterprise has "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Here, Plaintiffs have sufficiently alleged the existence of an association in fact enterprise. They claim the Albertellis started the Scheme and that it grew to include each of the Defendants. (Doc. 117 at ¶ 51). The alleged purpose of the Scheme was to obtain Continental construction contracts "by bribery, [to] obtain payments for work that [was] not done or [was] deficient, and [to] add unfounded costs to construction projects to ensure that the maximum price [was] paid." (Doc. 117 at ¶¶ 53). Through these actions, the Scheme aimed to "extract as much money as it could, as quickly as it could, without regard to contractual performance or any lawful right to payment of the participants." (Doc. 117 at ¶ 53).

The Third Amended Complaint also establishes a nexus between the purpose of the Scheme and the acts it carried out, and a relationship between individuals that comprised the Scheme itself. First, it connects the acts with the Scheme's aims by alleging Defendants intended to defraud Continental through several avenues and that Defendants followed through with those aims by sending bribe payments (Doc. 117 at ¶¶

57-81), falsifying documents and engaging in self-dealing (Doc. 117 at ¶¶ 82-181), and committing theft (Doc. 117 at ¶¶ 182-211).  Second, it establishes each Defendant's relationship with the Scheme by specifying their purported actions.  (Doc. 117 at ¶¶ 14-15, 52-56, 212-526).  The common thread among each Defendant was that they were connected to David, and that they either had knowledge of acts, actually committed acts, or conspired to commit acts, against Continental.  (Doc. 117 at ¶¶ 14-15, 52-56, 157, 189, 192, 206-07, 212-14, 216, 218, 221, 224, 226, 228, 231-32, 234, 237, 239, 241, 243, 245, 247, 249, 251).  Last, Plaintiffs allege the acts took place over at least eight work sites during six years.  (Doc. 117 at ¶¶ 14, 52).  These facts plausibly support the allegation of an association in fact enterprise and they are not grounds for dismissal.

### 3. Predicate Acts

Defendants next argue Count 1 should be dismissed because it does not adequately plead fraud-related predicate acts.  Under RICO, fraudulent predicate acts must meet Rule 9(b)'s heightened pleading threshold.  *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008).  This normally means "a plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (internal quotations omitted).  But where "the alleged fraud occurred over an extended period of time and the acts were numerous, the specificity requirements are applied less stringently." *Lawrence Holdings, Inc. v. ASA Int'l, LTD.*, No. 8:14-CV-1862-T-33EAJ, 2014 WL 5502464, at *11 (M.D. Fla. Oct. 30, 2014).  This is true where defendants possess factual information about the ongoing conduct of their business. *Id.*

at *13. States of mind like intent and knowledge may also be alleged generally. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997).

In broad strokes, Count 1 alleges four main sets of predicate acts: bribery, wire fraud, mail fraud, and bank fraud. First, Plaintiffs allege they were affected by bribery in Florida, Colorado, Texas and Minnesota. (Doc. 117 at ¶¶ 57-81, 256). To sufficiently allege bribery, a plaintiff must claim a defendant offered, conferred, or agreed to confer a payment to influence another to violate a known duty. *See* Colo. Rev. Stat. § 18-5-401; *see also* Tex. Penal Code § 32.43; Minn. Stat. § 609.86. Here, the Third Amended Complaint alleges that from 2011 to 2017, ACI, the Albertellis, Westcore I, Kozlowski, Salat and Burke paid at least $1,464,735.00 in bribes to Eguizabal, Continental's Vice President of Construction, to secure construction over $200,000,000.00 in construction contracts. (Doc. 117 at ¶ 14). The Third Amended Complaint spells out Defendants' individual roles in the commission of bribery, time frames for the bribery, specific instances, and the temporal relation to specific projects. (Doc. 117 at ¶¶ 57-81, 212-252). Bribery is adequately pled as a predicate act.[5]

Next, Plaintiffs allege Defendants committed a range of acts that can be wire fraud or mail fraud. (Doc. 117 at ¶¶ 212-13). Such claims generally require a plaintiff to allege: "(1) that defendants knowingly devised or participated in a scheme to defraud plaintiffs,(2) that they did so willingly with an intent to defraud, and (3) that the defendants used the

---

[5] George also argues bribery is not sufficiently alleged as a predicate act because the Third Amended Complaint does not detail what bribery statute he purportedly violated. This argument is a non-starter. First, as the Court found above, the failure to cite specific statutory authority in a pleading is not grounds for dismissal. *See Johnson*, 135 S. Ct. at 346. In any event, the Amended Complaint does list various state bribery laws to which George Albertelli is subject. (Doc. 117 at ¶ 256). The claim survives.

