UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CONTINENTAL 332 FUND, LLC,
CONTINENTAL 298 FUND, LLC
CONTINENTAL 306 FUND LLC,
CONTINENTAL 326 FUND LLC,
CONTINENTAL 347 FUND LLC,
CONTINENTAL 355 FUND LLC,
CONTINENTAL 342 FUND LLC, and
CONTINENTAL 245 FUND LLC

Case No. 2:17-cv-000041-SPC-MRM

     Plaintiffs,

vs.

DAVID ALBERTELLI, ALBERTELLI
CONSTRUCTION, INC., GEORGE
ALBERTELLI, WESTCORE CONSTRUCTION,
LLC, (Del.), WESTCORE CONSTRUCTION,
L.L.C. (Nev.), FOUNDATION MANAGEMENT
LLC, NATIONAL FRAMING, LLC, KMM
CONSTRUCTION LLC, MFDC LLC, TEAM
CCR, LLC, BROOK KOZLOWSKI, JOHN
SALAT, KEVIN BURKE, KERRY
HELTZEL, AMY BUTLER, and US
CONSTRUCTION TRUST

     Defendants.

_____/

ALBERTELLI CONSTRUCTION, INC.,

     Counterclaim and Third Party
     Plaintiff,

v.

CONTINENTAL 332 FUND LLC,
CONTINENTAL 298 FUND LLC,
CONTINENTAL 326 FUND LLC,
CONTINENTAL 306 FUND LLC,

Counterclaim Defendants,
and

CONTINENTAL PROPERTIES GROUP,
INC., a/k/a CONTINENTAL
PROPERTIES COMPANY, INC., and
ANGELO EGUIZABAL,

Third Party Defendants.
_____/

## THIRD AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT

[Document continues on next page]

## TABLE OF CONTENTS

Page

**ALLEGATIONS COMMON TO COUNTS I THROUGH XV** ........................................1

**CLAIMS RELATING TO THE SIX MILE PROJECT**......................................................3

    COUNT I – BREACH OF CONTRACT ..........................................10

    COUNT II – FRAUD............................................................10

    COUNT III – DECEPTIVE AND UNFAIR TRADE PRACTICES ..............11

    COUNT IV – TORTIOUS INTERFERENCE..................................12

    COUNT V – QUANTUM MERUIT ..........................................14

    COUNT VI – UNJUST ENRICHMENT......................................15

    COUNT VII – EQUITABLE LIEN ..........................................16

**CLAIMS RELATING TO THE SAVAGE PROJECT** ...........................................17

    COUNT VIII – BREACH OF CONTRACT ....................................17

    COUNT IX — UNJUST ENRICHMENT......................................21

    COUNT X – FRAUD IN INDUCEMENT OF CHANGE ORDER 10 (rescission) .......22

    COUNT XI – FRAUD IN INDUCEMENT OF CHANGE ORDER 10 (damages)........23

**CLAIMS RELATING TO THE ROCHESTER PROJECT** .........................................24

    COUNT XII – BREACH OF CONTRACT....................................24

    COUNT XIII – UNJUST ENRICHMENT .....................................27

**CLAIMS RELATING TO THE NEW BRAUNFELS PROJECT**.................................29

    COUNT XIV – BREACH OF CONTRACT ....................................29

    COUNT XV – UNJUST ENRICHMENT .....................................32

**RICO CLAIMS** ..............................................................33

    COUNT XVI – RICO (§ 1962(a) vs. Eguizabal)..............................46

    COUNT XVII – RICO (§ 1962(b) vs. Eguizabal) .............................47

    COUNT XVIII – RICO (§ 1962(c) vs. Eguizabal) ............................47

    COUNT XIX – RICO (§ 1962(d) vs. Continental) ............................48

**JURY TRIAL DEMAND** ........................................................49

**CERTIFICATE OF SERVICE**....................................................49

Plaintiff, Albertelli Construction, Inc. ("Counterclaim Plaintiff" or "ACI"), by and through its undersigned counsel, sues Counterclaim Defendants, Continental 332 Fund LLC ("Six Mile Fund"), Continental 298 Fund LLC ("Savage Fund"), Continental 326 Fund LLC ("Rochester Fund"), Continental 306 Fund LLC ("New Braunfels Fund"), and Third Party Defendants Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc. ("Continental") and Angelo Eguizabal ("Eguizabal"), and alleges:

## ALLEGATIONS COMMON TO COUNTS I THROUGH XV

1.     This is an action for damages which are in excess of $75,000.00, exclusive of interest, costs, and attorney's fees.

2.     Counterclaim Plaintiff is a Florida corporation authorized to do business and doing business in the State of Florida, with its principal place of business in Jacksonville, Duval County, Florida.

3.     Counterclaim Defendant Six Mile Fund is a Wisconsin limited liability company that owns an apartment complex in Ft. Myers, Lee County, Florida, known as the Springs at Six Mile Cypress (the "Six Mile Project"), more particularly described as follows:

> TRACT "MF", OF SIX MILE CROSSING, A SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED AS INSTRUMENT NO. 2015000032022, OF THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA.

(the "Six Mile Property").

4.     Counterclaim Defendant Savage Fund is a Wisconsin limited liability company that owns an apartment complex in Savage, Minnesota, known as the Springs at Egan Drive (the "Savage Project").

5.      Counterclaim Defendant Rochester Fund is a Wisconsin limited liability company that owns an apartment complex in Rochester, Minnesota, known as the Springs at South Broadway (the "Rochester Project").

6.      Counterclaim Defendant New Braunfels Fund is a Wisconsin limited liability company that owns an apartment complex in New Braunfels, Texas, known as the Springs at Creekside (the "New Braunfels Project").

7.      Third Party Defendant Continental is a Wisconsin corporation that owns and manages Six Mile Fund, Savage Fund, Rochester Fund and New Braunfels Fund on behalf of itself and certain investors.  All actions alleged herein to have been taken by Continental were made in its capacity as manager of, and on behalf of, Six Mile Fund, Savage Fund, Rochester Fund or New Braunfels Fund, as applicable, except where specifically alleged otherwise.

8.      This court has long-arm jurisdiction over Counterclaim Defendant Six Mile Fund and Third Party Defendant Continental as they own, possess or operate a business on real property in the State of Florida and this action arises out of said activities in the State of Florida.  Additionally, each of the Counterclaim Defendants has submitted to the jurisdiction of this Court by seeking affirmative relief in this Court in their Third Amended Complaint.

9.      Venue is proper in this district in that the Six Mile Property is located within this district.

10.     Plaintiff has engaged the undersigned attorneys and is obligated to pay a fee for their services herein.

11.     All conditions precedent to the maintenance of this action have been performed, have occurred or have been waived.

2

## CLAIMS RELATING TO THE SIX MILE PROJECT

12.     ACI is a general contractor in the business of constructing, among other things, multi-family housing projects, including apartment complexes.

13.     ACI entered into negotiations with Continental to construct the Six Mile Project – a 288 unit apartment complex – in late 2014 which continued into early 2015.

14.     The negotiations led to the execution of an agreement between ACI and the Six Mile Fund (the "Six Mile Contract") consisting of three parts:

(1)    an AIA Document A101 – 2007 Standard Form of Agreement Between Owner and Contractor;

(2)    an AIA Document A201 – 2007 General Conditions of the Contract for Construction; and

(3)    a Contract Agreement document dated February 20, 2015, containing 28 exhibits to the Contract.

15.     The Six Mile Contract is in the possession of Six Mile Fund and is too voluminous to attach as an exhibit to this Counterclaim.

### Contractor Clarifications Fraud

16.     The "Contract Agreement" portion of the Six Mile Contract was materially and fraudulently altered by Justin Sell, the associate project manager for the Six Mile Project for Continental. In particular, ACI submitted its Exhibit F "Contractor Clarifications" in the form attached hereto as **Exhibit A**. However, without informing ACI, and with the intent to deceive ACI, Sell switched out the Exhibit F "Contractor Clarifications" submitted by ACI for the set attached as **Exhibit B** that were purportedly included in the "Contract Agreement" portion of the Six Mile Contract.

3

17.    The Exhibit F "Contractor Clarifications" fraudulently inserted into the Contract in lieu of those submitted by ACI were substantially more favorable to Continental to the tune of hundreds of thousands of dollars of items that Sell fraudulently and surreptitiously inserted into ACI's scope of work without ACI's knowledge or consent.

18.    Once ACI discovered Sell's fraudulent switch-out of its Contractor Clarifications, Continental conceded several items of work that Sell had surreptitiously inserted were not, in fact, part of ACI's contract. Nevertheless, ACI still suffered damages from Continental's attempt to dupe ACI into performing work which it was not obligated to perform and for which Continental had paid no consideration.

