UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CONTINENTAL 332 FUND LLC,                    Case No. 2:17-cv-000041-SPC-MRM
CONTINENTAL 298 FUND LLC,
CONTINENTAL 306 FUND LLC,
CONTINENTAL 326 FUND LLC,
CONTINENTAL 347 FUND LLC,
CONTINENTAL 355 FUND LLC,
CONTINENTAL 342 FUND LLC, and
CONTINENTAL 245 FUND LLC

      Plaintiffs,

vs.

DAVID ALBERTELLI, ALBERTELLI
CONSTRUCTION, INC., GEORGE
ALBERTELLI, WESTCORE
CONSTRUCTION, LLC, (Del.),
WESTCORE CONSTRUCTION,
L.L.C. (Nev.), FOUNDATION
MANAGEMENT LLC, NATIONAL
FRAMING, LLC, KMM CONSTRUCTION
LLC, MFDC LLC, TEAM
CCR, LLC, BROOK KOZLOWSKI, JOHN
SALAT, KEVIN BURKE, KERRY
HELTZEL, AMY BUTLER, and US
CONSTRUCTION TRUST

      Defendants.

_____/

**COUNTER-DEFENDANTS AND THIRD-PARTY DEFENDANT'S ANSWER TO ACI'S
FIFTH AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT AND
THIRD PARTY DEFENDANT'S COUNTERCLAIM AGAINST ALBERTELLI
CONSTRUCTION, INC. AND JURY TRIAL DEMAND**

Plaintiffs/Counter-Defendants, Continental 332 Fund, LLC ("*Six Mile Fund*") Continental

298 Fund LLC ("*Savage Fund*"), Continental 306 Fund LLC ("*New Braunfels Fund*"), and

Continental 326 Fund LLC ("*Rochester Fund*") (collectively the "*Funds*") and Third-Party

Defendant, Continental Properties Company, Inc. ("*Continental*" and together with the Funds,

DM1\9667193.1

"*Counter-Defendants*"), by and through their undersigned attorneys, file this Answer to Albertelli

Construction, Inc.'s ("*ACI*") Fifth Amended Counterclaim and Third Party Complaint:

## ALLEGATIONS COMMON TO ALL COUNTS

1.      This is an action for damages which are in excess of $75,000.00, exclusive of interest, costs, and attorney's fees.

**ANSWER:**    Denied. Further answering, Counter-Defendants admit ACI claims alleged

damages in excess of $75,000.00, exclusive of interest, costs, and attorney's fees.

2.      Counterclaim Plaintiff is a Florida corporation authorized to do business and doing business in the State of Florida, with its principal place of business in Jacksonville, Duval County, Florida.

**ANSWER:**    Admitted.

3.      Counterclaim Defendant Six Mile Fund is a Wisconsin limited liability company that owns an apartment complex in Ft. Myers, Lee County, Florida, known as the Springs at Six Mile Cypress (the "Six Mile Project"), more particularly described as follows:

> TRACT "MF", OF SIX MILE CROSSING, A SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED AS INSTRUMENT NO. 2015000032022, OF THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA.

(the "Six Mile Property").

**ANSWER:**    Admitted.

4.      Counterclaim Defendant Savage Fund is a Wisconsin limited liability company that owns an apartment complex in Savage, Minnesota, known as the Springs at Egan Drive (the "Savage Project").

**ANSWER:**    Admitted.

5.      Counterclaim Defendant Rochester Fund is a Wisconsin limited liability company that owns an apartment complex in Rochester, Minnesota, known as the Springs at South Broadway (the "Rochester Project").

**ANSWER:**    Admitted.

6.      Counterclaim Defendant New Braunfels Fund is a Wisconsin limited liability company that owns an apartment complex in New Braunfels, Texas, known as the Springs at Creekside (the "New Braunfels Project").

DM1\9667193.1

**ANSWER:**    Admitted.

7.    Third Party Defendant Continental is a Wisconsin corporation that owns and manages Six Mile Fund, Savage Fund, Rochester Fund and New Braunfels Fund on behalf of itself and certain investors.  All actions alleged herein to have been taken by Continental were made in its capacity as manager of, and on behalf of, Six Mile Fund, Savage Fund, Rochester Fund or New Braunfels Fund, as applicable, except where specifically alleged otherwise.

**ANSWER:**    Denied. Further answering, Counter-Defendants admit that Continental manages Six Mile Fund, Savage Fund, Rochester Fund and New Braunfels Fund.

8.    This court has long-arm jurisdiction over Counterclaim Defendant Six Mile Fund and Third Party Defendant Continental as they own, possess or operate a business on real property in the State of Florida and this action arises out of said activities in the State of Florida. Additionally, each of the Counterclaim Defendants has submitted to the jurisdiction of this Court by seeking affirmative relief in this Court in their Fourth Amended Complaint.

**ANSWER:**    Denied. Further answering, Counter-Defendants admit the Court has jurisdiction over Counter-Defendants.

9.    Venue is proper in this district in that the Six Mile Property is located within this district.

**ANSWER:**    Admitted.

10.    Plaintiff has engaged the undersigned attorneys and is obligated to pay a fee for their services herein.

**ANSWER:**    Counter-Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 10 and Counter-Defendants therefore deny same.

11.    All conditions precedent to the maintenance of this action have been performed, have occurred or have been waived.

**ANSWER:**    Denied. Further answering, Counter-Defendants state that ACI did not provide labor and services according to its contracts with the Funds. ACI also failed to perform under the contracts as it provided late, incomplete, and defective work. Additionally, Counter-Defendants hereby incorporate by reference each of their Affirmative Defenses 1-8 as if fully set

forth herein, which provide further bases for denying that ACI met the necessary conditions
precedent to maintain its claims against Counter-Defendants.

## CLAIMS RELATING TO THE SIX MILE PROJECT

12.    ACI is a general contractor in the business of constructing, among other things, multi-family housing projects, including apartment complexes.

**ANSWER:**    Admitted.

13.    ACI entered into negotiations with Continental to construct the Six Mile Project – a 288 unit apartment complex – in late 2014 which continued into early 2015.

**ANSWER:**    Denied. Further answering, ACI bribed a former Continental employee, without knowledge of the Funds or Continental, to improperly secure a contract with the Six Mile Fund.

14.    The negotiations led to the execution of an agreement between ACI and the Six Mile Fund (the "Six Mile Contract") consisting of three parts:

> (1)    an AIA Document A101 — 2007 Standard Form of Agreement Between Owner and Contractor;
>
> (2)    an AIA Document A201 — 2007 General Conditions of the Contract for Construction; and
>
> (3)    a Contract Agreement document dated February 20, 2015, containing 28 exhibits to the Contract.

**ANSWER:**    Denied. Further answering, ACI bribed a former Continental employee, without knowledge of the Funds or Continental, to improperly secure a contract with the Six Mile Fund. Counter-Defendants do admit to the existence of a contract between ACI and Six Mile Fund.

15.    The Six Mile Contract is in the possession of Six Mile Fund and is too voluminous to attach as an exhibit to this Counterclaim.

**ANSWER:**    Admitted.

**Contractor Clarifications Fraud**

16.    The "Contract Agreement" portion of the Six Mile Contract was materially and fraudulently altered by Justin Sell, the associate project manager for the Six Mile Project for Continental.  In particular, ACI submitted its Exhibit F "Contractor Clarifications" in the form

4

DM1\9667193.1

attached hereto as **Exhibit A**.  However, without informing ACI, and with the intent to deceive ACI, Sell switched out the Exhibit F "Contractor Clarifications" submitted by ACI for the set attached as **Exhibit B** that were purportedly included in the "Contract Agreement" portion of the Six Mile Contract.

> **ANSWER:**    Denied.

17.    The Exhibit F "Contractor Clarifications" fraudulently inserted into the Contract in lieu of those submitted by ACI were substantially more favorable to Continental to the tune of hundreds of thousands of dollars of items that Sell fraudulently and surreptitiously inserted into ACI's scope of work without ACI's knowledge or consent.

> **ANSWER:**    Denied.

18.    Once ACI discovered Sell's fraudulent switch-out of its Contractor Clarifications, Continental conceded several items of work that Sell had surreptitiously inserted were not, in fact, part of ACI's contract.  Nevertheless, ACI still suffered damages from Continental's attempt to dupe ACI into performing work which it was not obligated to perform and for which Continental had paid no consideration.

> **ANSWER:**    Denied.

### Delays Occurring During Course of Construction

19.    ACI began site work activities in March 2015, including earthwork, construction of access roads, installation of underground utilities and building pad construction.

> **ANSWER:**    Denied. Further answering, ACI began some work in March 2015 but that

work did not include all work alleged in paragraph 19.

20.    ACI's site work activities were on the critical path for construction because, until these activities were completed, ACI could not obtain approval from government authorities to commence work on vertical construction.

> **ANSWER:**    Denied. Further answering, some of ACI's site work activities were on the

critical path but others were not.

21.    During the period from March 2015 to January 2016, site work activities were negatively affected by significant and, in some cases, severe rainfall.  In the month of July 2015 alone, the site received nearly double the historical average for rainfall in the month of July.

5

DM1\9667193.1

**ANSWER:** Denied. Further answering, ACI failed to dewater and to otherwise appropriately account for weather-related circumstances, which failure negatively affected site work activities.

22. The severe rainfall resulted in unfavorable site conditions which prevented work from progressing as planned and hindered the productivity of ACI and its subcontractors.

**ANSWER:** Denied. Further answering, ACI failed to dewater and to otherwise appropriately account for weather-related circumstances, which failure negatively affected site work activities.

23. The soil conditions on site did not allow water to percolate after each rain event, resulting in standing water on the site for extended periods of time.

**ANSWER:** Denied. Further answering, ACI failed to dewater and to otherwise appropriately account for weather-related circumstances, which failure negatively affected site work activities.

24. Due to the soil conditions on site, and rainfall typically encountered in Ft. Myers over the planned course of the project, it was reasonably foreseeable that dewatering would be required in order to allow site work and underground utility work to be performed. However, Continental failed to apply for a dewatering permit until nearly five months after site work began. As a result, ACI was not able to remove water from the site after each rainfall event. This resulted in unfavorable conditions for site work multiple days after each rain event.

**ANSWER:** Denied. Further answering, Counter-Defendants admit that a dewatering permit was obtained.

25. The inability to dewater the site for those five months due to the lack of a permit, coupled with rainfall during the month of July 2015 that was nearly double the historical average, and severe rainfall experienced in subsequent months, caused substantial delays to the project in general and the site work and underground utility work in particular.

**ANSWER:** Denied. Further answering, the delays on the project were caused by, among other things, ACI's lack of appropriate and necessary staffing on site and failure to hire subcontractors.

6

26.     The unfavorable site conditions had a direct and significant negative impact on the start of vertical construction. Vertical construction activities could not proceed until the waterline/fire hydrant clearances were issued, which was dependent upon the installation of necessary underground utilities. Underground utilities work was most susceptible to the flooding caused by the rain events and lack of dewatering. The final waterline clearance was not issued until January 11, 2016.

**ANSWER:**    Denied. Further answering, Counter-Defendants admit that construction

activities could not proceed until the waterline/fire hydrant clearances were issued, which was

dependent upon the installation of necessary underground utilities. ACI failed to appropriately

staff the project, which caused the delays in the start of vertical construction.

27.     The unfavorable conditions caused by the lack of dewatering and extreme rainfall events required material changes to ACI's means and methods of construction and caused substantial delays to ACI's work on the Six Mile Project. ACI incurred extended general conditions and other costs as a result of these delays which were compensable delays under the Six Mile Contract.

**ANSWER:**    Denied.

28.     Continental, acting as manager of Six Mile Fund and on its behalf, also actively interfered with ACI's supervision and direction of the work under the Contract, by communicating directly with ACI's subcontractors, by directing ACI's subcontractors to perform the work contrary to ACI's directions and out-of-sequence with ACI's project schedule, and otherwise. Continental's active interference also delayed the progress of ACI's work under the Six Mile Contract.

**ANSWER:**    Denied. Further answering, Counter-Defendants admit to communication

with subcontractors with which it had worked previously. Counter-Defendants deny that it directed

any subcontractor in its performance of work.

29.     Despite demand, Six Mile Fund failed and refused to approve appropriate extensions of the contract time to account for the weather impact delays and the delays caused by the owner's active interference, and further failed to approve change orders for ACI's resulting extended general conditions and other costs.

**ANSWER:**    Denied.

**Continental's Failure to Pay in Accordance with the Contract**

30.     From the beginning of the Six Mile Project (and on the Rochester Project, as alleged more particularly in Count IX below), Continental insisted upon using a new system for processing

7

payment – known as the Textura system – which was a web-based system for processing payments. Use of the Textura system was not required by the contract, but Continental insisted it would only process payments submitted through Textura.

**ANSWER:**    Denied. Further answering, use of the Textura system was allowed under

the terms of the Six Mile Contract and was required under the terms of the Rochester Contract.

31.    The Textura system was new to Continental and ACI frequently was required to obtain system support from Continental's Information Technology (IT) employees who, in turn, had to obtain updates and fixes to address problems with the system that repeatedly held up payment.

**ANSWER:**    Denied.

32.    Despite the numerous technical difficulties ACI encountered with Textura, Continental refused to process payments until they were cleared through Textura, resulting in delays of weeks and, in some cases, months before payment would be processed.

**ANSWER:**    Denied.

33.    Continental also delayed payments to ACI over exceedingly minor discrepancies in supporting paperwork submitted by ACI or its subcontractors, holding up millions of dollars in payments to downstream subcontractors.

**ANSWER:**    Denied.

34.    Continental's failure to pay ACI except through Textura, and its late payment to ACI through its use and implementation of Textura, was a breach of the duties of Six Mile Fund under the Six Mile Contract, as nothing in the Six Mile Contract required ACI to submit its payments through that system, and Continental implemented payment through Textura in an unreasonable way which interfered with ACI's performance under the Six Mile Contract.

**ANSWER:**    Denied.

35.    Continental's failure to pay timely negatively affected ACI's ability to perform under the Six Mile Contract and damaged ACI's relationship with its subcontractors whose payments were delayed because of the Textura issues.

**ANSWER:**    Denied.

**Continental's Unwarranted Withholding of Payment**

36.    Beginning in March 2015, ACI submitted regular monthly applications for payment for progress payment amounts which were then reviewed and certified by the architect in accordance with the terms of the Six Mile Contract.

**ANSWER:**    Admitted.

8

DM1\9667193.1

37.    In spite of multiple delays in payment as previously alleged, in general, Continental, acting as manager of Six Mile Fund, would process ACI's payment applications for the amounts certified by the architect.

**ANSWER:**    Counter-Defendants deny delays in payment but admit that Continental

would process payment applications certified by the architect.

38.    However, beginning with the application for payment for the month of September 2016, Continental began withholding amounts certified by the architect.  Despite the architect's certification of the amount submitted by ACI as due and owing for the month of September 2016, Continental unilaterally processed ACI's payment application for an amount less than what was fully due (but which included all amounts due and owing to ACI's subcontractors and suppliers). Continental then withheld payment of ACI's monthly payment application for October 2016 for the amounts attributable to ACI's general conditions expenses, buyout savings, and fee, but again processed payment for all amounts due to ACI's subcontractors and suppliers.  On the September 2016 payment application, Continental withheld $36,667.19 from ACI, and on the October 2016 payment application, Continental withheld $176,251.13 from ACI, even though these amounts were certified as due and owing by the architect.

**ANSWER:**    Denied. Further answering, Continental admits to withholding certain

amounts to which ACI was not entitled.

39.    Continental's alleged justification for this withholding was its contention that ACI was liable for liquidated damages for late delivery of portions of the project.  However, Continental's withholding caused Six Mile Fund to breach the Six Mile Contract, as no proper notification was provided to ACI regarding the reasons for the withholding and, in any event, it is the architect who is empowered to withhold certificates for payment under the Six Mile Contract, and the architect had certified these amounts as due and payable to ACI.

**ANSWER:**    Denied. Further answering, Continental admits to withholding certain

amounts to which ACI was not entitled.

40.    Continental's withholding caused Six Mile Fund to breach its duties under the Six Mile Contract because the delays for which Continental asserted liquidated damages were in part caused by the adverse weather conditions previously described.  Continental never provided notice to ACI of the amount of liquidated damages it was withholding on Six Mile Fund's behalf or how they were computed, nor did it account for the compensable delays experienced by ACI.  Instead, Continental arbitrarily withheld payment of amounts certified by the architect as due to ACI.

**ANSWER:**    Denied. Further answering, Continental admits to withholding certain

amounts to which ACI was not entitled.

DM1\9667193.1

41.    Continental's improper withholding of ACI's payments in breach of Six Mile Fund's duties under the Six Mile Contract negatively impacted ACI's ability to continue performing under the Six Mile Contract.

**ANSWER:**    Denied.

**Continental's Refusal to Process Change Orders**

42.    ACI also performed extra work on the Six Mile Project having a value of over $383,000 for which it requested change orders.  Attached hereto as **Exhibit C** is a summary description of such extra work and the amount attributable to each item of extra work.

**ANSWER:**    Denied. Further answering, Counter-Defendants admit that ACI requested certain change orders. Counter-Defendants deny ACI was entitled to change orders that were denied or for which additional information was requested but never received. Further answering, Continental approved change orders when, and if, appropriate.

43.    ACI submitted requests for change orders for most or all of the amounts reflected in Exhibit C in accordance with the requirements of the Six Mile Contract.  However, Continental wrongfully and in breach Six Mile Fund's duties under the Six Mile Contract failed and refused to process change orders for the extra work ACI performed.

**ANSWER:**    Denied. Further answering, Counter-Defendants admit that ACI requested certain change orders. Counter-Defendants deny ACI was entitled to change orders that were denied or for which additional information was requested but never received. Further answering, Continental approved change orders when, and if, appropriate.

**Contract Termination**

44.    On December 23, 2016, ACI placed Six Mile Fund, through Continental, on notice of its payment defaults and of ACI's reservation of its right to stop work under the Six Mile Contract if the payment default was not cured within seven (7) days.

**ANSWER:**    Denied. Further answering, Counter-Defendants deny the existence of a payment default but admit that ACI sent its December 23, 2016, notice.

45.    Six Mile Fund did not cure its payment default.  Accordingly, by letter dated January 5, 2017, ACI gave notice that it would begin demobilizing from the Six Mile Project.

10

DM1\9667193.1

**ANSWER:**    Denied. Further answering, Counter-Defendants deny the existence of a payment default but admit that ACI sent its January 5, 2017, letter.

46.    The next day, January 6, 2017, Continental, as manager of the Six Mile Fund, purported to terminate ACI's right to perform work on the Six Mile Project.

**ANSWER:**    Denied. Further answering, ACI' right to perform work on the Six Mile Project was terminated.

### ACI's Damages

47.    ACI has suffered damages due to Six Mile Fund's:  (a) refusal to grant extensions of the contract time for delays beyond ACI's control, (b) failure to pay in accordance with the Contract; (c) improper withholding of payment to ACI; (d) refusal to process and pay for valid change orders for costs ACI incurred which were beyond its scope of work under the Contract, (e) improper withholding of payment from ACI for work performed, and (f) improper termination of the Contract.

**ANSWER:**    Denied.

### COUNT I – BREACH OF CONTRACT – SIX MILE PROJECT

48.    Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 47 above and incorporates the same herein by reference.

**ANSWER:**    Counter-Defendants re-assert their responses to Paragraphs 1-47 above and incorporate those responses as if fully set forth herein.

49.    ACI substantially performed its obligations under the Six Mile Contract up until the termination of the Six Mile Contract.

**ANSWER:**    Denied.

50.    The Six Mile Fund materially breached the Six Mile Contract by its failure to make payment to ACI and the other breaches as alleged herein.

**ANSWER:**    Denied.

51.    ACI's damages due to Six Mile Fund's breach of the Six Mile Contract include, without limitation, unpaid interest on payments not timely paid, under the Six Mile Contract; the amounts improperly withheld by Six Mile Fund, together with accrued interest; the contract balance earned through performance as of the date of the improper termination; the value of the extra work performed by ACI without compensation by Six Mile Fund; ACI's extended general

DM1\9667193.1

conditions costs and other costs occasioned by the delays in the project that were beyond its control; and other damages, in an amount to be proven at trial.

**ANSWER:**    Denied.

## COUNT II – FRAUD – SIX MILE PROJECT

52.    Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 18 above and incorporates the same herein by reference.

**ANSWER:**    Counter-Defendants re-assert their responses to Paragraphs 1-18 above and

incorporate those responses as if fully set forth herein.

53.    Continental, on its own and as manager of Six Mile Fund, acting through Justin Sell, its Associate Project Manager and agent, misrepresented the Contractor Clarifications included in the Contract Agreement document to be the Contractor Clarifications submitted by ACI which formed the basis of the Six Mile Contract, when in fact Sell had altered the Contractor Clarifications document to make it more favorable to Continental.

**ANSWER:**    Denied.

54.    Continental, on its own and as manager of Six Mile Fund, intended to and did induce ACI to enter into the Six Mile Contract based on his false representation.

