UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CONTINENTAL 332 FUND, LLC,
CONTINENTAL 298 FUND LLC,
CONTINENTAL 306 FUND LLC,
CONTINENTAL 326 FUND LLC,
CONTINENTAL 347 FUND LLC,
CONTINENTAL 355 FUND LLC,
CONTINENTAL 342 FUND LLC,
and CONTINENTAL 245 FUND LLC,

    Plaintiffs,

v.                              Case No.:  2:17-cv-41-FtM-38MRM

BROOK KOZLOWSKI, JOHN
SALAT, KEVIN BURKE, and
GREGORY HILZ,

    Defendants.
_____/

## OPINION AND ORDER[1]

Before the Court are the following motions (and all related responses, replies, and surreplies):

- Defendant Gregory Hilz's *Daubert* Motion to Exclude Report and Testimony of Plaintiffs' Proffered Experts Richard Sieracki and Kimberly Reome of the Kenrich Group, LLC (Doc. 451)
- Hilz's *Daubert* Motion to Exclude Report and Testimony of Plaintiffs' Proffered Expert, Jason Linder (Doc. 454)
- Hilz's Motion for Summary Judgment (Doc. 456)

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

- Defendant John Salat's Motion for Summary Judgment (Doc. 460)
- Defendants Brook Kozlowski and Kevin Burke's Motion for Partial Judgment on the Pleadings (Doc. 470)
- Hilz's Motion to Strike Certain Evidence Submitted in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment (Doc. 532)

Continental Properties Group, Inc. (Continental) is a real estate developer that created Plaintiffs as holding companies for individual apartment complex projects. Continental hired Angelo Eguizabal as Vice President of Construction in 2007. In that role, Eguizabal found contractors for Continental projects and could sign construction contracts and change orders. Continental began hiring contractor Albertelli Construction, Inc. (ACI) around 2011. About two years later, Eguizabal agreed with George and David Albertelli that ACI would pay Eguizabal a portion of its proceeds from Continental contracts. In exchange, Eguizabal would direct Continental projects to ACI (and later Westcore) and help the Albertellis increase profits by easing the approval of change orders. Eguizabal and David Albertelli memorialized the arrangement in a Commission Services Agreement on March 5, 2013. (Doc. 456-7).

Continental grew dissatisfied with ACI's work and decided to stop awarding ACI contracts. The Albertellis and their associates found more underhanded ways to make money from Continental projects. For example, they formed Westcore Construction with Defendant Gregory Hilz to bid on Continental projects, while hiding their ownership stake in Westcore from Continental personnel. Continental eventually uncovered the schemes, fired Eguizabal, and filed this case. Most of the parties have settled their claims. The remaining defendants are Brook Kozlowski, Kevin Burke, Gregory Hilz, and John Salat. Only Burke and Hilz challenge the evidence presented specifically against them. Hilz's

role in the dispute is discussed below. Burke's motion is not yet ripe, and the Court will address it in a separate order.

### A. Defendants' Summary Judgment Motions

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The initial burden falls on the movant, who must identify the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat summary judgment, the non-movant must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material facts exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences drawn from it in the light most favorable to the non-movant. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). But a "court need not permit a case to go to a jury…when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citations omitted).

#### 1. Standing

On September 29, 2017, a Continental executive formed Continental Recovery Fund, LLC ("ConRec") as a subsidiary of Continental. About a week later, Eguizabal agreed to disclose and disgorge all the payments he received under the Albertelli-

Eguizabal arrangement. Eguizabal partly fulfilled this obligation by assigning all his interests in Continental funds and projects to ConRec and agreed to pay the remainder to ConRec in cash.

Salat contends Plaintiffs lack prudential standing because they assigned their claims to ConRec and are thus not the real parties in interest. But the parties dispute whether Plaintiffs assigned the claims, and Salat's evidence is far from conclusive. He cites about 30 pages of mostly irrelevant testimony. Plaintiffs, on the other hand, submitted the declarations of four Continental executives, each stating directly that Plaintiffs did not assign their claims. ([Doc. 511-2](#)). Salat's attack on Plaintiffs' standing lacks merit.