U.S. mails or the interstate wires for the purpose of executing the scheme." *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000); *see also* 18 U.S.C. §§ 1341, 1343. Plaintiffs allege Defendants committed wire or mail fraud by setting up and sending bribes by wire (Doc. 117 at ¶¶ 60, 66, 68, 72, 74, 77, 212-214, 228(a), 249(a)), setting up and submitting falsified corporate documents and financial information to Continental by wire (Doc. 117 at ¶¶ 78, 94, 106-07, 213, 249(b), 259), setting up and submitting false or inflated payment applications by wire (Doc. 117 at ¶¶ 121-22, 142-43, 169, 213, 258, 218(b), 231(e), 251(b)), and using wire and mail to steal joint checks (Doc. 117 at ¶ 183, 191, 193, 195-98, 200, 203-05, 213, 216(c), 218(c), 221(g), 260). These acts are also adequately pled.

Finally, to alleged bank fraud under 18 U.S.C. § 1344(2), a plaintiff must allege (1) a defendant intended to obtain money or property under the control of a financial institution, and (2) that they actually obtained such money "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2); *see also Loughrin v. United States*, 134 S. Ct. 2384, 2389 (2014). The Supreme Court has found that the statute's use of the phrase "by means of" "demands that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money." *Loughrin*, 134 S. Ct. at 2394. Here, Plaintiffs allege Defendants committed bank fraud in relation to the theft of the joint checks because David deposited joint checks into ACI's bank account without the legal right to do so. (Doc. 117 at ¶¶ 196, 210, 213, 260). Count 1 alleges how the checks were addressed, why they were addressed jointly, the circumstances preceding the check deposits, the roles of individual Defendants involved, when the actions took place, and their effects. (Doc. 117 at ¶¶ 182-211, 216(c), 218(c),

218(g), 231(f), 249(c)).  Bank fraud is also sufficiently alleged as a predicate act.

    4.  *Injury to Business or Property*

Next, Defendants draw issue with whether Plaintiffs' injuries are actionable under 18 U.S.C. § 1962(a) or (b), and whether they were proximately caused by the Scheme. Because Defendants only specifically attack Count 1's viability under § 1962(a) and (b), the Court will tread no further.  Regardless, the Court finds Count 1 plausibly alleges a violation of § 1962(a), but not of (b).

        a.  18 U.S.C. § 1962(a)

Defendants argue Count 1 should be dismissed because it fails to allege they proximately caused actionable injuries under § 1962(a).  Under § 1962(a), it is illegal for any person who has received "any income derived, directly or indirectly, from a pattern of racketeering activity" to "use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  As with each subsection of § 1962, a civil RICO Act claim requires an injury to business or property.  18 U.S.C. § 1964(c).

But no binding standard exists for how an injury to business or property should be assessed in the context of § 1962(a).  On the one hand, a majority of courts have adopted the "investment rule", which mandates that "a claimant under § 1962(a) must plead an injury which stems not from the racketeering predicate acts themselves but from the use or investment of racketeering income."  *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1369 (M.D. Fla. 2005) (internal punctuation omitted) (collecting cases). Only the Fourth Circuit Court of Appeals has allowed § 1962(a) claims based on injuries

caused by the predicate acts themselves.  *Busby v. Crown Supply, Inc.,* 896 F.2d 833, 837 (4th Cir. 1990).  In either case, the conduct must have proximately caused the alleged injuries.  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