**Delays Occurring During Course of Construction**

19.    ACI began site work activities in March 2015, including earthwork, construction of access roads, installation of underground utilities and building pad construction.

20.    ACI's site work activities were on the critical path for construction because, until these activities were completed, ACI could not obtain approval from government authorities to commence work on vertical construction.

21.    During the period from March 2015 to January 2016, site work activities were negatively affected by significant and, in some cases, severe rainfall. In the month of July 2015 alone, the site received nearly double the historical average for rainfall in the month of July.

22.    The severe rainfall resulted in unfavorable site conditions which prevented work from progressing as planned and hindered the productivity of ACI and its subcontractors.

4

23.    The soil conditions on site did not allow water to percolate after each rain event, resulting in standing water on the site for extended periods of time.

24.    Due to the soil conditions on site, and rainfall typically encountered in Ft. Myers over the planned course of the project, it was reasonably foreseeable that dewatering would be required in order to allow site work and underground utility work to be performed. However, Continental failed to apply for a dewatering permit until nearly five months after site work began. As a result, ACI was not able to remove water from the site after each rainfall event. This resulted in unfavorable conditions for site work multiple days after each rain event.

25.    The inability to dewater the site for those five months due to the lack of a permit, coupled with rainfall during the month of July 2015 that was nearly double the historical average, and severe rainfall experienced in subsequent months, caused substantial delays to the project in general and the site work and underground utility work in particular.

26.    The unfavorable site conditions had a direct and significant negative impact on the start of vertical construction. Vertical construction activities could not proceed until the waterline/fire hydrant clearances were issued, which was dependent upon the installation of necessary underground utilities. Underground utilities work was most susceptible to the flooding caused by the rain events and lack of dewatering. The final waterline clearance was not issued until January 11, 2016.

27.    The unfavorable conditions caused by the lack of dewatering and extreme rainfall events required material changes to ACI's means and methods of construction and caused substantial delays to ACI's work on the Six Mile Project. ACI incurred extended

5

general conditions and other costs as a result of these delays which were compensable delays under the Six Mile Contract.

28.    Continental, acting as manager of Six Mile Fund and on its behalf, also actively interfered with ACI's supervision and direction of the work under the Contract, by communicating directly with ACI's subcontractors, by directing ACI's subcontractors to perform the work contrary to ACI's directions and out-of-sequence with ACI's project schedule, and otherwise.  Continental's active interference also delayed the progress of ACI's work under the Six Mile Contract.

29.    Despite demand, Six Mile Fund failed and refused to approve appropriate extensions of the contract time to account for the weather impact delays and the delays caused by the owner's active interference, and further failed to approve change orders for ACI's resulting extended general conditions and other costs.

**Continental's Failure to Pay in Accordance with the Contract**

30.    From the beginning of the Six Mile Project (and on the Rochester Project, as alleged more particularly in Count XII below), Continental insisted upon using a new system for processing payment – known as the Textura system – which was a web-based system for processing payments.  Use of the Textura system was not required by the contract, but Continental insisted it would only process payments submitted through Textura.

31.    The Textura system was new to Continental and ACI frequently was required to obtain system support from Continental's Information Technology (IT) employees who, in turn, had to obtain updates and fixes to address problems with the system that repeatedly held up payment.

6

32. Despite the numerous technical difficulties ACI encountered with Textura, Continental refused to process payments until they were cleared through Textura, resulting in delays of weeks and, in some cases, months before payment would be processed.

33. Continental also delayed payments to ACI over exceedingly minor discrepancies in supporting paperwork submitted by ACI or its subcontractors, holding up millions of dollars in payments to downstream subcontractors.

34. Continental's failure to pay ACI except through Textura, and its late payment to ACI through its use and implementation of Textura, was a breach of the duties of Six Mile Fund under the Six Mile Contract, as nothing in the Six Mile Contract required ACI to submit its payments through that system, and Continental implemented payment through Textura in an unreasonable way which interfered with ACI's performance under the Six Mile Contract.

35. Continental's failure to pay timely negatively affected ACI's ability to perform under the Six Mile Contract and damaged ACI's relationship with its subcontractors whose payments were delayed because of the Textura issues.

**<u>Continental's Unwarranted Withholding of Payment</u>**

36. Beginning in March 2015, ACI submitted regular monthly applications for payment for progress payment amounts which were then reviewed and certified by the architect in accordance with the terms of the Six Mile Contract.

37. In spite of multiple delays in payment as previously alleged, in general, Continental, acting as manager of Six Mile Fund, would process ACI's payment applications for the amounts certified by the architect.

7

38.    However, beginning with the application for payment for the month of September 2016, Continental began withholding amounts certified by the architect. Despite the architect's certification of the amount submitted by ACI as due and owing for the month of September 2016, Continental unilaterally decided it would process ACI's payment application only for the amounts due and owing to ACI's subcontractors and suppliers. Continental withheld payment of the balance of ACI's monthly payment applications for September and October 2016 for the amounts attributable to ACI's general conditions expenses, buyout savings, and fee. On the September 2016 payment application, Continental withheld $36,667.19, and on the October 2016 payment application, Continental withheld $176,251.13, even though these amounts were certified as due and owing by the architect.

39.    Continental's alleged justification for this withholding was its contention that ACI was liable for liquidated damages for late delivery of portions of the project. However, Continental's withholding caused Six Mile Fund to breach the Six Mile Contract, as no proper notification was provided to ACI regarding the reasons for the withholding and, in any event, it is the architect who is empowered to withhold certificates for payment under the Six Mile Contract, and the architect had certified these amounts as due and payable to ACI.

40.    Continental's withholding caused Six Mile Fund to breach its duties under the Six Mile Contract because the delays for which Continental asserted liquidated damages were in part caused by the adverse weather conditions previously described. Continental never provided notice to ACI of the amount of liquidated damages it was withholding on Six Mile Fund's behalf or how they were computed, nor did it account for the compensable delays experienced by ACI. Instead, Continental arbitrarily withheld payment of amounts certified by the architect as due to ACI.

8

41.     Continental's improper withholding of ACI's payments in breach of Six Mile Fund's duties under the Six Mile Contract negatively impacted ACI's ability to continue performing under the Six Mile Contract.

### Continental's Refusal to Process Change Orders

42.     ACI also performed extra work on the Six Mile Project having a value of over $383,000 for which it requested change orders. Attached hereto as **Exhibit C** is a summary description of such extra work and the amount attributable to each item of extra work.

43.     ACI submitted requests for change orders for most or all of the amounts reflected in Exhibit C in accordance with the requirements of the Six Mile Contract. However, Continental wrongfully and in breach Six Mile Fund's duties under the Six Mile Contract failed and refused to process change orders for the extra work ACI performed.

### Contract Termination

44.     On December 23, 2016, ACI placed Six Mile Fund, through Continental, on notice of its payment defaults and of ACI's reservation of its right to stop work under the Six Mile Contract if the payment default was not cured within seven (7) days.

45.     Six Mile Fund did not cure its payment default. Accordingly, by letter dated January 5, 2017, ACI gave notice that it would begin demobilizing from the Six Mile Project.

46.     The next day, January 6, 2017, Continental, as manager of the Six Mile Fund, purported to terminate ACI's right to perform work on the Six Mile Project.

### ACI's Damages

47.     ACI has suffered damages due to Six Mile Fund's:  (a) refusal to grant extensions of the contract time for delays beyond ACI's control, (b) failure to pay in accordance with the Contract; (c) improper withholding of payment to ACI; (d) refusal to

9

process and pay for valid change orders for costs ACI incurred which were beyond its scope of work under the Contract, (e) improper withholding of payment from ACI for work performed, and (f) improper termination of the Contract.

## COUNT I – BREACH OF CONTRACT – SIX MILE PROJECT

48.     Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 47 above and incorporates the same herein by reference.

49.     ACI substantially performed its obligations under the Six Mile Contract up until the termination of the Six Mile Contract.

50.     The Six Mile Fund materially breached the Six Mile Contract by its failure to make payment to ACI and other breaches as alleged herein.

51.     ACI's damages due to Six Mile Fund's breach of the Six Mile Contract include, without limitation, unpaid interest on payments not timely paid under the Six Mile Contract; the amounts improperly withheld by Six Mile Fund, together with accrued interest; the contract balance earned through performance as of the date of the improper termination; the value of the extra work performed by ACI without compensation by Six Mile Fund; ACI's extended general conditions costs and other costs occasioned by the delays in the project that were beyond its control; and other damages, in an amount to be proven at trial.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 332 Fund, LLC for damages together with prejudgment interest, court costs and such other relief as the court deems just.