**ANSWER:**    Denied.

55.    ACI acted in reliance upon Sell's misrepresentation by entering into the Six Mile Contract and undertaking performance thereunder.

**ANSWER:**    Denied.

56.    ACI has suffered damages as a result of Continental's fraud in an amount to be proven at trial.

**ANSWER:**    Denied.

57.    ACI reserves the right to seek amendment of this count to seek punitive damages, in addition to its other damages, at the appropriate time.

**ANSWER:**    Denied. Further answering, no rule allows reservation of rights to amend.

## COUNT III – DECEPTIVE AND UNFAIR TRADE PRACTICES – SIX MILE PROJECT

58.    Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 18, and 53 through 55 above and incorporates the same herein by reference.

12

DM1\9667193.1

**ANSWER:**    Counter-Defendants re-assert their responses to Paragraphs 1-18 and 53-55 above and incorporate those responses as if fully set forth herein.

59.    Continental's actions in misrepresenting the Contractor Clarifications inserted into the Contract as being the same as those submitted by ACI is a deceptive and unfair trade practice.

**ANSWER:**    Denied.

60.    Continental's deceptive and unfair trade practices caused ACI to incur actual damages in an amount to be proven at trial.

**ANSWER:**    Denied.

61.    ACI seeks its attorney's fees herein pursuant to § 501.211(2), Florida Statutes.

**ANSWER:**    Admitted.

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS – SIX MILE PROJECT

62.    Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 14 above and incorporates the same herein by reference.

**ANSWER:**    Counter-Defendants re-assert their responses to Paragraphs 1-14 above and incorporate those responses as if fully set forth herein.

63.    This is an action for damages for tortious interference with contractual relations which seeks relief independent of any remedies to which ACI may be entitled as against Six Mile Fund under the Six Mile Contract.

**ANSWER:**    Denied.

64.    ACI subcontracted portions of the work under the Six Mile Contract to various subcontractors who performed the work under ACI's supervision and direction.    ACI's subcontracts required each subcontractor to follow the instructions and directions of ACI's project superintendent and to perform its work in accordance with ACI's construction progress schedule.

**ANSWER:**    Counter-Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 64 and Counter-Defendants therefore deny same. Counter-Defendants admit that ACI used subcontractors on the Six Mile Project.

13

DM1\9667193.1

65.     Continental, as manager of Six Mile Fund, had knowledge of ACI's contractual relationships with the various subcontractors through, among other things, information submitted to Continental through the Textura payment system.

**ANSWER:**    Denied. Counter-Defendants admit that ACI used subcontractors on the Six Mile Project.

66.     Continental knowingly and intentionally procured the breach by various subcontractors of their contractual duty to follow the directions and instructions of ACI's project superintendent by, among other things, contacting ACI's subcontractors and directing them to perform their work contrary to ACI's instructions.

**ANSWER:**    Denied.

67.     Continental further knowingly and intentionally procured the breach by various subcontractors of their contractual duty to perform their work in accordance with ACI's construction progress schedule by, among other things, contacting ACI's subcontractors and directing them to perform their work out of sequence with ACI's construction progress schedule.

**ANSWER:**    Denied.

68.     Continental further knowingly and intentionally interfered with ACI's contractual relations with its subcontractors by causing ACI's payments under the Six Mile Contract to be improperly withheld and delayed and then falsely telling ACI's subcontractors that ACI was the cause of the payment delay.

**ANSWER:**    Denied.

69.     Continental further knowingly and intentionally interfered with ACI's contractual relations with its subcontractors by refusing to process payment for ACI's general conditions and fees based on alleged claims for liquidated damages, while insisting on full payment to ACI's subcontractors, directly undermining ACI's supervision of its subcontractors and preventing ACI from passing through the alleged liquidated damages to the responsible subcontractors in accordance with its subcontracts.

**ANSWER:**    Denied.

70.     ACI suffered damages as a result of Continental's tortious interference with ACI's contractual relationships with its subcontractors, including without limitation delays to the performance of the work, inefficiency in the performance of the work and other costs to attempt to overcome the effects of Continental's tortious interference.

**ANSWER:**    Denied.

71.     ACI reserves the right to seek amendment of this count to seek punitive damages at the appropriate time.

DM1\9667193.1

**ANSWER:** Denied. Further answering, no rule allows reservation of rights to amend.

## COUNT V – QUANTUM MERUIT – SIX MILE PROJECT

72. Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 13 above and incorporates the same herein by reference.

**ANSWER:** Counter-Defendants re-assert their responses to Paragraphs 1-13 above and incorporate those responses as if fully set forth herein.

73. This is an action against in the alternative to Count I for relief based on a contract implied-in-fact.

**ANSWER:** Denied.

74. ACI provided labor, services and materials consisting of construction of an apartment complex on Six Mile Fund's Property (the "services").

**ANSWER:** Denied.

75. Continental, as manager and owner of Six Mile Fund, had knowledge of, assented to, and received a benefit from ACI's services.

**ANSWER:** Denied.

76. Continental knew that ACI was not volunteering its services and expected compensation. Under the circumstances, a reasonable person receiving Plaintiff's services would expect to pay for them.

**ANSWER:** Denied.

77. Despite demand, Continental has refused to pay the reasonable value of ACI's services.

**ANSWER:** Denied.

## COUNT VI – UNJUST ENRICHMENT – SIX MILE PROJECT

78. Counterclaim Plaintiff re-alleges the allegations of Paragraphs 1 through 13 above and incorporates the same herein by reference.

**ANSWER:** Counter-Defendants re-assert their responses to Paragraphs 1-13 above and incorporate those responses as if fully set forth herein.

79. This is an action in the alternative to Counts I, II and V for relief based on a contract implied in law to prevent unjust enrichment.

DM1\9667193.1

**ANSWER:**    Denied.

80.    ACI provided labor, services and materials consisting of construction of an apartment complex on Six Mile Fund's Property (the "benefits") to improve the Six Mile Property at the owner's request.

**ANSWER:**    Denied.

81.    Continental, as manager and owner of Six Mile Fund, had knowledge of, assented to, accepted, and retained the benefits conferred by ACI.

**ANSWER:**    Denied.

82.    Under the circumstances, it would be inequitable for Continental to retain the benefits conferred by ACI without paying a sum representing the reasonable value of the benefits conferred.

**ANSWER:**    Denied.

83.    Continental has not paid for the benefits conferred by ACI and, thus, has been unjustly enriched to the extent of the benefit conferred.

**ANSWER:**    Denied.

84.    ACI has no adequate remedy at law.

**ANSWER:**    Denied.

## CLAIMS RELATING TO THE SAVAGE PROJECT

85.    This action involves real property located in Scott County, Minnesota and is comprised of the lot described as follows:

Lot One (1), Block One (1), Springs at Egan Drive, Scott County, Minnesota (the "Real Property"), which is located at 14125 Louisiana Avenue South in Savage, Minnesota, and identified as Parcel No. 264560010.

(the "Savage Property").

**ANSWER:**    Admitted.

86.    Savage Fund is the current fee owner of the Savage Property and was the fee owner of said property at all times material to this action.

**ANSWER:**    Admitted.

16

DM1\9667193.1

## COUNT VII – BREACH OF CONTRACT – SAVAGE PROJECT

87.     Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 85 through 86 above and incorporates same herein.

**ANSWER:**     Counter-Defendants re-assert their responses to Paragraphs 1-11 and 85-86 above and incorporate those responses as if fully set forth herein.

88.     ACI and Savage Fund entered into a contract (the "Savage Contract") whereby ACI agreed to perform labor and furnish material and machinery, as a general contractor for the construction project known as the Springs at Egan Drive (the "Savage Project"), all of which related to the permanent development and improvement of the Savage Property.

**ANSWER:**     Admitted.

89.     Savage Fund is in possession of the Savage Contract, a copy of which is too voluminous to attach.   The Savage Contract includes plans, specifications, and other such documents identified in the Savage Contract.

**ANSWER:**     Admitted.

90.     In consideration for the labor, material, and general contractor services ACI provided for the Project on the Savage Property, Continental agreed to pay ACI in accordance with the Savage Contract and the payment applications submitted by ACI.

**ANSWER:**     Denied.

91.     Pursuant to the Savage Contract, ACI provided the necessary labor, skill, material and general contractor services for the Savage Project and has completed its work in connection with the Savage Project in a workmanlike and professional manner and has otherwise fulfilled its obligations under the Savage Contract.

**ANSWER:**     Denied.

92.     Despite the foregoing and ACI's demands, Savage Fund has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to pay ACI for the labor, material, and general contractor services that ACI provided in connection with the Savage Project and the permanent development and improvement to the Savage Property.

**ANSWER:**     Denied.

93.     ACI encountered work on the Savage Project that was not part of the original Savage Contract.

**ANSWER:**     Denied.

94.     ACI submitted proposed change orders for this extra work.

DM1\9667193.1

**ANSWER:**    Counter-Defendants admit that ACI requested certain change orders. Counter-Defendants deny ACI was entitled to change orders that were denied or for which additional information was requested but never received. Further answering, Continental approved change orders when, and if, appropriate.

95.    Savage Fund unjustifiably and in breach of the Savage Contract refused to execute said proposed change orders or enter into good faith negotiations with ACI over the proposed change orders.

**ANSWER:**    Counter-Defendants admit that ACI requested certain change orders. Counter-Defendants deny ACI was entitled to change orders that were denied or for which additional information was requested but never received. Further answering, Continental approved change orders when, and if, appropriate.

96.    ACI encountered conditions over which it had no control that extended the time period needed to complete the Savage Contract.

**ANSWER:**    Denied.

97.    ACI requested time extensions to the Savage Contract period as a result of these conditions.

**ANSWER:**    Denied that such conditions existed. Admitted that ACI requested extensions of time.

98.    Savage Fund unjustifiably and in breach of the Savage Contract refused to grant said time extensions, or granted time extensions in change order 10 which depended on Savage Fund performing actions in a timely manner so that ACI could meet the extended deadlines, and Savage Fund failed or refused to perform said actions.

**ANSWER:**    Denied.

99.    ACI submitted payment applications to Savage Fund during the Project.

**ANSWER:**    Admitted.

100.    Savage Fund unjustifiably and in breach of the Savage Contract failed to process payment to ACI of the amounts due and owing in accordance with the contract's terms, improperly delayed payments, improperly withheld payments and improperly reduced payments due and owing to ACI.

18

**ANSWER:**     Denied.

101.     A condition precedent to ACI's duties to perform the work under the Savage Contract included Savage Fund's duty to provide permits and design documents in a timely manner during the course of the Savage Project.

**ANSWER:**     Denied.

102.     Savage Fund did not provide permits and design documents in a timely manner during the Savage Project.

**ANSWER:**     Denied.

103.     Savage Fund's failure to provide permits and design documents in a timely fashion delayed ACI's work and made it more expensive to perform.  Among other things, ACI incurred costs to attempt to assist the Savage Fund with design issues and permitting delays for which Savage Fund provided no compensation to ACI.

**ANSWER:**     Denied.

104.     The Savage Contract included an allowance for winter conditions.

**ANSWER:**     Admitted.

105.     Per the Savage Contract, the allowance was to be adjusted based on the actual cost for winter conditions.

**ANSWER:**     Denied. Further answering, ACI submitted various items under the guise of winter conditions that actually resulted from its own negligence.

106.     Savage Fund unjustifiably and in breach of the Savage Contract refused to adjust the contract price based on the actual cost for winter conditions.

**ANSWER:**     Denied.

107.     There is in every contract an implied promise of good faith and fair dealing.

**ANSWER:**     Admitted.

108.     Savage Fund improperly asserted liquidated damages for delays against ACI, when in fact Savage Fund's own actions on the Savage Project and other factors beyond ACI's control caused many of the delays.

**ANSWER:**     Denied.

109.     Savage Fund consistently interfered with ACI's subcontracts during the Savage Project.

19

DM1\9667193.1

**ANSWER:**    Denied.

110.    Savage Fund's actions were in breach of the duty of good faith and fair dealing.

**ANSWER:**    Denied.

111.    Savage Fund provided the Plans and Specifications for the Savage Project.

**ANSWER:**    Denied. Further answering, Savage Fund provided some plans and specifications, while ACI and/or other entities provided other plans and specifications.

112.    By providing the Plans and Specifications for the Savage Project, Savage Fund impliedly warranted the adequacy of the plans and specifications for construction of the Savage Project.

**ANSWER:**    Denied.

113.    The Plans and Specifications provided by Savage Fund were not adequate for the purposes of completing the Savage Project.

**ANSWER:**    Denied.

114.    Savage Fund's actions as alleged herein constitute a breach of the Savage Contract.

**ANSWER:**    Denied.

115.    As a direct and proximate result of Savage Fund's breach of the Savage Contract, ACI has suffered damages in excess of $3,000,000, including unpaid interest on payments not timely paid under the Contract; the unpaid contract balance plus accrued interest thereon; the value of the extra work performed by ACI without compensation by Continental; ACI's extended general conditions costs and other costs occasioned by the delays in the project that were beyond its control; and other damages, in an amount to be proven at trial.

**ANSWER:**    Denied.

## COUNT VIII – UNJUST ENRICHMENT – SAVAGE PROJECT

116.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 85 through 86 above and incorporates same herein.

**ANSWER:**    Counter-Defendants re-assert their responses to Paragraphs 1-11 and 85-86 above and incorporate those responses as if fully set forth herein.

117.    This is an action in the alternative to Count VII for relief based on a contract implied in law to prevent unjust enrichment.

DM1\9667193.1

**ANSWER:**    Denied.

118.    ACI provided labor, services and materials consisting of construction of an apartment complex on Savage Fund's property to improve said property at Savage Fund's request.

**ANSWER:**    Denied.

119.    Continental, as manager and owner of Savage Fund, had knowledge of, assented to, accepted, and retained the benefits conferred by ACI.

**ANSWER:**    Denied.

120.    Continental failed and refused to pay ACI for the labor, material, and general contractor services provided by ACI.

**ANSWER:**    Denied.

121.    The reasonable value of the labor, material, and general contractor services that remains unpaid exceeds $3,000,000.

**ANSWER:**    Denied.

122.    By retaining the labor, material, and general contractor services furnished by ACI without making payment to ACI for same, Continental has received a benefit of value and have been unjustly enriched in a manner that is illegal or unlawful.

**ANSWER:**    Denied.

123.    To prevent the unjust enrichment of Continental, ACI is entitled to judgment against Continental for damages exceeding $3,000,000, together with the maximum interest allowable by law, and ACI's costs and disbursements in this action.

**ANSWER:**    Denied.

## CLAIMS RELATING TO THE ROCHESTER PROJECT

124.    This action involves real property located at 305 28th SE, Rochester, Minnesota (the "Rochester Property").

**ANSWER:**    Admitted.

125.    Rochester Fund is the current fee owner of the Rochester Property and was the fee owner of said property at all times material to this action.

**ANSWER:**    Admitted.

DM1\9667193.1

## COUNT IX – BREACH OF CONTRACT – ROCHESTER PROJECT

126.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11, 30 through 33, and 124 through 125 above and incorporates same herein.

**ANSWER:**    Counter-Defendants re-assert their responses to Paragraphs 1-11, 30-33 and

124-125 above and incorporate those responses as if fully set forth herein.

127.    ACI and Rochester Fund entered into a contract (the "Rochester Contract") whereby ACI agreed to perform labor and furnish material and machinery, as a general contractor for the construction project known as the Springs at South Broadway (the "Rochester Project"), all of which related to the permanent development and improvement of the Rochester Property.

**ANSWER:**    Admitted.

128.    Rochester Fund is in possession of the Rochester Contract, a copy of which is too voluminous to attach.  The Rochester Contract includes plans, specifications, and other such documents identified in the Rochester Contract.

**ANSWER:**    Admitted.

129.    In consideration for the labor, material, and general contractor services ACI provided for the Project on the Rochester Property, Rochester Fund agreed to pay ACI in accordance with the Rochester Contract and the payment applications submitted by ACI.

**ANSWER:**    Denied. Further answering, Rochester Fund agreed to pay in accordance

with the terms of the Rochester Contract.

130.    Pursuant to the Rochester Contract, ACI provided the necessary labor, skill, material and general contractor services for the Rochester Project and has completed its work in connection with the Rochester Project in a workmanlike and professional manner and has otherwise fulfilled its obligations under the Rochester Contract.

**ANSWER:**    Denied.

131.    Despite the foregoing and ACI's demands, Rochester Fund has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to pay ACI for the labor, material, and general contractor services that ACI provided in connection with the Rochester Project and the permanent development and improvement to the Rochester Property.

**ANSWER:**    Denied.

132.    ACI encountered work on the Rochester Project that was not part of the original Rochester Contract.

**ANSWER:**    Denied.

22

DM1\9667193.1

133.    ACI submitted proposed change orders for this extra work.

**ANSWER:**    Counter-Defendants admit that ACI requested certain change orders. Counter-Defendants deny ACI was entitled to change orders that were denied or for which additional information was requested but never received. Further answering, Continental approved change orders when, and if, appropriate.

134.    Rochester Fund unjustifiably and in breach of the Rochester Contract refused to execute said change orders or enter into good faith negotiations with ACI over the proposed change orders.

**ANSWER:**    Denied.

135.    ACI encountered conditions over which it had no control that extended the time period needed to complete the Rochester Contract.

**ANSWER:**    Denied.

136.    ACI requested time extensions to the Rochester Contract period as a result of these conditions.

**ANSWER:**    Denied that such conditions exist. Admitted that ACI requested extensions of time.

137.    Rochester Fund unjustifiably and in breach of the Rochester Contract refused to grant said time extensions.

**ANSWER:**    Denied.

138.    ACI submitted payment applications to Rochester Fund during the Project.

**ANSWER:**    Admitted.

139.    Rochester Fund unjustifiably and in breach of the Rochester Contract failed to process payment to ACI of the amounts due and owing in accordance with the contract's terms, improperly delayed payments, improperly conditioned payments on extra-contractual conditions, improperly withheld payments and improperly reduced payments due and owing to ACI.

**ANSWER:**    Denied.

140.    As with the Six Mile Project, Continental, acting as manager of Rochester Fund, refused to process ACI's payment applications for the Rochester Project except through Textura, even though use of Textura was not a requirement of the Rochester Contract.  And much like what

23

happened on the Six Mile Project, payment to ACI on the Rochester Project was delayed due to software glitches in Textura and Continental's insistence on delaying payments to ACI over exceedingly minor discrepancies in supporting paperwork submitted by ACI or its subcontractors.

**ANSWER:**    Denied. Further answering, use of Textura was an express term of the

Rochester Contract.

141.    Continental's failure to pay ACI except through Textura, and its late payment to ACI through its use and implementation of Textura, was a breach of the duties of Rochester Fund under the Rochester Project, as nothing in the Rochester Contract required ACI to submit its payments through that system, and Continental implemented payment through Textura in an unreasonable way which interfered with ACI's performance under the Rochester Contract.

**ANSWER:**    Denied.

142.    There is in every contract an implied promise of good faith and fair dealing.

**ANSWER:**    Admitted.

143.    Rochester Fund improperly asserted liquidated damages for delays against ACI, when in fact Rochester Fund's own actions on the Rochester Project and other factors beyond ACI's control caused many of the delays.

**ANSWER:**    Denied.

144.    Rochester Fund consistently interfered with ACI's subcontracts during the Rochester Project.

**ANSWER:**    Denied.

145.    Rochester Fund's actions were in breach of the duty of good faith and fair dealing.

**ANSWER:**    Denied.

146.    Rochester Fund provided the Plans and Specifications for the Rochester Project.

**ANSWER:**    Denied. Further answering, Savage Fund provided some plans and

specifications, while ACI and/or other entities provided other plans and specifications.

147.    By providing the Plans and Specifications for the Rochester Project, Rochester Fund impliedly warranted the adequacy of the plans and specifications for construction of the Rochester Project.

**ANSWER:**    Denied.

DM1\9667193.1

148.    The Plans and Specifications provided by Rochester Fund were not adequate for the purposes of completing the Rochester Project.

**ANSWER:**    Denied.

149.    Rochester Fund's actions as alleged herein constitute a breach of the Rochester Contract.

**ANSWER:**    Denied.

150.    As a direct and proximate result of Rochester Fund's breach of the Rochester Contract, ACI has suffered damages in the principal amount of $4,357,112.18, inclusive of amounts for which ACI remains potentially liable to its subcontractors and suppliers for work performed.

**ANSWER:**    Denied.

151.    ACI is entitled to judgment against Rochester Fund for the total principal sum of $4,357,112.18, together with the maximum interest allowable by law, ACI's costs and disbursements in this action.

**ANSWER:**    Denied.

### COUNT X – UNJUST ENRICHMENT – ROCHESTER PROJECT

152.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 124 through 125 above and incorporates same herein.

**ANSWER:**    Counter-Defendants re-assert their responses to Paragraphs 1-11and 124-

125 above and incorporate those responses as if fully set forth herein.

153.    This is an action in the alternative to Count IX for relief based on a contract implied in law to prevent unjust enrichment.

**ANSWER:**    Denied.

154.    ACI provided labor, services and materials consisting of construction of an apartment complex on Rochester Fund's property to improve said property at Rochester Fund's request.