### 2. Claims against Hilz

In February 2015, Hilz formed Westcore at the direction of David Albertelli to bid on Continental projects in Texas and Colorado. Initially, Hilz owned 30% of Westcore and David Albertelli 70%. In November 2015, someone sent a fraudulent Pre-Qualification Statement for Westcore to Continental, but the parties do not agree on who to blame. Hilz claims David Albertelli prepared the fraudulent document, and the apparent signatory of the document, Michael Breaton, sent it. But Plaintiffs challenge Michael Breaton's existence. They claim that Hilz provided the false information in the statement and sent it to Continental.

After Continental approved the Qualification Statement, Westcore submitted winning bids for three projects. Eguizabal collected fees—characterized as commissions by Defendants and bribes by Plaintiffs—from the Westcore jobs under his agreement with the Albertellis. The parties dispute when Hilz learned about the payments to Eguizabal,

but they agree that Eguizabal sent his invoices and other communications about the fees to the Albertellis. Meanwhile, unbeknownst to Hilz, David Albertelli formed a second Westcore entity to replace the original Westcore and receive the proceeds from the Westcore contracts. Around April 4, 2017, David Albertelli ended his relationship with Hilz. On April 13, 2017, Hilz left Continental employee Brian Strandt a voicemail message about the Albertelli-Eguizabal arrangement. Strandt did not believe Hilz's accusations, but he reported it to Continental's Director of Human Resources. In early June 2017, Hilz emailed Continental officers about Eguizabal. Later that month, Continental fired Eguizabal and terminated its contracts with Westcore. Plaintiffs then amended their complaint to add three counts against Hilz: fraud, conspiracy to commit fraud, and a RICO violation.[2]

> i. RICO

Hilz challenges three elements of the RICO count: a pattern of racketeering activity, predicate acts, and causation. To show a pattern of racketeering activity, Plaintiffs must show: "(1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated a criminal conduct of a *continuing* nature." *Jackson*, 372 F.3d at 1264. Hilz first attacks the continuity requirement. Under RICO, continuity can be open- or close-ended. Since Plaintiffs have cut business ties with Defendants, they rely on close-ended continuity.

---

[2] Hilz moved for summary judgment on five counts (Counts 1-3, 5, and 6 of the Fourth Amended Complaint) that Plaintiffs asserted "against all Defendants" before amending their complaint to add Hilz as a party to the case. Plaintiffs clarified in their response brief that they are not asserting Counts 1-3, 5, and 6 against Hilz.

5

Hilz argues that Plaintiffs cannot show close-ended continuity because "there is a single alleged victim…and one purported scheme with a discrete goal," and "the alleged scheme as to Hilz lasted less than two years." (Doc. 456 at 17). As Plaintiffs' point out, Hilz's arguments are based in part on the faulty premise that the Court should look only to Hilz's role in the enterprise. The Court must instead decide whether the enterprise as a whole satisfies the continuity requirement. So the parties' disagreement over how long Hilz's participated in the enterprise—Plaintiffs say over two years, Hilz says under two years—is irrelevant because Plaintiffs accuse Hilz of joining an ongoing enterprise.

Hilz's other attack on continuity relies on an oversimplification of the enterprise. Despite their shared connection with Continental, Plaintiffs are distinct entities, not a single victim. Hilz's claim that Plaintiffs are wholly owned by Continental is not true. Continental owns 25% of each plaintiff and outside investors own the remaining 75%. (Doc. 456-2 at 17). And Hilz's characterization of the RICO claim as a single scheme with a discrete goal—to obtain construction projects—ignores the complexity of the enterprise. Winning the bid for each construction project was a discrete step in service of a larger objective—to get Plaintiffs' money. The enterprise also involved other schemes, like inflating costs and using sham entities to intercept payments. Plaintiffs have shown a pattern of racketeering activity.