The Court will join the majority by embracing the investment rule.  Because it is the use or investment of racketeering income that violates § 1962(a), rather than the racketeering acts themselves, it makes sense that qualifying injuries under § 1962(a) should flow from the prohibited acts.  A broader interpretation would render § 1962(c) superfluous, as that provision is violated by the predicate acts themselves.  *See* 18 U.S.C. § 1962(c); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

Defendants argue Count 1 should be dismissed because it does not comply with the investment rule.  The Court disagrees.  Plaintiffs allege Defendants secured income through a pattern of racketeering activity that began with bribery, and that they invested that income by establishing new entities, such as Albertelli Team CCR, and by funding contractors operating under false pretenses, such as Westcore I, that were intended to further the Scheme.  (Doc. 117 at ¶¶ 54-55, 238, 240, 244, 251).  These entities then furthered the Scheme and harmed Plaintiffs by committing other acts of bribery, submitting falsified documents and payment requests, and self-dealing.  (Doc. 117 at ¶¶ 52-55, 70-71, 75, 161, 213, 224(a)-(e), 245(a)-(b), 257, 259).

Still, Defendants argue Plaintiffs' injuries were not proximately caused by the establishment of, or investment in, third-party entities, and instead result from poor contractual performance.  But this attempt to sever the causational string falls short.  Courts have found that proximate cause can be satisfied for a § 1962(a) claim where a defendant uses racketeering income to establish a new entity that then proximately

causes harm to a Plaintiff. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 328 (2d Cir. 2011) (finding a § 1962(a) violation where a Defendant did not charge sales taxes on products at one store and used the increased revenue to establish a second store that proximately competed with Plaintiff's business, thereby damaging it); *see also Colonial Penn Ins. Co. v. Value Rent–A–Car, Inc.*, 814 F. Supp. 1084, 1095 (S.D. Fla. 1992) (finding a § 1962(a) violation where "the investment of the income fraudulently obtained allegedly enabled the Defendants to perpetuate the operation of the enterprise and continue to defraud" the plaintiff). With that in mind, the Court finds Count 1's allegations to be sufficient. Had Defendants never established Albertelli Team CCR or invested in Westcore I, those entities would not have been able to join the Scheme and commit predicate acts to further injure Plaintiffs.[6] Because Defendants did establish the entities with the intent to use them to further the Scheme, it was foreseeable that they would cause Plaintiffs' injuries. Plaintiffs have plausibly pled proximate cause in relation to § 1962(a).

　　　b. 18 U.S.C. § 1962(b)

Next, Defendants argue Count 1 fails to allege they proximately caused actionable injuries under § 1962(b). The Court agrees. Under § 1962(b), "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly

---

[6] To the extent Defendants allege Plaintiffs seek to treble ordinary breach of contract claims by characterizing Defendants' activities as fraudulent, this argument fails as well. For one thing, this argument does not contest the substantive allegations of the Third Amended Complaint. For another, Defendants cite no authority definitively holding RICO Act claims are incompatible with ordinary breach of contract claims. But the Eleventh Circuit has allowed such claims to co-exist. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1411 (11th Cir.), opinion modified on reh'g, 30 F.3d 1347 (11th Cir. 1994). Defendants' argument fails.

or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." While § 1962(a) prohibits using funds acquired through a pattern of racketeering activity to invest in or acquire an enterprise, § 1962(b) prohibits the acquisition or maintenance of an enterprise through a pattern of racketeering activity. *See id.* at §§ 1962(a)-(b). Plaintiffs have not plausibly alleged a violation of § 1962(b). While the Third Amended Complaint is rife with predicate acts that allowed Defendants to establish and fund enterprises, it is devoid of any allegation those enterprises were directly acquired or maintained *through* racketeering activity.

The Complaint alleges Defendants bribed Eguizabal to gain influence on Continental's decision-making process. But it does not claim that Defendants gained any interest in Continental, or to control Continental's decision-making process. Likewise, Plaintiffs do not assert Defendants acquired, maintained, or controlled entities like Westcore I, Westcore II, or Albertelli Team CCR through direct racketeering activity. Rather, Plaintiffs claim Defendants committed racketeering activities that either enabled the enterprises to be formed or that racketeering activities were committed through the enterprises once they were formed. That is not enough. And because Plaintiffs do not plausibly allege a violation of § 1962(b), they cannot plausibly allege that such a violation proximately caused their injuries. To the extent Count 1 alleges a § 1962(b) claim, it fails.