## COUNT II – FRAUD – SIX MILE PROJECT

52.     Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 18 above and incorporates the same herein by reference.

10

53.     Continental, on its own and as manager of Six Mile Fund, acting through Justin Sell, its Associate Project Manager and agent, misrepresented the Contractor Clarifications included in the Contract Agreement document to be the Contractor Clarifications submitted by ACI which formed the basis of the Six Mile Contract, when in fact Sell had altered the Contractor Clarifications document to make it more favorable to Continental.

54.     Continental, on its own and as manager of Six Mile Fund, intended to and did induce ACI to enter into the Six Mile Contract based on his false representation.

55.     ACI acted in reliance upon Sell's misrepresentation by entering into the Six Mile Contract and undertaking performance thereunder.

56.     ACI has suffered damages as a result of Continental's fraud in an amount to be proven at trial.

57.     ACI reserves the right to seek amendment of this count to seek punitive damages, in addition to its other damages, at the appropriate time.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 332 Fund LLC and Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc., for damages together with prejudgment interest, court costs and such other relief as the court deems just.

### COUNT III – DECEPTIVE AND UNFAIR TRADE PRACTICES – SIX MILE PROJECT

58.     Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 18, and 53 through 55 above and incorporates the same herein by reference.

11

59. Continental's actions in misrepresenting the Contractor Clarifications inserted into the Contract as being the same as those submitted by ACI is a deceptive and unfair trade practice.

60. Continental's deceptive and unfair trade practices caused ACI to incur actual damages in an amount to be proven at trial.

61. ACI seeks its attorney's fees herein pursuant to § 501.211(2), Florida Statutes.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 332 Fund LLC and Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc. for damages together with prejudgment interest, court costs and attorneys' fees.

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS – SIX MILE PROJECT

62. Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 14 above and incorporates the same herein by reference.

63. This is an action for damages for tortious interference with contractual relations which seeks relief independent of any remedies to which ACI may be entitled as against Six Mile Fund under the Six Mile Contract.

64. ACI subcontracted portions of the work under the Six Mile Contract to various subcontractors who performed the work under ACI's supervision and direction. ACI's subcontracts required each subcontractor to follow the instructions and directions of ACI's project superintendent and to perform its work in accordance with ACI's construction progress schedule.

12

65. Continental, as manager of Six Mile Fund, had knowledge of ACI's contractual relationships with the various subcontractors through, among other things, information submitted to Continental through the Textura payment system.

66. Continental knowingly and intentionally procured the breach by various subcontractors of their contractual duty to follow the directions and instructions of ACI's project superintendent by, among other things, contacting ACI's subcontractors and directing them to perform their work contrary to ACI's instructions.

67. Continental further knowingly and intentionally procured the breach by various subcontractors of their contractual duty to perform their work in accordance with ACI's construction progress schedule by, among other things, contacting ACI's subcontractors and directing them to perform their work out of sequence with ACI's construction progress schedule.

68. Continental further knowingly and intentionally interfered with ACI's contractual relations with its subcontractors by causing ACI's payments under the Six Mile Contract to be improperly withheld and delayed and then falsely telling ACI's subcontractors that ACI was the cause of the payment delay.

69. Continental further knowingly and intentionally interfered with ACI's contractual relations with its subcontractors by refusing to process payment for ACI's general conditions and fees based on alleged claims for liquidated damages, while insisting on full payment to ACI's subcontractors, directly undermining ACI's supervision of its subcontractors and preventing ACI from passing through the alleged liquidated damages to the responsible subcontractors in accordance with its subcontracts.

70.    ACI suffered damages as a result of Continental's tortious interference with ACI's contractual relationships with its subcontractors, including without limitation delays to the performance of the work, inefficiency in the performance of the work and other costs to attempt to overcome the effects of Continental's tortious interference.

71.    ACI reserves the right to seek amendment of this count to seek punitive damages at the appropriate time.

WHEREFORE, Counterclaim Plaintiff demands judgment against Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc. for damages, together with prejudgment interest, court costs, and such other relief as the court deems just.

## COUNT V – QUANTUM MERUIT – SIX MILE PROJECT

72.    Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 13 above and incorporates the same herein by reference.

73.    This is an action against in the alternative to Count I for relief based on a contract implied-in-fact.

74.    ACI provided labor, services and materials consisting of construction of an apartment complex on Six Mile Fund's Property (the "services").

75.    Six Mile Fund and Continental, as manager and owner of Six Mile Fund, had knowledge of, assented to, and received a benefit from ACI's services.

76.    Six Mile Fund and Continental knew that ACI was not volunteering its services and expected compensation.  Under the circumstances, a reasonable person receiving Plaintiff's services would expect to pay for them.

14

77.    Despite demand, Six Mile Fund and Continental have refused to pay the reasonable value of ACI's services.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 332 Fund LLC and Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc. for damages, together with prejudgment interest, court costs, and such other relief as the court deems just.

### COUNT VI – UNJUST ENRICHMENT – SIX MILE PROJECT

78.    Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 13 above and incorporates the same herein by reference.

79.    This is an action in the alternative to Counts I, II and V for relief based on a contract implied in law to prevent unjust enrichment.

80.    ACI provided labor, services and materials consisting of construction of an apartment complex on Six Mile Fund's Property (the "benefits") to improve the Six Mile Property at the owner's request.

81.    Six Mile Fund and Continental, as manager and owner of Six Mile Fund, had knowledge of, assented to, accepted, and retained the benefits conferred by ACI.

82.    Under the circumstances, it would be inequitable for Six Mile Fund and Continental to retain the benefits conferred by ACI without paying a sum representing the reasonable value of the benefits conferred.

83.    Six Mile Fund and Continental have not paid for the benefits conferred by ACI and, thus, have been unjustly enriched to the extent of the benefit conferred.

84.    ACI has no adequate remedy at law.

15

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 332 Fund LLC and Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc. for damages, together with prejudgment interest, court costs, and such other relief as the court deems just.

## COUNT VII – EQUITABLE LIEN – SIX MILE PROJECT

85.    Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 13, 16 through 18, 53 through 56, and 80 through 84 above and incorporates the same herein by reference.

86.    This is an action in the alternative to Counts I, II and V for imposition of an equitable lien.

87.    Counterclaim Plaintiff is entitled to an equitable lien on the Six Mile Property based on defendants' fraud and misrepresentation regarding the Contractor Clarifications incorporated into the Six Mile Contract.

88.    Counterclaim Plaintiff is also entitled an equitable lien on the Six Mile Property to prevent the unjust enrichment of Six Mile Fund and Continental at Counterclaim Plaintiff's expense.

WHEREFORE, Counterclaim Plaintiff demands judgment adjudicating an equitable lien in favor of Counterclaim Plaintiff as against the interest of Counterclaim Defendant Continental 332 Fund LLC and Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc. in the Six Mile Property in the amount of Counterclaim Plaintiff's damages, together with prejudgment interest, court costs, and such other relief as the court deems just.

16

## CLAIMS RELATING TO THE SAVAGE PROJECT

89.    This action involves real property located in Scott County, Minnesota and is comprised of the lot described as follows:

> Lot One (1), Block One (1), Springs at Egan Drive, Scott County, Minnesota (the "Real Property"), which is located at 14125 Louisiana Avenue South in Savage, Minnesota, and identified as Parcel No. 264560010.

(the "Savage Property").

90.    Savage Fund is the current fee owner of the Savage Property and was the fee owner of said property at all times material to this action.

## COUNT VIII – BREACH OF CONTRACT – SAVAGE PROJECT

91.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 89 through 90 above and incorporates same herein.

92.    ACI and Savage Fund entered into a contract (the "Savage Contract") whereby ACI agreed to perform labor and furnish material and machinery, as a general contractor for the construction project known as the Springs at Egan Drive (the "Savage Project"), all of which related to the permanent development and improvement of the Savage Property.

93.    Savage Fund is in possession of the Savage Contract, a copy of which is too voluminous to attach. The Savage Contract includes plans, specifications, and other such documents identified in the Savage Contract.

94.    In consideration for the labor, material, and general contractor services ACI provided for the Project on the Savage Property, Continental agreed to pay ACI in accordance with the Savage Contract and the payment applications submitted by ACI.

95.    Pursuant to the Savage Contract, ACI provided the necessary labor, skill, material and general contractor services for the Savage Project and has completed its work in connection with

17

the Savage Project in a workmanlike and professional manner and has otherwise fulfilled its obligations under the Savage Contract.