**ANSWER:**    Denied.

155.    Continental, as manager and owner of Rochester Fund, had knowledge of, assented to, accepted, and retained the benefits conferred by ACI.

**ANSWER:**    Denied.

DM1\9667193.1

156.    Continental failed and refused to pay ACI for the labor, material, and general contractor services provided by ACI.

**ANSWER:**    Denied.

157.    The reasonable value of the labor, material, and general contractor services that remains unpaid is the principal sum of $4,357,112.18.

**ANSWER:**    Denied.

158.    By retaining the labor, material, and general contractor services furnished by ACI without making payment to ACI for same, Continental has received a benefit of value and have been unjustly enriched in a manner that is illegal or unlawful.

**ANSWER:**    Denied.

159.    To prevent the unjust enrichment of Continental, ACI is entitled to judgment against Continental for the total principal sum of $4,357,112.18, together with the maximum interest allowable by law, and ACI's costs and disbursements in this action.

**ANSWER:**    Denied.

## CLAIMS RELATING TO THE NEW BRAUNFELS PROJECT

160.    This action involves real property located in New Braunfels, Texas as more particularly described as follows:

> Property located at the municipal address of 2980 CREEK BEND DR., NEW BRAUNFELS, TX 78130-6474, in the county of COMAL, TX, legally described as C306 FUND, BLOCK 1, LOT 1, APN 389681., Municipality / Township of NEW BRAUNFELS, Census Tract 3104.01, in the Subdivision of C306 FUND, Legal Bloc 1, Legal Lot 1, in the school district of CIS.

(the "New Braunfels Property").

**ANSWER:**    Admitted.

161.    New Braunfels Fund is the current fee owner of the New Braunfels Property and was the fee owner of said property at all times material to this action.

**ANSWER:**    Admitted.

## COUNT XI – BREACH OF CONTRACT – NEW BRAUNFELS PROJECT

162.    Counterclaim Plaintiff re-alleges the allegations contained in Paragraphs 1 through 11 and 160 through 161 above and incorporates same herein.

DM1\9667193.1

**ANSWER:**    Counter-Defendants re-assert their responses to Paragraphs 1-11 and 160-161 above and incorporate those responses as if fully set forth herein.

163.    ACI and New Braunfels Fund entered into a contract (the "New Braunfels Contract") whereby ACI agreed to perform labor and furnish material and machinery, as a general contractor for the construction project known as the Springs at Creekside (the "New Braunfels Project'), all of which related to the permanent development and improvement of the New Braunfels Property.

**ANSWER:**    Admitted.

164.    New Braunfels Fund is in possession of the New Braunfels Contract, a copy of which is too voluminous to attach.  The New Braunfels Contract includes plans, specifications, and other such documents identified in the New Braunfels Contract.

**ANSWER:**    Admitted.

165.    In consideration for the labor, material, and general contractor services ACI provided for the Project on the New Braunfels Property, New Braunfels Fund agreed to pay ACI in accordance with the New Braunfels Contract and the payment applications submitted by ACI.

**ANSWER:**    Denied. Further answering, New Braunfels Fund agreed to pay in accordance with the terms of the New Braunfels Contract.

166.    Pursuant to the New Braunfels Contract, ACI provided the necessary labor, skill, material and general contractor services for the New Braunfels Project and has completed its work in connection with the New Braunfels Project in a workmanlike and professional manner and has otherwise fulfilled its obligations under the New Braunfels Contract.

**ANSWER:**    Denied.

167.    Despite the foregoing and ACI's demands, New Braunfels Fund has unjustifiably failed and refused, and continues to unjustifiably fail and refuse, to pay ACI for the labor, material, and general contractor services that ACI provided in connection with the New Braunfels Project and the permanent development and improvement to the New Braunfels Property.

**ANSWER:**    Denied.

168.    ACI encountered work on the New Braunfels Project that was not part of the original New Braunfels Contract.

**ANSWER:**    Denied.

169.    ACI submitted proposed change orders for this extra work.

27

**ANSWER:**    Counter-Defendants admit that ACI requested certain change orders. Counter-Defendants deny ACI was entitled to change orders that were denied or for which additional information was requested but never received. Further answering, Continental approved change orders when, and if, appropriate.

170.    New Braunfels Fund unjustifiably and in breach of the New Braunfels Contract refused to execute said change orders or enter into good faith negotiations with ACI over the proposed change orders.

**ANSWER:**    Denied.

171.    ACI encountered weather and other conditions over which it had no control that extended the time period needed to complete the New Braunfels Contract.

**ANSWER:**    Denied.

172.    ACI requested time extensions to the New Braunfels Contract period as a result of these conditions.

**ANSWER:**    Denied that such conditions existed. Admitted that ACI requested extensions of time.

173.    New Braunfels Fund unjustifiably and in breach of the New Braunfels Contract refused to grant said time extensions, and instead purported to impose liquidated damages on ACI for delays not caused by ACI.

**ANSWER:**    Denied. Further answering, New Braunfels Fund did impose liquidated damages on ACI.

174.    ACI submitted payment applications to New Braunfels Fund during the New Braunfels Project.

**ANSWER:**    Admitted.

175.    New Braunfels Fund unjustifiably and in breach of the New Braunfels Contract failed to process payment to ACI of the amounts due and owing in accordance with the contract's terms.

**ANSWER:**    Denied.

176.    There is in every contract an implied promise of good faith and fair dealing.

28

DM1\9667193.1

**ANSWER:** Admitted.

177. New Braunfels Fund improperly asserted liquidated damages for delays against ACI, when in fact New Braunfels Fund's own actions on the New Braunfels Project and other factors beyond ACI's control caused many of the delays.

**ANSWER:** Denied.

178. New Braunfels Fund consistently interfered with ACI's subcontracts during the New Braunfels Project.

**ANSWER:** Denied.

179. New Braunfels Fund's actions were in breach of the duty of good faith and fair dealing.

**ANSWER:** Denied.

180. New Braunfels Fund's actions as alleged herein constitute a breach of the New Braunfels Contract.

**ANSWER:** Denied.

181. As a direct and proximate result of New Braunfels Fund's breach of the New Braunfels Contract, ACI has suffered damages in the principal amount of $301,308.83.

**ANSWER:** Denied.

182. ACI is entitled to judgment against New Braunfels Fund for the total principal sum of $301,308.83, together with the maximum interest allowable by law, ACI's costs and disbursements in this action.

**ANSWER:** Denied.

WHEREFORE, Plaintiffs/Counter-Defendants, Continental 332 Fund, LLC, Continental 298 Fund LLC, Continental 306 Fund LLC, and Continental 326 Fund LLC, and Third-Party Defendant, Continental Properties Company, Inc., respectfully request this Honorable Court to dismiss ACI's Fifth Amended Counterclaim and Third-Party Complaint, with prejudice, to grant judgment in Plaintiffs/Counter-Defendants/Third-Party Defendant's favor, and for any further relief this Court deems just and equitable.

DM1\9667193.1

## AFFIRMATIVE DEFENSES

Plaintiffs/Counter-Defendants, Continental 332 Fund, LLC ("*Six Mile Fund*") Continental

298 Fund LLC ("*Savage Fund*"), Continental 306 Fund LLC ("*New Braunfels Fund*"), and

Continental 326 Fund LLC ("*Rochester Fund*") (collectively the "*Funds*") and Third-Party

Defendant, Continental Properties Company, Inc. ("*Continental*" and together with the Funds,

"*Counter-Defendants*"), assert the following Affirmative Defenses to Albertelli Construction,

Inc.'s ("*ACI*") Fifth Amended Counterclaim and Third-Party Complaint:

### First Affirmative Defense

### (Failure to State a Claim)

ACI's claims fail because it has failed to state a claim upon which relief can be granted.

### Second Affirmative Defense

### (Unclean Hands)

ACI's claims fail in whole or in part pursuant to the doctrine of unclean hands.

### Third Affirmative Defense

### (Comparative Fault)

ACI's claims fail in whole or in part on the basis that it, as well as other persons other

than Counter-Defendants, are responsible for ACI's alleged damages, if any.

### Fourth Affirmative Defense

### (Failure to Mitigate Damages)

ACI's claims fail in whole or in part on the basis that it failed to mitigate its damages.

### Fifth Affirmative Defense

### (Equitable Estoppel)

ACI's claims fail pursuant to the doctrine of equitable estoppel.

### Sixth Affirmative Defense

30

DM1\9667193.1

**(Speculative Damages)**

The damages claimed by ACI are speculative in whole or in part and are not recoverable.

**Seventh Affirmative Defense**

**(Right of Offset)**

Counter-Defendants have a right to offset any amounts awarded to ACI by amounts owed to Counter-Defendants and/or their affiliated entities.

**Eighth Affirmative Defense**

**(Failure of Condition Precedent)**

ACI failed to perform under the terms of the contract with Continental such that it cannot obtain its requested relief. Specifically, ACI did not provide labor and services according to its contracts with the Funds. ACI also failed to perform under the contracts as it provided late, incomplete, and defective work.

Dated: June 4, 2019

Respectfully submitted,

**DUANE MORRIS LLP**
*Trial Counsel for Plaintiffs/Counter-Defendants*
*CONTINENTAL 332 FUND LLC,*
*CONTINENTAL 298 FUND LLC,*
*CONTINENTAL 306 FUND LLC, and*
*CONTINENTAL 326 FUND LLC, and*

*Trial Counsel for Third Party Defendant*
*CONTINENTAL PROPERTIES COMPANY, INC.*

By: */s/ Jeffrey L. Hamera*
     (*pro hac vice*)

Larry Selander (*pro hac vice*)
Jeffrey L. Hamera (*pro hac vice)*
Duane Morris LLP
190 S. LaSalle St., #3700
Chicago, IL 60603
Phone: 312-499-0147
lselander@duanemorris.com
jlhamera@duanemorris.com

Alvin D. Lodish
Duane Morris LLP
200 S. Biscayne Blvd., #3400
Miami, FL 33131
Phone: 305.960.2318
Florida Bar No.: 622273
slodish@duanemorris.com

31

DM1\9667193.1

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CONTINENTAL 332 FUND LLC,
CONTINENTAL 298 FUND LLC,
CONTINENTAL 306 FUND LLC,
CONTINENTAL 326 FUND LLC,
CONTINENTAL 347 FUND LLC,
CONTINENTAL 355 FUND LLC,
CONTINENTAL 342 FUND LLC, and
CONTINENTAL 245 FUND LLC,

        Plaintiffs,

vs.

DAVID ALBERTELLI,
ALBERTELLI CONSTRUCTION INC.,
GEORGE ALBERTELLI, WESTCORE
CONSTRUCTION, LLC (Del.), WESTCORE
CONSTRUCTION, L.L.C. (Nev.),
FOUNDATION MANAGEMENT LLC,
NATIONAL FRAMING, LLC, KMM
CONSTRUCTION LLC, MFDC LLC, TEAM
CCR, LLC, BROOK KOZLOWSKI, JOHN
SALAT, KEVIN BURKE, KERRY
HELTZEL, AMY BUTLER, US
CONSTRUCTION TRUST, and GREGORY
HILZ

        Defendants.

_____/

Docket No.
2:17-cv-00041-SPC-MRM

## THIRD PARTY DEFENDANT'S COUNTERCLAIM AGAINST ALBERTELLI CONSTRUCTION, INC. AND JURY TRIAL DEMAND

Third-Party Defendant / Third-Party Counter-Plaintiff Continental Properties Company,

Inc. ("*CPCI*" or "*Counter-Plaintiff*") for its Counterclaim against, Third-Party Plaintiff / Third-

Party Counter-Defendant Albertelli Construction, Inc. ("*ACI*" or "*Counter-Defendant*"), states as

follows:

DM1\9667193.1

**183.**    <u>**Summary of the Case**</u>[1]

1.    George Albertelli is the founder and CEO of ACI, a commercial construction contractor based in Jacksonville, Florida and counterclaim-defendant in this Third-Party Counterclaim.  He founded the business approximately 21 years ago, and later brought in his son, David Albertelli, who joined the organization as Vice President and at some time became a minority owner of ACI.

2.    A third construction executive who is also central to the RICO violations in this case – Mr. Angelo Eguizabal – previously worked for George Albertelli and with David Albertelli at a contractor where unlawful bribes, expensive gifts, and kickbacks were used to obtain construction contracts and to retain clients.

3.    In November 2007, Angelo Eguizabal was hired by CPCI, a large development and property management company and counterclaim-plaintiff in this Third-Party Counterclaim, as its Vice President of Construction.  CPCI is a national company headquartered in Wisconsin that has developed projects in 24 states across the U.S.  By 2017, CPCI had developed or broken ground on more than 20,000 apartment homes.  During the years after Eguizabal was hired, the development of residential apartment complexes became an increasingly significant business for CPCI, which is what eventually brought the Albertellis calling.

4.    Before CPCI hired Eguizabal, neither ACI nor any other Albertelli-controlled entity had done construction or any other work for CPCI.  But, given the past experience of Eguizabal

---

[1] The Summary of the Case (Section I), the Parties (Section II),  the Underlying Construction Contracts (Section III), Jurisdiction and Venue (Section IV), and Counts 1-5 are nearly identical to and rely on the same facts as alleged in Sections I-IV and Counts 1-3 and 5-6 of the Funds' Fourth Amended Complaint. (Dkt. No. 218.) CPCI has merely revised or omitted certain allegations to conform to the requirements of this pleading. Moreover, Counts 6-13 herein also rely on the same factual allegations. In sum, the filing of this Counterclaim should have no effect on the scope of discovery or the current case management and scheduling order.

DM1\9667193.1

and George and David Albertelli with the use of bribes and kickbacks to win construction contracts – and given that Eguizabal was now not only inside a major development company, but also as head of construction was in a pivotal position to steer business and influence contract awards, terms and implementation – it was not long before the Albertellis were bribing Eguizabal to obtain work from CPCI. Beginning in 2011, David and George Albertelli gave several small bribes to Eguizabal.

5.     But then, in early 2013, the three took the corrupt scheme to a new level.  Hatched during a meeting in Jacksonville, Florida, both George and David Albertelli confirmed that ACI would pay bribes or kickbacks to Eguizabal for up to 2% of the value of the contracts awarded by CPCI to ACI.

6.     Eguizabal accepted the Albertellis' corrupt offer.  By May 2013 the Albertellis had raised the stakes and paid Eguizabal a bribe of $30,000.  Less than three months later, Eguizabal fulfilled his part in the unlawful conspiracy by using his influential post as Vice President for Construction at CPCI to help arrange for ACI to be awarded the contract to build an apartment complex in Lexington, Kentucky – a contract worth $16,192,014.

7.     The bribes continued and more construction contracts were awarded by CPCI to ACI.  Although CPCI was not aware of the bribes, ACI's poor job performance and late delivery of projects eventually caused CPCI to decide to award no new contracts to ACI and the Albertellis. The Albertellis and ACI responded by doubling down on their illegal conduct, and expanded the conspiracy to recruit new front men and create sham construction companies.

8.     David Albertelli recruited Gregory Hilz, the owner of an occasional ACI subcontractor, to form Westcore Construction, LLC ("Westcore I"), to continue the bribery and fraud begun by ACI and the Albertellis.  To obtain CPCI's approval of Westcore I as an acceptable

34

general contractor, David Albertelli and others created and submitted to CPCI a sworn qualification statement that consisted almost entirely of lies: that the newly created Westcore I had total assets of $69,433,530; 23 years of construction experience; and a bonding capacity of $325 million, when it actually had no assets and had not performed a single job. David Albertelli even sought a banker to assist their criminal actions and falsely "vouch for us having $10MM in a bank account that has $100". David Albertelli intentionally hid his ownership in Westcore I from CPCI because he knew CPCI would not give Westcore I any work if CPCI knew he was involved.

9.      CPCI relied on the truth of the phony qualification statement and awarded a contract to Westcore I. Westcore I continued to bribe Eguizabal and was awarded two more contracts.

10.     The Albertellis were relentless in their pursuit of CPCI contracts. Even while chasing work as Westcore[2], the Albertellis ingratiated themselves with Fabio Fasanelli, an owner of Florida based construction companies doing business with CPCI. Albertelli created new companies (referred to as the "New Fasanelli Companies") to mirror the original Fasanelli companies, but hid his ownership in them from CPCI. Albertelli, via the New Fasanelli Companies, then bribed Eguizabal to get two contracts for the newly formed companies and such companies failed to perform.

11.     During the course of the Defendants' illegal conduct, they devised and carried out a series of elaborate and unlawful schemes, including:

      a.  bribing Eguizabal to obtain contracts for ACI, Westcore I and the New Fasanelli Companies and to arrange favorable financial terms and treatment from the Funds on change orders and assessments of liquidated damages,

---

[2] Terms not defined herein are used as defined in the Fourth Amended Verified Complaint for Injunctive Relief and Damages Under RICO and Other Theories (Doc. No. 218),

DM1\9667193.1

b.  inventing a series of sham subcontractors and submitting false payment applications to divert construction payments from the rightful recipients to the Defendants,

c.  stealing outright over $2 million by illegally converting Joint Checks issued by CPCI, which were intended to be paid to legitimate subcontractors which had performed the actual work.

12.    The Albertellis did not act alone.  The schemes were assisted by the illegal conduct of accountants and administrators such as Amy Butler and Kerry Heltzel, and a team of men including Brook Kozlowski, John Salat, and Kevin Burke who secretly created, owned or controlled sham companies like KMM, MFDC, and Team CCR, and whose affirmative acts on behalf of the conspiracy ranged from assisting in receiving tens of millions of dollars of corruptly obtained and managed construction contracts to concealing the wrongdoing and involvement of the Albertellis from CPCI.

13.    Because Defendants purposefully hid their wrongdoing from CPCI and were aided by Eguizabal, CPCI did not learn many of these facts until after the Funds filed this lawsuit.  In fact, the bribery of Eguizabal, the involvement of the Albertellis in Westcore, and the complete fabrication of the sworn qualification statement submitted by Westcore were not discovered until just before the Second Amended Complaint was filed in this case.

14.    But in the end, the facts are not so mysterious.  Many of the most significant facts are not even in dispute.  Angelo Eguizabal is now cooperating with CPCI, and has described in detail the bribery and other fraudulent schemes.  And Westcore I admitted when it filed a counterclaim in state court in Colorado that Westcore alone had paid "kickbacks totaling about $1,000,000 on three projects."  All told, in their unlawful efforts to obtain construction contracts

36

from CPCI and the Funds, which are eight CPCI-related Funds that held the major construction contracts at issue in this case, during the six years from 2011 to 2017 ACI, George Albertelli, David Albertelli, Westcore I, Brook Kozlowski, John Salat and Kevin Burke paid at least $1,464,735 in bribes to CPCI's Vice President for Construction, Angelo Eguizabal – and each played roles in the looting and manipulation of construction contracts with a value of over $200 million dollars that are at issue in this case. Because of the complexity of the schemes to extract money, the CPCI is still learning the full extent of the damages it has suffered.

15.    As such, ACI's acts violate the commercial bribery and other statutes of multiple states. ACI and its joint-tortfeasors committed and conspired to commit wire fraud, mail fraud, bank fraud, Federal RICO violations and common law fraud. ACI also breached every contract awarded to it and their surrogates, was negligent in managing construction projects, and committed professional negligence and other torts. The total damages ACI caused CPCI are myriad and still undetermined, but upon information and belief, will at minimum be in the millions of dollars for (a) increased personnel overhead; (b) loss of project management fees; (c) the amount of all bribes paid to Eguizabal; and (d) all profits earned by ACI on projects for which a bribe was paid to Eguizabal.

**184.    The Parties**

**ANSWER:    Counter-Plaintiff**

16.    CPCI is the manager of various "Funds," which are the Plaintiffs in this litigation and each of which is a special purpose entity that owns and is developing, or has developed, an apartment complex (individually a "Project" and collectively the "Projects"). The Funds and Projects related to this Counterclaim are as follows:

   a. Continental 332 Fund LLC ("Six Mile Fund") owns and is developing Springs at Six Mile Cypress, Fort Myers, Florida ("Six Mile Project").

37

DM1\9667193.1

b.   Continental 298 Fund LLC ("Savage Fund") owns and is developing Springs at

Egan Drive, Savage, Minnesota ("Savage Project").

c.   Continental 306 Fund LLC ("New Braunfels Fund") owns and developed Springs

at Creekside, New Braunfels, Texas ("New Braunfels Project").

d.   Continental 326 Fund LLC ("Rochester Fund") owns and is developing Springs at

Rochester, and also known as the Springs at South Broadway, Rochester,

Minnesota ("Rochester Project").

e.   Continental 355 Fund LLC ("Bryan Fund") owns and is developing Springs at

University Drive, Bryan, Texas ("Bryan Project").

f.   Continental 347 Fund LLC ("Waco Fund") owns and is developing Springs at

Cottonwood Creek, Waco, Texas ("Waco Project").

g.   Continental 342 Fund LLC ("Longmont Fund") owns and is developing Springs at

Sandstone Ranch, Longmont, Colorado ("Longmont Project").

h.   Continental 245 Fund LLC ("Lexington Fund") owns and developed Springs at

Winchester Road, Lexington, Kentucky ("Lexington Project").