Hilz next claims that Plaintiffs cannot show he committed any predicate acts. To begin, the parties disagree whether Plaintiffs must show that Hilz himself committed predicate acts. According to Plaintiffs, they need only show that Hilz "conspired to help the overall objective of the conspiracy or agreed that other defendants would commit two predicate acts[.]" (Doc. 513 at 18). But as Hilz points out, Plaintiffs charged him with a

substantive RICO violation under 18 U.S.C. § 1962(c), not a RICO conspiracy under § 1962(d)—nowhere in Count 24 do Plaintiffs allege that Hilz conspired with anyone else.[3] And § 1962(c) requires a RICO claimant to prove that each Defendant committed predicate acts. *United States v. Persico*, 832 F.2d 705, 714-15 (2d Cir. 1987); *see also Emess Capital, LLC v. Rothstein*, 2011 WL 13214302, at *4 (S.D. Fla. Mar. 9, 2011) ("Because the language of § 1962(c) provides for liability for a *person* engaged in a RICO enterprise, not the enterprise itself, the elements of a cause of action under § 1962(c) must be alleged **as to each defendant**." (emphasis in original)). So Plaintiffs' RICO claim against Hilz cannot rest on predicate acts committed by others. They must prove that Hilz committed at least two predicate acts.

Plaintiffs allege that Hilz committed two categories of predicate acts: bribery and wire fraud. But Plaintiffs' bribery evidence only shows that Hilz was aware of the payments to Eguizabal and that he told John Salat on a recorded phone call, "I didn't like the concept in the first place, so I told him not to pay Angelo…" (Doc. 513 at 6). Mere knowledge of a bribery scheme is not enough under either of the applicable state bribery statutes—Tex. Penal Code § 32.43 and Colo. Rev. Stat. § 18-5-401.

Plaintiffs accuse Hilz of four acts of wire fraud. To prove wire fraud, Plaintiffs must show that Hilz (1) knowingly devised or participated in a scheme to defraud Plaintiffs, (2)

---

[3] Plaintiffs argue in their Surreply that Count 24 charges Hilz with violations of both 18 U.S.C. § 1962(c) and (d). But the only conspiracy allegation they point to comes from Count 1. (Doc. 598 at 3 ("All Defendants, as participants in the Corrupt Enterprise, conspired to engage and engaged in a pattern of racketeering…")). And in their Response, Plaintiffs stated that Count 1 is "asserted against only those defendants who were parties to this action before Hilz was added by the FAC." (Doc. 513 at 14). Count 24 contains no conspiracy allegations, nor does it incorporate conspiracy allegations from elsewhere in the Fourth Amended Complaint.

did so willingly with an intent to defraud, and (3) used the interstate wires to execute the scheme. *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000). Before considering Plaintiffs' evidence of wire fraud, the Court must address the parties' dispute over the admissibility of Hilz's response to requests for admission from a related case in California state court (Doc. 513-3). Under both California and Federal rules, such an admission "is not an admission for any other purpose and cannot be used against the party in any other proceeding." FED. R. CIV. P. 36(b); CAL. CIV. PROC. CODE § 2033.410(b); *Annamalai v. Warden,* 760 F. App'x 843, 850 (11th Cir. 2019) (holding, "the district court did not err in not considering the RFAs purportedly filed in…other criminal or state court proceedings" because federal and state rules preclude them). The Court thus disregards the admissions Hilz made in the California case (Doc. 513-3).

Turning to the alleged acts of wire fraud, Plaintiffs first point to the Qualification Statement. Plaintiffs cite portions of David Albertelli's and Hilz's depositions to establish his role in the preparation and transmission of Westcore's Qualification Statement. David Albertelli testified that he used information provided by Hilz—mostly names and contact information of Hilz's associates—when preparing the statement. The information Hilz provided was apparently true, but Albertelli used it to mislead Continental and induce it to award contracts to Westcore. Hilz later emailed a copy of the Qualification Statement to a Continental employee who requested it. This evidence raises a question of fact on whether Hilz committed wire fraud when he emailed the Qualification Statement. Although Plaintiffs present no direct evidence that Hilz intended to defraud Plaintiffs, the facts surrounding the Qualification Statement allow for such an inference. But this is just one predicate act, and Plaintiffs need to show two.

8

The next two wire fraud allegations are alike. Plaintiffs accuse Hilz of concealing his connection with David Albertelli by lying on his LinkedIn page and of hiding the involvement of Albertelli, Kozlowski, and ACI in Westcore from Continental. As Hilz points out, nondisclosure of material information can underpin a wire fraud claim only when the defendant has a duty to disclose. [Town of Gulf Stream v. O'Boyle, 654 F. App'x 439, 444 (11th Cir. 2016)](). So Plaintiffs must show that Hilz had a duty to disclose Albertelli's, Kozlowski's, and ACI's involvement in Westcore. Plaintiffs suggest no basis for such a duty, statutory or otherwise, and the Court can find none. Plaintiffs instead characterize Hilz's conduct as "active concealment." But given the evidence, this semantic distinction does not circumvent the duty requirement. Hilz nondisclosures do not constitute wire fraud and are not RICO predicate acts.