**B.    Civil Theft**

Count 4 alleges the Albertellis and ACI committed civil theft. In Florida, theft occurs where a person knowingly obtains or uses the property of another without legal entitlement and with the intent to deprive another of the right to that property. Fla. Stat.

§ 812.014.  Florida has provided a civil cause of action for persons injured by theft, which carries a penalty of "threefold the actual damages sustained . . . minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts."  Fla. Stat. § 772.11.  Defendants argue Count 4 should be dismissed for two reasons.

First, Defendants contend Count 4 must be dismissed because Plaintiffs were reimbursed by the bank for the joint checks that David purportedly deposited into ACI's bank account.  This is a standing issue.  To have standing, a plaintiff must allege (1) an actual or imminent injury or a concrete "invasion of a legally protected interest," (2) causation, and (3) redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Here, Count 1 alleges that David and ACI deposited joint checks meant for subcontractors without the right to do so.  (Doc. 117 at ¶¶ 182, 196, 205).  In so doing, the Fort Myers and Rochester Projects suffered an invasion of a legally protected interest.   Defendants cite no authority to suggest the court should look to recovery from a third-party when determining whether Plaintiffs have suffered an injury in fact.  That type of recovery is typically addressed by the collateral source rule.  *See Muzuco v. Re$ubmitIt*, LLC, 297 F.R.D. 504, 512 (S.D. Fla. 2013).   What matters here is David and ACI's conduct. Allegations on that subject are strong enough to confer standing.

Second, Defendants argue Count 4 should be dismissed because Plaintiffs failed to provide a written demand to George.  Florida Statute 772.11 requires that "[b]efore filing an action for damages under this section, the person claiming injury must make a written demand for $200 or the treble damage amount of the person liable for damages under this section."  *Id.*  Here, Plaintiffs argue, and the record substantiates, that such a

demand letter was sent to David and ACI for the return of the stolen joint checks deposited by David into ACI's bank account.  (Doc. 49-1 at 145-46).  Plaintiffs claim they also provided sufficient notice to George because he was an owner of ACI and therefore he also had notice of the demand for return of the checks.  But the language of Florida Statute 772.11 is clear.  It requires that a demand for relief be made to each person liable for civil theft damages.  ACI and George are separate persons under the law.  While Plaintiffs addressed ACI's potential liability through their demand letter, they did not address that of George.

But Plaintiffs' failure to supply George with a demand letter is not grounds for dismissal.  As a threshold matter, the demand requirement in the statute is not substantive because it does not relate to the activities that give rise to the cause of action itself.  It exists to "encourage negotiation and settlement prior to the commencement of litigation." *In re Tadlock*, No. 3:09-BK-712-PMG, 2010 WL 8320065, at *5 (Bankr. M.D. Fla. Sept. 1, 2010).  Perhaps recognizing this finding, courts within this circuit have enforced the demand requirement leniently and have declined to dismiss nonconforming claims.  *See Inglis v. Wells Fargo Bank N.A.*, No. 2:14-CV-677-FTM-29CM, 2017 WL 637485, at *7 (M.D. Fla. Feb. 16, 2017); *Deman Data Sys., LLC v. Schessel*, No. 8:12-CV-2580-T-24, 2014 WL 6751195, at *23 (M.D. Fla. Dec. 1, 2014), amended on reconsideration, No. 8:12-CV-2580-T-24, 2015 WL 58650 (M.D. Fla. Jan. 5, 2015).  The Court agrees with this approach.[7]

---

[7] The Court recognizes a decision from the Southern District of Florida holding that "Florida law does not require a demand for the return of the money in order to state a cause of action for civil theft."  *Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1266 (S.D. Fla. 2011).  But, in light of the relatively straightforward language of the statute, the Court declines to embrace that holding here.