96.    Despite the foregoing and ACI's demands, Savage Fund has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to pay ACI for the labor, material, and general contractor services that ACI provided in connection with the Savage Project and the permanent development and improvement to the Savage Property.

97.    ACI encountered work on the Savage Project that was not part of the original Savage Contract.

98.    ACI submitted proposed change orders for this extra work.

99.    Savage Fund unjustifiably and in breach of the Savage Contract refused to execute said proposed change orders or enter into good faith negotiations with ACI over the proposed change orders.

100.    ACI encountered conditions over which it had no control that extended the time period needed to complete the Savage Contract.

101.    ACI requested time extensions to the Savage Contract period as a result of these conditions.

102.    Savage Fund unjustifiably and in breach of the Savage Contract refused to grant said time extensions, or granted time extensions in change order 10 which depended on Savage Fund performing actions in a timely manner so that ACI could meet the extended deadlines, and Savage Fund failed or refused to perform said actions.

103.    ACI submitted payment applications to Savage Fund during the Project.

104.    Savage Fund unjustifiably and in breach of the Savage Contract failed to process payment to ACI of the amounts due and owing in accordance with the contract's

18

terms, improperly delayed payments, improperly withheld payments and improperly reduced payments due and owing to ACI.

105. A condition precedent to ACI's duties to perform the work under the Savage Contract included Savage Fund's duty to provide permits and design documents in a timely manner during the course of the Savage Project.

106. Savage Fund did not provide permits and design documents in a timely manner during the Savage Project.

107. Savage Fund's failure to provide permits and design documents in a timely fashion delayed ACI's work and made it more expensive to perform. Among other things, ACI incurred costs to attempt to assist the Savage Fund with design issues and permitting delays for which Savage Fund provided no compensation to ACI.

108. The Savage Contract included an allowance for winter conditions.

109. Per the Savage Contract, the allowance was to be adjusted based on the actual cost for winter conditions.

110. Savage Fund unjustifiably and in breach of the Savage Contract refused to adjust the contract price based on the actual cost for winter conditions.

111. There is in every contract an implied promise of good faith and fair dealing.

112. Savage Fund improperly asserted liquidated damages for delays against ACI, when in fact Savage Fund's own actions on the Savage Project and other factors beyond ACI's control caused many of the delays.

113. Savage Fund consistently interfered with ACI's subcontracts during the Savage Project.

114. Savage Fund's actions were in breach of the duty of good faith and fair dealing.

115. Savage Fund provided the Plans and Specifications for the Savage Project.

116. By providing the Plans and Specifications for the Savage Project, Savage Fund impliedly warranted the adequacy of the plans and specifications for construction of the Savage Project.

117. The Plans and Specifications provided by Savage Fund were not adequate for the purposes of completing the Savage Project.

118. Savage Fund's actions as alleged herein constitute a breach of the Savage Contract.

119. As a direct and proximate result of Savage Fund's breach of the Savage Contract, ACI has suffered damages in excess of $3,000,000, including unpaid interest on payments not timely paid under the Contract; the unpaid contract balance plus accrued interest thereon; the value of the extra work performed by ACI without compensation by Continental; ACI's extended general conditions costs and other costs occasioned by the delays in the project that were beyond its control; and other damages, in an amount to be proven at trial.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 298 Fund LLC for its damages, together with interest, costs and such other relief as may be appropriate.

## COUNT IX — UNJUST ENRICHMENT – SAVAGE PROJECT

120.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 89 through 90 above and incorporates same herein.

121.    This is an action in the alternative to Count VIII for relief based on a contract implied in law to prevent unjust enrichment.

122.    ACI provided labor, services and materials consisting of construction of an apartment complex on Savage Fund's property to improve said property at Savage Fund's request.

123.    Savage Fund and Continental, as manager and owner of Savage Fund, had knowledge of, assented to, accepted, and retained the benefits conferred by ACI.

124.    Savage Fund and Continental have failed and refused to pay ACI for the labor, material, and general contractor services provided by ACI.

125.    The reasonable value of the labor, material, and general contractor services that remains unpaid exceeds $3,000,000.

126.    By retaining the labor, material, and general contractor services furnished by ACI without making payment to ACI for same, Savage Fund and Continental have received a benefit of value and have been unjustly enriched in a manner that is illegal or unlawful.

127.    To prevent the unjust enrichment of Savage Fund and Continental, ACI is entitled to judgment against Savage Fund and Continental for damages exceeding $3,000,000, together with the maximum interest allowable by law, and ACI's costs and disbursements in this action.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 298 Fund LLC  and Third Party Defendant Continental Properties

Group, Inc., a/k/a Continental Properties Company, Inc. for its damages, together with interest, costs and such other relief as may be appropriate.

## COUNT X – FRAUD IN THE INDUCEMENT OF CHANGE ORDER 10 – RESCISSION

128.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11, 89 through 90 above and incorporates same herein.

129.    This is an action for rescission of change order 10 to the Savage Contract. The relief sought herein is in the alternative to any remedies with respect to change order 10 prayed for in Counts VIII or XI.

130.    To induce ACI to enter into change order 10, which reduced the contract balance by an amount representing liquidated damages claimed by Continental acting as manager and agent for Savage Fund, Continental, acting as Savage Fund's agent and manager, represented to ACI that it would cause Savage Fund to perform the duties necessary to allow ACI to perform in accordance with the revised turnover dates set forth in change order 10.

131.    Both the revised turnover dates and Continental's representation that it would cause Savage Fund to perform the duties that were necessary to perform if ACI was to be able to perform in accordance with the revised turnover dates, were material inducements to ACI in agreeing to enter into change order 10.

132.    ACI reasonably and justifiably relied on Continental's representations as alleged herein.

133.    Continental failed to perform in accordance with its representations to ACI. Among other things, Savage Fund failed to secure required governmental permits so that ACI

22

would be able to call in timely inspections of the buildings so as not to slow the progress of the work.

134.   At the time Continental made its representations to ACI, Continental had no intention of performing as represented to ACI or had formed a positive intent not to perform as represented.

135.   As a result of Continental's fraud in the inducement of change order 10, ACI is entitled to rescission of change order 10.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 298 Fund LLC for rescission of change order 10 and such other relief as the court deems just.

## COUNT XI – FRAUD IN THE INDUCEMENT OF CHANGE ORDER 10 – DAMAGES

136.   Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11, 89 through 90 and 130 through 134 above and incorporates same herein.

137.   This is an action for damages for fraud in the inducement of change order 10. The relief sought herein is in the alternative to any remedies with respect to change order 10 prayed for in Counts VIII or X.

138.   As a result of Continental's fraud in the inducement of change order 10, ACI has suffered damages in an amount to be proven at trial.

WHEREFORE, Counterclaim Plaintiff demands judgment against Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc. for its damages, together with interest, costs and such other relief as may be appropriate.

23

## CLAIMS RELATING TO THE ROCHESTER PROJECT

139.    This action involves real property located at 305 28th SE, Rochester, Minnesota (the "Rochester Property").

140.    Rochester Fund is the current fee owner of the Rochester Property and was the fee owner of said property at all times material to this action.

## COUNT XII – BREACH OF CONTRACT – ROCHESTER PROJECT

141.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11, 30 through 33, and 139 through 140 above and incorporates same herein.

142.    ACI and Rochester Fund entered into a contract (the "Rochester Contract") whereby ACI agreed to perform labor and furnish material and machinery, as a general contractor for the construction project known as the Springs at South Broadway (the "Rochester Project"), all of which related to the permanent development and improvement of the Rochester Property.

143.    Rochester Fund is in possession of the Rochester Contract, a copy of which is too voluminous to attach. The Rochester Contract includes plans, specifications, and other such documents identified in the Rochester Contract.

144.    In consideration for the labor, material, and general contractor services ACI provided for the Project on the Rochester Property, Rochester Fund agreed to pay ACI in accordance with the Rochester Contract and the payment applications submitted by ACI.

145.    Pursuant to the Rochester Contract, ACI provided the necessary labor, skill, material and general contractor services for the Rochester Project and has completed its work in connection with the Rochester Project in a workmanlike and professional manner and has otherwise fulfilled its obligations under the Rochester Contract.

24

146. Despite the foregoing and ACI's demands, Rochester Fund has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to pay ACI for the labor, material, and general contractor services that ACI provided in connection with the Rochester Project and the permanent development and improvement to the Rochester Property.