**ANSWER:   Counter-Defendant**

17.    ACI is a Florida corporation owned in whole or in part by George and David

Albertelli.  ACI has an office at 10751 Deerwood Park Boulevard, Jacksonville, Florida.

**ANSWER:   Counter-Defendant's Joint Malfeasors, *i.e.*, other members of the
"Corrupt Enterprise" (defined below)**

18.    George Albertelli resides in Florida.  He is David Albertelli's father and the

founder, past President and an owner of ACI. On information and belief, George Albertelli helped

form and has an ownership interest in MFDC.

38

19.    David Albertelli resides in Florida.  David Albertelli is the President and an owner of ACI.  David Albertelli created, controls, influences and owns (in part or whole, directly or indirectly) the other corporate Defendants named in this litigation: MFDC LLC ("MFDC"), Foundation Management LLC ("Foundation Management"), National Framing, LLC ("National Framing"), KMM Construction LLC ("KMM"), Westcore Construction, LLC (Del.) ("Westcore I"), Westcore Construction, L.L.C. (Nev.) ("Westcore II"), and Team CCR.  On information and belief, David Albertelli is also the trustee and the beneficiary of defendant US Construction Trust.

20.    Brook Kozlowski, on information and belief, resides in Florida.  On information and belief, he is a manager, officer and owner of ACI, Foundation Management, Westcore I, and Westcore II.

21.    Westcore Construction, LLC ("Westcore I") is a Delaware limited liability company.  Westcore I was formed by David Albertelli and Gregory Hilz ("Hilz"), the owner of a subcontractor that had worked for ACI.  David Albertelli (through US Construction Trust), Hilz, and Kozlowski own Westcore I.

22.    Westcore Construction, L.L.C. ("Westcore II") is a Nevada limited liability company.  It has or had places of business in Jacksonville, Florida and Jacksonville Beach, Florida.  One or more of David Albertelli, John Salat, Brook Kozlowski, Kevin Burke and Foundation Management formed Westcore II for the purpose of diverting funds from Westcore I.

23.    MFDC, LLC ("MFDC") is a Delaware limited liability company.  It has a place of business at 10751 Deerwood Park Boulevard, Jacksonville, Florida.  MFDC was formed by or at the direction of George Albertelli and David Albertelli.  MFDC was used as a conduit for bribes to Eguizabal and Eguizabal's company, Bravo21, LLC.

DM1\9667193.1

24.     Team CCR, LLC ("Team CCR") is a Delaware limited liability company formed on September 27, 2016, with a place of business in Jacksonville Beach, Florida.

25.     Amy Butler ("Butler") is, on information and belief, a resident of Florida and the current or past Accounting Manager of ACI.

26.     Kevin Burke ("Burke") is, on information and belief, the Chief Financial Officer of Foundation Management, a resident of Florida and an agent of MFDC, Foundation Management, and Westcore II.

27.     John Salat ("Salat") is, on information and belief, a resident of Florida.  Salat was or is a Project Manager, Division Manager, Vice-President or President of Westcore I who has held himself out to be Westcore I's owner, and is an owner of Westcore II.  He is a former employee of ACI; a former co-worker of David Albertelli, George Albertelli and Eguizabal; and the owner of a separate company which operated out of ACI's offices.

28.     Kerry Heltzel ("Heltzel") is a resident of Florida and is a current or former project accountant for ACI, Westcore I, Westcore II and Foundation Management.

29.     US Construction Trust is, on information and belief, a trust owned, controlled by and benefitting David Albertelli.  US Construction Trust is used by David Albertelli to, among other things, own part of Westcore I.

30.     Foundation Management LLC ("Foundation Management") is a Delaware limited liability company and, on information and belief, is owned by David Albertelli.  Foundation Management has a principal place of business in Jacksonville Florida.

31.     National Framing, LLC ("National Framing") is a Delaware limited liability company and, on information and belief, is owned by David Albertelli.  Foundation Management is the manager of National Framing.

40

32.     KMM Construction, LLC ("KMM") is a Delaware limited liability company with a place of business in Pembroke Pines, Florida. Foundation Management is the manager of KMM.

33.     Angelo Eguizabal ("Eguizabal") is a resident of Wisconsin and is the former Vice President of Construction of Continental. Eguizabal was a defendant in this case but was dismissed without prejudice on November 13, 2017.

34.     Bravo21, LLC ("Bravo21"), is a Delaware limited liability company that has a place of business in the State of Florida. It was created and is owned by Eguizabal and has the sole purpose of accepting bribes related to Continental projects. Bravo21 was a defendant in this case but was dismissed without prejudice on November 13, 2017.

**185.    The Underlying Construction Contracts**

35.     Each Fund entered into a separate construction contract with either ACI or Westcore I under which, among other things, ACI or Westcore I agreed to provide labor, materials and services for the construction of an apartment complex Project. The price to be paid under the contract was either a "Stipulated Sum" or "Cost of the Work Plus Fee with a Guaranteed Maximum Price" ("Cost Plus Fee").

36.     Where the basis of payment is a stipulated sum, the contractor is paid monthly progress payments that in total equal an agreed upon lump sum amount. When the contract is based on Cost Plus Fee, the contractor is paid monthly for the legitimate costs it incurs plus a fee but in no event more that the guaranteed maximum price. Both contract types require the contractor to submit to the relevant Fund, and that Fund's construction lender, a monthly application for payment that is accompanied by a sworn statement representing the amount paid to, and remaining to be paid to, each of its subcontractors. Subcontractors are likewise required to submit payment applications and sworn statements for their own work and their own sub-subcontractors.

DM1\9667193.1

37.     Other than price structure, the contracts all follow the same basic form.    All contracts use modified American Institute of Architects ("AIA") forms and include AIA A201 General Conditions that establish many of the terms and conditions governing the process applicable to the construction of the various Projects.   Each contract also includes many exhibits that, among other things, identify the scope of work and schedule for the work to be performed by the general contractor.

38.     Each contract structures progress payments so that the amount paid to the general contractors, ACI or Westcore I, would not exceed the value of the work performed at any time, required the general contractor to pay its subcontractors and suppliers promptly after receipt of funds, and, as a condition to its right to be paid, required the general contractor to represent under oath the amount owed and previously paid to each subcontractor on the Project.   The payment terms were intended to ensure that the Project owner had sufficient funds to complete the Project and pay the various subcontractors within the Project budget should the general contractor fail to do so.

39.     The Funds and the construction lender for each Project relied upon the truth of the payment applications and sworn statements submitted by ACI, Westcore I, Westcore II and their subcontractors in managing the Projects and in paying ACI, Westcore I, Westcore II and their subcontractors.

40.     Each of the contracts included terms requiring the contractor to pay liquidated damages for late completion of the individual buildings that comprise each particular Project. The liquidated damages are assessed in an agreed amount for each day that the relevant building was completed late without contractually authorized excuse.   Each contract included a maximum

42

DM1\9667193.1

amount of liquidated damages which could be assessed against the contractor, typically two percent of the contract price.

41.     All of the contracts allowed for changes in the contract price, the scope of work and time for completion of the work under defined circumstances.  Each time such a change was made, the Fund and the contractor were required to execute a written "change order", effectively an amendment of the contract.

42.     The contracts provide that they could be terminated for cause if the contractor substantially breaches the contract, including by failing to provide enough materials or workers on the job and by failing to pay subcontractors.

43.     All of the Projects were completed late by ACI or Westcore I and have substantial defective work, thereby damaging the Funds.  More specifically:

     a.  Lexington Fund and ACI entered into a written contract[3] dated August 22, 2013, ("Lexington Contract") for the construction of the Lexington Project for a Stipulated Sum of $16,192,014.  The Lexington Project was completed by ACI.  Significant defects in the construction have greatly diminished the value of the Lexington Project, causing the Lexington Fund to undertake repair work at additional cost.

     b.  Savage Fund and ACI entered into a written contract dated April 25, 2014 ("Savage Contract") for the construction of the Savage Project on a Cost Plus Fee basis with an initial guaranteed maximum price of $28,209,835. ACI abandoned the Savage Project in July, 2016 and it was thereafter

---

[3] The contracts for the projects are too voluminous to attach and the Defendants have a copy of the contracts.

DM1\9667193.1

completed and repairs of ACI work were performed by the Savage Fund directly managing the construction at additional cost.

c. New Braunfels Fund and ACI entered into a written contract dated November 21, 2014 ("New Braunfels Contract") for the construction of the New Braunfels Project on a Cost Plus Fee basis with an initial guaranteed maximum price of $23,992,353. The New Braunfels Project was completed late by ACI. Extensive construction defects in the work executed by ACI have been corrected by others at additional cost.

d. Six Mile Fund and ACI entered into a written contract dated February 20, 2015, ("Six Mile Contract") for the construction of the Six Mile Project for a Stipulated Sum of $29,367,849.38. ACI was terminated on January 6, 2017 and the Six Mile Project was thereafter corrected and completed by the Six Mile Fund, by directly managing the construction at additional cost.

e. Rochester Fund and ACI entered into a written contract dated June 23, 2015, ("Rochester Contract") for the construction of the Rochester Project for a Stipulated Sum of $27,331,562. ACI was terminated by Continental on January 6, 2017 and the Rochester Project was completed late by Continental both by managing the construction directly and by hiring a construction manager, causing Continental to incur additional construction costs.

44. The Contracts are too voluminous to be attached to the Counterclaim.

186. **Jurisdiction and Venue**

45. This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1964(c).

44

DM1\9667193.1

46.     This Court has jurisdiction over Counter-Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 in that they are part of the same case or controversy as Counter-Plaintiff's claims under 18 U.S.C. § 1962.

47.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) in that ACI resides in this judicial district and a substantial part of the conduct, events and/or omissions giving rise to Counter-Plaintiff's claims occurred in this judicial district.  In addition, the Six Mile Project is located in Ft. Myers, Florida.

48.     This Court has personal jurisdiction over ACI in that, at all relevant times hereto, it transacted business in this judicial district and resides in this judicial district.

## COUNT 1– RICO

**ANSWER:**    **Overview of Counter-Plaintiff's RICO Case**

49.     Count 1 is a complex action for civil remedies authorized by the Racketeering Influenced and Corrupt Practices Act ("RICO") in federal statutes at 18 U.S.C. 1961 *et seq.*  See 18 U.S.C. §§ 1964(a) and (c).

50.     George Albertelli and David Albertelli started a corrupt enterprise (the "Corrupt Enterprise") that grew to include ACI, George Albertelli, David Albertelli, Kozlowski, Salat, Burke, Butler, Foundation Management, MFDC, Westcore I, Westcore II, Team CCR, National Framing, KMM, Heltzel, US Construction Trust, Eguizabal and Bravo21, Gregory Hilz and Fabio Fasanelli, acting collectively.  The role of each person in the Corrupt Enterprise is described below.

51.     All participants in the Corrupt Enterprise, conspired to engage and engaged in a pattern of racketeering activity across state lines involving numerous RICO predicate acts over a period of approximately six years   The actions of these persons, acting as the Corrupt Enterprise, damaged Counter-Plaintiff. ACI is jointly and severally liable for the actions of the Corrupt Enterprise.

45

52.     The purpose of the Corrupt Enterprise is to be awarded construction contracts by bribery, obtain payments for work that is not done or is deficient, and add unfounded costs to construction projects to ensure that the maximum price is paid by the owners of the projects.  The Corrupt Enterprise was designed to extract as much money as it could, as quickly as it could, without regard to contractual performance or any lawful right to payment of the participants in the Corrupt Enterprise.

53.     The RICO predicate acts can generally be characterized as 1) bribery to get contracts; 2) falsification of a qualification statement for Westcore I to win approval of CPCI as a general contractor: 3) paying bribes to get contracts from CPCI for the New Fasanelli Companies; 4) defrauding the Funds by falsifying payment applications and using subcontractors owned by Defendants to divert funds from the rightful recipients; and 5) stealing over $2 Million worth of checks intended to be paid to subcontractors ("Joint Checks") in December 2016.

54.     David and George Albertelli, ACI, Westcore I, Westcore II, Kozlowski, Salat, Foundation Management, Burke and MFDC used the proceeds of their fraudulent activities to perpetuate and grow the Corrupt Enterprise, in part by: 1) funding the creation of sham subcontractors (subcontractors that performed no work but added unwarranted cost), such as Team CCR; 2)  funding  contractors operating under false pretenses such as Westcore I, Westcore II, and the New Fasanelli Companies; 3) paying bribes to get new projects; and 4) funding Foundation Management to hide the Albertellis' role in the Corrupt Enterprise.

55.     George and David Albertelli are the leaders of the Corrupt Enterprise, and all the members played significant roles in furthering the fraud of the Corrupt Enterprise.   While additional unlawful conduct is still being uncovered, certain acts of each member of the Corrupt Enterprise are set forth below and are also summarized for each member at the end of Count 1.

46

**ANSWER:    ACI, Westcore I, Westcore II and the Albertellis Bribed Eguizabal to Get Work and Favorable Treatment**

**B-1.    The Albertelli - Eguizabal Connection**

56.    Prior to being employed by CPCI, Eguizabal worked for George Albertelli, and with David Albertelli, Salat and Fabio Fasanelli, at another construction company, where bribes, expensive gifts, and kickbacks were used to secure construction contracts and retain clients.

57.    In November 2007, CPCI hired Eguizabal as its Vice President of Construction.

58.    Before CPCI hired Eguizabal, neither ACI nor any other Albertelli-controlled entity ever worked for CPCI.

59.    In 2011, ACI began paying bribes to Eguizabal.  In 2011, ACI began performing work for CPCI. Between 2011 and October 2012, ACI paid 7 bribes by wire transfer to Eguizabal in amounts ranging from $100 to $10,000.  Those bribes totaled $30,731.76.

**B-2.    Hatching the Bribery Scheme**

60.    In early 2013, George and David Albertelli wanted contracts for more and larger projects from CPCI. Eguizabal and David Albertelli discussed a larger bribery scheme over dinner. David Albertelli offered to give Eguizabal a percentage of the value of future contracts awarded by CPCI to ACI.

61.    Eguizabal asked David Albertelli for confirmation from George Albertelli that Eguizabal would be paid bribes.  David Albertelli told Eguizabal that George knew about, and agreed to, kicking-back money to Eguizabal in return for favorable consideration on projects. Nevertheless, Eguizabal insisted that he hear this directly from George Albertelli.

62.    Shortly thereafter, Eguizabal met with George Albertelli and David Albertelli in Jacksonville, Florida.  During that meeting, George Albertelli and David Albertelli confirmed that Eguizabal would receive bribes or kickbacks of up to 2% of the amount of the contracts awarded

47

to ACI.  As part of their unlawful agreement, David and George Albertelli also required Eguizabal to keep the projects profitable for the Albertellis by, among other things, giving ACI favorable treatment on change orders and assessments of liquidated damages.

### B-3.    The First Bribes on the New Deal

63.    On or before May 31, 2013, David and George Albertelli and ACI began paying substantial bribes to Eguizabal under the new arrangement.  On that date, the Albertellis and ACI paid a $30,000 bribe to Eguizabal.

64.    On August 22, 2013, CPCI awarded ACI the Springs at Winchester Road, in Lexington, Kentucky.

65.    From May 31, 2013 to May 21, 2014, George Albertelli and David Albertelli paid bribes to Eguizabal totaling at least $244,724.20 by wire transfer from Southern Supply and Equipment, a company used by the Albertellis to funnel bribes to Eguizabal, to Eguizabal's personal account at USAA Bank.  There were at least 13 such wire transfers during that period. *See* **Exhibit 1**, a chart that includes the dates and amounts of the bribes presently known to Counter-Plaintiff that were paid to Eguizabal, and the dates and amounts of the construction contracts that were awarded to ACI, Westcore I and the New Fasanelli Companies.  **Exhibit 1** shows the continued pattern of paying bribes to Eguizabal at the direction of the Albertellis and getting contracts from CPCI.

### B-4.    Establishing a Corporate Structure for Bribes: MFDC and Bravo21

66.    On July 31, 2014, David Albertelli, George Albertelli and, on information and belief, Burke and Kozlowski formed MFDC in Delaware as a conduit to pay secret bribes to Eguizabal.

DM1\9667193.1

67.    The Albertellis and ACI paid bribes to Eguizabal through MFDC by wire transfers from at least September 19, 2014 ($100,000) through August 16, 2016 ($9,972), in the total amount of not less than $669,302.  *See* **Exhibit 1**.

68.    Soon thereafter, on May 24, 2016, Eguizabal formed his own company in Delaware, Bravo21, to conceal his receipt of bribes.  Beginning with a payment on October 21, 2016 of $50,000, George and David Albertelli, ACI, MFDC, Burke and Kozlowski sometimes sent bribes to Eguizabal at Bravo21.

69.    By 2016, the bribes became such an ingrained part of their business that David Albertelli and, on information and belief, Kozlowski and Salat, included a line item in the internal budgets for the Waco, Bryan and Longmont Projects that identified MFDC as the recipient of a $495,000 fee to be used to bribe Eguizabal.  The notes for the MFDC Fee on the Longmont Project state:

> this is for Angelo [Eguizabal] but if he dicks with ACI then this will be paid to
> ACI toward the open change orders.  **Exhibit** 2.

70.    David Albertelli, MFDC, Burke, Kozlowski, Westcore I and Westcore II concealed from Longmont Fund the MFDC Fee portion of the contract price on the Longmont Contract – that is, concealed the portion that represented the bribe to Eguizabal.

71.    On March 16, 2017, Eguizabal sent "invoices", which were really for some of the bribes, by email to Burke and David Albertelli and, on information and belief, Burke then paid the bribes to Eguizabal.

### B-5.    The Bribes were a Permanent Way of Doing Business for the Corrupt Enterprise

72.     By May 2016, the Albertellis' scheme of paying hundreds of thousands of dollars of secret bribes to Eguizabal in exchange for tens of millions of dollars of construction contracts had continued for more than five years.  But during a phone call that same month, when Eguizabal

49

DM1\9667193.1

suggested ending the bribery scheme, David Albertelli told Eguizabal, "This is like the mafia, no one gets out."

73.     The hardball was played in both directions.  On May 18, 2016, Eguizabal sent an email to David Albertelli setting forth a counterproposal for a bribe to be paid in return for Eguizabal's assistance in steering the contract for Longmont to Westcore I, saying "[t]he only way Longmont is going to [Westcore I] is if I force it."  Eguizabal also complained of David Albertelli's failure to pay the full amount of the agreed kickbacks, telling Albertelli, "[i]f we were in the mafia, as you mentioned, you would be in a wheelchair because somebody would have taken a baseball bat to your kneecaps for not paying."

### B-6.    The Totality of the Bribes

74.     In their unlawful efforts to obtain construction contracts from CPCI and the Funds, from approximately December 11, 2011 through April 21, 2017, ACI, George Albertelli, David Albertelli, Westcore I, Westcore II, Kozlowski, Salat, Burke, MFDC and the New Fasanelli Companies paid at least $1,464,735 in bribes to Eguizabal.

75.     In a counterclaim filed in state court litigation in Colorado by Westcore II, Westcore II admitted it alone paid "kickbacks totaling about $1,000,000 on three projects, including the Longmont Contract." (Consolidated Resource, LLC v. Westcore Construction, L.L.C., Dist. Court, Weld County, CO, Case 2017CV30381.)

### B-7.    Misrepresentations and Omissions Perpetuating the Bribes

76.     None of the Defendants disclosed the wrongful bribery of Eguizabal to CPCI or any of the Funds.

77.     To obtain money to pay the bribes, David and George Albertelli, ACI, Westcore I, Westcore II, Kozlowski, Salat, Burke, and MFDC misrepresented the cost of projects, the amount

50

due on payment applications, and the amount attributed to overhead, profit and general conditions costs.

### B-8.    What the Corrupt Enterprise Gained From the Bribes

78.    Between 2011 and 2015, ACI obtained 17 contracts from CPCI to construct Projects, many, if not all, procured by bribing Eguizabal.  Three more were awarded to Westcore I and two more were awarded to the New Fasanelli Companies.  None of the contracts awarded to ACI would have been awarded had CPCI known of the bribes.  None of the contracts awarded to Westcore I or the New Fasanelli Companies would have been awarded if CPCI had been aware of the bribery, the false and perjurious qualification statements, or that the Albertellis had any connection with either Westcore or the New Fasanelli Companies, all of which was intentionally hidden from CPCI.

79.    In return for the bribes paid by the Albertellis, ACI and Westcore I, Eguizabal provided them confidential, internal information about competing bids and CPCI's confidential budgets for new projects.  Eguizabal also worked secretly inside CPCI to steer new projects to ACI, Westcore I and the New Fasanelli Companies, to receive favorable treatment for increases in project prices through change orders, and to be granted relief from contractual liquidated damages resulting from construction delays.

80.    For example, on March 18, 2015, Eguizabal secretly sent David Albertelli the confidential site plan and budget of a Westcore I competitor for the Longmont Project.