Plaintiffs sole evidence of the final alleged predicate act—that "Hilz lied to Continental in response to a request for additional experience of Westcore in Colorado" ([Doc. 513 at 16]())—is Hilz's response to Plaintiffs' requests for admission in the California case, which the Court has excluded. Plaintiffs fail to carry their evidentiary burden for this predicate act.

Even making all reasonable inferences in favor of Plaintiffs, they have only shown that Hilz committed one predicate act. One act cannot show a pattern of racketeering activity. The Court will thus dismiss Count 24 of the Fourth Amended Complaint. Hilz's causation argument is moot.

        *ii. Fraud and Conspiracy to Commit Fraud*

Plaintiffs' fraud claim against Hilz—Count 22 of the Fourth Amended Complaint—is based on the same conduct alleged as predicate acts in the RICO claim, and Hilz

9

challenges them on the same grounds. The Court's reasoning in the discussion of the RICO claim applies, and the fraud claim survives this challenge thanks to evidence that Hilz contributed information to the fraudulent Qualification Statement and emailed it to a Continental employee.

Hilz also raises Florida's independent tort doctrine, which prohibits plaintiffs from "recast[ing] causes of action that are otherwise breach-of-contract claims as tort claims." *CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-CV-186-J-34JRK, 2018 WL 905752, at *10 (M.D. Fla. Feb. 15, 2018). This argument fails for at least two reasons. First, Hilz has not shown that he is in contractual privity with Plaintiffs, and the independent tort doctrine applies only when the parties are in privity with one another. *Spears v. SHK Consulting and Dev., Inc.*, 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018). Second, a fraudulent inducement claim, as alleged here, is independent of a breach of contract claim when "the fraud allegations are separate and distinct from defendants' performance under the contract." *Id.* (quoting *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1031 (11th Cir. 2017)).

Hilz's challenge to the conspiracy claim—Count 23 of the Fourth Amended Complaint—depends on the failure of the fraud claim. Since the fraud claim survives, so does the conspiracy claim.

### 3. *In Pari Delicto* and Ratification

Hilz argues that Counts 22, 23, and 24 of the Fourth Amended Complaint are barred by the doctrines of *in pari delicto* and ratification.[4] The upshot of both theories is

---

[4] Other defendants have adopted Hilz's *in pari delicto* and ratification arguments (Doc. 460; Doc. 468), but none of those defendants are named in Counts 22-24.

that Plaintiffs' relationship with Eguizabal should estop them from recovering against Hilz. Under the *in pari delicto* defense, "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006). Hilz's theory is that because Eguizabal acted in Continental's interests when he awarded contracts to ACI and Westcore, the Court should impute his actions to Continental and consider Continental a participant in the scheme.

Whether *in pari delicto* applies here hinges on the adverse-interest exception to the general rule that an agent's guilty conduct is imputed to his principal. Under the adverse-interest exception, knowledge and conduct are not imputed when the agent's interests are "entirely adverse" to the principal. *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernst & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998). The agent's conduct needs not rise to the level of corporate looting or embezzlement to be adverse, "as long as the corporation receives no benefit from the [agent]'s misbehavior." *Id.* The exception "typically presents a jury question," so summary judgment is inappropriate if there is enough evidence for a jury to find that Eguizabal acted adversely to Continental's interests. *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1354-55 (11th Cir. 2008).

The record here contains enough evidence to preclude summary judgment based on *in pari delicto*. For example, in a particularly damning email, Eguizabal describes "embed[ding] the 2% commission in the job" and "funnel[ing] in additional funds into the project above the 2% which would be passed along as the work was completed." (Doc. 513-2). This email strongly suggests Eguizabal was using his position with Continental

to loot its coffers. And while the email predates the Westcore jobs, it characterizes Eguizabal's embezzlement as an ongoing practice.