By now, George has notice of the claim and no time machine exists to further the interests of pre-suit negotiation.  Moreover, it stands to reason that because he is a partial owner of ACI, the policy interests (but not the strict letter) of the statute were satisfied by serving a demand on ACI prior to suit.  For these reasons, the Court does not find the lack of strict statutory compliance grounds for dismissal.  But in an abundance of caution, Plaintiffs will comply with the statute by serving a demand upon George within 10 days. Count 4 survives.

## C.    Common Law Fraud

Count 5 alleges all Defendants are liable for common law fraud.  In Florida, the elements of fraud are "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).  Fraud claims are subject to Rule 9(b).  Fed. R. Civ. P. 9(b).  Defendants argue Plaintiffs have not met this obligation as it relates to George and Butler.  The Court disagrees.

Count 5 is based on some of the same predicate acts the Court found plausibly alleged in Count 1.  The Court finds that both Defendants' roles are specifically alleged in the intentional preparation of incorrect payment applications on the Six Mile Project. (Doc. 117 at ¶¶ 12, 63, 78, 109, 121-125, 218, 249).  The Third Amended Complaint also establishes that George and Butler expected Plaintiffs to rely on the applications because they requested payments from the Six Mile Fund, and that the Six Mile Fund was injured when the payments were disbursed and subcontractors later claimed they were owed additional funds.  (Doc. 117 at ¶¶ 121-126, 128).

In addition, Count 5 plausibly alleges Butler played an active part in the theft of joint checks from the Six Mile and Rochester Funds by helping to prepare payment requests that ACI never intended to honor and by making numerous false representations regarding distributing said payments. (Doc. 117 at ¶¶ 189-91, 195, 199-200, 203-04, 206-207). Based on these representations the Fort Myers and Rochester Funds allegedly distributed payments in the form of joint checks and were injured when David deposited them into ACI's bank account. (Doc. 117 at ¶¶ 196, 205, 208). Count 5, thus, passes muster.

## D. Common Law Conspiracy to Commit Fraud

Count 6 alleges all Defendants are liable for conspiracy to commit common law fraud. In Florida, the elements of a civil conspiracy are "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). Conspiracy claims must also meet Rule 9(b)'s heightened particularity requirements. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007). Count 6 meets those requirements. First, it alleges individual Defendants agreed to participate, and took part in certain specific unlawful acts including bribery, falsification of documents, the surreptitious use of sham contractors and self-dealing, and the theft of joint checks, which was to further the Scheme. (Doc. 117 at ¶¶ 52-54, 62, 116, 212, 214, 216, 218, 218, 224, 226, 228, 231, 234, 237, 239, 241, 243, 245, 247, 249, 251, 319-320). It then alleges Defendants' unlawful acts injured Plaintiffs in several ways. (Doc. 117 at ¶¶ 304, 309, 313, 316). Count 6, therefore, survives.

**E.    Supplemental Jurisdiction**

Finally, Defendants argue that the Court should decline to exercise jurisdiction over the remaining state court claims.  Under 28 U.S.C. § 1367(a) "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  The Eleventh Circuit has found that "[w]henever a federal court has supplemental jurisdiction under section 1367(a), that jurisdiction should be exercised unless" a statutory exclusion applies.  *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006).  Here, Count 1 arises under the RICO Act, thereby providing the Court with original jurisdiction.  All the other claims stem from the same set of operative facts, and no exceptions to subject matter jurisdiction apply.  Defendants' argument fails.

It is now

**ORDERED:**

1. Defendants Motions to Dismiss (Docs. 130; 135; 136; 137; 138) are **DENIED in part**.

2. To the extent Count 1 alleges a violation of 18 U.S.C. § 1962(b), it is **DISMISSED without prejudice**.

3. Defendants have fourteen (14) days to answer or otherwise respond to this action.

4. Plaintiffs must serve a demand on George Albertelli under Florida Statute 772.11 within ten (10) days of this Order.

**DONE** and **ORDERED** in Fort Myers, Florida this 11th day of June, 2018.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record