147. ACI encountered work on the Rochester Project that was not part of the original Rochester Contract.

148. ACI submitted proposed change orders for this extra work.

149. Rochester Fund unjustifiably and in breach of the Rochester Contract refused to execute said change orders or enter into good faith negotiations with ACI over the proposed change orders.

150. ACI encountered conditions over which it had no control that extended the time period needed to complete the Rochester Contract.

151. ACI requested time extensions to the Rochester Contract period as a result of these conditions.

152. Rochester Fund unjustifiably and in breach of the Rochester Contract refused to grant said time extensions.

153. ACI submitted payment applications to Rochester Fund during the Project.

154. Rochester Fund unjustifiably and in breach of the Rochester Contract failed to process payment to ACI of the amounts due and owing in accordance with the contract's terms, improperly delayed payments, improperly conditioned payments on extra-contractual conditions, improperly withheld payments and improperly reduced payments due and owing to ACI.

25

155. As with the Six Mile Project, Continental, acting as manager of Rochester Fund, refused to process ACI's payment applications for the Rochester Project except through Textura, even though use of Textura was not a requirement of the Rochester Contract. And much like what happened on the Six Mile Project, payment to ACI on the Rochester Project was delayed due to software glitches in Textura and Continental's insistence on delaying payments to ACI over exceedingly minor discrepancies in supporting paperwork submitted by ACI or its subcontractors.

156. Continental's failure to pay ACI except through Textura, and its late payment to ACI through its use and implementation of Textura, was a breach of the duties of Rochester Fund under the Rochester Project, as nothing in the Rochester Contract required ACI to submit its payments through that system, and Continental implemented payment through Textura in an unreasonable way which interfered with ACI's performance under the Rochester Contract.

157. There is in every contract an implied promise of good faith and fair dealing.

158. Rochester Fund improperly asserted liquidated damages for delays against ACI, when in fact Rochester Fund's own actions on the Rochester Project and other factors beyond ACI's control caused many of the delays.

159. Rochester Fund consistently interfered with ACI's subcontracts during the Rochester Project.

160. Rochester Fund's actions were in breach of the duty of good faith and fair dealing.

161. Rochester Fund provided the Plans and Specifications for the Rochester Project.

26

162. By providing the Plans and Specifications for the Rochester Project, Rochester Fund impliedly warranted the adequacy of the plans and specifications for construction of the Rochester Project.

163. The Plans and Specifications provided by Rochester Fund were not adequate for the purposes of completing the Rochester Project.

164. Rochester Fund's actions as alleged herein constitute a breach of the Rochester Contract.

165. As a direct and proximate result of Rochester Fund's breach of the Rochester Contract, ACI has suffered damages in the principal amount of $4,357,112.18, inclusive of amounts for which ACI remains potentially liable to its subcontractors and suppliers for work performed.

166. ACI is entitled to judgment against Rochester Fund for the total principal sum of $4,357,112.18, together with the maximum interest allowable by law, ACI's costs and disbursements in this action.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 326 Fund LLC for its damages, together with interest, costs and such other relief as may be appropriate.

## COUNT XIII – UNJUST ENRICHMENT – ROCHESTER PROJECT

167. Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 139 through 140 above and incorporates same herein.

168. This is an action in the alternative to Count XII for relief based on a contract implied in law to prevent unjust enrichment.

27

169.    ACI provided labor, services and materials consisting of construction of an apartment complex on Rochester Fund's property to improve said property at Rochester Fund's request.

170.    Rochester Fund and Continental, as manager and owner of Rochester Fund, had knowledge of, assented to, accepted, and retained the benefits conferred by ACI.

171.    Rochester Fund and Continental have failed and refused to pay ACI for the labor, material, and general contractor services provided by ACI.

172.    The reasonable value of the labor, material, and general contractor services that remains unpaid is the principal sum of $4,357,112.18.

173.    By retaining the labor, material, and general contractor services furnished by ACI without making payment to ACI for same, Rochester Fund and Continental have received a benefit of value and have been unjustly enriched in a manner that is illegal or unlawful.

174.    To prevent the unjust enrichment of Rochester Fund and Continental, ACI is entitled to judgment against Rochester Fund and Continental for the total principal sum of $4,357,112.18, together with the maximum interest allowable by law, and ACI's costs and disbursements in this action.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 326 Fund LLC and Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc., for its damages, together with interest, costs and such other relief as may be appropriate.

28

## CLAIMS RELATING TO THE NEW BRAUNFELS PROJECT

175.    This action involves real property located in New Braunfels, Texas as more particularly described as follows:

> Property located at the municipal address of 2980 CREEK BEND DR., NEW BRAUNFELS, TX 78130-6474, in the county of COMAL, TX, legally described as C306 FUND, BLOCK 1, LOT 1, APN 389681., Municipality / Township of NEW BRAUNFELS, Census Tract 3104.01, in the Subdivision of C306 FUND, Legal Bloc 1, Legal Lot 1, in the school district of CIS.

(the "New Braunfels Property").

176.    New Braunfels Fund is the current fee owner of the New Braunfels Property and was the fee owner of said property at all times material to this action.

## COUNT XIV – BREACH OF CONTRACT – NEW BRAUNFELS PROJECT

177.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 175 through 176 above and incorporates same herein.

178.    ACI and New Braunfels Fund entered into a contract (the "New Braunfels Contract") whereby ACI agreed to perform labor and furnish material and machinery, as a general contractor for the construction project known as the Springs at Creekside (the "New Braunfels Project"), all of which related to the permanent development and improvement of the New Braunfels Property.

179.    New Braunfels Fund is in possession of the New Braunfels Contract, a copy of which is too voluminous to attach. The New Braunfels Contract includes plans, specifications, and other such documents identified in the New Braunfels Contract.

180.    In consideration for the labor, material, and general contractor services ACI provided for the Project on the New Braunfels Property, New Braunfels Fund agreed to pay

29

ACI in accordance with the New Braunfels Contract and the payment applications submitted by ACI.

181.    Pursuant to the New Braunfels Contract, ACI provided the necessary labor, skill, material and general contractor services for the New Braunfels Project and has completed its work in connection with the New Braunfels Project in a workmanlike and professional manner and has otherwise fulfilled its obligations under the New Braunfels Contract.

182.    Despite the foregoing and ACI's demands, New Braunfels Fund has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to pay ACI for the labor, material, and general contractor services that ACI provided in connection with the New Braunfels Project and the permanent development and improvement to the New Braunfels Property.

183.    ACI encountered work on the New Braunfels Project that was not part of the original New Braunfels Contract.

184.    ACI submitted proposed change orders for this extra work.

185.    New Braunfels Fund unjustifiably and in breach of the New Braunfels Contract refused to execute said change orders or enter into good faith negotiations with ACI over the proposed change orders.

186.    ACI encountered weather and other conditions over which it had no control that extended the time period needed to complete the New Braunfels Contract.

187.    ACI requested time extensions to the New Braunfels Contract period as a result of these conditions.

188.    New Braunfels Fund unjustifiably and in breach of the New Braunfels Contract refused to grant said time extensions, and instead purported to impose liquidated damages on ACI for delays not caused by ACI.

189.    ACI submitted payment applications to New Braunfels Fund during the New Braunfels Project.

190.    New Braunfels Fund unjustifiably and in breach of the New Braunfels Contract failed to process payment to ACI of the amounts due and owing in accordance with the contract's terms.

191.    There is in every contract an implied promise of good faith and fair dealing.

192.    New Braunfels Fund improperly asserted liquidated damages for delays against ACI, when in fact New Braunfels Fund's own actions on the New Braunfels Project and other factors beyond ACI's control caused many of the delays.

193.    New Braunfels Fund consistently interfered with ACI's subcontracts during the New Braunfels Project.

194.    New Braunfels Fund's actions were in breach of the duty of good faith and fair dealing.

195.    New Braunfels Fund's actions as alleged herein constitute a breach of the New Braunfels Contract.

196.    As a direct and proximate result of New Braunfels Fund's breach of the New Braunfels Contract, ACI has suffered damages in the principal amount of $301,308.83.

197.    ACI is entitled to judgment against New Braunfels Fund for the total principal sum of $301,308.83, together with the maximum interest allowable by law, ACI's costs and disbursements in this action.

31

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 306 Fund LLC for its damages, together with interest, costs and such other relief as may be appropriate.

### COUNT XV – UNJUST ENRICHMENT – NEW BRAUNFELS PROJECT

198.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 175 through 176 above and incorporates same herein.

199.    This is an action in the alternative to Count XIV for relief based on a contract implied in law to prevent unjust enrichment.

200.    ACI provided labor, services and materials consisting of construction of an apartment complex on New Braunfels Fund's property to improve said property at New Braunfels Fund's request.