**ANSWER:    David Albertelli, Brook Kozlowski, Gregory Hilz and Others Falsified a Qualification Statement and Financials for Westcore**

81.    By late 2014, because of ACI's repeated failures to pay subcontractors, deliver projects on time, provide adequate supervision and execute its work free of construction defects, CPCI decided to award no further work to ACI.

51

82.    David Albertelli knew of this decision in late 2014.

83.    To circumvent the decision to not award more contracts to ACI, David Albertelli developed a plan to get more work from CPCI by using other companies as fronts. In early 2015, David Albertelli advised Gregory Hilz, the owner of one of his former subcontractors, of a potential opportunity to perform work for CPCI using different companies.

84.    In early 2015, David Albertelli asked Hilz to form a new company, namely Westcore I. Hilz formed Westcore I as a Delaware limited liability company, on February 13, 2015.

85.    Hilz and David Albertelli agreed that Westcore I was to be owned 70% by Albertelli and 30% by Hilz.

86.    David Albertelli then transferred a portion of his interest in Westcore I to his ACI colleague, Kozlowski. The ownership of Westcore I became 60% David Albertelli, 30% Hilz and 10% Kozlowski.

87.    David Albertelli informed Kozlowski and Hilz on October 24, 2015, that an "extra $240,000" would be included in the Six Mile Project Price "to fund DEVCON/Westcore Operations".

88.    In approximately March 2015, David Albertelli told Hilz that neither David Albertelli nor Kozlowski should be included on the Westcore I website nor be acknowledged to be a part of Westcore I to executives of CPCI. David Albertelli told Hilz that issues had arisen between CPCI and ACI, and it was unlikely ACI would be doing any further work for CPCI. CPCI viewed the website prior to approving Westcore I as a contractor.

89.    To bid on CPCI projects, CPCI required potential contractors to submit sworn qualification statements to demonstrate their financial capacity and experience to perform CPCI's

52

projects.  Consistent with that practice, CPCI required Westcore I to submit such a qualification statement under oath as a condition to being considered as a contractor for CPCI.

90.    To further disguise Westcore I's true identity from CPCI, on March 23, 2015, David Albertelli warned Hilz to sanitize Hilz' work history on the web site "LinkedIn" to remove any ties to the Albertellis.  David Albertelli wrote that Hilz should "make sure that your linked in is pretty clean of most things or take it down for the short term.  I just don't want CPCI [CPCI] to see how new west core [sic] is."

91.    As a further part of the scheme, beginning in March 2015, David Albertelli invented a fictitious business history for Westcore I.

92.    Also beginning in March 2015, David Albertelli and, on information and belief, Hilz and Kozlowski, fabricated a sworn qualification statement for Westcore I ("Qualification Statement") that was comprised almost entirely of lies.

93.    David Albertelli sent an email to Hilz and Kozlowski dated July 6, 2015 that described David Albertelli's preferred method of creating phony documents, including using "real people for this stuff when possible" and inquiring whether Hilz might "have someone at the bank that's a buddy and would vouch for us having $10MM in a bank account that has $100 then great use a real person."  **Exhibit 3**.

94.    The Qualification Statement submitted to CPCI for Westcore I states "[t]he undersigned certifies under oath that the information provided herein is true and sufficiently complete so as not to be misleading".  In the bogus Qualification Statement, David Albertelli included a signature purporting to be a Mr. "Michael Breaton, CPA", as the Chief Financial Officer of Westcore.

DM1\9667193.1

95.     On information and belief, it appears there is no such "Michael Breaton". Michael Breaton did not sign the Qualification Statement, was not Westcore's CFO, and there is no CPA named Michael Breaton in California, Westcore's purported state of residence.

96.     David Albertelli attached to the Qualification Statement a letter from a surety representing that Westcore I had $325,000,000 in bonding capacity and a financial statement for Westcore I indicating that Westcore I held total assets of more than $69,000,000.

97.     The information included in the financial statement and the surety letter attached to the Qualification Statement are completely false.

98.     Among the false representations included on the Qualification Statement are that Westcore I had been in business for 23 years under its present name, that it was incorporated in 1992 in Nevada, and that it performed an average of $376,196,476 of work annually over the past 5 years.

99.     In October and November 2015, CPCI informed Westcore I that the Qualification Statement and attached information was needed for CPCI and CPCI's lenders to approve Westcore I as a general contractor to bid on CPCI's projects.

100.     David Albertelli finalized the fictitious Qualification Statement on or before November 6, 2015. On information and belief, David Albertelli sent the Qualification Statement to Eguizabal on or about November 6, 2015. On information and belief, Westcore I also sent the Qualification Statement to others at CPCI in November 2015.

101.     CPCI relied upon the false representations of Westcore I in the Qualification Statement in awarding construction contracts to Westcore I.

DM1\9667193.1

102.    In January and February 2016, Hilz, acting for Westcore I, continued negotiations and executed contracts with CPCI for projects in Waco, Texas and Bryan, Texas.  Hilz also began negotiations with CPCI, for a project in Longmont, Colorado.

103.    At the direction of David Albertelli, Hilz concealed the involvement of David Albertelli and Brook Kozlowski in Westcore I and did not inform CPCI that the Qualification Statement was false.

104.    Hilz had many opportunities to do so.  For example, on February 22, 2016, CPCI asked Hilz to provide CPCI with information as to any additional experience of Westcore I in Colorado.

105.    Hilz sent the request to David Albertelli.  In an email dated February 24, 2016 to Hilz, David Albertelli responded, "I don't really have any. I would say let's provide him with the Residences at Little Nell and I'll look pick [sic] an apartment complex off of the internet."

106.    And in fact, on March 2, 2016, Hilz sent an email to CPCI misrepresenting the Residences at Little Nell as an example of Westcore I's work in Colorado.

107.    CPCI was materially misled by the sworn Qualification Statement that portrayed Westcore I as having significant experience, financial resources, bonding support, a CFO, and other elements of an established general contractor and by deliberately hiding and omitting any identification of David Albertelli, Kozlowski or others linked to ACI as having an interest in or control over Westcore I.

**ANSWER:    Examples of ACI, Westcore I and other Members of the Corrupt Enterprise Defrauding the Funds**

108.    As described below, ACI, David Albertelli, Kozlowski, and Butler, then the Accounting Manager of ACI, intentionally falsified payment applications to be paid money to

55

which ACI was not entitled.  Those Defendants tried to cover their tracks by characterizing the falsified payment applications as simply containing unintentional mistakes.

109.    After Westcore I was awarded contracts by CPCI, David Albertelli, Kozlowski, one time ACI employee John Salat and ACI accountant Kerry Heltzel, engaged in fraudulent conduct similar to that perpetrated by ACI.

110.    By intentionally overstating the amounts due to subcontractors, ACI and Westcore I defrauded Plaintiffs by obtaining payments they were not entitled to receive.  On the projects on which a Fund terminated ACI or Westcore I's right to perform work and the work was completed by CPCI or others under direct contracts with CPCI or a Fund, the overpayments left CPCI with insufficient budgeted funds to complete the Projects and pay the subcontractors.  For example, Westcore I and its subcontractors have filed Mechanics Liens totaling $4,670,189.14 on the Waco Project and $4,052,473.73 on the Bryan Project.

111.    Judging by the evidence known to date, more fraud and breaches will be uncovered through Counter-Plaintiff's investigation and discovery in this case.  Nevertheless, even at this early juncture, Counter-Plaintiff has learned of certain specific examples, as alleged below:

      **D-1.    Example 1 - ACI Misled the Savage Fund by Agreeing to Change Order 10 to Induce a Payment but then Filing a Delay Claim and Lien**

112.    By early 2015, the Savage Project was significantly behind schedule, thereby subjecting ACI to the assessment of liquidated damages.

113.    On June 2, 2015, David Albertelli signed Change Order Number 10 on the Savage Project in which ACI accepted responsibility for $401,780.00 in liquidated damages for delays.  In return, the Savage Fund extended the turnover dates for some buildings, thereby providing ACI relief from potential additional liquidated damages for delays.

DM1\9667193.1

114.    ACI and David Albertelli intended that the Savage Fund would rely on ACI's acceptance of responsibility for liquidated damages in Change Order Number 10 and continue to make payments to ACI, which the Savage Fund did.

115.    However, in late 2015 and early 2016, ACI, Kozlowski, and David Albertelli demanded that the Savage Fund pay for ACI's alleged costs due to delays that ACI and David Albertelli had already agreed were the fault of ACI.

116.    ACI, Kozlowski, and David Albertelli thereafter held the Savage Project "hostage" – both by slowing progress and threatening not to complete the work - unless the unwarranted payments were made to ACI by the Savage Fund.

117.    On September 23, 2016, ACI recorded a lien against the Savage Project that includes the delay damages that ACI had previously accepted as ACI's responsibility.

118.    On information and belief, ACI, Kozlowski, and David Albertelli believed that filing the lien would interfere with the Savage Fund's financing for the project and compel the Savage Fund to pay ACI more than ACI was owed.

119.    By misleading the Savage Fund regarding Change Order 10, ACI benefitted by obtaining a compromise on deadlines for some buildings and obtaining payments that it would not have otherwise received.  The Savage Fund was damaged by making payments it was not required to make and having to defend against a spurious lien claim.

### D-2.    Example 2 - National Framing – Six Mile; Fraud by Subcontractor

120.    ACI, David Albertelli, George Albertelli, Butler and National Framing lied on payment applications, sworn statements and other documents regarding the amount owed by ACI to National Framing, a related party subcontractor of the enterprise, to induce Six Mile Fund to pay ACI a progress payment of over $1 Million.  They represented that, after the payment, National Framing would be owed $364,783.75.  However, after the Six Mile Fund paid over $1 Million,

57

DM1\9667193.1

National Framing and ACI filed mechanics liens that claim $581,470.90 is owed to National Framing, $216,687.15 more than previously represented by ACI and National Framing in sworn statements.

121.    On November 10, 2016, David Albertelli executed and submitted by wire to CPCI Payment Application 20 and a sworn statement for ACI that represented National Framing was due a payment of $60,673.14 and thereafter the balance due to National Framing would be $364,783.75.

122.    In its payment application, National Framing agreed with ACI's numbers.

123.    On December 1, 2016, acting in reliance on the accuracy of the representations of David Albertelli, ACI, Butler and National Framing, Six Mile Fund released the payment requested by ACI ($1,072,397.64), including the $60,673.14 for National Framing.

124.    After the Six Mile Fund paid, on April 3, 2017, George Albertelli signed two documents under oath, a Claim of Lien for ACI and a Contractor's Final Payment Affidavit. Butler notarized both knowing they contradicted the earlier sworn statements. The Claim of Lien represented $581,470.90 to be due and owing to National Framing.

125.    Three days later, on April 7, 2017, contrary to its earlier representation, National Framing executed, under oath and notarized, an Amended Claim of Lien for $581,470.90, $216,687.15 more than it and ACI previously represented National Framing was owed.

126.    As a result of the fraudulent representations and claims of George Albertelli, David Albertelli and ACI, Six Mile Fund was forced to procure a lien bond to "bond-over" the ACI and National Framing mechanics liens, thereby substituting the bond for the real estate as collateral for the lien claim.

58

DM1\9667193.1

127.    Because of false statements regarding the costs left to be incurred in Payment Application No. 20, Six Mile Fund was injured by paying $1,072,397.64 that was not deserved, procuring a lien bond, and defending against and potentially having to honor National Framing's lien claim that on its face is $216,687.15 more than what ACI and David Albertelli represented was owed to National Framing.

### D-4.    Example 3 - Defendants Improper Self-Dealing on Savage and Rochester

128.    The Savage Contract is a Cost Plus a Fee contract. ACI was to receive payments only for the legitimate costs of the work that were incurred by ACI plus a fee to account for ACI's profit for those Projects.

129.    Accordingly, the Savage Contract allowed ACI to be reimbursed for subcontractor payments only if they were legitimate payments to legitimate subcontractors.

130.    Section 7.8 of the "Standard Form of Agreement" portion of the Savage Contract required ACI to disclose commonality of ownership or management of any subcontractor it hired for the Project.  Specifically, Section 7.8.1 defines a "related party" to include "any entity in which any stockholder in, or management employee of, the Contractor [ACI] owns any interest in excess of ten percent in the aggregate".

131.    Section 7.8.2 of the General Conditions of the Savage Contract says:

> If any of the costs to be reimbursed arise from a transaction between the Contractor and a related party, the Contractor shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred.

132.    As such, ACI was prohibited from subcontracting any work for the Savage Project to a related party without notice to and the written approval of the relevant Fund.  David Albertelli is an owner of ACI.  David Albertelli, Brook Kozlowski and Kevin Burke are managers of ACI.

DM1\9667193.1

David Albertelli, Kozlowski and Burke owned and/or managed related party subcontractor National Framing.

133.    ACI, David Albertelli, Kozlowski and Burke did not disclose that National Framing was a related party and actively tried to hide their interest by having Foundation Management hold the ownership interest and manage National Framing.

134.    On Savage, ACI issued a subcontract to National Framing for $2,615,326 to perform framing work and another subcontract for $534,832 to perform siding work, both without the consent or knowledge of the Savage Fund.

135.    Similarly, the Rochester Fund has been damaged by ACI's use of undisclosed, related party subcontractors KMM and National Framing because both claim liens for work on the Rochester Project attributable to non-payment by ACI.  KMM and National Framing filed suit in Minnesota claiming $207,736.31 for KMM and $764,724.62 for National Framing and seeking a Foreclosure of Mechanic's Lien for both.  (KMM Construction of Florida, LLC v. CPCI 326 Fund, LLC, State of Minnesota, Third Judicial District, County of Olmsted, Case 55-CV-17-8603.) However, neither KMM nor National Framing named ACI in that lawsuit despite claiming to be subcontractors of ACI.  The Rochester Fund has been damaged and continues to be by the existence of the liens on the title of the property and the cost of defending against those liens.

### D-4.    Example 4 - Westcore II – Ghost Company; Fraudulent Diversion of Payments

136.    Having duped CPCI, both through the bribery of Eguizabal and the falsified Qualification Statement, into awarding Westcore I contracts for the construction of CPCI Projects, Westcore I then utilized some of the same scams used by ACI to enrich the Corrupt Enterprise and hence the Defendants.

DM1\9667193.1

137.    In 2016 Westcore I entered into contracts for the Longmont Project, the Waco Project and the Bryan Project.  Those contracts called for the respective Funds to make payments to Westcore I.  Westcore I was owned by David Albertelli through US Construction Trust, Kozlowski and Hilz.

138.    On March 8, 2016, just two months after the Bryan Contract was signed and one month after the Waco Contract was signed, David Albertelli, Salat, Kozlowski, Burke, and Foundation Management formed Westcore II, a Nevada limited liability company called Westcore Construction, L.L.C.  Foundation Management is listed as the managing member in the Westcore II Articles of Organization.  David Albertelli, Salat, Kozlowski, Burke, and Foundation Management concealed the true nature and ownership of Westcore II from the Funds.

139.    David Albertelli, Salat, Kozlowski, Burke, and Foundation Management copied the name of Westcore I knowingly and intentionally to use Westcore II to obtain payments from the Funds that should have been paid to Westcore I.

140.    David Albertelli, Salat, Kozlowski, Burke, Heltzel, and Foundation Management, acting as Westcore I and/or Westcore II, directed CPCI to make payments to an account established in the name of Westcore II.

141.    On March 10, 2016, Heltzel sent wire instructions to CPCI for payments on the Bryan Project.

142.    On August 18, Heltzel sent an email to CPCI directing payments be made to a new account.  On information and belief, the new account was for Westcore II.

143.    Throughout 2016, the Funds were misled by the payment requests and nearly identical company names of Westcore I and Westcore II.  As a result, the Funds made contract payments to Westcore II for the Waco Project, Bryan Project and Longmont Project.

61

DM1\9667193.1

144. By creating Westcore II and diverting payments to Westcore II that were due, if at all, to Westcore I, Defendants Westcore I, Westcore II, Foundation Management, David Albertelli, Kozlowski, Salat, Heltzel and Burke diverted project funds away from Westcore I and Westcore I's subcontractors. In engineering this diversion of funds, their purpose was to maintain and grow their Corrupt Enterprise.

145. As a result of taking money from Westcore I, the Westcore I Projects have been subjected to more than $8 million dollars of liens from the subcontractors on those Projects.

### D-5.    Example 5 - Team CCR – A Sham Subcontractor

146. David Albertelli, Salat, Kozlowski, Foundation Management, Westcore II, and Heltzel used Defendant Team CCR, which they formed, to impersonate Consolidated Resources ("Consolidated"), a subcontractor of Westcore I, in order to steal payments due Consolidated.

147. Westcore I or Westcore II awarded subcontracts to Consolidated for three separate scopes of work on the Longmont Project:  earthwork, framing and electrical work. The earthwork subcontract is dated September 22, 2016.

148. In 2016, around the time Consolidated's work on the Longmont Project was getting started, Consolidated's owner, Marchel Morningstar, told Kelly Moore, CPCI's project manager, that Consolidated would be changing its name to Team CCR.

149. On information and belief, Morningstar also informed Westcore I that he would create a company called Team CCR.  On information and belief, Salat, David Albertelli, Kozlowski and Burke also knew that Morningstar planned to change the name of Consolidated.

150. On information and belief, Salat, David Albertelli, Kozlowski and Burke formed Team CCR, LLC as a Delaware limited liability company on September 26, 2016, just four days after the date of the earthwork subcontract awarded to Consolidated in order to trick CPCI into making payments to them instead of Consolidated.  A certificate of formation was filed in

62

Delaware on September 27, 2016, and a Statement of Foreign Authority was filed in Colorado on October 3, 2016.

151.    CPCI had requested that Westcore I and all subcontractors on Westcore I projects use an internet-based system called Textura to input payment application data for the Longmont Project.

152.    Using Textura, Westcore I and Westcore II submitted payment applications for the Longmont Project.  Those payment applications included Team CCR as its sole subcontractor on its first payment application.  Team CCR also submitted its payment information using Textura for the earthwork it claimed to be performing.  Team CCR did not list any subcontractors.  In contrast, at the direction of Westcore I and/or Westcore II, Consolidated submitted only a paper application to Westcore I, rather than using Textura.  If Consolidated had used Textura instead of a paper application, CPCI would also have received Consolidated payment application paperwork.

153.    Salat, David Albertelli, Kozlowski, and Burke used Team CCR and its representations via Textura to create the false impression that Team CCR was performing the earthwork without using any lower tier subcontractors, when in fact Consolidated was doing the work and submitted paper applications to Westcore I.

154.    By using the name "Team CCR", which is the same as the new name Consolidated planned to use, Westcore I and Westcore II's payment applications misled CPCI and the Longmont Fund into believing that the payment being requested was for Consolidated under the new name "Team CCR" rather than for a sham contractor unrelated to Consolidated.

155.    Team CCR's payment applications in Textura are electronically signed by "Robert Anderson".  Moore asked Morningstar about the role of Robert Anderson and was informed by Morningstar that Consolidated had no employee by that name.

156.    On information and belief, Heltzel, Salat, David Albertelli, Kozlowski and Burke knew that the signature of Robert Anderson on the Team CCR applications was false.

157.    When Moore described the billing pattern to Morningstar, Morningstar accused Westcore I of stealing the name "Team CCR" and also alerted Moore to the improper billing.

158.    Shortly thereafter, Moore confronted Westcore I's on-site superintendent, Mark Baugh, about the billing and payment irregularities.  In response, Baugh dissembled and falsely claimed that Team CCR had been created by Westcore I to bill work that Westcore I was itself performing directly, not through a subcontractor.  In reality, the Westcore I was not itself performing the earthwork, which had been subcontracted to Consolidated.

159.    The earthwork contract awarded by Westcore I to Consolidated was for $1,805,450.55.  But the subcontract that Westcore I gave to Team CCR for earthwork was in the amount of $2,083,723.71.  That allowed Team CCR, at a minimum, to pocket the difference, $278,273.16, while performing no construction work to justify the payment.

160.    Even worse, Westcore I failed to pay Consolidated.  As a result of Westcore I's unlawful failure to pay Consolidated, Consolidated recorded a mechanics lien on the Longmont Project, and then also filed a lawsuit to foreclose and collect on its lien.  Longmont Fund is currently defending the suit. If the Longmont Fund is required to pay Consolidated for work it has already paid Team CCR, its damages will increase by that amount.

161.    As this example shows, Westcore I intentionally deviated from proper, contractually required billing practices by charging CPCI more than the work cost and by failing to pay its subcontractors all amounts owed to them.  Westcore I's fraud has caused unpaid subcontractors to file mechanics lien claims on the Projects for amounts they claim are owed to them by Westcore I.

64

DM1\9667193.1

### D-6.    Example 6 - Fraud Involving Peal & Associates and Framing USA on the Waco Project.

162.    Westcore I used one of the sham subcontractors, Framing USA Group, LLC, which on information and belief is owned by David Albertelli through US Construction Trust and Foundation Management, to defraud the Waco Fund into believing the framing and siding labor on the Waco Project was more expensive than it actually was, thereby fraudulently inducing the Waco Fund to make inflated payments to Westcore I.  After Westcore I defaulted on the Waco Contract, the Waco Fund was forced to have the project completed at a higher than budgeted cost balance because the Defendants had fraudulently billed and collected for work that was not done or was done defectively.