Hilz's ratification argument is based on the idea that the victim of a fraud cannot adopt the fraudulent transaction, then recover damages resulting from it. *See Ball v. Ball*, 160 Fla. 601, 610 (1948). But neither of the cases Hilz cites in support of his position— *Ball* and *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994)—are pertinent. Both show that a party can ratify a fraudulent act by knowingly tolerating it, i.e., by taking no action after discovering the fraud. That is not the case here. When Continental learned of the Eguizabal-Albertelli agreement, they fired and sued Eguizabal. Continental's subsequent settlement with Eguizabal, in which he repaid to Continental the money he apparently embezzled from it, is not a ratification of the fraud.

### B. Motion for Partial Judgment on the Pleadings

In their Motion for Partial Judgment on the Pleadings, Kozlowski and Burke moved for "dismiss[al] of the portion of Count 1 seeking punitive damages." (Doc. 470 at 4). But a Rule 12(c) motion for judgment on the pleadings is not an appropriate tool to eliminate an element of damages. "Judgment on the pleadings is appropriate when no material facts are in dispute and the movant is entitled to judgment as a matter of law." *Washington v. Rivera*, 939 F.3d 1239, 1242 (11th Cir. 2019). Kozlowski and Burke argue that punitive damages are unavailable in federal RICO claims. Even assuming they are correct, Kozlowski and Burke would not be entitled to judgment on Count 1, and courts should not use Rule 12(c) to split claims into component parts and dismiss them piecemeal. *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). The Court thus denies the motion for judgment on the pleadings.

### C. *Daubert* Motions

Defendants Hilz—joined by Kozlowski and Burke—moves to exclude the reports and testimony of three experts proffered by Plaintiffs. Federal Rule of Evidence 702 provides the starting point when considering the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that trial courts have a gatekeeping function designed to test expert evidence for relevance and reliability. In performing this function, courts apply a "rigorous three-part inquiry" by considering whether (1) the expert is qualified to testify competently about the issues at hand, (2) the expert's methodology is reliable enough, and (3) the expert's testimony helps the trier of fact understand the evidence or determine a factual issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *Id.* "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

    1. <u>Richard Sieracki and Kimberly Reome</u>

Plaintiffs hired The Kenrich Group, LLC to provide expert opinions on their claimed damages. Reome led the team at Kenrich that did the work, which Sieracki oversaw and reviewed. Both Sieracki and Reome signed the Kenrich Report. Hilz attacks the reliability and helpfulness of the Kenrich Report and seeks to exclude Sieracki and Reome from testifying at trial.

Hilz argues the Kenrich Report is unreliable and unhelpful because it is not based on any methodology or independent analysis, but instead presents Continental's "own estimation of damages in the guise of an expert opinion." (Doc. 451 at 9 (quoting *JRL Enters., Inc. v. Procorp Assocs., Inc.*, 2003 WL 21284020, at *5 (E.D. La. June 3, 2003)). He claims that "Kenrich merely took a Job Cost Report excel spreadsheet and re-sorted the entries without testing the validity of those entries." (Doc. 451 at 9). Plaintiffs counter that Kenrich reviewed more than 100,000 pages of documents, conducted dozens of hours of interviews, and made independent calculations. Plaintiffs argue that while the calculations may seem simple, they involved complicating factors that required Kenrich's expertise.

Courts should exclude experts who would merely give their stamp of approval on a party's contentions because that testimony does not help the jury. *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1315 (N.D. Ga. 2006), *aff'd per curiam*, 212 F. App'x 916 (11th Cir. 2006). Expert testimony parroting information provided by other witnesses and applying simple arithmetic "will not 'help the trier of fact to understand the evidence or to determine a fact in issue' and is devoid of any 'scientific, technical, or other specialized knowledge.'" *Jones Creek Inv'rs, LLC v. Columbia Cty., Ga.*, 2013 WL 12141348, at *19 (S.D. Ga. Dec. 23, 2013) (quoting FED. R. EVID. 702(a)).