201.    New Braunfels Fund and Continental, as manager and owner of New Braunfels Fund, had knowledge of, assented to, accepted, and retained the benefits conferred by ACI.

202.    New Braunfels Fund and Continental have failed and refused to pay ACI for the labor, material, and general contractor services provided by ACI.

203.    The reasonable value of the labor, material, and general contractor services that remains unpaid is the principal sum of $301,308.83.

204.    The actions of New Braunfels Fund in retaining the labor, material, and general contractor services without making payment to ACI constitute unjust enrichment to the New Braunfels Fund and Continental.

205.    To prevent the unjust enrichment of New Braunfels Fund and Continental, ACI is entitled to judgment against New Braunfels Fund and Continental for the total

32

principal sum of $301,308.83, together with the maximum interest allowable by law, and ACI's costs and disbursements in this action.

WHEREFORE, Counterclaim Plaintiff demands judgment against Counterclaim Defendant Continental 306 Fund LLC and Third Party Defendant Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc., for its damages, together with interest, costs and such other relief as may be appropriate.

## RICO CLAIMS

## INTRODUCTION OF THE PARTIES AND SUMMARY OF THE CASE

206.    Continental is a national property development and management company with its headquarters located at Executive Parkway, Menomonee Falls, Wisconsin. Continental has a large market presence in development and management of multifamily residential properties throughout the United States.  Continental facilitates its multifamily residential development projects through the use of special purpose funds (the "Funds"), each Fund a discrete Wisconsin limited liability company, likewise located at Executive Parkway, Menomonee Falls, Wisconsin, that owns and develops each multifamily residential project. Continental is the member of each Fund, exercises complete control over the affairs of each Fund, acts as the agent for each Fund, and receives a management fee from each Fund.

207.    Eguizabal is the former Vice President of Construction for Continental and, while working for Continental operated out of Continental's headquarters in Menomonee Falls, Wisconsin.  Eguizabal was employed by Continental in this role from November of 2007 until his departure which, upon information and belief, was in or about August of 2017.

208.    While employed by Continental, Eguizabal had vast direct responsibility for all aspects of project development both financial and construction related, effectively

reporting only to James Schloemer ("Schloemer"), Continental's Chief Executive Officer, and Daniel Minahan ("Minahan"), Continental's Chief Operating Officer. In his role as Vice President of Construction, Eguizabal served as Continental's agent and "point man" for purposes of Continental's dealings with the general contractors with which Continental "partnered," including without limitation, contract compliance with regard to price, scope, and timing, and evaluation and vetting of general contractor performance.

209. ACI, a Florida corporation, is a construction general contracting services company with its principal place of business in Jacksonville, Florida. ACI was formed by George Albertelli upon his separation from another contracting company located in Jacksonville, Florida in 1997. David Albertelli joined George Albertelli at ACI in 2005.

210. Eguizabal, Continental's Vice President of Construction, created, operated, and controlled a corrupt enterprise by and through the Continental-managed Funds and Continental's contractor "partners" through which Eguizabal extorted payments from the victimized contractors for work performed on projects owned and developed by Continental-managed Funds, and solicited and received bribes and kickbacks from contractors in exchange for contracts to build projects owned and developed by Continental-managed Funds, reinvesting those ill-gotten proceeds into the Continental-managed Funds. As part of the corrupt enterprise, Eguizabal required each exploited contractor to be the low-cost "bidder," even requiring pricing below Continental's own internal pro-forma financials, so as to create an economic windfall for Continental-managed Funds, a windfall that would inure to Continental while Continental received its management fee, and create a perverse incentive for Continental to engage in a silent conspiracy with Eguizabal by turning a blind

34

eye to Eguizabal's activities. After facilitating the award of work to the low-cost "bidder," Eguizabal would begin his demand for kickbacks and bribes.

211. Eguizabal's pattern of racketeering began in or about 2011, and grew to include additional entities including, but not limited to, Westcore Construction, LLC, National Framing, LLC, and KMM Construction, LLC. The purpose of the enterprise was to create an Eguizabal-controlled empire that profited Eguizabal at the expense of victimized contractors while creating a financial windfall for his enabling employer, Continental.

212. Eguizabal's scheme in Wisconsin, constituted systemic violation of Wisconsin's commercial bribery statute found in Wisconsin statute § 134.05(2)(a).[1] Eguizabal's violation of Wisconsin statute § 134.05(2)(a) is a predicate offense for purposes of establishing a violation of the Travel Act, 18 U.S.C. § 1952. Likewise, Eguizabal's continuing extortion constitutes a violation of the Hobbs Act, 18 U.S.C. § 1951.

213. As per 18 U.S.C. § 1961(1)(B), violations of the Travel Act and the Hobbs Act constitute racketeering activity for purposes of establishing a violation of the Racketeer Influenced and Corrupt Organizations Act, codified as Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961 to 1968 ("RICO"). Indeed, 18 U.S.C. § 1962(b) prohibits a person who has received any income from a pattern of racketeering to invest any part of that income in an enterprise engaged in interstate commerce; 18 U.S.C. § 1962(c) prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering; and 18 U.S.C. § 1962(d) prohibits a person from conspiring to violate 18

---

[1] Eguizabal operated his scheme out of Continental's headquarters located in Menomonee Fall, Wisconsin and therefore Eguizabal is subject to Wisconsin criminal law pursuant to Wisconsin statute §939.03(1)(enumerating what acts subject a person to prosecution and punishment under Wisconsin law including but not limited to "commit[ting] a crime, any of the constituent elements of which takes place in [Wisconsin]".)

U.S.C. § 1962(c). In as much as Eguizabal and Continental fit neatly into the statutory definition of "person" under RICO, their respective actions described herein constitute violations of RICO, thus entitling ACI to recover treble damages against Eguizabal and Continental.

## JURISDICTION AND VENUE

214. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1367 as the claims asserted herein are so related to the claims asserted in the original action against ACI that they form part of the same case or controversy.

215. This Court has personal jurisdiction over Continental as, for all times relevant hereto, Continental by and through Continental 332 Fund, LLC ("Six Mile Fund"), owned real property in the State of Florida, and Six Mile Fund has submitted to the jurisdiction of this Court by seeking affirmative relief in this Court in the Fourth Amended Complaint. Furthermore, this Court has personal jurisdiction over Eguizabal and Continental in as much as, at all times relevant hereto, Eguizabal and Continental conducted business in this district.

216. Venue is proper in this district as Continental, by and through its Funds are seeking affirmative relief in this district and the operative facts underlying ACI's claims against Eguizabal and Continental overlap with the operative facts occurring in this district that are the subject matter of the Fourth Amended Complaint.

## FACTS

217. The relationship between George Albertelli, David Albertelli, and Eguizabal relates back to another construction general contractor in Jacksonville, Florida. George Albertelli was an owner of this general contractor and Eguizabal was an employee *after* George Albertelli sold his interest and had formed ACI. That said, George Albertelli never

36

knew nor worked with Eguizabal much less mentored Eguizabal in anyway. David Albertelli was also employed by this general contractor and his employment overlapped with that of Eguizabal.

218.   After Eguizabal's separation from this general contractor in 2004, Eguizabal eventually resurfaced at Continental in 2007.  Shortly after, Eguizabal reached out to David Albertelli.  At the outset of the renewal of Eguizabal's relationship with David Albertelli, David Albertelli, through ACI, essentially performed free consulting work on various projects as requested by Eguizabal for Continental in an effort to establish good-will with Eguizabal and, as a result, hopefully secure work with Continental in the future.  Although Eguizabal was Continental's Vice President of Construction, his background was more sales-related and Eguizabal sought David Albertelli's advice on construction-related matters. Indeed, Eguizabal relied heavily upon David Albertelli's construction knowledge and expertise.

219.   As a result of these good-will building efforts, ACI was awarded its first Continental project in 2011, construction of an approximately 15,000 square foot retail building addition that consisted of a "cold dark shell" and a "white box" which ultimately became a Dollar Tree store located in Tavares, Florida.

220.   Soon after beginning work on that first project, Eguizabal devised an illegal "pay to play scheme" designed to enrich himself, requiring ACI to pay Eguizabal a portion of ACI's profit for its work for continuing receipt of payment for work performed by ACI. Between September 7, 2011 and May 4, 2012, ACI was required to pay six separate payments to US Building Supply, Inc., an entity created to facilitate payments to Eguizabal, totaling $77,800.00.

37

221.    Eguizabal also began to require that ACI pay for his private vacations, entertainment and other items in order to ensure continuing payment for work performed by ACI.