163.    The Waco Contract provides for progress payments to be made based on the state of completion of line items in a Schedule of Values, which allocates the contract price to each separate element of work.  The Schedule of Values includes a value for each segment of work, for example plumbing or ceramic tile.  In the Sworn Statements that Westcore I submitted on March 15, 2017 to get paid, Westcore represented that two line items in the Schedule of Values, "Framing labor" and "Siding", together accounted for $3,241,194.33 of the project cost.

164.    However, on or about August 5, 2016, Westcore I and Framing USA Group, LLC entered into a subcontract for $1,907,218.00 for "Framing, Siding and Cornice", which on information and belief related only to labor and did not include the materials required for that work.

165.    Further, on or about August 11, 2016, Framing USA Group, LLC entered into a sub-subcontract with Peal & Associates, Inc. in the amount of $1,907,000, for "Framing & Siding," which again on information and belief related only to labor.

DM1\9667193.1

166.    Based on these facts, Westcore I represented to the Waco Fund that the Framing and Siding Labor accounted for approximately $1.4 Million more of the contract price than it actually did: $3.3 million represented in the sworn statements versus the approximate $1.9 million of the actual subcontracts.

167.    Westcore I knew that the Framing and Siding Labor would be performed, billed and paid early in the project and that its payment application and sworn statement would be used as the basis for determining the amount to be paid.  By falsely inflating the amount of the contract price attributed to Framing and Siding Labor, Westcore defrauded the Waco Fund to pay Westcore more and sooner than if it had accurately represented such amount.

168.    Westcore I transmitted its misrepresentations to CPCI by wire and knew that funding for the payments would come in part from a bank acting as a construction lender.

169.    In reliance on Westcore I's false representations about the amount of the contract price attributable to Framing and Siding Labor, the Waco Fund authorized payments to Westcore I for that work in late 2016 and early 2017.  Those payments were based on the inflated numbers that Westcore I provided for the value of that work and therefore the payments were also inflated.

170.    In the end, Westcore I defaulted on its obligations under the Waco Contract and its right to perform work was terminated on June 27, 2017.  At the time it was terminated, Westcore had been overpaid for Framing and Siding Labor.  The Waco Fund paid $2,325,864.35 for that work but would have been paid only approximately 60% of that amount if the cost had been accurately represented.

171.    Westcore II, on information and belief, received the excess payments and other Defendants, including Salat, Kozlowski, David Albertelli, Foundation Management and Burke benefitted from that overpayment.

DM1\9667193.1

172.    After Westcore I defaulted, the Waco Fund had to complete the Waco Project for more than the budgeted cost and was thereby damaged.

**ANSWER:    Albertellis Infiltrate Fasanelli Construction; the Bribery and Fraud Continue**

173.    The Albertellis were not content with only using Westcore I to defraud CPCI. David Albertelli, Kozlowski and Burke used Foundation Management to infiltrate the relationship of another general contractor, Fasanelli Construction Inc., with CPCI by purportedly partnering with Fabio Fasanelli to form multiple entities using "Fasanelli" or "FCS" in their names so the Corrupt Enterprise could access more CPCI projects.

174.    In 2015, after CPCI cut off ACI from new work, David Albertelli started forming a business relationship with Fabio Fasanelli, who was doing projects with CPCI as Fasanelli Construction, Inc. in South Carolina. David Albertelli told Mr. Fasanelli that he had cash available through a vehicle to invest in contractors. Mr. Fasanelli agreed to partner with David Albertelli.

175.    David Albertelli caused FCS Construction, LLC; Fasanelli Construction, LLC; and FCS of Florida, LLC (collectively the "New Fasanelli Companies") to be formed.

176.    David Albertelli formed these multiple copy-cat entities to cause CPCI to believe they were owned by Fabio Fasanelli. Fasanelli Construction, LLC was formed on June 26, 2015 in Delaware and subsequent filings identify Foundation Management as its Manager. FCS of Florida, LLC represented that Kevin Burke of Foundation Management was its agent on July 24, 2016. By a filing dated September 15, 2016, Fasanelli Construction, LLC changed its name to FCS Construction, LLC and identified Foundation Management as its authorized representative. Kevin Burke is listed as the CFO of FCS Construction LLC as of May 8, 2017.

177.    David Albertelli prepared qualification statements to be submitted to CPCI by the newly formed New Fasanelli Companies. David Albertelli did not disclose his ownership or

DM1\9667193.1

management of FCS to CPCI and he requested that Mr. Fasanelli not disclose David Albertelli's involvement.

178.    David Albertelli, with the assistance of Kozlowski, used the same tactics on FCS projects for CPCI that he used with ACI to take money from CPCI and legitimate subcontractors.

179.    David Albertelli caused bribes of $125,000 to be paid to Eguizabal through the New Fasanelli Companies to obtain work for the New Fasanelli Companies.

180.    David Albertelli's involvement with Fasanelli follows the same pattern of corruption he used with ACI and Westcore I and Westcore II.

**ANSWER:    Defendants Stole Joint Checks That Were Intended to be Paid to Subcontractors**

181.    In November and December 2016, David Albertelli, Kozlowski, ACI, Butler and Heltzel stole checks worth over $2 Million that were meant for subcontractors.

182.    They used false and misleading Payment Applications, Sworn Statements, emails and other documents to mislead the Six Mile Fund and Rochester Fund into believing that if they sent ACI checks payable jointly to ACI and a subcontractor, ACI would use them to pay the subcontractor.

183.    It is a common practice for construction owners to issue joint checks to the general contractor and its subcontractors to pay such subcontractors.  Typically, the joint check is delivered to the general contractor, which indorses it and delivers it to the subcontractor, which indorses it and deposits it in its bank account.  The joint check process creates a paper trail showing payment to the contractor and ensures the money is received by the subcontractor.

184.    CPCI and ACI had used the common joint check process with the added requirement that ACI would provide FedEx tracking number for the envelopes that ACI used to

68

send the joint checks to the subcontractors – thus providing CPCI with verification the checks had been forwarded to the subcontractors.

185.    In the Rochester Contract and Six Mile Contract, ACI agreed, among other things, that it would only include an amount for a Subcontractor in a Payment Application if it intended to pay that Subcontractor the amount requested, that work for which prior payments were received would be free of claims by subcontractors, that ACI would pay each Subcontractor within seven (7) days of receipt of payment,  and that any amount paid to ACI that was payable to a Subcontractor would be held in a constructive trust by ACI for that Subcontractor.

### F-1.    Six Mile Project – Theft of Joint Checks

186.    On November 10, 2016, David Albertelli signed a "Sworn Statement for Contractor and Subcontractor" for the period ending October 31, 2016 for the Six Mile Project.  The Sworn Statement includes a list identifying subcontractors by name and giving a specific amount due each Subcontractor for "This Payment."

187.    The Sworn Statement includes the following representation by David Albertelli and ACI:

> "That there is due and to become due them, respectively, the amounts set opposite their names for material or labor as stated.  That this statement is a full, true, and complete statement of all such persons, the amounts paid and the amounts due or to become due to each."

188.    On information and belief, Butler, as the Accounting Manager of ACI, knew the Sworn Statement was false because she knew that ACI did not intend to pay the subcontractors.

189.    With David Albertelli's and Kozlowski's direction and consent, Butler notarized the Sworn Statement and transmitted it to CPCI on or about November 10, 2016, by uploading it as part of ACI's October 2016 Payment Application using the on-line payment administration service Textura.

DM1\9667193.1

190.    On November 30, 2016, a CPCI project accountant, sent an email to Butler asking her to confirm that the amounts listed in the Sworn Statement should be used to prepare the Joint Checks.  In response, Butler confirmed the amounts for the Joint Checks.

191.    On information and belief, David Albertelli and Kozlowski knew that Butler confirmed the amounts for the Joint Checks.

192.    Six Mile Fund was misled by the Sworn Statement, Payment Application, agreements and emails from Butler, David Albertelli and ACI because that information was consistent with CPCI and ACI's past practice of using joint checks to pay subcontractors.  Six Mile Fund's explicit understanding was that the subcontractors would be paid if it issued Joint Checks to ACI, as requested.

193.    On December 1, 2016, Six Mile Fund delivered the Joint Checks to ACI as requested and they were received by Butler or Ken Jones, another ACI employee.

194.    On information and belief, Melissa Peek, an ACI employee, on the instructions of one or more of David Albertelli, Ken Jones and Butler, prepared FedEx envelopes that were addressed to the subcontractors and placed the waivers and documentation, but not the Joint Checks, in the FedEx envelopes.  Peek then sent the FedEx envelopes to the subcontractors and provided the tracking numbers to CPCI.  At no time did anyone from ACI ask Six Mile Fund for permission to withhold the Joint Checks nor did anyone inform Six Mile Fund that the Joint Checks had been withheld.

195.    On or about December 5 and 6, 2016, David Albertelli indorsed nineteen Joint Checks that were intended to be paid to subcontractors and intentionally and wrongfully deposited those Joint Checks into ACI's account at CenterState Bank, without any of the second signatures from subcontractors.

70

DM1\9667193.1

196.    On information and belief, on or about December 5, 2016, the subcontractors received FedEx envelopes from ACI containing lien releases and/or lien waivers but without any Joint Checks.

197.    On December 5, 2016, Nichole Barton of Texas Contract Floors, Inc., a subcontractor, sent an email to Melissa Peek at ACI informing her that the FedEx envelope she received did not contain a Joint Check.  In an attempt to cover-up the fraud and theft, Ms. Peek lied to Ms. Barton and stated that the checks had not been "received at my desk" and delivery of the Fed Ex packages without the Joint Checks was the fault of an "admin".

### F-2.    Rochester Project – Theft of Joint Checks

198.    In November 2016, ACI, David Albertelli, Kozlowski and Butler submitted an October Payment Application and supporting documents to CPCI, including a Sworn Statement signed by David Albertelli, and a supplemental list of amounts due subcontractors representing that payments were due from the Rochester Fund, with specific amounts earmarked for subcontractors.

199.    On November 30, 2016, Butler sent CPCI an email containing "the joint check list for Draw 16."  That list identified subcontractors by name and listed the amount of the Joint Check that ACI wanted Rochester Fund to draw for each Subcontractor.

200.    On December 2, 2016, Rochester Fund sent Joint Checks in the amounts as requested by Butler, ACI, David Albertelli and Kozlowski. On information and belief, Ken Jones and/or Amy Butler received the Joint Checks on behalf of ACI.

201.    Tamma, a CPCI project accountant, requested that Butler send the Joint Checks to the subcontractors, to which Butler replied, "Sure thing."

202.    On information and belief, Melissa Peek and Butler prepared FedEx envelopes for sixteen subcontractors, and on the instructions of David Albertelli, Kozlowski and Ken Jones, Peek

DM1\9667193.1

and Butler placed the documentation but not the Joint Checks in the FedEx envelopes.  At the direction of David Albertelli, Kozlowski and Jones, Peek and Butler then sent the FedEx envelopes to the subcontractors and provided the FedEx tracking numbers to Rochester Fund.  At no time did anyone from ACI ask Rochester Fund for permission to exclude the Joint Checks or inform Rochester Fund that the Joint Checks had been withheld.

203.    On December 8, 2016, Butler told Tamma and others that Butler was told by people in ACI's office that the Joint Checks would be placed in FedEx boxes for the subcontractors that day.  But in fact, the Joint Checks were never sent to the subcontractors.

204.    Between December 7 and 8, 2016, David Albertelli intentionally and wrongfully deposited sixteen separate Joint Checks totaling $1,189,414.88 from the Rochester Project into ACI's account at CenterState Bank, without any of the second signatures from subcontractors and without notice to or consent from Rochester Fund.

### F-3.    Malice & Intent

205.    ACI, David Albertelli, Kozlowski and Butler intended and knew that CPCI, Six Mile Fund and Rochester Fund would rely on their false representations and be fraudulently induced to issue the Joint Checks.

206.    ACI, David Albertelli, Kozlowski and Butler knew that they would not in fact send the Joint Checks to the subcontractors.

207.    Six Mile Fund and Rochester Fund were misled by and reasonably relied on the representations made by Butler and David Albertelli on behalf of ACI as to the amount due each subcontractor, that ACI would pay each subcontractor, that ACI would forward each Joint Check to the appropriate subcontractor, and that the tracking numbers would be for FedEx packages that contained the Joint Checks that were sent to subcontractors.

DM1\9667193.1

### F-4.    What Defendants Obtained

208.    By the theft of the Joint Checks, ACI obtained $1,189,414.88 from the Rochester Fund and $896,146.51 from the Six Mile Fund to which it was not entitled by the theft of the Joint Checks.

209.    CPCI's bank reimbursed amounts wrongfully transferred to ACI's bank but the Defendants did not return any of the stolen money.

210.    David Albertelli, Kozlowski, Butler and ACI defrauded the Rochester Fund and the Six Mile Fund by stealing checks worth over $2 Million that were intended for subcontractors. George Albertelli knew of the theft, profited from it and took steps to retain the stolen money.

**ANSWER:    Specific Acts of the Defendants as Part of the Corrupt Enterprise**

211.    The members of the Corrupt Enterprise committed and conspired to commit the predicate acts alleged above that include bribery, mail fraud, wire fraud and bank fraud.

212.    The bribery acts are each a predicate act because, among other things, they violate bribery statutes, are wire fraud because the bribe money was transferred by wire, and are bank fraud because the bribes were used to obtain contracts that were paid by money loaned by banks. The transmission of the false Qualification Statement for Westcore I is wire fraud or mail fraud, or both, and bank fraud because it was part of a scheme to obtain payments funded by a bank. The transmission of false payment applications, supporting documents, change orders, liens and emails are wire fraud or mail fraud depending on how the information was transmitted, and bank fraud when the information was transmitted to obtain payments funded by banks through construction loans. The theft of the stolen checks was wire fraud, mail fraud and bank fraud because it included the transmission of false and misleading information by wire and mail (FedEx) for the purpose of obtaining payment funded by a bank.

73

DM1\9667193.1

213.    ACI is part of the Corrupt Enterprise, had knowledge of one or more predicate acts committed by the Corrupt Enterprise, conspired to commit or committed one or more predicate acts, or has knowingly agreed to the commission of one or more illegal predicate acts by the Corrupt Enterprise.

214.    The predicate acts of each member of the Corrupt Enterprise, which are alleged in detail above, are summarized below.

**G-1.    Specific Predicate Acts of ACI and the other members of the Corrupt Enterprise**

215.    **ACI** committed and conspired to commit the following predicate acts:

   a.   bribery of Eguizabal; (see Section B; ¶¶ 50 – 75);

   b.   sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors (see ¶¶ 103-106; 107- 114; 115-122; 123-134);  and

   c.   stealing the Joint Checks by sending false representations to induce CPCI to send the Joint Checks, wrongfully depositing the checks and then sending false statements by wire and mail to conceal the theft (see ¶¶ 180-184; 185-196; 197-203; 204-209).

216.    ACI benefitted from the enterprise through payments received for contracts awarded to ACI.

217.    **George Albertelli** committed and conspired to commit the following predicate acts:

   a.   bribery of Eguizabal (see ¶¶ 57 - 81);

DM1\9667193.1

    b.   sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors by wire and mail (see ¶¶ 121 - 128); and

    c.   as majority owner and CEO of ACI, receiving the proceeds of the stolen Joint Checks and not returning those proceeds when CPCI later made a demand  (see ¶¶ 182-211).

218.   George Albertelli is a leader of the Corrupt Enterprise and was the president of ACI during commission of many of the predicate acts.  George Albertelli participated in and directed the execution of many of the predicate acts.

219.   George Albertelli benefitted from the enterprise through his ownership of and income from his employment by ACI and payments receive for contracts awarded to ACI.

220.   **David Albertelli** committed and conspired to commit all of the predicate acts alleged above throughout Count 1.  More specifically, he committed and conspired to commit the following predicate acts:

    a.   the bribery of Eguizabal, (see ¶¶ 57-81);

    b.   preparing and sending the false Qualification Statement for Westcore I (see ¶¶ 82-108);

    c.   not disclosing and actively concealing his interest in Westcore I, the New Fasanelli Companies, Westcore II, Foundation Management, National Framing, KMM and Team CCR (see ¶¶ 82-108; 129-136; 139; 178);

    d.   creating and using Westcore II to fraudulently divert payments from Westcore I (see ¶¶ 137-146);

DM1\9667193.1

  e. preparing and sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors (see ¶¶ 109-136; 146-173);

  f. creating and using the New Fasanelli Companies to obtain contracts through fraud and deception, and not disclosing his ownership (see ¶¶ 174-181);

  g. stealing the Joint Checks by sending and having others send false representations to induce CPCI to send the Joint Checks, wrongfully depositing them in ACI's account and then authorizing others to send false statements to conceal the theft (see ¶¶ 182-211).

221. David Albertelli is a leader of the Corrupt Enterprise and directed the execution of many of the predicate acts.

222. David Albertelli benefitted from the enterprise through his ownership of and income from his employment by ACI; ownership, direct or indirect, of Westcore I, Westcore II, the New Fasanelli Companies, Foundation Management, Team CCR, MFDC, National Framing, KMM, and US Construction Trust; and payments received for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

223. **Westcore I** committed and conspired to commit the following predicate acts:

  a. bribery of Eguizabal (see ¶¶ 57-81);

  b. submitting a false Qualification Statement for Westcore I (see ¶¶ 82-108);

  c. not disclosing and actively concealing David Albertelli's and Kozlowski's interest in Westcore I (see ¶¶ 82-108);

  d. creating, using and concealing the true nature of Team CCR so that it could wrongfully obtain payments (see ¶¶ 147-162); and

DM1\9667193.1

e. sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors (see ¶¶ 147-173).

224. Westcore I benefitted from the enterprise through payments received for contracts awarded to Westcore I and from payments made on the New Braunfels Project that were used to fund Westcore I.

225. **Westcore II** committed and conspired to commit the following predicate acts:

a. bribery of Eguizabal (see ¶¶ 57-81);

b. not disclosing and actively concealing David Albertelli's interest in Westcore II (see ¶¶ 139);

c. wrongfully obtaining payments under Westcore I's contracts (see ¶¶ 137-146); and

d. sending false payment applications, sworn statements, and change orders, including claims for payments of sham subcontractors (see ¶¶ 147-173).

226. Westcore II benefitted from the enterprise through payments from CPCI related to contracts awarded to Westcore I.

227. **Kevin Burke** conspired to commit and committed the following predicate acts:

a. Burke paid or caused bribes to be paid to Eguizabal, using Foundation Management and MFDC to wire money to Eguizabal (see ¶¶ 57-81);

b. setting up and processing payments, directly or through Foundation Management, to sham subcontractors including Team CCR, Framing USA, and National Framing, (see ¶¶ 147-173), and ghost contractor Westcore II (¶¶ 137-146); and the New Fasanelli Companies (see ¶¶ 174-181); and

77

c. Using Foundation Management to conceal the role of David Albertelli and Kozlowski in subcontractors and general contractors (see ¶¶ 82-108, 174 (Westcore I); ¶¶; see ¶¶ 174-181 (the New Fasanelli Companies); ¶¶ 129-136 (Related Parties), ¶ 139 (Westcore II).

228. Burke was the de facto CFO of the enterprise; he controlled several other Defendants by being a CFO, agent or manager, either directly or through Foundation Management, of National Framing, KMM, Team CCR, Westcore II, and Foundation Management.

229. Burke benefitted from the enterprise through income from employment by Foundation Management and payments received for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

230. **Brook Kozlowski** was David Albertelli's chief lieutenant within the enterprise and as such committed and conspired to commit all of the predicate acts alleged above. More specifically, he committed and conspired to commit the following predicate acts:

a. bribery of Eguizabal; he set up budgets for Westcore I projects that included a line item for MFDC Fee, which was for the bribes (see ¶¶ 57-81);

b. Assisted with preparing and transmitting the false Qualification Statement for Westcore I (see ¶¶ 82-108);

c. not disclosing and actively concealing David Albertelli and his interest in Westcore I, Westcore II, the New Fasanelli Companies, Foundation Management, National Framing, KMM, Team CCR, MFDC and US Construction Trust (see ¶¶ 82-108, 129-136, 139, 174).

d. creating and using Westcore II to wrongfully obtain payments (see ¶¶ 137-146);

78

    e.   sending false payment applications, sworn statements, change orders and mechanics liens, including claims for payments of sham subcontractors by wire and mail (see ¶¶ 109-173);

    f.   on information and belief, assisting with the theft of the Joint Checks (see ¶¶ 182-211).

231.    Kozlowski is David Albertelli's chief lieutenant and as such had knowledge of all illegal activity of the enterprise.