On its face, the Kenrich Report appears to be nothing more than simple arithmetic applied to Plaintiffs' cost data. Kenrich calculated three categories of damages. First, Kenrich determined the amount of "improper payments" Defendants made to Eguizabal by totaling the payments, trebling the sum (i.e., multiplying it by three) as instructed by Plaintiffs' counsel, and subtracting Eguizabal's repayment. Plaintiffs admit these calculations are "facially straightforward" but try to inject "complicating factors that required the application of industry experience and principles from the construction cost and fraud arenas." (Doc. 512 at 4). It appears Plaintiffs invented these "complicating factors" out of whole cloth. They are not reflected in the Kenrich Report, and Plaintiffs cited no other supporting evidence.

Kenrich calculated the second category of damages—"Albertelli Construction's Theft of Joint Checks"—by totaling the checks Continental reissued to subcontractors, trebling the sum as instructed by Plaintiffs' counsel, and subtracting a credit issued by Continental Properties' bank.[5] (Doc. 528-1 at 17-18). Plaintiffs argue that Kenrich's methodology was not just this simple math: "Kenrich factored into its calculation that the Plaintiffs did not pay subcontractors affiliated with ACI (who are defendants) a second time and that ACI paid a rightful payee after the theft." (Doc. 512 at 5-6). But these decisions required common sense, not expertise or specialized knowledge.

The third category is "Project Damages," which the Kenrich Report breaks down into seven subcategories for each job, but it does not explain the methodology used to calculate them. (Doc. 528-1 at 19-62). According to Hilz, "Kenrich merely took a Job

---

[5] The parties have since notified the Court that Plaintiffs and Albertelli Construction reached a settlement, so these damages might not be an issue at trial. (*See* Doc. 509).

Cost Report excel spreadsheet and re-sorted the entries without testing the validity of those entries." (Doc. 451 at 9). Plaintiffs claim that Kenrich tested 5% of the entries, but the evidence shows that all Kenrich did was compare the excel data with the PDF version of the Job Cost Report. (Doc. 451-7). The Plaintiffs also claim, without citation, that "Kenrich used the actual cost records of the Plaintiffs and removed costs not linked to a breach, as a reasonable methodology to calculate damages." (Doc. 512 at 6). They point specifically to two subcategories: liquidated damages and costs to complete and correct Defendants' work.

For the liquidated damages calculations, Plaintiffs claim that Kenrich used its expertise to determine the key inputs, like the number of apartments in each building, scheduled turnover dates, and actual turnover dates. But the Kenrich Report does not explain how Kenrich made those determinations or even say what inputs it used in the calculations. Sieracki's deposition suggests that Kenrich did not use specialized knowledge or expertise—they simply pulled the dates from the construction contracts, change orders, and other documents. (Doc. 528-2 at 14). Plaintiffs point to other complicating factors, but they do not hold up to scrutiny. For example, the Rochester Project contract has a two-part cap on liquidated damages, but Kenrich, at the direction of Plaintiffs' counsel, did not apply it. (Doc. 528-1 at 31).

Plaintiffs also fail to show specialized knowledge at work in calculating "cost to complete and correct" damages. They claim that Kenrich excluded costs "not sufficiently supported by source documents." (Doc. 512 at 14). But according to Sieracki, Kenrich copied the data from Plaintiffs' Job Cost Report and removed some entries at the direction of Continental. (Doc. 528-2 at 40 ("We then went into the cost report, extracted the costs

16

associated with the defective work, compiled those into work papers, reviewed the work papers with the Continental personnel to make sure we had captured the proper costs, and to the extent we did not, we would eliminate the costs, et cetera.")).

Plaintiffs have not carried their burden on the Kenrich Report. The methodology appears to be nothing more than simple arithmetic applied to Plaintiffs' data—a task the jury can handle without the aid of an expert. Plaintiffs assure the Court there is more complicated methodology under the surface, but they failed to produce evidence of it. The Court will thus exclude the Kenrich Report and any expert testimony from Sieracki and Reome.

2. <u>Jason Linder</u>

Plaintiffs hired attorney Jason Linder to give expert testimony "on the legality of a 'commission agreement' that amounts to an agreement to pay kickbacks in exchange for business advantages and preferential treatment, such as the awarding of contracts." ([Doc. 454-6 at 5](Doc. 454-6 at 5)). Linder's expert report describes his experience with corruption arrangements, recites the facts of this case according to certain pleadings and contracts, and states the following conclusion:

> The existence of a written agreement memorializing a corrupt scheme does not shield its participants from liability. Here, the arrangement between Eguizabal and the Albertellis was corrupt, and the written contract is merely direct evidence establishing the arrangement.