222.    After the economic downturn in 2008 and 2009, the multifamily development business cycle began to work on an upward trend in 2011, and Continental took advantage of that trend by greatly increasing its multifamily development projects.

223.    As ACI had successfully completed the Dollar Tree project in Tavares, Florida, ACI was awarded its first multifamily project with Continental, a project known as Springs at East 51st, in Tulsa, Oklahoma in 2012.  Minahan, in a conversation with David Albertelli, explained that Continental required its general contractors to invest equity into the Continental Projects as a condition of being awarded work. As such,  ACI agreed to become an investment partner in the Springs at East 51st and "invested" $247,000.

224.    During work on the Springs at East 51st, ACI became aware of the difficulties in getting change orders approved by Continental.  Eguizabal explained to David Albertelli during a discussion regarding a site issue that change orders at Continental were practically impossible, despite actual need for the work, because they were paid from Continental's contingency budget and that "Jim [Schloemer] and Dan [Minahan] want[ed] to pocket that cash."

225.    After the award of the Springs at East 51st project, Eguizabal approached David Albertelli and informed him that, as a condition of continued payment and performance on the Springs at East 51st project, and as a condition of receipt of additional Continental projects, that ACI would be required to formalize a "Commission Sales Agreement" prepared by Eguizabal.

38

226.    Significantly, Eguizabal's "commission" was linked to project change orders due to ACI's continued difficulty getting any change orders approved by Continental. Indeed, the Commission Sales Agreement expressly stated that Eguizabal would "assist in and manage the payment of open and legitimate change orders as part of its commission agreement." Moreover, the Commission Sales Agreement stated in pertinent part:

> Payment of sales commissions and monies due will be paid to a corporation designated by [Eguizabal]. [Eguizabal] will provide all banking and wiring instructions in a timely manner to ACI in order to effectively execute the transfers. Corporation receiving the payment will be designated as an Exhibit to the [Commission Sales Agreement] . . . . All tax documents issued by ACI pertaining to [Commission Sales Agreement] will show the designated corporation having received payments.

227.    Between November 7, 2011, and October 12, 2015, ACI was forced to pay $1,065,623 to Eguizabal through the following entities created for his benefit: USBS, Inc., Southern Supply & Equipment, LLC and MFDC, LLC. All monies were paid from bank accounts in the name of ACI to bank accounts maintained by the above-referenced entities for the benefit of Eguizabal and as directed by Eguizabal. Adding insult to injury is the fact that Eguizabal apparently took a portion of the money extorted from ACI and re-invested that money into Continental projects. Specifically, and without limitation, Eguizabal used money paid to him through MFDC, LLC in February 2015 to invest in Continental's Six Mile project in Ft. Myers, Florida.

228.    By the second half of 2015, the relationship between Eguizabal and ACI had become strained. Although Eguizabal's position was that ACI was not paying him what he believed he was owed as per his Commission Sales Agreement, ACI's position was that Continental's failure, for which Eguizabal was ultimately responsible, to timely make

payment for construction work, and failure to approve necessary change orders occasioned by unforeseen site conditions and inevitable weather delays, had placed ACI in an untenable cash-flow situation that made it impossible for ACI to continue work on its Continental projects much less comply with Eguizabal's demands for payment.

229. Additionally, Continental was about to implement new, even more restrictive payment procedures that would ultimately leave ACI without enough cash flow to adequately implement the construction projects much less be able to make enough profit to cover Eguizabal's continued demand for payments.

230. Eguizabal eventually began to interfere in the payment application process and would only approve the funding of ACI's payment applications if he was also guaranteed to receive payment as soon as funds were released.

231. Moreover, it was ACI's position that Eguizabal was refusing to approve change orders that would reduce his share of ACI profits and was attempting to extract his "Commissions" from what was left, if any, of ACI's fees.

232. By the second-half of 2015, Eguizabal informed David Albertelli that ACI's viability as a "construction partner" with Continental had run its course and Eguizabal refused to direct any additional construction projects to ACI.

233. However, as the multifamily construction business cycle was continuing on an upward trend, Continental wanted to quickly expand its investments in multifamily developments across the nation.

234. Unfortunately for Continental, it was having trouble finding contractors willing or able to bid and build its multifamily projects at the low margins it demanded. Thus, in 2015, Eguizabal needed additional contractor options and reached out to David

Albertelli regarding creating additional general contractors to specifically meet Continental's needs, as Eguizabal had already successfully extended his and Continental's enterprise to sub-contractors.[2]

235. Eguizabal consulted with David Albertelli regarding a "master plan" that would address not only Continental's need for low-cost general contractors but would ensure continued profitability for Continental and its investors (and Eguizabal himself) in the inevitable event of the multifamily residential business cycle downturn. Eguizabal tapped into and relied upon David Albertelli's consulting expertise in internal Continental strategic discussions with Schloemer and Minahan.

236. The options discussed were internal improvements of Continental's existing construction division utilizing outside general contractors and creation of a separate company by Continental dedicated to construction, providing Continental operational flexibility in the event of the anticipated market downturn. An upside of the dedicated construction company model was Continental's ability to control costs. A downside of the dedicated construction company model was both start-up time and cost.

237. Unbeknownst to George Albertelli, Eguizabal directed David Albertelli to create more entities, specifically to solve market issues that Continental was having in particular areas of the United States, as Continental was having problems finding general

---

[2] In an effort to maximize revenue streams and profitability for himself and Continental, Eguizabal directed the creation of various sub-contractor entities such as National Framing, LLC and KMM Construction, LLC that, although were under the nominal control of David Albertelli, were represented to ACI to be owned by Eguizabal. Indeed, after efforts by ACI to obtain necessary evidence of insurance for National Framing, LLC were not addressed, Eguizabal stated that he would handle the situation as National Framing, LLC was owned by Eguizabal. Eguizabal facilitated the award of sub-contract work to National Framing, LLC from another general contractor, also located in Jacksonville, Florida on a Continental project in Ohio, thus expanding Continental's and his enterprise to include other general contractors as well. Eguizabal informed David Albertelli on a telephone call in 2015 that this other general contractor was additionally being solicited to join the scheme with Eguizabal and Continental and had been working on it with its principal over a dinner meeting.

contractors that would or could perform the project work for Continental at the price that Continental demanded.

238.    Ultimately Eguizabal instructed David Albertelli to create an "ACI-2", a smaller alternative to ACI that could perform work for a specific Continental project in Greenville, South Carolina, utilizing ACI experience and expertise, from which Eguizabal could not only extract his 2% but also would have an undisclosed ownership interest and ultimate control. That entity ultimately became FCS Construction, LLC.

239.    Due to the fact that the ACI-2 was a smaller entity by Eguizabal's design, he instructed David Albertelli to create an "ACI-3" an entity that could bid on larger jobs and would ultimately become known as Orion Construction.

240.    When Eguizabal became aware that both ACI-2 and ACI-3 would be located in Jacksonville, Florida, Eguizabal directed David Albertelli to "relocate" the companies. As such ACI-2, a.k.a. Fasanelli, became an Atlanta, Georgia general contractor and ACI-3, a.k.a. Orion was moved to Orlando, Florida.

241.    To solve Continental's problems of finding a general contractor in the Western region of the United States that would meet its target numbers, Eguizabal directed David Albertelli to form an "ACI-4" entity, Westcore Construction, LLC ("Westcore"), a name chosen by Eguizabal. Westcore was based in Newport Beach, California.

242.    Although all of these entities were newly created with no operational nor financial history, Eguizabal directed the creation of false resumes and financial reports for these entities that he brought before Continental's senior management for review and approval.

42

243.    Westcore was awarded three contracts by Continental on January 19, 2016, February 19, 2016, and July 16, 2016, respectively in Bryan, Texas, Waco, Texas, and Longmont, Colorado.

244.    While Eguizabal was awarding contracts to the other entities he had directed to be created for his and Continental's benefit, ACI continued to struggle to receive sufficient payments from Continental to keep its projects moving forward and continue to pay Eguizabal.

245.    Specifically, in February of 2016, Eguizabal informed ACI that although he could "sympathize" with ACI's struggles, he needed ACI to "please help me help you." Eguizabal demanded immediate payment of his "sales commissions" to ensure that ACI could make a "soft landing" explaining that a "soft landing" for ACI was "any landing that you walk away from is a good one."

246.    Despite attempting to appease Eguizabal with a couple of additional payments in March of 2016, by April of 2016, ACI could no longer meet Eguizabal's demands. When ACI could no longer pay, Eguizabal sent his subordinates to ACI's projects to interfere with subcontractors creating further damage and delay for ACI as an attempt to extort further payments from ACI.