232.    Kozlowski benefitted from the enterprise through the income for his employment by ACI and, on information and belief, Foundation Management, and his ownership in Westcore I and other of the companies established by the enterprise, and payments received for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

233.    **John Salat** conspired to commit and committed the following predicate acts:

    a.   Bribery related to Westcore I projects; Salat knew of the bribery, through his familiarity with the Westcore I and /or Westcore II budgets that showed an MFDC Fee (see ¶¶ 57-81);

    b.   Creation and transmission of the false Qualification Statement used to get contracts for Westcore I (see ¶¶ 82-108);

    c.   Failing to disclose the bribes and misrepresentations in the Qualification Statement (see ¶¶ 57-81; 82-108);

    d.   causing Westcore I and/or Westcore II to use sham subcontracting companies, notably Team CCR and Framing USA, to divert payment while giving the impression to CPCI that legitimate subcontractors were being paid, and concealing the true owners of those companies (see ¶¶ 147-173);

79

    e. participating in the diversion of payments to Westcore II (see ¶¶ 137-146);
and

    f. Not disclosing and actively concealing the role of David Albertelli and Kozlowski in Westcore I and Westcore II, by among other things claiming to own Westcore I and/or Westcore II (see ¶¶ 137-146).

234. Salat is part of the Corrupt Enterprise and held a leadership role within Westcore I and Westcore II.

235. Salat benefitted from the RICO enterprise through income for his employment by Westcore, his ownership in Westcore II, and payments received for contracts awarded to Westcore I.

236. **Foundation Management** conspired to commit and committed the following predicate acts:

    a. Bribery of Eguizabal; as the manager of MFDC, Westcore II and the New Fasanelli Companies, Foundation Management paid or caused the bribes to be paid (see ¶¶ 57-81);

    b. As Foundation Management is the manager of Westcore II, Team CCR, KMM, National Framing, and MFDC it is responsible for predicate acts they committed (see entries for those companies in this section);

    c. As the manager of Westcore II, National Framing and KMM, Foundation Management participated in the submission of fraudulent billing documents (see ¶¶ 150-176) and the diversion of payments from Westcore I to Westcore II (see ¶¶ 140-149); and from legitimate subcontractors to sham subcontractors (see ¶¶ 150-176); and

DM1\9667193.1

d.  Not disclosing and actively concealing the involvement of David Albertelli
and Kozlowski in Westcore I, Westcore II, the New Fasanelli Companies,
Team CCR, National Framing and KMM. MFDC and US Construction
Trust (see ¶¶ 82-108, 142, 150, 180-181).

237.  Foundation Management benefitted from the RICO enterprise through the fees it
derived from Westcore II, the New Fasanelli Companies, Team CCR, National Framing and
KMM, and, on information and belief, David Albertelli's investments in Foundation Management
through US Construction Trust of amounts received for contracts awarded to ACI, Westcore I and
the New Fasanelli Companies.

238.  **National Framing** conspired to commit and committed the following predicate
acts:

a.  providing false information about the cost of subcontract work as part of
the fraud related to sham subcontractors (see ¶¶ 121-136);

b.  National Framing provided misleading payment application documents that
misrepresented the amount it could claim is due and then filed a fraudulent
mechanics lien for a greater amount on the Six Mile Project in an attempt
to obtain a double payment from the Six Mile Fund to the enterprise (see
¶¶ 121-128); and

c.  placing a fraudulent lien on the Rochester Project for amounts not owed by
Rochester Fund to ACI (see ¶ 136).

239.  National Framing benefitted from the enterprise through the payments it received
from ACI, Westcore I, Westcore II and the New Fasanelli Companies; on information and belief,
David Albertelli's investments in National Framing through US Construction Trust of payments

81

for contracts awarded to ACI, Westcore I and the New Fasanelli Companies; and lien claims that

it may have due to nonpayment by ACI and Westcore I.

240.    **KMM** conspired to commit and committed the following predicate acts:

    a.  KMM was a subcontractor for ACI and Westcore on multiple projects; KMM filed a fraudulent lien on the Rochester Project for an amount not owed by Rochester Fund to ACI (see ¶ 136); and

    b.  Not disclosing and actively concealing the involvement of David Albertelli and Kozlowski in KMM (see ¶¶ 129-136).

241.    KMM benefitted from the RICO enterprise through the payments it received from

ACI and Westcore I and Westcore II; on information and belief, David Albertelli's investments in

KMM through US Construction Trust of amounts received for contracts awarded to ACI, and

Westcore I; and lien claims that it may have due to nonpayment by ACI and Westcore.

242.    **MFDC** conspired to commit and committed the predicate acts of bribing Eguizabal;

MFDC was formed and operated for the purpose of and paid multiple bribes to Eguizabal and to

Bravo21 (see ¶¶ 57-81).

243.    MFDC benefitted from the RICO enterprise through the payments it received from

ACI and Westcore, on information and belief, David Albertelli's investments in MFDC through

US Construction Trust of payments for contracts awarded to ACI, Westcore I and the New

Fasanelli Companies; and on information and belief, MFDC retained deposits to MFDC's account

earmarked for bribes which were never paid.

244.    **Team CCR** conspired to commit and committed the following predicate acts:

82

a. submitting false payment applications to divert project payments on the Longmont Project from the true subcontractor, Consolidated Resources (see ¶¶ 150-165); and

b. Team CCR intentionally concealed its true identity and David Albertelli's indirect ownership of Team CCR (see ¶ 150).

245. Team CCR benefitted from the enterprise through payments for the Longmont Project and, on information and belief, David Albertelli's investments in MFDC through US Construction Trust and Foundation Management of payments for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

246. **Kerry Heltzel** conspired to commit and committed the following predicate acts:

a. Bribery of Eguizabal, on information and belief, as an accountant for several defendants (see ¶¶ 29, 51), Heltzel processed payments of bribes and payment requests that were used to fund bribes;

b. On information and belief, Heltzel participated in the submission of payment applications she knew to be false (see ¶ 110);

c. On information and belief, Heltzel manipulated the Textura system for electronic submission of payment applications to allow her to electronically sign payment applications related to Westcore I and/or Westcore II and Team CCR on behalf of other persons without the consent or knowledge of those persons (see ¶¶ 150-165, specifically ¶¶ 150, 160); and

d. sending wiring instruction to CPCI for Westcore I jobs that, on information and belief, were for accounts controlled by Westcore II not Westcore I (see ¶¶ 140-149, specifically, ¶¶ 144-148).

247.    Heltzel benefitted from the RICO enterprise through income for her employment by Foundation Management or ACI, Westcore I and Westcore II, and from payments for contracts awarded to ACI, Westcore I and the New Fasanelli Companies.

248.    **Amy Butler** conspired to commit and committed the predicate acts:

    a.   Bribery of Eguizabal, on information and belief, Butler as an accounting manager of ACI (See ¶ 26) directed or at least knew of the bribes being paid to Eguizabal related to ACI contracts (see ¶¶ 57-81);

    b.   On information and belief, Butler either prepared or supervised the preparation of false payment applications submitted to CPCI (see ¶¶ 109-128);

    c.   Ms. Butler was directly involved with the theft of the Joint Checks and made material misrepresentations to CPCI to help conceal the theft of the Joint Checks (see ¶¶ 185-214).

249.    Butler benefitted from the enterprise through income for her employment by ACI.

250.    **US Construction Trust** conspired to commit and committed the following predicate acts:

    a.   Bribery; US Construction Trust was a managing member of Westcore I and, pursuant to a Consent in lieu of an Organizational Meeting dated February 13, 2015, held a 60% interest in Westcore I.  As such, US Construction Trust is responsible for the bribes and other fraud committed by Westcore I (see ¶¶ 57-81);

DM1\9667193.1

    b.   On information and belief, David Albertelli used US Construction Trust to invest in companies that he formed or acquired, and then used to commit bribery, wire fraud, mail fraud and bank fraud (see ¶¶ 30, 51, 141, 166); and

    c.   Concealing David Albertelli's ownership or other companies (see ¶¶ 30, 51, 141, 166).

251.    US Construction Trust benefitted from the enterprise through the income it derived as an owner of Westcore I and, on information and belief, David Albertelli's investments in US Construction Trust of payments from ACI, Westcore I and The New Fasanelli Company's contracts.

### G-2.   Other Victims

252.    While the Counter-Plaintiff's focus is on the actions of the Corrupt Enterprise as it relates to it, the Corrupt Enterprise defrauded parties other than the Funds and Counter-Plaintiff.

253.    The Corrupt Enterprise stole funds from multiple legitimate subcontractors and used the same tactics against other project owners.  For example, as alleged in the plaintiff's Original Petition in Lakefront Trail Rockwall Hotel, L.P. v. Albertelli Construction, Inc., David Albertelli, et al, No. 1-17-0359 (District Court, 382nd Judicial District, Rockwall County, Texas) ("Lakefront Case"), the owner of a construction project in Rockwall, Texas, alleges that ACI and David Albertelli used, among other things, false applications for payment sent by wire or through the mail, redirection of funds received from lenders that were earmarked for subcontractors to their own account, "front-end loading" (or requesting payment at the start of a project for work that has not yet been done), over-billing for work and supervision, refusing to correct defective work, failing to provide required staffing to keep the project on schedule, and not paying subcontractors in which Defendants have an interest and allowing those subcontractors to file liens for the "unpaid" amounts in an attempt to recover a second payment.

DM1\9667193.1

**ANSWER:    Racketeering Predicate Acts**

254.    ACI and the other members of the Corrupt Enterprise, have committed numerous RICO predicate acts.  Each of those predicate acts have damaged Counter-Plaintiff as further explained below.

255.    18 U.S.C. § 1961(1) states that: "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year") [emphasis added]. CPCI had projects in Colorado, Texas, Minnesota, and Florida that were negatively affected by the bribery scheme.  Each of these states have bribery statutes carrying penalties in excess of a year. See Colorado Revised Statutes Title 18 Criminal Code § 18-5-401 (bribery is a class 6 felony); Texas Penal Code § 32.43; Minnesota Criminal Statute 609.86 (commercial bribery sentence is up to five years' imprisonment).

256.    The bribery is wire fraud as the bribes were paid by wire transfers and the nature of such payments was intentionally concealed from Counter-Plaintiff.  The bribes fraudulently induced the Funds to award contracts to ACI and Westcore I and the Funds and Counter-Plaintiff have been severely damaged by the poor performance of ACI and Westcore on those contracts.

257.    The use of the sham subcontractors and related false statements on sworn payment applications are mail and/or wire fraud and occurred many, many times and resulted in payments being made for more than the amounts that were due, payments being made to the incorrect entities and a host of large mechanic's lien claims being filed against the Projects.

258.    The creation and submission of the phony Qualification Statement involved the use of email and constitutes wire fraud.  But for the submission of the phony Qualification Statement, CPCI would never have allowed Westcore I, or Westcore II, to perform any of its contracts and

86

would have avoided the significant damage it has incurred on the Westcore Projects as pleaded herein.

259.    The theft of the Joint Checks is a predicate act as mail fraud, wire fraud and bank fraud.  The theft of the Joint Checks damaged the Funds by the amount of the checks that was stolen and by other amounts in thereafter paying subcontractors.

260.    The definition of Racketeering in RICO includes violations of "section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud),  …."  18 U.S.C.A. § 1961 (West).

261.    Section 1341 addresses mail fraud and fraud using private interstate carriers:

> "Whoever, having **devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises**, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, **or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing**, shall be fined under this title or imprisoned not more than 20 years, or both. ….."  18 U.S.C. § 1341 (West) (emphasis added).

262.    Section 1343 addresses wire fraud, including telephone and electronic transmissions:

> "Whoever, having **devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire,** radio, or television **communication in interstate or foreign commerce, any writings, signs, signals, pictures,**

DM1\9667193.1

**or sounds for the purpose of executing such scheme or artifice**, shall be fined under this title or imprisoned not more than 20 years, or both.  …. If the violation …. affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1343 (West) (Emphasis added).

263.   Section 1344 addresses bank fraud, including the fraudulent attainment of funds from a financial institution:

"Whoever knowingly executes, or attempts to execute, a scheme or artifice

(1) to defraud a financial institution; or

(2) to **obtain any of the moneys, funds**, credits, assets, securities, or other property owned by, or **under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises**; …. 18 U.S.C. § 1344 (West) (emphasis added).

**Remedies Available**

264.   RICO, among other things, provides the following remedies:

"§ 1964. Civil remedies

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: **ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments** of any person, including, but not limited to, **prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce**; or **ordering dissolution or reorganization of any enterprise**, making due provision for the rights of innocent persons.
(b) ….
(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court **and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, ….**
(d) ….   18 U.S.C. §1964 (emphasis added).

265.   Counter-Plaintiff was damaged by ACI's other schemes and is entitled to treble damages arising from those schemes. Those damages include, but are not limited to, (a) increased personnel costs as a consequence of ACI's mismanaging Projects; (b) loss of project management

88

DM1\9667193.1

fees as a consequence of ACI's causing Projects' costs to exceed budgets; (c) the amount of all bribes paid to Eguizabal; and (d) the amount paid to Eguizabal for faithful employment while ACI was bribing him.

266.    The damages suffered by Counter-Plaintiff were proximately caused by the Defendants fraud and bribery.

267.    Pursuant to 18 U.S.C. § 1964 (a), ACI should be forbidden from participating in the construction industry.

268.    Counter-Plaintiff has been injured in an amount in excess of $75,000.

WHEREFORE, on Count 1, Counter-Plaintiff requests that this Court provide the following relief against the Defendants:

a)  Grant Counter-Plaintiff injunctive relief by ordering ACI to i) divest itself of any interest, direct or indirect, in any enterprise related to the construction industry, ii) be restricted from providing labor, services or materials to or participating in the construction industry as an consultant, contractor, subcontractor, owner or otherwise, and iii) be restricted from making investments in or loans to any person or entity engaging in the construction industry;

b)  Order dissolution of ACI;

c)  Grant Counter-Plaintiff's compensatory, statutory treble damages, exemplary, punitive, and other damages as shall be proven at trial;

d)  Grant Counter-Plaintiff's attorneys' fees and costs; and

e)  Grant such other and further relief in favor of the Counter-Plaintiff as this Court deems just and proper.

DM1\9667193.1

## <u>COUNT 2- FLORIDA RICO AND CIVIL REMEDIES</u>
## <u>FOR CRIMINAL ACTIVITIES</u>

269.    Because Count 2 is based on the same facts and circumstances as Count 1, the allegations of paragraphs 1 through 268, excluding paragraphs 45-48, are incorporated as though set forth in full herein as the allegations in this paragraph.

270.    This Count alleges claims against ACI under the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. Chapter 772, and the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. Chapter 895, asserting a statutory right of action against ACI for their conduct of, or participation in, an enterprise through a pattern of criminal and racketeering activity in violation of Fla. Stat. §§ 772.103 and 895.03.

271.    The Corrupt Enterprise constitutes an association-in-fact enterprise within the meaning of Fla. Stat. §§ 772.102(3), 772.103(3), 895.02(3), and 895.03(3).

272.    ACI participated, directly and indirectly, in the Corrupt Enterprise, including through the conduct, management, or operation of the Corrupt Enterprise's affairs through a "pattern of criminal activity" within the meaning of Fla. Stat. § 772.102(4) and in violation of Fla. Stat. § 772.103(3), including the incidents of criminal activity set forth in Count 1. These incidents of criminal activity had the same or similar intents, results, accomplices, victims, or methods of commission or were otherwise interrelated by distinguishing characteristics and were not otherwise isolated incidents.

273.    ACI participated, directly and indirectly, in the Corrupt Enterprise, including through the conduct, management, or operation of the Corrupt Enterprise's affairs through a "pattern of racketeering activity" within the meaning of Fla. Stat. § 895.02(4) and in violation of Fla. Stat. § 895.03(3), including the incidents of racketeering conduct set forth in Count 1. These incidents of racketeering conduct had the same or similar intents, results, accomplices, victims, or

DM1\9667193.1

methods of commission or were otherwise interrelated by distinguishing characteristics and were not otherwise isolated incidents.

274.    ACI and the other members of the Corrupt Enterprise committed a substantial number of related incidents of criminal activity and racketeering conduct over an extended period of time, including the predicate acts enumerated at Count 1. Each predicate act constitutes "criminal activity" within the meaning of Fla. Stat. § 772.102(1) and "racketeering activity" within the meaning of Fla. Stat. § 895.02(1). ACI and the other members of the Corrupt Enterprise's commission of predicate acts is part of a general course of business and will continue unless and until they are prevented from committing such acts.

275.    CPCI was, and continues to be, injured by reason of Defendants' violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts, as set forth in paragraphs 54-260.

276.    Despite their diligence and efforts, CPCI's discovery of these ongoing injuries was delayed by Defendants' fraudulent concealment activity as set forth in paragraphs 82-111, 137-146, 153, 178, 187-197, and 199-204.

277.    The injuries to CPCI were a direct, proximate, and reasonably foreseeable result of the violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts enumerated at Paragraphs 53-259. The Funds have been and will continue to be injured in an amount to be determined at trial.

278.    Pursuant to Fla. Stat. § 772.104(1), CPCI entitled to recover treble damages plus costs and attorneys' fees from ACI.

279.    Pursuant to Fla. Stat.§§ 895.05(1), 895.05(6), CPCI is entitled to an injunction preventing ACI from committing further violations of Fla. Stat. § 895.03.

DM1\9667193.1

WHEREFORE, on Count 2, Counter-Plaintiff requests that this Court provide the following relief against Counter-Defendant:

a)  Grant Counter-Plaintiff injunctive, compensatory, statutory, exemplary, punitive, and other damages as shall be proven at trial;

b)  Grant Counter-Plaintiff its attorneys' fees and costs; and

c)  Grant such other and further relief in favor of the Counter-Plaintiff as this Court deems just and proper.

### COUNT 3-  FLORIDA RICO AND FLORIDA CIVIL REMEDIES FOR CRIMINAL ACTIVITIES – CONSPIRACY

280.    Because Count 3 is for the conspiracy that is based on the same facts and circumstances as the RICO violations in Counts 1 and 2, the allegations of paragraphs 1 through 268, excluding paragraphs 45-48 of Count 1, and paragraphs 269-279 of Count 2 are incorporated as though set forth in full herein as the allegations in this paragraph.

281.    ACI and the other members of the Corrupt Enterprise violated Fla. Stat. §§ 772.103(4) and 895.03(4) by conspiring to violate Fla. Stat. §§ 772.103(3) and 895.03(3), respectively.

282.    In connection with the Corrupt Enterprise described in Paragraphs 51, 53, 55 and 56, above, ACI and the other members of the Corrupt Enterprise agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity, including the incidents of criminal and racketeering activity set forth in paragraphs 53-259, above.

283.    ACI and the other members of the Corrupt Enterprise agreed to the overall objective of the conspiracy, or each agreed to commit personally at least two acts of criminal and racketeering activity.

92

284.    As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, CPCI has been injured in its business or property.

285.    Despite its diligence and efforts, CPCI's discovery of these ongoing injuries was delayed by ACI and the other members of the Corrupt Enterprise's fraudulent concealment activity as set forth in paragraph 276 above.

286.    Pursuant to Fla. Stat. § 772.104(1), CPCI is entitled to recover treble damages plus costs and attorneys' fees from ACI.

287.    Pursuant to Fla. Stat. §§ 895.05(1), 895.05(6), CPCI is entitled to an injunction preventing ACI from committing further violations of Fla. Stat. § 895.03.

WHEREFORE, on Count 3, Counter-Plaintiff request that this Court provide the following relief against ACI:

a) Grant Counter-Plaintiff injunctive, compensatory, statutory, exemplary, punitive, and other damages as shall be proven at trial;

b) Grant Counter-Plaintiff their attorneys' fees and costs; and

c) Grant such other and further relief in favor of the Counter-Plaintiff as this Court deems just and proper.

### COUNT 4- COMMON LAW FRAUD

288.    Many of the actions that form the bases for the predicate acts alleged in Count 1 (RICO) are also cognizable under a common law fraud theory. The common law fraud committed by ACI and the other members of the Corrupt Enterprise generally falls into the same categories as the RICO predicate acts. Here, ACI is liable for the fraud it perpetrated against CPCI.

289.    As alleged in paragraphs 56-80, beginning on or about December 11, 2011 through at least March 2017, David Albertelli, George Albertelli, ACI, Westcore I, Westcore II, MFDC, Burke, Salat and Kozlowski agreed to pay bribes to Eguizabal in exchange for Eguizabal steering

DM1\9667193.1

projects to ACI, Westcore I, and the New Fasanelli Companies, and providing preferential treatment while administering those contracts. From December 11, 2011 through March 14, 2017, ACI and the other members of the Corrupt Enterprise paid Eguizabal at least $1,464,735 in bribes.

290. In exchange for bribes, Eguizabal steered the eight Projects to ACI and Westcore, as well as other projects to ACI and the New Fasanelli companies.

291. CPCI relied on Eguizabal to award the eight Projects and the other projects to contractors based upon the merits of the bids and qualifications of such contractors.

292. Had CPCI known Eguizabal was instead awarding the eight Projects and other projects to ACI and Westcore I based on bribes to Eguizabal, CPCI would not have awarded ACI and Westcore I those Projects.