([Doc. 454-6 at 20](Doc. 454-6 at 20)). Plaintiff want to use Linder's testimony to rebut a legal argument they anticipate from Defendants—that the Commission Services Agreement made the bribery payments to Eguizabal legal.

Hilz seeks to exclude Linder's testimony because it impermissibly draws a legal conclusion. In response, Plaintiffs incorrectly argue that expert testimony on ultimate

17

legal issues is admissible. While "[a]n expert may testify as to his opinion on an ultimate fact[,]" he "may not testify to the legal implications of conduct; the court must be the jury's only source of law." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990). The most difficult question in this type of *Daubert* challenge is often "whether challenged testimony is either an admissible factual opinion or an inadmissible legal conclusion." Hanson v. Waller, 888 F.2d 806, 811 (11th Cir. 1989). But here, Plaintiffs rightly make no attempt to characterize Linder's proposed testimony as factual. The Court will exclude Linder because his legal opinions would encroach on the Court's role of instructing the jury on the law. If Plaintiffs believe Defendants are hiding behind a shaky legal theory, they can make that case in closing arguments. *See* United States v. Frazier, 387 F.3d 1244, 1262-63 (11th Cir. 2004) ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

Hilz also argues that Linder fails the reliability prong because he did not explain how he applied his experience to the facts at hand. The Court agrees. In Edwards v. Shanley, 580 F. App'x 816 (11th Cir. 2014), the Eleventh Circuit summed up the law on this point:

> [T]o satisfy the reliability requirement, an expert witness who relies primarily on experience must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. To fulfill its gatekeeping function under Rule 702, a district court must not simply take the expert's word for it. If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

Edwards, 580 F. App'x at 823 (internal quotations and citations omitted). Linder's report describes his experience and states his opinions on this case, but it does nothing to link

the two. So the Court also finds Linder's proposed testimony inadmissible because Plaintiffs failed to meet their burden on reliability.

### D. Motion to Strike Certain Evidence

The final motion the Court will address is Hilz's motion to strike two pieces of evidence—the Declaration of Paul Seifert (Doc. 513-16) and Hilz's responses to requests for admission prepared in the related California state court case (Doc. 513-3)—because they are inadmissible as summary judgment evidence. The Court disfavors such motions. Before Congress amended Federal Rule of Civil Procedure 56 in 2010, parties properly moved to strike inadmissible summary judgment evidence. But the practice is now outdated. *See* Campbell v. Shinseki, 546 F. App'x 874, 879 (11th Cir. 2013) ("The plain meaning of [the 2010 amendments] show that objecting to the admissibility of evidence supporting a summary judgment motion is now part of summary judgment procedure, rather than a separate motion to be handled preliminarily."). Motions to strike should be reserved for the situations described in Rule 12(f). The Court will not strike the evidence, but it did consider Hilz's objections. As discussed above, the Court excluded Hilz's California admissions. Hilz's arguments on the Seifert Declaration are moot because the Court did not rely on the objectionable portions.

Accordingly, it is now

**ORDERED:**

(1) Defendant Gregory Hilz's *Daubert* Motion to Exclude Report and Testimony of Plaintiffs' Proffered Experts Richard Sieracki and Kimberly Reome of the Kenrich Group, LLC (Doc. 451) is **GRANTED**.

(2) Hilz's *Daubert* Motion to Exclude Report and Testimony of Plaintiffs' Proffered Expert, Jason Linder (Doc. 454) is **GRANTED**.

(3) Hilz's Motion for Summary Judgment (Doc. 456) is **GRANTED in part and DENIED in part**. Count 24 of the Fourth Amended Complaint is **DISMISSED**.

(4) Defendant John Salat's Motion for Summary Judgment (Doc. 460) is **DENIED**.

(5) Defendants Brook Kozlowski and Kevin Burke's Motion for Partial Judgment on the Pleadings (Doc. 470) is **DENIED**.

(6) Hilz's Motion to Strike Certain Evidence Submitted in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment (Doc. 532) is **DENIED**.

**DONE** and **ORDERED** in Fort Myers, Florida this 13th day of March, 2019.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record