247.    At the end of the day, it was Eguizabal's parasitic mission, as charged by Continental, to keep project construction costs as low as possible both for his benefit and the benefit of Continental and its investors, regardless of the formal structure of Continental's relationships with contractors.  The ultimate goal was control of costs whether effected through a construction company owned by Continental or through an "ACI-X+" model ultimately controlled by Eguizabal.

43

248.    Continental's senior management, including Minahan, turned a blind eye to Eguizabal's dealings to ensure that Continental's profitability remained high. Indeed, upon information and belief, Minahan told a former representative of Westcore in October of 2015 that Eguizabal followed a strategy of his own creation to keep construction costs down, thereby dramatically increasing Continental's profit margins on its multifamily residential projects and that Minahan and other senior management effectively turned a blind eye to Eguizabal so long as Continental's profitability remained high.

249.    Essentially, once ACI could no longer acquiesce to Eguizabal's demands for money, Eguizabal and Continental choked it to financial death, leaving it to die after it no longer played a role in their enterprise created and controlled by Eguizabal. As a result, ACI had no choice but to ultimately cease work on projects in Rochester, Minnesota, and Ft. Myers, Florida.    .

250.    Over time, between 2012 and 2015, Eguizabal, pursuant to his 2% "Sales Commission Agreement" attempted to extort and extorted money from ACI from the following Continental-managed projects:

   a.   Austin, Texas – Fund #248;

   b.   Charleston, South Carolina – Fund #234;

   c.   Greenville, South Carolina – Fund #235;

   d.   New Braunfels, Texas – Fund #306;

   e.   Ft. Myers, Florida – Fund #332;

   f.   Estero, Florida – Fund #305;

   g.   Savage, Minnesota – Fund #298;

   h.   San Antonio, Texas – Fund #157;

44

i.   San Antonio, Texas – Fund #254.

251.   Eguizabal's actions, as described herein, constitute repeated violation of Wisconsin statute § 134.05(2)(a) which makes it a crime for an agent, employee or servant to:

> "(c)orruptly request[s] or accept[s] a gift or gratuity . . . under an agreement . . . that he or she shall act in any particular manner in relation to the business of the agent's, employee's or servant's principal, employer or master."

252.   Likewise, Eguizabal's repeated demands for bribes from ACI (as well as demands for additional "gratuities" as well such as vacations), under threat of refusal to pay for performed work described herein in violation of Wisconsin law, constitutes extorsion as defined and prohibited in the Hobbs Act, 18 U.S.C. § 1951(a), a violation of which, in turn, expressly constitutes racketeering for purposes of establishing a RICO violation.

253.   The systematic deposit of money extorted by Eguizabal from ACI into bank accounts for entities directed and controlled by Eguizabal violates the Travel Act, 18 U.S.C. § 1952, prohibiting engaging in monetary transactions in criminally derived property greater than $10,000.00, derived from unlawful activity including, but not limited to, violation of the Hobbs Act, 18 U.S.C. § 1951 as described above. The Travel Act, 18 U.S.C. § 1952, likewise expressly constitutes racketeering for purposes of establishing a RICO violation.

254.   Continental is a corporation and is the manager of the Funds through which it directs and controls the development of multifamily housing projects, The Funds, listed herein, constitute the RICO enterprise pursuant to 18 U.S.C. Section 1961(4).

255.   Eguizabal is a RICO person pursuant to 18 U.S.C. Section 1961(3).   He committed the pattern of racketeering through his role as Vice President of Construction of Continental. Continental conducts its business across state lines, including Wisconsin, Texas,

Minnesota South Carolina, Georgia, and Florida. All of the RICO violations were committed through the Continental-managed Funds.

256. The above described schemes are related in that they were undertaken by Eguizabal to enrich Eguizabal and provide a windfall to Continental.

257. Each of the schemes involve racketeering acts—violations of 18 U.S.C. §§1951 and 1952 and which occurred over a more than a five-year period. They form a "closed pattern" of racketeering required by 18 U.S.C. §1961(5).

## COUNT XVI – RICO

### (Violation of 18 U.S.C. § 1962(a) Against Eguizabal)

258. ACI herein reincorporates the allegations of paragraphs 206 – 257 by reference.

259. Eguizabal violated 18 U.S.C. § 1962(a), which states, in pertinent part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . ., to use or invest, directly or indirectly, any part of such income . . . in acquisition of any interest in . . . any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .

260. As a direct and proximate cause of Eguizabal's pattern of racketeering, ACI has been injured/harmed in its business and property, pursuant to 18 U.S.C. §1964(a). ACI's damages flowing directly from Eguizabal's pattern of racketeering activity are in excess of $1,000,000.00.

WHEREFORE, ACI demands judgment be entered against Eguizabal pursuant to 18 U.S.C. §1964(a), for three times ACI's damages, plus attorney's fees and costs and pre-

judgment interest. ACI also asks for an injunction prohibiting any further racketeering activity.

### COUNT XVII – RICO

**(Violation of 18 U.S.C. § 1962(b) Against Eguizabal)**

261.    ACI herein reincorporates the allegations of paragraphs 206 – 257 by reference.

262.    Eguizabal violated 18 U.S.C. § 1962(b), which states, in pertinent part:

> It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in . . . interstate or foreign commerce.

263.    As a direct and proximate cause of Eguizabal's pattern of racketeering, ACI has been injured/harmed in its business and property, pursuant to 18 U.S.C. §1964(b). ACI's damages flowing directly from Eguizabal's pattern of racketeering activity are in excess of $1,000,000.00.

WHEREFORE, ACI demands judgment be entered against Eguizabal pursuant to 18 U.S.C. §1964(b), for three times ACI's damages, plus attorney's fees and costs and pre-judgment interest. ACI also asks for an injunction prohibiting any further racketeering.

### COUNT XVIII – RICO

**(Violation of 18 U.S.C. § 1962(c) against Eguizabal)**

264.    ACI herein reincorporates the allegations of paragraphs 206 – 257 by reference.

265.    Eguizabal violated 18 U.S.C §1962(c), which states, in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

> interstate or foreign commerce, to conduct or participate,
> directly or indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity...

266.   As a direct and proximate cause of Eguizabal's pattern of racketeering, ACI has been injured/harmed in its business and property, pursuant to 18 U.S.C. §1964(c). ACI's damages flowing directly from Eguizabal's pattern of racketeering activity are in excess of $1,000,000.00.

WHEREFORE, ACI demands judgment be entered against Eguizabal pursuant to 18 U.S.C. §1964(c), for three times ACI's damages, plus attorney's fees and costs and pre-judgment interest. Plaintiff also asks for an injunction prohibiting any further racketeering activity.

## COUNT XIX – RICO

### (Violation of 18 U.S.C. § 1962(d) against Continental)

267.   ACI herein reincorporates the allegations of paragraphs 1 - 52 by reference.

268.   Continental violated 18 U.S.C §1962(d), which states, in pertinent part:

> It shall be unlawful for any person to conspire to violate any of
> the provisions of subsection (a). (b), or (c) of this section.

269.   Continental is a RICO person pursuant to 18 U.S.C. Section 1961(3).

270.   As a direct and proximate cause of Continental's conspiracy with Eguizabal in Eguizabal's pattern of racketeering, ACI has been injured/harmed in its business and property, pursuant to 18 U.S.C. §1964(d).   ACI's damages flowing directly from Continental's conspiracy with Eguizabal's pattern of racketeering activity are in excess of $1,000,000.00.

48

WHEREFORE, ACI demands judgment be entered against Continental Properties Group, Inc., a/k/a Continental Properties Company, Inc., pursuant to 18 U.S.C. §1964(d), for three times Plaintiff's damages, plus attorney's fees and costs and pre-judgment interest. ACI also asks for an injunction prohibiting any further racketeering activity.

## JURY TRIAL DEMAND

Counterclaim Plaintiff / Third Party Plaintiff Albertelli Construction, Inc. hereby demands trial by jury on all claims herein so triable under applicable law.

Dated this 30th day of November, 2018.

GRAYROBINSON, P.A.

By: /s/ *Reese J. Henderson, Jr.*
Reese J. Henderson, Jr.
Florida Bar No. 969273
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
Phone: (904) 598-9929
Facsimile: (904) 598-9109
*reese.henderson@gray-robinson.com*
*maria.daniels@gray-robinson.com*
Attorneys for Plaintiff Albertelli
Construction, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 30, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ *Reese J. Henderson, Jr.*

49