293. ACI and the other Corrupt Enterprise's members' fraud damaged CPCI in two distinct ways. First, if not for the bribes, Plaintiffs would have hired a contractor that performed a higher standard of work. Due to the shoddy work and mismanagement by ACI and other Defendants, CPCI was forced to provide more project management to the Projects thereby increasing its personnel costs. CPCI was also unable to collect project management fees as a consequence of ACI's causing Projects' budgets to be exceeded.. Second, Eguizabal was CPCI's employee and by bribing ACI, Eguizabal's loyalties were compromised as his work benefitted ACI and it's enterprise, not CPCI.

WHEREFORE, on Count 4, Counter-Plaintiff requests that this Court provide the following relief against Counter-Defendant:

a) Grant Counter-Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial, including without limitation, the amount of all bribes paid to Eguizabal, all profits earned by ACI on projects for which a bribe was paid to Eguizabal, the cost of

DM1\9667193.1

increased personnel costs incurred for all Projects managed by ACI, and CPCI's project management fees that CPCI was unable to collect due to ACI's mismanagement of and cost overruns on the Projects; and

b) Grant such other and further relief in favor of the Counter-Plaintiff as this Court deems just and proper.

## COUNT 5- COMMON LAW CONSPIRACY TO COMMIT FRAUD

294.    The allegations of Count , Common Law Fraud, paragraphs 278-283, form the basis for this Count 5, Conspiracy to Commit Fraud, and are incorporated herein as though set forth in full herein as the allegations in this paragraph.  Paragraphs 16-44 regarding definitions of ACI and members of the Corrupt Enterprise and the Underlying Contracts are incorporated herein as though set forth in full. Any defined term used in such paragraphs shall have the meaning defined in this Counterclaim even if such term is not defined in a paragraph incorporated in this Count.

295.    ACI and the other members of the Corrupt Enterprise conspired among themselves to coordinate the numerous details required for their fraud.

296.    George Albertelli, David Albertelli, ACI, Kozlowski, Salat, Westcore I, Westcore II, Butler, Burke, Heltzel, Eguizabal, Bravo21, Foundation Management, National Framing, KMM, MFDC, Team CCR, and US Construction Trust, and others conspired to defraud CPCI.

WHEREFORE, on Count 5, Counter-Plaintiff requests that this Court provide the following relief against ACI:

a) Grant Counter-Plaintiff compensatory, exemplary, punitive, and other damages as shall be proven at trial; and

b) Grant such other and further relief in favor of the Counter-Plaintiff as this Court deems just and proper.

95

## COUNT 6- NEGLIGENCE – SAVAGE PROJECT

297.    Counter-Plaintiff incorporates by reference into Count 6 by reference paragraphs 1-17 and 35-44 as if fully set forth herein.

298.    This is an action for damages caused by ACI's negligence on the Savage Project.

299.    CPCI managed the Savage Project for the Project's owner, the Savage Fund; and CPCI also managed the Savage Fund.

300.    ACI served as the general contractor responsible for providing all services, work, labor, materials, and or equipment necessary to construct the Savage Project; and ACI owed CPCI a duty to exercise reasonable care to ensure that its work and the work of its employees, subcontractors, suppliers, laborers, agents, or representatives was performed or supplied *inter alia*:

   a.    in a reasonable manner that did not create an unreasonable risk of harm or damage to CPCI, the Savage Fund, the Savage Project, others, or the personal or other property located in or at the Savage Project;

   b.    in compliance and or conformance with:  (i) applicable building codes; (ii) the permitted plans and specifications; (iii) industry standards; and (iv) the best of modern trade practice; and

   c.    in compliance with all federal, state, and local laws, codes, ordinances, rules, regulations, and requirements applicable to the construction of the Savage Project.

301.    ACI knew, or should have known, and could foresee, that in breaching its duty of care by negligently performing its work, ACI would cause harm or damage to CPCI, the Savage Project, the Savage Fund, others, or personal or other property located in or at the Savage Project.

302.    ACI was negligent and breached its duty of care by:  (1) delivering its work with latent or patent defects or deficiencies; (2) failing to perform its work in compliance or conformance with (i) the applicable building codes, (ii) the permitted plans and specifications, (iii) industry standards, or (iv) the best of modern trade practice; or (3) failing to properly supervise, direct or be responsible for the work of its employees, subcontractors, suppliers, laborers, agents, or representatives.

96

DM1\9667193.1

303. As a result of ACI's negligence CPCI expended resources in the form of money and manpower to rectify the issues created by ACI—work for which ACI was already paid.

304. CPCI has been, and will continue to be, damaged as a direct and proximate result of ACI's breaches of its duty of care including, without limitation: (a) amounts CPCI expended for increased project management personnel cost and (b) other direct and consequential damages.

WHEREFORE, on Count 6, Counter-Plaintiff requests this Honorable Court enter judgment in its favor and against ACI for:

a) compensatory and other damages in an amount that shall be proven at trial, and interest thereon; and

b) such other and further relief in favor of Counter-Plaintiff as this Honorable Court deems just and proper.

### COUNT 7- UNJUST ENRICHMENT – SAVAGE PROJECT

305. Counter-Plaintiff incorporates by reference into Count 7 by reference paragraphs 1-17 and 35-44 as if fully set forth herein.

306. This is an action for unjust enrichment against ACI.

307. CPCI managed the Savage Project for the Project's owner, the Savage Fund; and CPCI also managed the Savage Fund.

308. ACI served as the general contractor responsible for providing all services, work, labor, materials, and or equipment necessary to construct the Savage Project.

309. ACI underperformed one or more aspects of its work on the Savage Project.

310. The Savage Fund, however, compensated ACI for work that ACI performed even though that work was incomplete or otherwise defective in material respects.

311. As a result of ACI's incomplete or otherwise materially deficient work, CPCI expended resources in the form of money and manpower to rectify the issues created by ACI.

97

312. CPCI was also forced to assign additional project management personnel to address Project issues that ACI did not address—work for which ACI was already paid, which was a direct benefit to ACI as it was not required to expend more money and manpower to perform its obligations.

313. ACI understood and appreciated the benefit of CPCI's actions in providing additional project management resources to supplement ACI.

314. The Savage Fund paid ACI for services actually performed by CPCI which benefitted ACI.

315. ACI has accepted and retained the benefit from CPCI.

316. Circumstances make it inequitable for ACI to retain the benefit without compensating CPCI the value of said benefit.

317. CPCI has no adequate remedy at law.

WHEREFORE, on Count 7, Counter-Plaintiff requests this Honorable Court enter judgment in its favor and against ACI for:

a) compensatory and other damages in an amount that shall be proven at trial, and interest thereon; and

b) such other and further relief in favor of Counter-Plaintiff as this Honorable Court deems just and proper.

### **COUNT 8- NEGLIGENCE – ROCHESTER PROJECT**

318. Counter-Plaintiff incorporates by reference into Count 8 by reference paragraphs 1-17 and 35-44 as if fully set forth herein.

319. This is an action for damages caused by ACI's negligence on the Rochester Project.

320. CPCI managed the Rochester Project for the Project's owner, the Rochester Fund; and CPCI also managed the Rochester Fund.

98

DM1\9667193.1

321.    ACI served as the general contractor responsible for providing all services, work, labor, materials, and or equipment necessary to construct the Rochester Project; and ACI owed CPCI a duty to exercise reasonable care to ensure that its work and the work of its employees, subcontractors, suppliers, laborers, agents, or representatives was performed or supplied *inter alia*:

    a.    in a reasonable manner that did not create an unreasonable risk of harm or damage to CPCI, the Rochester Fund, the Rochester Project, others, or the personal or other property located in or at the Rochester Project;

    b.    in compliance and or conformance with:  (i) applicable building codes; (ii) the permitted plans and specifications; (iii) industry standards; and (iv) the best of modern trade practice; and

    c.    in compliance with all federal, state, and local laws, codes, ordinances, rules, regulations, and requirements applicable to the construction of the Rochester Project.

322.    ACI knew, or should have known, and could foresee, that in breaching its duty of care by negligently performing its work, ACI would cause harm or damage to CPCI, the Rochester Project, the Rochester Fund, others, or personal or other property located in or at the Rochester Project.

323.    ACI was negligent and breached its duty of care by:  (1) delivering its work with latent or patent defects or deficiencies; (2) failing to perform its work in compliance or conformance with (i) the applicable building codes, (ii) the permitted plans and specifications, (iii) industry standards, or (iv) the best of modern trade practice; or (3) failing to properly supervise, direct or be responsible for the work of its employees, subcontractors, suppliers, laborers, agents, or representatives.

324.    As a result of ACI's negligence CPCI expended resources in the form of money and manpower to rectify the issues created by ACI.

DM1\9667193.1

325.    CPCI has been, and will continue to be, damaged as a direct and proximate result of ACI's breaches of its duty of care including, without limitation: (a) amounts CPCI expended for increased project management personnel costs; and (b) other direct and consequential damages.

WHEREFORE, on Count 8, Counter-Plaintiff requests this Honorable Court enter judgment in its favor and against ACI for:

a) compensatory and other damages in an amount that shall be proven at trial, and interest thereon; and

b) such other and further relief in favor of Counter-Plaintiff as this Honorable Court deems just and proper.

### COUNT 9- UNJUST ENRICHMENT – ROCHESTER PROJECT

326.    Counter-Plaintiff incorporates by reference into Count 9 by reference paragraphs 1-17 and 35-44 as if fully set forth herein.

327.    This is an action for unjust enrichment against ACI.

328.    CPCI managed the Rochester Project for the Project's owner, the Rochester Fund; and CPCI also managed the Rochester Fund.

329.    ACI served as the general contractor responsible for providing all services, work, labor, materials, and or equipment necessary to construct the Rochester Project.

330.    ACI underperformed one or more aspects of its work on the Rochester Project.

331.    The Rochester Fund, however, compensated ACI for work that ACI performed even though that work was incomplete or otherwise defective in material respects.

332.     As a result of ACI's incomplete or otherwise materially deficient work, CPCI expended resources in the form of money and manpower to rectify the issues created by ACI.

333.    CPCI was also forced to assign additional project management personnel to address Project issues that ACI did not address—work for which ACI was already paid, which was a direct

100

benefit to ACI as it was not required to expend more money and manpower to perform its obligations.

334.    ACI understood and appreciated the benefit of CPCI's actions in providing project management  to supplement ACI.

335.    The Rochester Fund paid ACI for services actually performed by CPCI, which benefitted ACI.

336.    ACI has accepted and retained the benefit from CPCI.

337.    Circumstances make it inequitable for ACI to retain the benefit without compensating CPCI the value of said benefit.

338.    CPCI has no adequate remedy at law.

WHEREFORE, on Count 9, Counter-Plaintiff requests this Honorable Court enter judgment in its favor and against ACI for:

a)  compensatory and other damages in an amount that shall be proven at trial, and interest thereon; and

b)  such other and further relief in favor of Counter-Plaintiff as this Honorable Court deems just and proper.

### COUNT 10- NEGLIGENCE – SIX MILE PROJECT

339.    Counter-Plaintiff incorporates by reference into Count 10 by reference paragraphs 1-17 and 35-44 as if fully set forth herein.

340.    This is an action for damages caused by ACI's negligence on the Six Mile Project.

341.    CPCI managed the Six Mile Project for the Project's owner, the Six Mile Fund; and CPCI also managed the Six Mile Fund.

342.    ACI served as the general contractor responsible for providing all services, work, labor, materials, and or equipment necessary to construct the Six Mile Project; and ACI owed

CPCI a duty to exercise reasonable care to ensure that its work and the work of its employees, subcontractors, suppliers, laborers, agents, or representatives was performed or supplied *inter alia*:

a.  in a reasonable manner that did not create an unreasonable risk of harm or damage to CPCI, the Six Mile Fund, the Six Mile Project, others, or the personal or other property located in or at the Six Mile Project;

b.  in compliance and or conformance with:  (i) applicable building codes; (ii) the permitted plans and specifications; (iii) industry standards; and (iv) the best of modern trade practice; and

c.  in compliance with all federal, state, and local laws, codes, ordinances, rules, regulations, and requirements applicable to the construction of the Six Mile Project.

343.  ACI knew, or should have known, and could foresee, that in breaching its duty of care by negligently performing its work, ACI would cause harm or damage to CPCI, the Six Mile Project, the Six Mile Fund, others, or personal or other property located in or at the Six Mile Project.

344.  ACI was negligent and breached its duty of care by:  (1) delivering its work with latent or patent defects or deficiencies; (2) failing to perform its work in compliance or conformance with (i) the applicable building codes, (ii) the permitted plans and specifications, (iii) industry standards, or (iv) the best of modern trade practice; or (3) failing to properly supervise, direct or be responsible for the work of its employees, subcontractors, suppliers, laborers, agents, or representatives.

345.  As a result of ACI's negligence:  CPCI expended resources in the form of money and manpower to rectify the issues created by ACI—work for which ACI was already paid.

346.  CPCI has been, and will continue to be, damaged as a direct and proximate result of ACI's breaches of its duty of care including, without limitation: (a) amounts CPCI expended for increased project management personnel costs; and (b) other direct and consequential damages.

WHEREFORE, on Count 10, Counter-Plaintiff requests this Honorable Court enter judgment against ACI and in Counter-Plaintiff's favor for:

DM1\9667193.1

a) compensatory and other damages in an amount that shall be proven at trial, and interest thereon; and

b) such other and further relief in favor of Counter-Plaintiff as this Honorable Court deems just and proper.

### COUNT 11- UNJUST ENRICHMENT – SIX MILE PROJECT

347.    Counter-Plaintiff incorporates by reference into Count 11 by reference paragraphs 1-17 and 35-44 as if fully set forth herein.

348.    This is an action for unjust enrichment against ACI.

349.    CPCI managed the Six Mile Project for the Project's owner, the Six Mile Fund; and CPCI also managed the Six Mile Fund.

350.    ACI served as the general contractor responsible for providing all services, work, labor, materials, and or equipment necessary to construct the Six Mile Project.

351.    ACI underperformed one or more aspects of its work on the Six Mile Project.

352.    The Six Mile Fund, however, compensated ACI for work that ACI performed even though that work was incomplete or otherwise defective in material respects.

353.     As a result of ACI's incomplete or otherwise materially deficient work, CPCI expended resources in the form of money and manpower to rectify the issues created by ACI.

354.    CPCI was also forced to hire other contractors to correct ACI's defective work—work for which ACI was already paid, which was a direct benefit to ACI as it was not required to expend more money and manpower to perform obligation to correct defective work.

355.    ACI understood and appreciated the benefit of CPCI's actions in providing additional project management resources to supplement ACI.

356.    The Six Mile Fund paid ACI for services actually performed by CPCI which benefitted ACI.

DM1\9667193.1

357.    ACI has accepted and retained the benefit from CPCI.

358.    Circumstances make it inequitable for ACI to retain the benefit without compensating CPCI the value of said benefit.

359.    CPCI has no adequate remedy at law.

WHEREFORE, on Count 11, Counter-Plaintiff requests this Honorable Court enter judgment in its favor and against ACI for:

a)  compensatory and other damages in an amount that shall be proven at trial, and interest thereon; and

b)  such other and further relief in favor of Counter-Plaintiff as this Honorable Court deems just and proper.

## COUNT 12- NEGLIGENCE – NEW BRAUNFELS PROJECT

360.    Counter-Plaintiff incorporates by reference into Count 12 by reference paragraphs 1-17 and 35-44 as if fully set forth herein.

361.    This is an action for damages caused by ACI's negligence on the New Braunfels Project.

362.    CPCI managed the New Braunfels Project for the Project's owner, the New Braunfels Fund; and CPCI also managed the New Braunfels Fund.

363.    ACI served as the general contractor responsible for providing all services, work, labor, materials, and or equipment necessary to construct the New Braunfels Project; and ACI owed CPCI a duty to exercise reasonable care to ensure that its work and the work of its employees, subcontractors, suppliers, laborers, agents, or representatives was performed or supplied *inter alia*:

a.    in a reasonable manner that did not create an unreasonable risk of harm or damage to CPCI, the New Braunfels Fund, the New Braunfels Project, others, or the personal or other property located in or at the New Braunfels Project;

b.    in compliance and or conformance with:  (i) applicable building codes; (ii) the

104

permitted plans and specifications; (iii) industry standards; and (iv) the best of modern trade practice; and

c.    in compliance with all federal, state, and local laws, codes, ordinances, rules, regulations, and requirements applicable to the construction of the New Braunfels Project.

364.    ACI knew, or should have known, and could foresee, that in breaching its duty of care by negligently performing its work, ACI would cause harm or damage to CPCI, the New Braunfels Project, the New Braunfels Fund, others, or personal or other property located in or at the New Braunfels Project.

365.    ACI was negligent and breached its duty of care by: (1) delivering its work with latent or patent defects or deficiencies; (2) failing to perform its work in compliance or conformance with (i) the applicable building codes, (ii) the permitted plans and specifications, (iii) industry standards, or (iv) the best of modern trade practice; or (3) failing to properly supervise, direct or be responsible for the work of its employees, subcontractors, suppliers, laborers, agents, or representatives.

366.    As a result of ACI's negligence: CPCI expended resources in the form of money and manpower to rectify the issues created by ACI—work for which ACI was already paid.

367.    CPCI has been, and will continue to be, damaged as a direct and proximate result of ACI's breaches of its duty of care including, without limitation: (a) amounts CPCI expended for increased project management personnel overhead; and (b) other direct and consequential damages.

WHEREFORE, on Count 12, Counter-Plaintiff requests this Honorable Court enter judgment in its favor and against ACI for:

a) compensatory and other damages in an amount that shall be proven at trial, and interest thereon; and

105

DM1\9667193.1

b) such other and further relief in favor of Counter-Plaintiff as this Honorable Court deems just and proper.

## COUNT 13- UNJUST ENRICHMENT – NEW BRAUNFELS PROJECT

368.    Counter-Plaintiff incorporates by reference into Count 13 by reference paragraphs 1-17 and 35-44 as if fully set forth herein.

369.    This is an action for unjust enrichment against ACI.

370.    CPCI managed the New Braunfels for the Project's owner, the New Braunfels; and CPCI also managed the New Braunfels.

371.    ACI served as the general contractor responsible for providing all services, work, labor, materials, and or equipment necessary to construct the New Braunfels Project.

372.    ACI underperformed one or more aspects of its work on the New Braunfels Project.

373.    The New Braunfels Fund, however, compensated ACI for work that ACI performed even though that work was incomplete or otherwise defective in material respects.

374.     As a result of ACI's incomplete or otherwise materially deficient work, CPCI expended resources in the form of money and manpower to rectify the issues created by ACI.

375.    CPCI was also forced to hire other contractors to correct ACI's defective work— work for which ACI was already paid, which was a direct benefit to ACI as it was not required to expend more money and manpower to perform obligation to correct defective work.

376.    ACI understood and appreciated the benefit of CPCI's actions in providing additional project management resources to supplement ACI.

377.    The New Braunfels Fund paid ACI for services actually performed by CPCI which benefitted ACI.

378.    ACI has accepted and retained the benefit from CPCI.

106

DM1\9667193.1

379.    Circumstances make it inequitable for ACI to retain the benefit without compensating CPCI the value of said benefit.

380.    CPCI has no adequate remedy at law.

WHEREFORE, on Count 13, Counter-Plaintiff requests this Honorable Court enter judgment in its favor and against ACI for:

a)  compensatory and other damages in an amount that shall be proven at trial, and interest thereon; and

b)  such other and further relief in favor of Counter-Plaintiff as this Honorable Court deems just and proper.

## JURY TRIAL DEMAND

Third-Party Defendant / Third-Party Counter-Plaintiff Continental Properties Company, Inc. hereby demands trial by jury on all claims herein so triable under applicable law.


Dated: June 4, 2019                          Respectfully submitted,

                                             **DUANE MORRIS LLP**
                                             *Trial Counsel for Counter-Plaintiff*
                                             CONTINENTAL PROPERTIES COMPANY INC.

                                             By: /s/ *Jeffrey L. Hamera*
                                                   (*pro hac vice*)

Larry Selander   (*pro hac vice*)            Alvin D. Lodish
Jeffrey L. Hamera (*pro hac vice)*           Duane Morris LLP
Duane Morris LLP                             200 S. Biscayne Blvd., #3400
190 S. LaSalle St., #3700                    Miami, FL  33131
Chicago, IL  60603                           Phone: 305.960.2318
Phone: 312-499-0147                          Florida Bar No.: 622273
lselander@duanemorris.com                    slodish@duanemorris.com
jlhamera@duanemorris.com
*Counsel for Counter-Plaintiff*

107

DM1\9667193.1

**VERIFICATION**

Under penalties as provided by law, pursuant to 28 U.S.C. §1746, the undersigned certifies that he is authorized to make this Verification, and that the statements set forth in the foregoing "COUNTERCLAIM AGAINST ALBERTELLI CONSTRUCTION, INC. AND JURY DEMAND" are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: June 4, 2019

*/s/ Paul R. Seifert*
Paul R. Seifert
Executive Vice President of Operations/
Chief Legal Officer
Continental Properties Company, Inc.

108

DM1\9667193.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 4, 2019, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic

filing to all CM/ECF participants.

/s/ *Jeffrey L. Hamera*

DM1\9667193.1